# EXHIBIT 1

Fulton County Superior Court
***EFILED***ZZ
Date: 1/5/2026 2:09 PM
Che Alexander, Clerk

IN THE SUPERIOR COURT FOR FULTON COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| CHIN MUSIC PARTNERS, LLC, KEN CLAYTON, and JACK DUNN | ) | |
| | ) | |
| | ) | |
| | ) | CIVIL ACTION NO.  26CV000081 |
| PLAINTIFFS | ) | |
| | ) | _____ |
| vs. | ) | |
| | ) | |
| GRADUMGSWING FRANCHISING, LLC, LORENZO GARMENDIA, and CARLOS GARMENDIA | ) | |
| | ) | |
| | ) | |
| | ) | |
| DEFENDANTS | ) | |
| | ) | |

## COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

Plaintiffs CHIN MUSIC PARTNERS, LLC, KEN CLAYTON, and JACK DUNN (collectively, "Plaintiffs" or "CMP") bring this Complaint against Defendants LORENZO GARMENDIA, CARLOS GARMENDIA, and GRADUMGSWING FRANCHISING, LLC (collectively, "Defendants"), as follows:

## INTRODUCTION

1.    This case concerns a) violations of the FTC Franchise Rule, b) violations of Georgia law, namely the Georgia Fair Business Practices Act, O.C.G.A. § 10-1-390, et seq. ("GFBPA") and O.C.G.A. § 51-1-6, c) violations of Florida law, namely the Florida Deceptive and Unfair Trade Practices Act (F.S.A. § 501.201, et seq.) ("FDUTPA") and the Florida Franchise Act (F.S.A. § 817.416), d) common law claims for fraud, negligent misrepresentation, and e) and alternative claims for breach of contract and quantum meruit.

1

## PARTIES

2.     Plaintiff Ken Clayton is a resident of Georgia.

3.     Plaintiff Jack Dunn is a resident of Georgia.

4.     Plaintiff Chin Music Partners, LLC is a limited liability company organized under the laws of the State of Georgia.  Its principal office address is 12136 Walnut Terrace, Alpharetta, GA, 30004.  The only members of Chin Music Partners, LLC are Ken Clayton and Jack Dunn.

5.     Defendant GradumGwing Franchising, LLC ("GGF") is a limited liability company organized under the laws of the State of Florida.  Its principal office address and registered agent address is 7872 SW Jack James Drive, Unit 4, Stuart, FL 34997.

6.     Defendant Lorenzo Garmendia is a resident of Florida.  Lorenzo Garmendia is a founder of GGF, and for all times relevant to this Complaint, Lorenzo Garmendia was an agent for and controlled the conduct of GGF.  Lorenzo Garmendia personally made knowing, material misrepresentations to Plaintiffs because, as a founder and member of GGF, he profited from inducing Plaintiffs to make the actions described herein.

7.     Defendant Carlos Garmendia is a resident of Florida.  Carlos Garmendia is a founder of GGF, and for all times relevant to this Complaint, Carlos Garmendia was an agent for and controlled the conduct of GGF.  Carlos Garmendia personally made knowing, material misrepresentations to Plaintiffs because, as a founder and member of GGF, he profited from inducing Plaintiffs to make the actions described herein.

## JURISDICTION AND VENUE

8.     Defendants are subject to jurisdiction in this Court because they conduct substantial business in Georgia, including offering and selling franchises to Georgia residents, and because they engaged in the wrongful acts alleged in this Complaint and caused injury within Georgia.

285665460.v5

9.      Venue is proper in this Court because Defendants conduct business in Fulton County and a substantial number of the acts and transactions forming the basis of the Complaint took place within Fulton County.

10.     All conditions precedent to Plaintiffs' bringing this action have occurred or have been waived.

## FACTS

11.     Pursuant to the Federal Trade Commission's Franchise Rule, 16 C.F.R. Part 436 (the "Franchise Rule"), franchisors are required to provide prospective franchisees with a Franchise Disclosure Document ("FDD") fourteen days before signing any agreement with them for a single franchised business (or "unit") or the development of multiple units.

12.     Per the Franchise Rule, the FDD must disclose 23 different "items" of information to prospective franchisees so that they may make an informed decision, including information about: the nature of the franchise system; the principals who own and operate it; the costs of opening and operating a franchise; the existence of any recent litigation involving the franchisor; any consideration or "kickbacks" the franchisor or its affiliates receive based on required purchases of goods or services by franchisees; the material terms of the franchise agreement and all fees that may be charged by the franchisor; the existence of other franchisees and their locations; and, if the franchisor elects to provide it, the representations about the financial performance of its outlets (whether company-owned or franchised), or projections of a prospective franchisee's performance with a full and fair presentation of those figures, the factual bases supporting them, and the percentage of franchisees that are realizing these financial performance representations.

13.     Under Section 436.7 of the Franchise Rule, the FDD must be current as of the franchisor's most recent fiscal year and must be revised each quarter to reflect material changes.

3

14.    GGF was formed in January 2023.  It is in the business of selling franchised businesses that offer specialized baseball and softball hitting instruction associated with word and design trademarks/service marks "GRADUM", "GRADUM GSWING", and "GSWING".

15.    In January 2024, GGF's franchise director contacted Plaintiffs about the possibility of owning one or more GSWING franchised units.

16.    On or about March 4, 2024, Plaintiff Clayton met with Lorenzo Garmendia and Carlos Garmendia to learn more about GGF.  At that time, Lorenzo Garmendia and Carlos Garmendia represented to Plaintiffs that GGF had a fully-developed and proven operating system and training manual in place that would enable Plaintiffs to successfully open and operate a GSWING franchised business.

17.    At the March 4, 2024 meeting, Lorenzo Garmendia specifically told Clayton that Plaintiffs could "kick your feet up and prepare to manage this business from your phone at night while printing money."  Lorenzo Garmendia also told Clayton Plaintiffs could expect to average 20 swing assessments (i.e., new leads) per week.

18.    GGF provided CMP with a copy of its 2023 Franchise Disclosure Document on March 4, 2024.  A true and correct copy of the 2023 FDD is attached as Exhibit A.

19.    CMP executed a Franchise Agreement with GGF on March 27, 2024, for the opening of a GGF franchised unit in Huntsville, AL.  Clayton and Dunn executed a Guaranty of CMP's obligations under the Franchise Agreement.  A true and correct copy of the Huntsville Franchise Agreement is attached as Exhibit B.

20.    GGF collected a franchise fee of $50,000 from Plaintiffs in connection with the Huntsville Franchise Agreement.

21.    CMP executed a second Franchise Agreement with GGF on March 27, 2024, for

285665460.v5

the opening of a GGF franchised unit in Nashville, TN. Clayton and Dunn executed a Guaranty of CMP's obligations under the Nashville Franchise Agreement. A true and correct copy of the Nashville Franchise Agreement is attached as Exhibit C.

22.    CMP also executed a Multi-Territory Development Agreement (the "March MTDA") with GGF in connection with the Nashville Franchise Agreement on or about March 27, 2024. Under the terms of the March MTDA, CMP was obligated to open two new GGF franchised units in the Nashville, TN area within 12 months of the opening of the Huntsville unit. A true and correct copy of the March MTDA is attached as Exhibit D.

23.    Defendants collected $50,000 from Plaintiffs as a "premium" for the Nashville territory in connection with the March MTDA.

24.    The FDD provided to Plaintiffs prior to the execution of the March MTDA failed to disclose in Item 2 that the de facto chief executive officer and manager of the franchise system was Lorenzo Garmendia.

25.    Lorenzo Garmendia has a criminal record. He has been charged, inter alia, with making or furnishing a false statement and with issuing worthless checks. The omission of Garmendia's involvement in the franchise system was a material violation of the Franchise Rule.

26.    The FDD provided to Plaintiffs also failed to reference the MTDA on the Cover Page of the FDD, in violation of the Franchise Rule.

27.    Thee FDD provided to Plaintiffs also failed to specifically disclose costs that are required payments to GGF as the franchisor, in violation of the Franchise Rule.

28.    The FDD that GGF provided to Plaintiffs contained materially incomplete or non-compliant financial statements for GGF.

5

29.    The FDD that GGF provided to Plaintiffs materially failed to properly and accurately describe the revenue capacity of each franchised facility. Item 19 of the FDD included a Profit and Loss statement from an affiliate operated Gradum GSWING business in South Miami, Florida, but Defendants told Plaintiffs they had recently changed GGF's pricing model and that, as a result, the revenue would be higher than what shown in Item 19. Defendants, however, failed to provide any details on the new pricing model.

30.    Both the FDD provided to Plaintiffs and the Franchise Agreement for the Huntsville unit refenced the existence of GGF's Operations Manual. The FDD specifically referenced as Exhibit F to the FDD a 255 page operations manual and identified sub-parts in a Table of Contents. A true and correct copy of the Table of Contents is attached as Exhibit E.

31.    Neither at the time GGF's FDD was provided to Plaintiffs nor at any time since has there been an operations manual for GGF franchisees.

32.    The FDD that GGF provided to Plaintiffs prior to executing the Huntsville Franchise Agreement failed to disclose material costs associated with buildout and construction of a new franchised unit in Item 7 of the FDD, and failed to disclose that such costs would be collected by Defendants.

33.    For instance, Defendants, through GGF's affiliate Gradum Baseball LLC, charged Plaintiffs approximately $10,522.90 in travel and meal expenses in the summer of 2024 as they worked as contractors to build out the Huntsville unit, which expenses were never disclosed in the FDD or Huntsville Franchise Agreement.

34.    Plaintiffs would not have executed the Huntsville Franchise Agreement, March MTDA, or taken the subsequent actions described herein but for Defendants' misrepresentations and omissions.

285665460.v5

35.    CMP opened its first GSWING franchised business in Huntsville, AL on August 22, 2024.

36.    CMP executed a second MTD (the "August MTDA") with GGF on August 29, 2024.  Under the terms of the August MTDA, CMP was obligated to open ten new GSWING franchised units in Alabama and Tennessee over a period of 3 years.  CMP's Huntsville GSWING franchised business was credited as the first of the ten units.  A true and correct copy of the August MTDA is attached as Exhibit F.

37.    Defendants collected $150,000 from Plaintiffs as an annual fee for the rights conveyed in the August MTDA in 2024, and they collected another $150,000 from Plaintiffs in 2025.  GGF collected these fees from Plaintiffs despite having failed to provide a timely, accurate FDD to Plaintiffs prior to execution of the August MTDA.

38.    GGF's failure to provide CMP or its owners with an updated FDD prior to the execution of the August MTDA is a material violation of the Franchise Rule.

39.    CMP opened its second GSWING franchised business on February 11, 2025 in Birmingham, AL.

40.    GGF did not provide Plaintiffs with an updated FDD prior to the opening of Birmingham unit, in violation of the Franchise Rule.

41.    GGF never offered Plaintiffs a franchise agreement for the Birmingham unit in violation of the Franchise Rule.

42.    Despite not having disclosed such charges in advance in the FDD and despite the nonexistence of a franchise agreement for the Birmingham unit, GGF charged CMP with numerous expenses unrelated to the construction or opening of the unit.  Specifically, Lorenzo

7

Garmendia insisted that Plaintiffs provide a physical credit card for expenses incurred by Defendants, while they were building the Birmingham location.

43.    As was done in connection with the buildout of the Huntsville unit, Defendants, through GGF's affiliate Gradum Baseball LLC, charged approximately $5,272.46 in travel and meal expenses to Plaintiffs' credit card as they worked as contractors to build out the Birmingham unit, which expenses were never disclosed in an FDD.

44.    Despite having not disclosed such costs, Defendants also burdened Plaintiffs with undisclosed and unauthorized workers compensation insurance premiums. Defendants required CMP to utilize GGF's preferred construction vendor, "Lady and a Forklift", when that vendor did not have workers compensation insurance coverage required by Alabama law, then required Plaintiffs to pay for the vendor to obtain such coverage.

45.    Upon information and belief, Defendants have an undisclosed relationship with Lady and a Forklift which might include rebates or kickbacks, and which also would have been required to be disclosed in Item 8 of the FDD.

46.    CMP is also, with GGF's full knowledge and encouragement, in development of a GSWING franchised unit in Marietta, GA, a location not anticipated under either MTDA between Plaintiffs and Defendants.

47.    GGF never offered Plaintiffs a franchise agreement for the pending Marietta unit, in violation of the Franchise Rule.

48.    Despite the nonexistence of a franchise agreement, GGF has, without Plaintiffs' knowledge or approval, posted an unauthorized "performance guarantee" on the websites for Plaintiffs' Birmingham and Huntsville units, which websites GGF controls, committing CMP to provide free lessons indefinitely if any customer does not improve their performance within four

8

weeks of signing up as a customer.

49.     Despite the terms of the franchise agreement for the Birmingham unit, GGF charged CMP from October 2024 through January 2025 for monthly Mindbody point-of-sale software invoices in an amount in excess of that disclosed in Items 6 and 7 of the FDD.  When the charges were brought to Defendants' attention, Defendants reduced those charges for subsequent months to the lower amount that had been disclosed in the FDD, but without ever refunding CMP for the excessively charged amounts collected from CMP.

50.     Despite having not disclosed such charges in advance in the FDD, GGF charged CMP a "market premium" fee for the March MTDA and August MTDAs in violation of the Franchise Rule.

51.     Despite having not disclosed such charges in advance in the FDD, GGF has charged CMP unauthorized fees for maintaining email addresses for Plaintiffs and their businesses.

52.     Despite its material failure to provide an operations manual, GGF has collected approximately $58,374.35 in royalties payments from Plaintiffs to date for the Huntsville unit.

53.     Despite the nonexistence of a franchise agreement for the Birmingham unit and despite GGF's failure to provide an operations manual as it had said it would, GGF has collected approximately $41,398.66 in royalties and other fees and expenses from CMP since the Birmingham unit opened.

54.     Following Defendants' flagrant and material breaches of their written and oral agreements and representations, Plaintiffs' formally demanded rescission of all agreements in writing on November 4, 2025.  In their demand letter, Plaintiffs' also gave Defendants notice of Plaintiffs' claims under the Georgia Fair Business Practices Act, O.C.G.A. § 10-1-390, et seq. (the "GFBPA").  A true and correct copy of the demand letter is attached as Exhibit G.

285665460.v5

55.    Immediately following service of Plaintiffs' demand letter, GGF shut off Plaintiff's access to the franchise system's Customer Relationship Management System ("CRM") and to the social media accounts for Plaintiff's businesses through GGF. GGF took these retaliatory actions without warning.

56.    When questioned about the denial of Plaintiffs' access to the CRM and social media accounts, GGF, through its registered agent Priscilla Garmendia Sullivan responded on November 5, 2025 with a vague non-answer, stating, "As part of our standard brand-security, system integrity, and compliance protocols, we are temporarily reviewing access to certain centralized, company-owned platforms, including the Gradum Instagram credentials and our HighLevel HQ account. These platforms are owned and administered by Gradum." Ms. Sullivan later clarified in a communication to all GSWING franchisees that same day that Gradum had "recently identified a security incident involving our camera monitoring system at one of the locations." A true and correct copy of the November 5, 2025, email communication is attached as Exhibit H.

57.    On November 7, 2025, GGF's counsel sent Plaintiffs a notice of default alleging violations of the Huntsville Franchise Agreement and of a nonexistent Birmingham Franchise Agreement. Moreover, the notice of default patently mis-cited the language of the Huntsville Franchise Agreement and Plaintiffs' obligations under it, and it made no reference to Plaintiffs' demand letter sent days earlier.

58.    Over the course of the following weeks, Plaintiffs, through counsel, sought repeatedly to confer with Defendants' counsel in good faith. Defendants' counsel requested patience due to litigation unrelated to Plaintiffs or Defendants. Nonetheless, Defendants' counsel found time to draft and serve Plaintiffs with a second default notice on December 8, 2025. This second notice concerned posts to the Instagram accounts for Plaintiffs' Huntsville and Birmingham

businesses made on April 2, 2025 and August, 8, 2025, respectively, that had both been cured months before the date of the second demand letter.

59.    Meanwhile, GGF has continued to deny Plaintiffs access to social media accounts established for Plaintiffs GSWING locations.  GGF's only explanation for the denial of access, given on a franchise-system wide call on December 9, 2025, is that it locked Plaintiffs out of their social media accounts because of a "hack", yet GGF has never contacted Plaintiffs directly to address any security concerns.

60.    Despite Plaintiffs' repeated efforts over several months to resolve their differences with Defendants out of court, Defendants have shown no interest in addressing Plaintiffs' concerns and have eschewed any communication by phone to address them.

**COUNT I**
**Violations of Georgia Fair Business Practices Act**
**O.C.G.A. § 10-1-390, et seq**

61.    Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

62.    Defendants knowingly engaged in unfair or deceptive acts or practices in the conduct of its transaction with Plaintiffs, in direct violation the Georgia Fair Business Practices Act of 1975, O.C.G.A. § 10-1-390 et seq. ("GFBPA").

63.    Defendants intentionally sold Plaintiffs two franchises, as the term is defined in 16 C.F.R. § 436.1, without having provided a current franchise disclosure document, which is an unfair or deceptive act or practice in violation of Section 5 of the Federal Trade Commission Act.

64.    Defendants intentionally sold Plaintiffs two other franchises based on materially false or reckless representations and omissions in the franchise disclosure document provided to Plaintiffs, which is an unfair or deceptive act or practice in violation of Section 5 of the Federal

285665460.v5

Trade Commission Act.

65.    Defendants' violations of the Federal Trade Commission Act are violations of the GFBPA.

66.    As a direct and proximate result of Defendants' unfair or deceptive acts and practices in violation of Georgia law, Plaintiffs have suffered damages in an amount to be determined at trial.

67.    Defendants' acts and practices constituted willful and intentional violations of the GFBPA, and Plaintiffs are therefore entitled to exemplary damages, reasonable attorney's fees, and all expenses of litigation.

68.    At least 30 days prior to filing this action, Plaintiffs made a written demand for relief on Defendant in full compliance with O.C.G.A. § 10-1-399(b), and Defendants have not responded to Plaintiffs' written demand. Plaintiffs are therefore entitled to three times actual damages for the intentional violations by Defendants.

## COUNT II
### Violation of Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")
### (F.S.A. § 501.201, et seq.)

69.    Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

70.    Defendants intentionally sold Plaintiffs a franchise, as the term is defined in 16 C.F.R. § 436.1, without having provided a current franchise disclosure document, which is an unfair or deceptive act or practice in violation of Section 5 of the Federal Trade Commission Act.

71.    Defendants intentionally sold Plaintiffs two other franchises based on materially false or reckless representations and omissions in the franchise disclosure document provided to Plaintiffs, which is an unfair or deceptive act or practice in violation of Section 5 of the Federal

285665460.v5

Trade Commission Act.

72.    Defendants' violations of the Federal Trade Commission Act are violations of the FDUTPA.

73.    As a direct and proximate result of Defendants' unfair or deceptive acts and practices in violation of Florida law, Plaintiffs have suffered damages in an amount to be determined at trial.

74.    Defendants' acts and practices constituted willful and intentional violations of the GFBPA, and Plaintiffs are therefore entitled to exemplary damages, reasonable attorney's fees, and all expenses of litigation.

## COUNT III
### Violation of Florida Franchise Act
### (F.S.A. § 817.416)

75.    Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

76.    Defendants intentionally sold Plaintiffs a franchise, as the term is defined in 16 C.F.R. § 436.1, without having provided a current franchise disclosure document, which failure to disclose is a violation of the Florida Franchise Act, F.S.A. § 817.416.

77.    As a direct and proximate result of Defendants' violations of the Florida Franchise Act, Plaintiffs have suffered damages in an amount to be determined at trial, plus interest, attorneys' fees, and costs.

## COUNT IV
### Breach of Duty, O.C.G.A. § 51-1-6

78.    Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully

285665460.v5

set forth herein.

79.    All the misrepresentations and omissions of material fact described above, as well as Defendants' representations made in the FDD and outside of the FDD, are violations of the FTC Franchise Rule.

80.    Defendants' violations of the FTC Franchise Rule constitute breaches of duty to Plaintiffs and give rise to private right of action in Georgia pursuant to O.C.G.A. § 51-1-6.

81.    Plaintiffs have been harmed as a direct and proximate result of Defendants' breaches of the FTC Franchise Rule and O.C.G.A. § 51-1-6.

82.    As a direct and proximate result of Defendants' violations of the FTC Franchise Rule and O.C.G.A. § 51-1-6, Plaintiffs are entitled to rescission of any franchise agreements with Defendants and to recovery of damages in an amount to be determined at trial, plus interest, attorneys' fees, and costs.

## COUNT V
## Fraud/Intentional Misrepresentation

83.    Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

84.    All the misrepresentations and omissions of material fact described above, as well as Defendants' representations made in the FDD and outside of the FDD, also constitute common law fraud in the inducement and negligent misrepresentation.

85.    As described supra, Defendants falsely represented material facts and omitted material facts that were necessary in order to make the representations not misleading with the intent to induce Plaintiffs to act upon the information in entering into the two Franchise Agreements.

14

285665460.v5

86.     Defendants committed fraud by intentionally making known, material misrepresentations to induce Plaintiffs to sign the Franchise Agreements and MTDAs and invest hundreds of thousands of dollars in opening Gradum GSWING businesses in Huntsville, AL, Birmingham, AL, Nashville, TN, and Marietta, GA, thus making substantial investments of time and money that would directly benefit the Defendants at the Plaintiffs' expense.

87.     The above-described statements and material omissions made by Defendants in order to induce Plaintiffs to invest in Gradum GSWING businesses were both false and willfully made with knowledge of their falsity (or ignorance as to the truth or falsity of the representations).

88.     Plaintiffs reasonably relied on Defendants' representations and material omissions and have been damaged by the fraud perpetrated by Defendants.

89.     As a direct and proximate result of Defendants' misrepresentations, Plaintiffs have suffered damages in an amount to be determined at trial, plus interest, attorneys' fees, and costs.

## COUNT VI
## Negligent Misrepresentation

90.     Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

91.     Defendants owed Plaintiffs a duty to use reasonable care in making representations that they knew Plaintiffs were relying upon.

92.     Defendants owed Plaintiffs a duty of care because they were supplying information for the guidance of Plaintiffs in a transaction in which Defendants had a pecuniary interest and which transaction was in the course of their business.

93.     As described supra, Defendants breached their duty of reasonable care by negligently supplying false and misleading information (or omitting material facts), which

15

Plaintiffs reasonably relied upon.

94.     As a direct and proximate result of Defendants' misrepresentations, Plaintiffs have been damaged in an amount to be determined at trial, plus interest, attorneys' fees, and costs.

## COUNT VII
### Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing

95.     Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

96.     Per its terms, Florida law applies to interpretation of the Huntsville Franchise Agreement.

97.     The elements of a breach of contract claim under Florida law are: (1) the existence of a contract, (2) a breach of a duty imposed by the contract, and (3) damages.

98.     Florida law recognizes an implied covenant of good faith and fair dealing associated with all contracts.

99.     GGF has breached the Huntsville Franchise Agreement and the implied covenant of good faith and fair dealing by failing to meet its obligations and duty of care to CMP by, inter alia:

   a) Shutting off Plaintiffs' access to electronic communications through the GGF franchise system, and refusing, despite demands for cure, to turn such access back on;

   b) Causing Plaintiff to incur substantial operational and construction costs due to lack of the promised operations manual from GGF,

   c) Causing Plaintiff to incur expenses for fees charged by Defendant GGF which were not disclosed in the FDD; and

285665460.v5

    d) Causing Plaintiff to incur costs for buildout, construction and start-up that were not disclosed in an FDD and which were falsely charged by Defendants to Plaintiff.

100.    As a direct and proximate result of Defendants' breaches of contract, Plaintiffs have suffered damages in an amount to be determined at trial, plus interest, attorneys' fees, and costs.

## COUNT VIII
## Unjust Enrichment

101.    Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

102.    Plaintiffs allege in the alternative to their breach of contract claim arising from the Huntsville GSWING franchised location that they are entitled to recover from Defendants under the doctrine of unjust enrichment.

103.    Plaintiffs also allege claims against Defendants in connection with the Birmingham and pending Marietta GSWING franchised businesses under the doctrine of unjust enrichment.

104.    Plaintiffs conferred a benefit on Defendants through the payment of franchise fees, premiums, territory fees, royalties, and other fees.

105.    Defendants had knowledge of the benefit conferred on them by Plaintiffs.

106.    Defendants accepted and retained the benefit that Plaintiffs conferred on them.

107.    It is unjust to permit Defendants to retain the benefits paid to them by Plaintiffs without compensating them.

108.    Defendants are liable to Plaintiffs in an amount to be determined at trial, plus interest, attorneys' fees, and costs.

285665460.v5

## COUNT IX
## Civil Conspiracy

109.    Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

110.    As set forth herein, the Defendants conspired together to unlawfully damage Plaintiffs.

111.    The tortious and unlawful acts taken by Defendants, and described supra, were taken in furtherance of this common scheme and conspiracy and in furtherance of their objective to harm Plaintiffs.

112.    The Defendants' wrongful acts were pursuant to their common scheme and conspiracy, and were in furtherance of their objective, to wrongfully damage Plaintiffs.

113.    As a direct and proximate result of the Defendants' acts in furtherance of the conspiracy, Plaintiffs have been damaged in an amount to be determined at trial, but more than $75,000.00, and the Defendants are jointly and severally liable for such damages as a result of this conspiracy.

## DEMAND FOR JURY

Plaintiffs demand a trial by jury.

## PRAYER

**WHEREFORE**, Plaintiffs respectfully request the following relief:

a)    That judgment be entered in favor of Plaintiffs and against Defendants on all counts;

b)    That Plaintiffs be granted rescission of any contractual relationship with Defendants;

18

285665460.v5

c)   That Plaintiffs be awarded their full amount of actual damages incurred due to the actions of Defendants;

d)   That Plaintiffs be awarded treble damages due to Defendants' willful and intentional violations of Georgia law;

e)   That Plaintiffs be awarded treble damages due to Defendants' willful and intentional violations of Florida law;

f)   That Plaintiffs be released from any further obligation to any Defendants, including but not limited to, any Franchise Agreement or Guaranty thereof;

g)   That Plaintiffs be awarded their complete costs, disbursements and reasonable attorneys' fees, to the extent authorized under applicable law; and

h)   That Plaintiffs be awarded such other and further relief as the Court may deem just and appropriate.

This 5th day of January, 2026.

CLARK HILL PLC

/s/ A. Binford Minter
A. Binford Minter
Georgia Bar No. 117844
Michael S. Rosenthal
Georgia Bar No. 614750
3630 Peachtree Road NE, Suite 700
Atlanta, Georgia 30326

# EXHIBIT A

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

# FRANCHISE DISCLOSURE DOCUMENT



**GradumGswing Franchising, LLC**
**7872 SW Jack James Drive, Unit 4**
**Stuart, Florida 34997**
**Franchise@gradumgswing.com**
**www.gradumgswing.com**
**786-620-9131**

As a Gradum Gswing franchisee, you will operate a premier baseball/softball instruction service dedicated to teaching the proprietary Gswing method. With our personalized approach, advanced technology, and expert knowledge of swing mechanics and biomechanics, Gradum Gswing offers a comprehensive training experience that sets us apart from our competitors. Through video analysis, swing metrics, and exit velocity training, we empower players of all levels to enhance their hitting abilities and achieve their goals on the field.

The initial franchise fee that must be paid to the franchisor per location can range from $50,000 to a maximum of $250,000, as some territories carry premiums up to $200,000. The premium is determined based on the marketability of the geographic area and tier of baseball market (example MLB or MILB location) in which you will locate your Granum Gwing(s). This fee is uniform and is not refundable. Therefore, dependent upon premiums, the total investment necessary to begin operation of one Gradum Gswing franchise location is between $141,000 to $450,000.

This disclosure document summarizes certain provisions of your franchise agreement and other information in plain English. Read this disclosure document and all accompanying agreements carefully. You must receive this disclosure document at least 14 calendar-days before you sign a binding agreement with, or make any payment to, the franchisor or an affiliate in connection with the proposed franchise sale. **Note, however, that no governmental agency has verified the information contained in this document.**

You may wish to receive your disclosure document in another format that is more convenient for you. To discuss the availability of disclosures in different formats, please contact Priscilla Garmendia, Esq., priscilla@gradumgswing.com.The terms of your contract will govern your franchise relationship. Don't rely on the disclosure document alone to understand your contract. Read all of your contract carefully. Show your contract and this disclosure document to an advisor, like a lawyer or an accountant.

Buying a franchise is a complex investment. The information in this disclosure document can help you make up your mind. More information on franchising, such as "A Consumer's Guide to Buying a Franchise," which can help you understand how to use this disclosure document, is available from the Federal Trade Commission. You can contact the FTC at 1-877-FTC- HELP or by writing to the FTC at 600 Pennsylvania Avenue, NW. Washington, D.C. 20580. You can also visit the FTC's home page at www.ftc.gov for additional information. Call your state agency or visit your public library for other sources of information on franchising. There may also be laws on franchising in your state. Ask your state agencies about them.

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

Issuance date August 11, 2023

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

## How to Use This Franchise Disclosure Document

Here are some questions you may be asking about buying a franchise and tips on how to find more information:

| QUESTION | WHERE TO FIND INFORMATION |
|---|---|
| **How much can I earn?** | Item 19 may give you information about outlet sales, costs, profits or losses. You should also try to obtain this information from others, like current and former franchisees. You can find their names and contact information in Item 20 or Exhibit G. |
| **How much will I need to invest?** | Items 5 and 6 list fees you will be paying to the franchisor or at the franchisor's direction. Item 7 lists the initial investment to open. Item 8 describes the suppliers you must use. |
| **Does the franchisor have the financial ability to provide support to my business?** | Item 21 or Exhibit E includes financial statements. Review these statements carefully. |
| **Is the franchise system stable, growing, or shrinking?** | Item 20 summarizes the recent history of the number of company-owned and franchised outlets. |
| **Will my business be the only Gradum Gswing business in my area?** | Item 12 and the "territory" provisions in the franchise agreement describe whether the franchisor and other franchisees can compete with you. |
| **Does the franchisor have a troubled legal history?** | Items 3 and 4 tell you whether the franchisor or its management have been involved in material litigation or bankruptcy proceedings. |
| **What's it like to be a Gradum Gswing franchisee?** | Item 20 or Exhibit G lists current and former franchisees. You can contact them to ask about their experiences. |
| **What else should I know?** | These questions are only a few things you should look for. Review all 23 Items and all Exhibits in this disclosure document to better understand this franchise opportunity. See the table of contents. |

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

### What You Need To Know About Franchising *Generally*

**Continuing responsibility to pay fees**. You may have to pay royalties and other fees even if you are losing money.

**Business model can change.** The franchise agreement may allow the franchisor to change its manuals and business model without your consent. These changes may require you to make additional investments in your franchise business or may harm your franchise business.

**Supplier restrictions.** You may have to buy or lease items from the franchisor or a limited group of suppliers the franchisor designates. These items may be more expensive than similar items you could buy on your own.

**Operating restrictions.** The franchise agreement may prohibit you from operating a similar business during the term of the franchise. There are usually other restrictions. Some examples may include controlling your location, your access to customers, what you sell, how you market, and your hours of operation.

**Competition from franchisor.** Even if the franchise agreement grants you a territory, the franchisor may have the right to compete with you in your territory.

**Renewal.** Your franchise agreement may not permit you to renew. Even if it does, you may have to sign a new agreement with different terms and conditions in order to continue to operate your franchise business.

**When your franchise ends.** The franchise agreement may prohibit you from operating a similar business after your franchise ends even if you still have obligations to your landlord or other creditors.

### Some States Require Registration

Your state may have a franchise law, or other law, that requires franchisors to register before offering or selling franchises in the state. Registration does not mean that the state recommends the franchise or has verified the information in this document. To find out if your state has a registration requirement, or to contact your state, use the agency information in Exhibit A.

Your state also may have laws that require special disclosures or amendments be made to your franchise agreement. If so, you should check the State Specific Addenda. See the Table of Contents for the location of the State Specific Addenda.

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

**Special Risks to Consider About *This* Franchise**

Certain states require that the following risk(s) be highlighted:

1.    The franchise agreement requires you to resolve disputes with the franchisor by mediation, arbitration and/or litigation only in Florida. Out-of-state mediation, arbitration, or litigation may force you to accept a less favorable settlement for disputes. It may also cost more to mediate, arbitrate, or litigate with the franchisor in Florida than in your own state.

2.    The franchise agreement states that Florida law governs the agreements, and this law may not provide the same protections and benefits as local law, you may want to compare these laws.

Certain states may require other risks to be highlighted. Check the "State Specific Addenda" (if any) to see whether your state requires other risks to be highlighted.

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

**(THE FOLLOWING APPLIES TO TRANSACTIONS GOVERNED BY
THE MICHIGAN FRANCHISE INVESTMENT LAW ONLY)**

THE STATE OF MICHIGAN PROHIBITS CERTAIN UNFAIR PROVISIONS THAT
ARE SOMETIMES IN FRANCHISE DOCUMENTS. IF ANY OF THE FOLLOWING
PROVISIONS ARE IN THESE FRANCHISE DOCUMENTS, THE PROVISIONS ARE VOID
AND CANNOT BE ENFORCED AGAINST YOU.

Each of the following provisions is void and unenforceable if contained in any documents
relating to a franchise:

(a)    A prohibition on the right of a franchisee to join an association of franchisees.

(b)    A requirement that a franchisee assent to a release, assignment, novation, waiver,
or estoppel which deprives a franchisee of rights and protection provided in this act. This shall not
preclude a franchisee, after entering into a franchise agreement, from settling any and all claims.

(c)    A provision that permits a franchisor to terminate a franchise prior to the expiration
of its term except for good cause. Good cause shall include the failure of the franchisee to comply
with any lawful provision of the franchise agreement and to cure such failure after being given
written notice thereof and a reasonable opportunity, which in no event need be more than 30 days,
to cure such failure.

(d)    A provision that permits a franchisor to refuse to renew a franchise without fairly
compensating the franchisee by repurchase or other means for the fair market value at the time of
expiration of the franchisee's inventory, supplies, equipment, fixtures, and furnishings.
Personalized materials which have no value to the franchisor and inventory, supplies, equipment,
fixtures, and furnishings not reasonably required in the conduct of the franchise business are not
subject to compensation. This subsection applies only if: (i) the term of the franchise is less than
5 years and (ii) the franchisee is prohibited by the franchise or other agreement from continuing to
conduct substantially the same business under another trademark, service mark, trade name,
logotype, advertising, or other commercial symbol in the same area subsequent to the expiration
of the franchise or the franchisee does not receive at least 6 months advance notice of franchisor's
intent not to renew the franchise.

(e)    A provision that permits the franchisor to refuse to renew a franchise on terms
generally available to other franchisees of the same class or type under similar circumstances. This
section does not require a renewal provision.

(f)    A provision requiring that arbitration or litigation be conducted outside this state.
This shall not preclude the franchisee from entering into an agreement, at the time of arbitration,
to conduct arbitration at a location outside this state.

(g)    A provision which permits a franchisor to refuse to permit a transfer of ownership
of a franchise, except for good cause. This subdivision does not prevent a franchisor from
exercising a right of first refusal to purchase the franchise. Good cause shall include, but is not
limited to:

GSwing FDD 2023

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

(i)     The failure of the proposed transferee to meet the franchisor's then-current reasonable qualifications or standards.

(ii)     The fact that the proposed transferee is a competitor of the franchisor or sub-franchisor.

(iii)     The unwillingness of the proposed transferee to agree in writing to comply with all lawful obligations.

(iv)     The failure of the franchisee or proposed transferee to pay any sums owing to the franchisor or to cure any default in the franchise agreement existing at the time of the proposed transfer.

(h)     A provision that requires the franchisee to resell to the franchisor items that are not uniquely identified with the franchisor. This subdivision does not prohibit a provision that grants to a franchisor a right of first refusal to purchase the assets of a franchise on the same terms and conditions as a bona fide third party willing and able to purchase those assets, nor does this subdivision prohibit a provision that grants the franchisor the right to acquire the assets of a franchise for the market or appraised value of such assets if the franchisee has breached the lawful provisions of the franchise agreement and has failed to cure the breach in the manner provided in subdivision (c).

(i)     A provision which permits the franchisor to directly or indirectly convey, assign, or otherwise transfer its obligations to fulfill contractual obligations to the franchisee unless provision has been made for providing the required contractual services.

If the franchisor's most recent financial statements are unaudited and show a net worth of less than $100,000, the franchisee may request the franchisor to arrange for the escrow of initial investment and other funds paid by the franchisee until the obligations, if any, of the franchisor to provide real estate, improvements, equipment, inventory, training or other items included in the franchise offering are fulfilled. At the option of the franchisor, a surety bond may be provided in place of escrow.

THE FACT THAT THERE IS A NOTICE OF THIS OFFERING ON FILE WITH THE ATTORNEY GENERAL DOES NOT CONSTITUTE APPROVAL, RECOMMENDATION, OR ENDORSEMENT BY THE ATTORNEY GENERAL.

Any questions regarding this notice should be directed to:

State of Michigan Department of Attorney General
G. Mennen Williams Building, 7th Floor
525 W. Ottawa Street
Lansing, Michigan 48909
Telephone Number: (517) 373 7117

GSwing FDD 2023

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

# TABLE OF CONTENTS

**Item**                                                                                                                    **Page**

Item 1 THE FRANCHISOR AND ANY PARENTS, PREDECESSORS, AND AFFILIATES ... 1
Item 2 BUSINESS EXPERIENCE ............................................................................................ 2
Item 3 LITIGATION ............................................................................................................. 2
Item 4 BANKRUPTCY ......................................................................................................... 2
Item 5 INITIAL FEES ........................................................................................................... 3
Item 6 OTHER FEES ............................................................................................................ 3
Item 7 ESTIMATED INITIAL INVESTMENT .................................................................... 6
Item 8 RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES ...................... 9
Item 9 FRANCHISEE'S OBLIGATIONS ........................................................................... 12
Item 10 FINANCING .......................................................................................................... 14
Item 11 FRANCHISOR'S ASSISTANCE, ADVERTISING, COMPUTER SYSTEMS, AND
        TRAINING ........................................................................................................... 14
Item 12 TERRITORY .......................................................................................................... 20
Item 13 TRADEMARKS ..................................................................................................... 22
Item 14 PATENTS, COPYRIGHTS AND PROPRIETARY INFORMATION .................... 24
Item 15 OBLIGATION TO PARTICIPATE IN THE ACTUAL OPERATION OF THE
        FRANCHISE BUSINESS ..................................................................................... 25
Item 16 RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL ........................... 26
Item 17 RENEWAL, TERMINATION, TRANSFER, AND DISPUTE RESOLUTION ......... 26
Item 18 PUBLIC FIGURES ................................................................................................ 30
Item 19 FINANCIAL PERFORMANCE REPRESENTATIONS ........................................ 30
Item 20 OUTLETS AND FRANCHISEE INFORMATION ............................................... 34
Item 21 FINANCIAL STATEMENTS ................................................................................. 37
Item 22 CONTRACTS ........................................................................................................ 37
Item 23 RECEIPTS ............................................................................................................. 37

## Exhibits

A.    State Administrators and Agents for Service of Process
B.    Franchise Agreement (with Exhibits)
C.    Multi-Territory Development Agreement
D.    Form of General Release
E.    Financial Statements
F.    Operations Manual Table of Contents
G.    Current and Former Franchisees
H.    State Addenda to Disclosure Document
I.    State Addenda to Agreements
State Effective Dates
Receipt (2 copies)

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

**Item 1**
## THE FRANCHISOR AND ANY PARENTS, PREDECESSORS, AND AFFILIATES

In this disclosure document, "we," "us," or "our" refers to GradumGswing Franchising, LLC. "You" means the person to whom we grant a franchise. If you are a corporation, limited liability company, or other entity, each owner of the franchise entity must sign our Guaranty and Non-Compete Agreement, which means that all of the franchise agreement's provisions also will apply to your owners.

<u>Us, Any Parents, and Certain Affiliates</u>

Our company name is GradumGswing Franchising, LLC. We are a Florida limited liability company that was formed on January 26, 2023. Our principal business address is 7872 SW Jack James Drive, Unit 4, Stuart, Florida 34997. We do business under the name Gradum Gswing. Neither we nor any of our affiliates have offered franchises in any other line of business. We do not have any predecessors or a parent company. GradumGswing Franchising, LLC does not operate a business of the type franchised; We have been offering franchises since the issuance date of this Disclosure Document. however, we have affiliates that have operated baseball swing instructional facilities since 2018. As of the issue date of this Disclosure Document, our affiliates operate 5 such facilities. The affiliated-operated locations are substantially similar to the franchise offered by this Disclosure Document. Our agent for service of process in Florida is Priscilla Garmendia, Esq., 7872 SW Jack James Drive, Unit 4, Stuart, Florida 34997. Our agents for service of process for certain other states is disclosed on Exhibit A.

If you sign a franchise agreement with us, you will open and operate a premier baseball/softball instruction service dedicated to teaching the proprietary Gswing method. With our personalized approach, advanced technology, and expert knowledge of swing mechanics and biomechanics, Gradum Gswing offers a comprehensive training experience that sets us apart from our competitors. Through video analysis, swing metrics, and exit velocity training, we empower players of all levels to enhance their hitting abilities and achieve their goals on the field.

You may also choose to sign a Multi-Territory Development Agreement (attached as Exhibit C to this disclosure document), in which case you will develop multiple Gradum Gswing outlets within a territory, on an agreed-upon schedule. You must pay an initial franchise fee for each location you develop in the territory. For each future franchise unit under a Multi-Territory Development Agreement, we will require you to sign our then-current form of franchise agreement, which may be different from the form of franchise agreement included in this disclosure document.

<u>Competition</u>

Your products and services will be offered year-round to the baseball/softball players and athletes who desire to increase the efficacy of their baseball swing , including high school players, college players and Major League Baseball players. The market for these services is fragmented. You will compete for clients with local and regional baseball instructors, coaches and similar businesses.

1

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

Laws and Regulations

You will be subject to general business, employment and other laws and regulations such as the Americans With Disabilities Act ("ADA"), Occupational Safety and Health Act ("OSHA"), Fair and Accurate Credit Transactions Act ("FACTA"), privacy of consumer, employee and transactional information, payment card industry data security standards, wage and hour laws, and business licensing and permit requirements. You should consult with your attorney and local, state and federal government agencies opening your business, or any business, to determine all legal requirements and consider their effects on you and the cost of compliance. It is your sole responsibility to investigate, satisfy and remain in compliance with all local, state and federal laws, since they vary from place to place and can change over time.

**Item 2**
**BUSINESS EXPERIENCE**

**Carlos Garmendia, Chief Executive Officer**
Carlos Garmendia has been our Chief Executive Officer since inception. He is also the Chief Operating Officer of Gradum, LLC. He was drafted by Major League Baseball out of high school and was an NCAA College Player for 4 years. Carlos received his bachelor's degree in Business Management from Rollins College and has over 6 years business operations experience and trained numerous Major League Baseball players.

**Matthew Garmendia, Director of Fulfillment Training**
Matthew Garmendia has been our Director of Fulfillment Training since inception. He is also the Director of Fulfillment Training for Gradum, LLC. He was an NJCAA College Player and has trained numerous Major League Baseball Players. He has been Director of Training for 4 years and has over 3 years of business operations experience.

**Item 3**
**LITIGATION**

No litigation is required to be disclosed in this Item.

**Item 4**
**BANKRUPTCY**

No bankruptcy information is required to be disclosed in this Item.

FDD 2023                                                                                    Franchise Agreement

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

## Item 5
## INITIAL FEES

Franchise Fee

When you sign your franchise agreement, you must pay us an initial franchise fee. The initial franchise fee that must be paid to the franchisor per location can range from $50,000 to a maximum of $250,000, as some territories carry premiums up to $200,000. The premium is determined based on the marketability of the geographic area and tier of baseball market (example MLB or MILB location) in which you will locate your Gradum Gwing(s). This fee is uniform and is not refundable.

Other Fees .

When you sign your franchise agreement, besides the initial franchise fee, at your option, you may also decide to pay us $3,250 as a Site Selection and Lease Negotiation Fee and/or $5,250 as a Construction Consulting Fee. These fees would cover our assistance in helping you find a suitable location, negotiating a lease for the site and/or consulting the appropriate construction of the site.

## Item 6
## OTHER FEES

| Type of Fee | Amount | Due Date | Remarks |
|---|---|---|---|
| Royalty | 8% of your gross sales | Monthly | See Note 1 and Note 2. |
| Brand Development Fund Contribution | 2% of your gross sales | Monthly | See Item 11 for a detailed discussion about these funds. Amounts due will be withdrawn by electronic funds transfer from your designated bank account. |
| Market Cooperative Contribution | As determined by co-op. Currently, we do not have any cooperatives | Monthly | We have the right to establish local or regional advertising cooperatives. Any location owned by us, or any affiliate will have the same voting rights as our franchisees. Dues will be imposed by a majority vote. Contributions to a cooperative may offset the corresponding amount of any required local advertising. |
| Local Marketing Spending | 5% of your gross sales | Monthly | See Note 3. You may only use promotional materials that we have provided to you or approved. |

Franchise Agreement

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

| Type of Fee | Amount | Due Date | Remarks |
|---|---|---|---|
| Replacement / Additional Training fee | Currently, $500 per day plus expenses for travel, food, lodging | Prior to attending training | If you send a manager or other employee to our training program after you open, we will charge our then-current training fee. |
| Non-compliance fee/ Reimbursement for curing non-compliance | $1,500 or Amount that we spend on your behalf, plus 10% | On demand | We may charge you $1,500 if your training center is not in compliance with our system specifications or the franchise agreement and you fail to correct the non-compliance after 30 days' notice. If we pay any amount that you owe or are required to pay to a third party or if we cure non-compliance on your behalf (for example, if you do not have required insurance, we may purchase insurance for you), you must reimburse us our costs plus a 10% administrative fee |
| Customer complaint or governmental report | Our expenses | On demand | We may take any action we deem appropriate to resolve a customer complaint about your training center . If we respond to a customer complaint, we may require you to reimburse us for our expenses. |
| Late fee | $100 plus interest on the unpaid amount at a rate equal to 18% per year (or, if such payment exceeds the maximum allowed by law, then interest at the highest rate allowed by law) | On demand | We may charge a late fee if you fail to make a required payment when due. |
| Insufficient funds fee | $30 (or, if such amount exceeds the maximum allowed by law, then the maximum allowed by law) | On demand | We may charge an insufficient funds fee if a payment made by you is returned because of insufficient funds in your account. |

FDD 2023                                                                                     Franchise Agreement

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

| Type of Fee | Amount | Due Date | Remarks |
|---|---|---|---|
| Costs of collection | Our actual costs | As incurred | Payable if we incur costs (including reasonable attorney fees) in attempting to collect amounts you owe to us. |
| Records audit | Our actual cost | On demand | Payable only if (1) we audit you because you have failed to submit required reports or other non-compliance, or (2) the audit concludes that you under-reported gross sales by more than 3% for any 4-week period. |
| Transfer fee | $10,000 plus any broker fees and other out-of-pocket costs we incur | When transfer occurs | Payable if you sell your business. |
| Liquidated damages | An amount equal to royalty fees and marketing fund contributions for the lesser of (i) 2 years or (ii) the remaining weeks of the franchise term. | On demand | Payable if we terminate your franchise agreement because of your default, or if you terminate the franchise agreement without the right to do so. |
| Indemnity | Our costs and losses from any legal action related to the operation of your franchise | On demand | You must indemnify and defend (with counsel reasonably acceptable to us) us and our affiliates against all losses in any action by or against us related to, or alleged to arise out of, the operation of your franchise (unless caused by our misconduct or negligence). |
| Prevailing party's legal costs | Our attorney fees, court costs, and other expenses of a legal proceeding, if we are the prevailing party | On demand | In any legal proceeding (including arbitration), the losing party must pay the prevailing party's attorney fees, court costs and other expenses. |

All fees are payable only to us except the software subscription charges (software subscription charges does not include High Level or other CRM we may decide to use in the future that is to be paid to us). All fees are imposed by us and collected by us except the software subscription charges (software subscription charges does not include High Level or other CRM

5

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

we may decide to use in the future that is to be paid to us). All fees are non-refundable. All fees are uniform for all franchisees, although we reserve the right to change, waive, or eliminate fees for any one or more franchisees as we consider appropriate. There are currently no marketing cooperatives, purchasing cooperatives, or other cooperatives that impose fees on you.

Notes

1.      "Gross Sales" is defined in our franchise agreement as the total dollar amount of all sales generated through your business for a given period, including, but not limited to, payment for any services or products sold by you, whether for cash or credit. Gross Sales does not include (i) bona fide refunds to customers, (ii) sales taxes collected, (iii) sale of used equipment not in the ordinary course of business, or (iv) sales of prepaid cards or similar products (but the redemption of any such card or product will be included in Gross Sales).

2.      We currently require you to pay royalty fees and other amounts due to us by pre-authorized bank draft, wire, or ACH. However, we can require an alternative payment method.

3.      Your expenditures for local advertising and marketing are made to third parties, not to us.

## Item 7
## ESTIMATED INITIAL INVESTMENT

### YOUR ESTIMATED INITIAL INVESTMENT - FRANCHISE AGREEMENT

| Type of expenditure | Low Amount | High Amount | Method of payment | When due | To whom payment is to be made |
|---|---|---|---|---|---|
| Initial franchise fee (see Note 1) | $ 50,000 | $250,000 | Lump sum | Upon signing the franchise agreement | GradumGswing Franchising, LLC |
| Site Selection and Lease Negotiation Fee (Optional) (see Note 2) | $ 3,250 | $   3,250 | Lump sum | Upon signing the franchise agreement | GradumGswing Franchising, LLC |
| Construction Consulting Fee (Optional) (see Note 2) | $ 5,250 | $   5,250 | Lump sum | Upon approval of a location | GradumGswing Franchising, LLC |
| Real Estate/Rent (see Note 3) | $ 3,000 | $  13,000 | As incurred | Upon signing lease | Landlord |

6

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

| Type of expenditure | Low Amount | High Amount | Method of payment | When due | To whom payment is to be made |
|---|---|---|---|---|---|
| Utilities | $ 400 | $ 1,000 | As incurred | Upon ordering service | Utility providers |
| Leasehold Improvements (see Note 4) | $ 20,000 | $ 50,000 | As arranged | As incurred | Contractors |
| Market Introduction Program | $ 1,500 | $ 4,000 | As incurred | As incurred or when billed | Vendors |
| Furniture, Fixtures, and Equipment | $ 30,000 | $ 50,000 | As arranged | As incurred | Vendors |
| Computer System (see Note 5) | $ 8,500 | $ 12,000 | As incurred | As incurred | Vendors and GradumGswing Franchising, LLC |
| Insurance | $ 1,000 | $ 3,500 | Lump sum | Upon ordering | Insurance company |
| Signage | $ 2,500 | $ 4,000 | Lump sum | Upon ordering | Vendor |
| Inventory | $ 2,800 | $ 7,000 | As arranged | Upon ordering | Vendors |
| Licenses and Permits | $ 800 | $ 2,500 | Lump sum | Upon application | Government |
| Professional Fees (lawyer, accountant, etc.) | $ 1,500 | $ 3,000 | As arranged | As incurred or when billed | Professional service firms |
| Office Expense | $ 1,000 | $ 3,000 | As incurred | As incurred | Vendors |
| Training | $ 3,000 | $ 12,000 | As incurred | As incurred | Airlines, hotels, and restaurants for two weeks of training |

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

| Type of expenditure | Low Amount | High Amount | Method of payment | When due | To whom payment is to be made |
|---|---|---|---|---|---|
| Additional funds (for first 3 months) (see Note 6) | $ 15,000 | $   35,000 | Varies | Varies | Employees, suppliers, utilities |
| Total (See Note 7) | $141,000 | $450,000 | | | |

Notes

    1.    The initial franchise fee that must be paid to the franchisor per location can range from $50,000 to a maximum of $250,000, as some territories carry premiums up to $200,000. The premium is determined based on the marketability of the geographic area and tier of baseball market (example MLB or MILB location) in which you will locate your Gradum Gswing(s). This fee is uniform and is not refundable. Your lease security deposit and utility deposits will usually be refundable unless you owe money to the landlord or utility provider. None of the other expenditures in this table will be refundable. Neither we nor any affiliate finances any part of your initial investment.

    2.    At your option, you may also decide to pay us $3,250 as a Site Selection and Lease Negotiation Fee and/or $5,250 as a Construction Consulting Fee. These fees would cover our assistance in helping you find a suitable location, negotiating a lease for the site and/or consulting the appropriate construction of the site.

    3.    The typical size of your facility will range from 2,000 sq ft to 4,000 sq ft. The low end of the initial investment represents a one-month payment at the then current market lease rate for a such space. The high end represents a one and a half-month payment at the then current market lease rate. You may be required to pay a security deposit with your lease, usually equal to one-month rent. You may be able to negotiate a period of rent abatement ("free rent") for the time reasonably required to build out the space (usually no longer than 1-2 months). We expect that you will rent your location. If you choose to purchase real estate instead of renting, your costs will be significantly different.

    4.    We anticipate that you will be able to set up a facility in a relatively small, leased space  if you do not already have a location from which you can provide hitting instruction. In most, but not all, cases, the cost of necessary leasehold improvements will be minimal. This expense will vary from location to location but could be up to $50,000.

8

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

5.      This estimate is based on the cost of the current hardware and software including the CRM Point-of-Sale ("CRM POS" system). The estimated cost includes us being paid $250 per month for High Level or other CRM we may decide to use in the future. We reserve the right to change hardware and software requirements.

6.      This includes any other required expenses you will incur before operations begin and during the first three months of operations, such as payroll, additional inventory, rent, and other operating expenses in excess of income generated by the business. It does not include any salary or compensation for you. In formulating the amount required for additional funds, we relied on our experience in the development of Gradum Gswing facilities by our affiliates, and our general knowledge of the business.

7.      This is the total estimated initial investment to open and commence operating your initial location for the first three months. We relied on our affiliate's experience opening and operating Gradum Gswing facilities to compile this estimate. We cannot guarantee that you will not have additional expenses starting your business. Your costs will depend on factors such as: the size of your territory, how much you follow our methods and procedures; your management skill, experience and business acumen; local economic conditions; the local market for the products and services; competition; and the sales level reached during the initial period. The estimate does not include the monthly cost of debt service. The estimate includes such items as initial payroll taxes, ongoing franchise fees, Brand Development Fund contributions, professional and accounting fees, additional advertising, insurance, health insurance and workers' compensation, rent, repairs and maintenance, bank charges (including interest), miscellaneous supplies and equipment, initial staff recruiting expenses, state tax, depreciation/amortization, deposits and prepaid expenses where applicable and other miscellaneous items. Additional operating expenses may be incurred in connection with the ongoing operation of your business and periodic reinvestment may be necessary following the initial start-up phase.

## Item 8
## RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES

Generally

We have the right to require you to purchase or lease all goods, services, supplies, fixtures, equipment, inventory, computer hardware and software or comparable items related to establishing or operating your business (1) either from us or our designee, or from suppliers approved by us, or (2) according to our specifications.

Specific Obligations

The following are our current specific obligations for purchases and leases:

A.      Real Estate. The location of your space is subject to our approval and must meet our specifications. You must use reasonable efforts to have your landlord sign our form of Rider

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

to Lease Agreement which is attached to this disclosure document as Exhibit 5 to the Franchise Agreement.

      B.    <u>Insurance</u>. You must obtain insurance as described in the Franchise Agreement and in our Operations Manual, which includes (i) "Special" causes of loss coverage forms, including fire and extended coverage, crime, on all property of the training center , for full repair and replacement value (subject to a reasonable deductible); (ii) Commercial General Liability insurance, including products liability coverage, and broad form commercial liability coverage, written on an "occurrence" policy form in an amount of not less than $1,000,000 single limit per occurrence and $2,000,000 aggregate limit with extended coverage, child endangerment and molestation,  from a company rated A+ or better by A.M. Best or equivalent, providing protection which is standard or greater in the hitting, baseball, fitness and health club industry, (iii) Umbrella liability insurance in excess of and not more restrictive than the underlying coverage listed above, with limits of not less than $1,000,000 per occurrence/$2,000,000 aggregate; and (iv) Workers Compensation coverage as required by state law. Your policies (other than Workers Compensation) must list us and our affiliates as an additional insured, must include a waiver of subrogation in favor of us and our affiliates, must be primary and non-contributing with any insurance carried by us or our affiliates, and must stipulate that we receive 30 days' prior written notice of cancellation.

      C.    <u>Point-of-sale software and hardware, and related software and hardware</u>. You must purchase or lease the point-of-sale software and hardware, and related software and hardware, that we specify. See Item 11 for more details. We may periodically change any software requirements to adapt to changing capabilities by written notice to you or by updating our Manual.

      D.    <u>Equipment, inventory and supplies</u>. You must purchase equipment, inventory and supplies from our affiliate or our Approved Vendors, including purchasing from our affiliate certain merchandise and supplies.

      E.    <u>Branded merchandise, Gswing training digital course and training tools.</u> You may be required to purchase from us or our affiliate certain branded merchandise, the Gswing training digital course and training tools. We may periodically add and remove items that you must purchase from us or our affiliate.

<u>Us or our Affiliates as Supplier</u>

      As of the date of this Disclosure Document, our affiliate may be a supplier of some items that you must purchase. Our officers own an interest in the branded merchandise supplier in Item 8C. None of our officers own an interest in any other supplier.

<u>Alternative Suppliers</u>

      If you want to use a supplier that is not on our list of approved suppliers, you must request our approval in writing. We will grant or revoke approvals of suppliers based on criteria appropriate to the situation, which may include evaluations of the supplier's capacity, quality, financial stability, reputation, and reliability; inspections; product testing, and performance reviews. Our criteria for approving suppliers are not available to you. We permit you to contract

10

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

with alternative suppliers who meet our criteria only if you request our approval in writing, and we grant approval. There is no fee for us to review or approve an alternate supplier. We will provide you with written notification of the approval or disapproval of any supplier you propose within 30 days after receipt of your request. We may grant approvals of new suppliers or revoke past approvals of suppliers on written notice to you, or by updating our Manual.

<u>Issuing Specifications and Standards</u>

We issue specifications and standards to you for applicable aspects of the franchise in our Manual and/or in written directives. We may issue new specifications and standards for any aspect of our brand system, or modify existing specifications and standards, at any time by revising our Manual and/or issuing new written directives (which may be communicated to you by any method we choose). We will generally (but are not obligated to) issue new or revised specifications only after thorough testing in our headquarters, in company-owned outlets, and/or a limited market test in multiple units.

No purchasing or distribution cooperative currently exists. We may negotiate purchase arrangements with suppliers, including price terms, for the benefit of franchisees. However, we are not required to and may choose to continue or discontinue such arrangements in the future. We do not provide any material benefit to you based on your purchase of particular goods or services, or your use of particular suppliers.

We estimate that  items purchased or leased from us, our affiliates or our other designated or approved suppliers, or in accordance with our specifications will represent approximately 50% to 80% of total purchases you will make to begin operations of your training center, and approximately 50% to 80% of the ongoing costs to operate your training center.

All items that you purchase from approved suppliers must meet our specifications. This includes advertising and marketing materials, forms, and promotional items. In addition, you must purchase the signs used to identify the facility from a vendor we approve utilizing designs we approve. None of our officers own an interest in any supplier.

We publish a list of approved vendors and order procedures in the Manual. We may approve other vendors if you request it in writing or if a vendor requests it and if the vendor demonstrates to our satisfaction that it is financially stable and can provide product(s) or service(s) that meet our specifications and that are consistent with our image. We may charge our reasonable costs incurred in evaluating a proposed vendor. We will give you a good faith estimate of our cost of evaluating a proposed vendor within a reasonable time after you make the request, but before we begin the evaluation process. We will normally make our decision within thirty (30) days. We reserve the right to disapprove any previously approved vendor whose performance falls below our standards. We will provide any approvals of new vendors or revoke approval of vendors in writing and will incorporate our decision in the Operations Manual.

We and our affiliates reserve the right to receive fees, payments, rebates, or other consideration from third party manufacturers, suppliers, and/or distributors on their sales of

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

products, services, equipment, goods and supplies to our affiliate and our franchisees. Except as described below, we and our affiliates will retain and use any fees, payments, rebates, commissions or other consideration as we deem appropriate or as required by a particular manufacturer, supplier or distributor. We may place fees, payments, rebates, commissions, allowances or other consideration we receive from some vendors with whom you do business in either the System-wide Brand Development Fund or a separate fund to cover the cost of franchisee conferences and conventions and franchisee incentive programs. We expect the amount and availability of such funds to vary from time to time based upon factors outside our control. We did not receive any revenue from franchisee purchases of goods, products and services from us or our affiliates in 2022.

## Item 9
## FRANCHISEE'S OBLIGATIONS

This table lists your principal obligations under the franchise and other agreements. It will help you find more detailed information about your obligations in these agreements and in other items of this disclosure document.

| Obligation | Section in agreement | Disclosure document item |
|---|---|---|
| a. Site selection and acquisition/lease | Franchise Agreement (FA): §§ 6.1, 6.2<br>Multi-Territory Development Agreement (MTDA): Not Applicable | Item 11 |
| b. Pre-opening purchase/leases | FA: §§ 6.2, 6.3<br>MTDA: Not Applicable | Items 5, 7, 8 and 11 |
| c. Site development and other pre-opening requirements | FA: Article 6<br>MTDA: §§1(a), 3 | Items 5, 7, 8 and 11 |
| d. Initial and ongoing training | FA: §§ 5.4, 6.4, 7.6<br>MTDA: Not Applicable | Items 5, 6, 8 and 11 |
| e. Opening | FA: §§ 6.5, 6.6<br>MTDA: §1(a) | Items 7, 8 and 11 |
| f. Fees | FA: Article 4, §§ 5.5, 7.8, 10.5, 11.2, 11.3, 15.2, 16.1, 17.6<br>MTDA: §1(a) | Items 5, 6 and 7 |
| g. Compliance with standards and policies/operating manual | FA: §§ 6.3, 7.1, 7.3, 7.5, 7.9 –7.13, 7.15, 10.1, 10.4, 11.1 | Items 8, 11 and 14 |

12

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

| Obligation | Section in agreement | Disclosure document item |
|---|---|---|
| | MTDA: Article 1 | |
| h. Trademarks and proprietary information | FA: Article 12, § 13.1<br>MTDA: Not Applicable | Items 13 and 14 |
| i. Restrictions on products/services offered | FA: § 7.3<br>MTDA: Not Applicable | Items 8, 11 and 16 |
| j. Warranty and customer service requirements | FA: §§ 7.3, 7.8, 7.9<br>MTDA: Not Applicable | Item 8 |
| k. Territorial development and sales quotas | FA: Not applicable<br>MTDA: §1(a), 4(ii) | Item 12 |
| l. Ongoing product/service purchases | FA: Article 8<br>MTDA: Not Applicable | Items 6 and 8 |
| m. Maintenance, appearance, and remodeling requirements | FA: §§ 7.12, 7.13<br>MTDA: Not Applicable | Items 6, 7 and 8 |
| n. Insurance | FA: § 7.15<br>MTDA: Not Applicable | Items 6, 7 and 8 |
| o. Advertising | FA: Article 9<br>MTDA: Not Applicable | Items 6, 7, 8 and 11 |
| p. Indemnification | FA: Article 16<br>MTDA: Not Applicable | Items 6 and 8 |
| q. Owner's participation/management/staffing | FA: § 2.4<br>MTDA: Not Applicable | Items 15 |
| r. Records and reports | FA: Article 10<br>MTDA: Not Applicable | Item 11 |
| s. Inspections and audits | FA: §§ 10.5, 11.2<br>MTDA: Not Applicable | Items 6 and 11 |
| t. Transfer | FA: Article 15<br>MTDA: Article 7 | Items 6 and 17 |
| u. Renewal | FA: § 3.2<br>MTDA: Not Applicable | Item 17 |
| v. Post-termination obligations | FA: Article 13, § 14.3 | Item 17 |

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

| Obligation | Section in agreement | Disclosure document item |
|---|---|---|
| | MTDA: Not Applicable | |
| w. Non-competition covenants | FA: § 13.2<br>MTDA: Not Applicable | Item 17 |
| x. Dispute resolution | FA: Article 17<br>MTDA: Article 7 | Items 6 and 17 |

**Item 10**
**FINANCING**

We do not offer direct or indirect financing. We do not guarantee your note, lease or obligations.

**Item 11**
**FRANCHISOR'S ASSISTANCE, ADVERTISING, COMPUTER SYSTEMS, AND TRAINING**

Except as listed below, we are not required to provide you with any assistance.

Our Pre-Opening Obligations

A.    *Your site.* At your option, we may review and advise you regarding potential locations for a site that you submit to us. (Franchise Agreement - Sections 5.1 and Section 6). We will approve or disapprove your proposed site within 30 days after you submit all of our required documents and information. If you do not have a site when you sign the franchise agreement, then we will specify in your franchise agreement the area in which you must select a location (Franchise Agreement, Summary Page). If you sign a Multi-Territory Development Agreement, we will approve the location of future sites and territories for those sites, and our then-current standards for sites and territories will apply.

B.    *Territory.* When a site is approved, we will designate your territory. (Franchise Agreement -Section 6.1)

C.    *Plans.* We will provide you with  specifications for  the layout of your facility. (Franchise Agreement - Section 5.1)

D.    Lease and Construction. We may provide assistance selecting a site,  working out a lease for your site and consulting on constructing the facility. (Franchise Agreement - Section 5.1)

E    *Necessary furniture, signs, fixtures, equipment,  computer system, vehicle and supplies.* We will provide you with a list of our specifications and approved suppliers for signs,

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

fixtures, equipment, parts computer system, vehicle and supplies. (Franchise Agreement - Section 5.1)

F.    *Hiring and training employees*. We will provide you with our suggested staffing levels (Franchise Agreement - Section 5.1), operational instructions in the Manual which you can use as part of training new employees (Franchise Agreement - Section 5.1), and our initial training program described below. Our opening support (as described below) includes assisting you in training employees. All hiring decisions and conditions of employment are your sole responsibility.

G    *Operations Manual*. We will give you access to our Operations Manual and any updates and revisions to the Manual (Franchise Agreement - Section 5.1).

H.    *Initial Training Program*. We will conduct our initial training program. (Franchise Agreement - Section 5.1) The current initial training program is described below.

I.    *Business plan review*. If you request, we will review your pre-opening business plan and financial projections. (Franchise Agreement - Section 5.1)

J.    *Market introduction plan*. We will advise you regarding the planning and execution of your market introduction plan. (Franchise Agreement - Section 5.1)

K.    *On-site opening support*. We will send at least one representative to your location for up to 2 weeks to provide support and additional training before you open. (Franchise Agreement - Section 5.1)

Length of Time to Open

The typical length of time between signing the franchise agreement and the opening of your training center is from three to six months depending on when you lease or otherwise acquire a location. Other factors besides acquiring a lease that may affect the time period include your ability to obtain financing, develop your location, obtain business permits and licenses, and hire employees.

Our Post-Opening Obligations

After you open your business:

A.    *Developing products or services you will offer to your customers*. Although it is our intent and practice to refine and develop products or services that you will offer to your customers, the franchise agreement does not obligate us to do so.

B.    *Resolving operating problems you encounter and additional training*. If you request, we will provide advice to you (by telephone or electronic communication) regarding improving and developing your business, and resolving operating problems you encounter, to the extent we deem reasonable. If we provide additional training in response to your request, we may charge our then-current additional training fee. As of the issue date of this Disclosure document,

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

the fee is $500 per diem plus any out-of-pocket expenses (such as travel, lodging, and meals for our employees providing onsite support). (Franchise Agreement - Section 5.2)

C.    *Establishing and using administrative, bookkeeping, accounting, and inventory control procedures.* We will provide you with our recommended procedures for administration, bookkeeping, accounting, and inventory control (Franchise Agreement - Section 5.2). We may make any such procedures part of required (and not merely recommended) procedures for our system.

D.    *Brand Development Fund.* We will administer the Brand Development Fund when it is formed (Franchise Agreement - Section 5.2). We will prepare an unaudited annual financial statement of the Brand Development Fund within 120 days of the close of our fiscal year and will provide the financial statement to you upon request. (Section 9.3)

E    *Website.* We will maintain a website for the Gradum Gswing brand, which will include your business information and telephone number. (Franchise Agreement - Section 5.2)

Advertising

We recommend you spend not less than five percent (5%) of your gross sales per month on advertising and promotional activities during each calendar year, in such types as we approve or as described in the Operations Manual or otherwise in writing. We encourage you, however, to spend additional amounts on local advertising and promotional activities beyond the minimum amounts required under the Franchise Agreement. Your local advertising expenditures will include advertising, merchandising, sales promotion and other forms of advertising at the local level. Each month, you must provide us with an accounting of the monies that you spent and documentation of the local advertising and promotional activities you executed during the preceding calendar year. If you fail to spend the required minimum amount during any calendar year on approved local advertising and promotional activities, you must pay us the difference between what you should have spent on approved local advertising and promotional activities during that year, and what you actually spent on those items during that year.

You must obtain our approval (in writing) of all marketing, advertising and promotional materials before use, including any of your own materials, at least 10 days before the deadline for running or using the marketing, advertising or promotional materials. Any marketing, advertising or promotional materials not approved by us within 14 days will be deemed disapproved. At any time, we may require you to stop any marketing, advertising or promotion. You must use marketing, advertising and promotional materials that depict any of our trademarks only in connection with your sale of approved services and products in connection with your training center . Any marketing, advertising and promotional materials you use must be current, in good taste and in good condition and communicate the brand position and character that we have established for franchised operations. We may periodically make available for purchase, from us or our affiliates or designated or approved suppliers, certain advertising, marketing and promotion materials.

You may use only approved advertising and promotional materials for your local advertising. If you desire to use any unapproved advertising or promotional materials bearing the

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

trademarks or other Marks proprietary to us, or any portion of those items, you must obtain our prior written approval before using those materials. Any advertising or promotional materials not approved by us within 10 days will be deemed to be disapproved. You must use your best efforts to promote and advertise your business and will participate in all advertising and promotional programs we establish in the manner we direct as described in the Operations Manual or otherwise in writing.

*Market Introduction Advertising*. We recommend you spend not less than $1,500 on initial advertising and promotional materials and advertising, promotion, and events to promote and execute the opening of your Gradum Gswing training facility, which must be coordinated with us and must occur not more than 60 days before or 30 days after the first day you open your training center . We must approve all Market introduction advertising and marketing. Your minimum expenditure on market introduction advertising is in addition to the local advertising requirements described above.

*Brand Development Fund*. You are required at this time to pay us a  Brand Development Fee or contribute to an advertising fund that we administer. You will contribute each month to the Fund up to two per cent (2%) of your Gross Sales. All franchisees will contribute to the Fund at the same rate. Any locations in which we or our affiliates have an ownership interest may, but are not obligated to, contribute to the Fund.

The Fund is not a trust or escrow account, and we do not have any fiduciary obligations with respect to the or any advertising fees we receive. We have no obligation to make expenditures on your behalf that are equivalent or proportionate to your contributions to the Fund, to ensure that any particular franchisee benefits directly or pro rata from marketing or advertising we develop or place or to ensure that any advertising directly impacts your business or penetrates your territory.

We may use the Fund to defray expenses incurred in connection with the cost of creating, formulating, developing and implementing marketing, advertising and promotional programs, campaigns and materials, and any other activities we, in our sole judgment, believe are appropriate to enhance, promote and protect the brand. These items and activities may include (i) preparing marketing and advertising materials; (ii) preparing and maintaining World Wide web pages and sites, and other activities related to advertising and promotion via the Internet and/or other public computer networks; (iii) preparing and conducting television, radio, magazine, newspaper and World Wide web/Internet advertising campaigns and other public relations activities; (iv) employing public relations firms and advertising agencies to assist in the activities described above, including without limitation the placement of print, broadcast or World Wide web/Internet advertising; (v) conducting new product development and research; (vi) conducting market research, sponsorships, mystery shopper programs, and client surveys and interviews; (vii) collecting and accounting for the marketing and advertising payments from our franchisees; and (viii) preparing accountings for the Fund. We may use the Fund to defray administrative costs and overhead that we or our affiliates incur in activities reasonably related to the administration of the Fund, including without limitation the salaries and benefits paid to our and our affiliates employees engaged in advertising-related functions. We may use any media, create any programs, campaigns and materials, and allocate advertising and promotional expenditures locally, regionally or nationally and to any regions or localities that we consider appropriate. We may use in- house

17

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

personnel and/or outside national, regional or local public relations firms and agencies to create and place marketing and advertising for the brands and otherwise perform the activities described above.

If requested by you in writing no sooner than 120 days after the end of our fiscal year, we will provide you with an annual unaudited statement of contributions and expenditures of the Brand Development Fund for our most recently completed fiscal year. We will not be required to audit the Fund. If we expend less than the total contributions available in the Fund during any fiscal year, we will retain the remaining amount in the Fund and expend the unused sum during the following fiscal year. If we expend an amount greater than the amount available in the Fund in any fiscal year(in addition to any sum required to be expended because we did not expend all the sums in the Fund during the preceding year), we will be entitled to reimburse ourselves from the Fund during the next fiscal year for all excess expenditures made during the preceding fiscal year. Although the Fund would be intended to be of perpetual duration, we have the right to discontinue the Brand Development Fund. We decide whether to form and whether to terminate the Fund. If we terminate the Fund, we may require that you spend an equivalent amount on local advertising in addition to the amount you are required to spend on local advertising. We will not discontinue the Fund, however, until we have expended all money in the Fund for advertising and promotional purposes. We may or may not use the Fund part of the fund for advertising that is directed primarily at soliciting the sale of new franchisees.

*Advertising Cooperatives.* As of the issuance date of this disclosure document, there were no advertising cooperatives. We have the power, however, to form, approve the franchisee formation of, change, dissolve or merge local or regional advertising cooperatives, and to establish the rules under which these cooperatives will operate. You must participate in and contribute to any local or regional advertising cooperative we form or approve in the area where your training center is located. As of the issuance date of this disclosure document, there was no advertising council for the Gradum Gswing System. We have the power, however, to form, change, or dissolve any advertising council. Any advertising council we form will serve in only an advisory capacity.

<u>System Website and Social Media</u>

We may provide you with materials for use on social media sites such as a Facebook page. You may not use any electronic media, including the Internet, or any social media, for viewing by the public that contains or is associated with your Gradum Gswing business or our registered trademarks without our prior written approval. You may not establish a Facebook®, Myspace®, Snap Chat®, Twitter®, TikTok® or similar pages, post through Instagram® or on YouTube®, or utilize other, similar social media, without our prior written approval. You may not establish a Twitter® feed or other social media that are associated with or refer to your Gradum Gswing business without our prior, written approval. We retain the right to approve all social media content

18

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

that displays or is associated with our trademarks or your business. We may require you to withdraw and/or discontinue the use of any social media posts, even if previously approved.

<u>Point of Sale and Computer Systems</u>

We require you to buy or lease and use a computer system to help manage the business. Currently, we require you to use Mindbody, V1 Sports, and High Level as the CRM Point-of-Sale system ("CRM POS System"). The CRM POS System will provide scheduling and payment information and stores customer information, sales and provide financial reports. The current purchase price for the CRM POS System and other hardware and software is approximately $650 to $900 per month per location. The estimated annual cost of maintaining, upgrading, updating and support for the software is approximately $700. We may change any required hardware and software requirements upon notice to you.

We are not obligated to provide any ongoing maintenance, repairs, upgrades, or updates. We do require you enter into a subscription contract for the POS System and any other applicable software/apps. You must upgrade or update any system when we determine. There is no contractual limit on the frequency or cost of this obligation.

You must give us independent access to the information that will be generated or stored in these systems. The information that we may access will include sales, customer data, and reports. There is no contractual limitation on our right to access the information.

<u>Operations Manual</u>

See Exhibit F for the table of contents of our Operations Manual as of the date this disclosure document, with the number of pages devoted to each subject. The Manual has approximately 255 pages.

<u>Training Program</u>

Our training program consists of the following:

**TRAINING PROGRAM**

| Subject | Hours of Classroom Training | Hours of On-The-Job Training | Location |
|---------|------------------------------|------------------------------|----------|
| Demand Generation | 4 | 4 | Stuart, Florida |
| Lead Nurture | 4 | 4 | Stuart, Florida |
| Sales | 8 | 16 | Stuart, Florida |

19

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

| | | | |
|---|---|---|---|
| Gswing Fulfillment | 16 | 128 | Stuart, Florida |
| Business Operations/Software | 8 | | Stuart, Florida |
| **TOTALS:** | **40** | **152** | |

Training classes will be scheduled in accordance with the needs of new franchisees or at your request. The principal franchise owner and operator of the training center location must attend training. Training classes will be generally held at our headquarters in Stuart, Florida or at one of the training sites operated by our affiliate in Florida. Training will also be conducted at your location before you are ready to open. We may choose alternate locations or provide portions of the training virtually. The instruction materials consist of our Operations Manual, the Digital GSwing Course and other materials along with lectures, discussions, and on-the-job demonstration and practice. Lorenzo Garmendia, Carlos Garmendia and Matthew Garmendia will conduct training. Lorenzo and Carlos Garmendia are GSwing certified trainers and Mathew Garmendia is our Director of Fulfillment Training. Their experience is described in Item 2 of this Disclosure Document. We anticipate initial training will take approximately from Monday through Saturday for 4 weeks for a total of 24 8-hour days .Up to 3 people may attend without a training fee, but you must pay the travel and living expenses for you and your employees and managers to attend training. As of the date of this Disclosure Document, the fee for additional persons beyond 3 people to attend initial training is $3,000 per additional person.

You must complete training to our satisfaction at least two weeks before opening your facility. Should you fail to pass the test or complete the initial training, we have the right to terminate the franchise agreement without refunding the initial franchise fee.

We will send at least one representative to your location for up to two weeks to assist you around the time you open. You must pay the meal, travel and lodging expenses of our representative to come to your location.

Your facility must at all times be under your on-site supervision or under the on-site supervision of someone who has completed our training program. At this time, we do not currently require additional training programs or refresher courses, but we have the right to do so in the future.

## Item 12
## TERRITORY

Your Location

We must approve the location for your business. To obtain our approval, you must provide all information and documents about the site that we require. If you do not have a location when you sign the franchise agreement, we will specify in your franchise agreement the area in which you must select a location. The factors we consider in approving sites are general location and

FDD 2023                                                                                    Franchise Agreement

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

neighborhood, competition, trade area demographics, traffic patterns, parking, size, physical characteristics of existing buildings, and lease terms. We generally do not own your premises.

We will approve or disapprove your proposed site within 30 days after you submit all of our required documents and information. If we and you cannot agree on a site, you will be unable to comply with your obligation to develop and open the franchise by the deadline stated in the franchise agreement. Unless we agree to extend the deadline, you will be in default, and we may terminate your franchise agreement. We are not obligated to assist you in conforming the premises of your site to local ordinances and building codes and obtaining any required permits. This will be your responsibility.

Grant of Territory

Your franchise agreement will specify a territory, which will be determined by us. Your territory will generally have a territory comprised of a population of approximately more or less than 250,000 people or a five-mile radius around your location depending on several factors including the demographics of the area. Your territory will be delineated by a radius around your location or by geographical boundaries, zip codes, political boundaries, streets, geographical features or trade area, depending on the density and demographics of the population of the area around your location.

Relocation; Establishment of Additional Outlets

You do not have the right to relocate your training center , and we have no obligation to approve any request for relocation. Our policy is to approve relocation of a franchisee's training center on a case-by-case basis, considering factors such as changes in demographics, profitability of your current business, or a loss of your premises due to circumstances beyond your control.

You do not have the right to establish additional franchised outlets unless you sign a Multi-Territory Development Agreement ("MTDA") in the form attached as Exhibit C to this disclosure document. If you and we sign a MTDA, then you will have the right to establish a mutually agreed number of additional outlets on a mutually agreed schedule. Under the MTDA, your right to develop additional outlets is subject to (1) you must comply with the mutually-agreed development schedule, (2) you must have sufficient financial and organizational capacity to develop, open, operate, and manage each additional Gradum Gswing training center, (3) you must be in compliance with all brand requirements at your training center, and (4) you must not be in default under any other agreement with us. We will approve the location of future sites and territories for those sites, and our then-current standards for sites and territories will apply. You are not obligated to develop additional territories under the MTDA, and you may terminate it any time without penalty. If you do not meet your development schedule in the MTDA, we have the right to terminate your right to develop additional outlets.

Options to Acquire Additional Franchises

You do not receive any options, rights of first refusal, or similar rights to acquire additional franchises.

Franchise Agreement

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

<u>Territory Protection</u>

In your franchise agreement, we grant you an exclusive territory. In your territory, we will not establish either a company-owned or franchised outlet selling the same or similar goods or services under the same or similar trademarks or service marks as a Gradum Gswing facility. The continuation of your territorial protection depends on achieving at least $350,000 in gross sales each year after your first year of operating the franchise. If you do not achieve this minimum gross sales requirement we may, at our option, reduce or eliminate your territory or terminate the franchise agreement.

If you sign an MTDA, you do not receive an exclusive territory as an area developer for the entire area. The protected territory is established for each site. Therefore, with respect to an MTDA, we make the following disclosure: You will not receive an exclusive territory. You may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we control.

<u>Restrictions on Us from Soliciting or Accepting Orders in Your Territory</u>

There are restrictions on us from soliciting or accepting orders from consumers inside your territory. We reserve the right to use other channels of distribution, such as the internet, catalog sales, telemarketing, or other direct marketing to advertise within your territory using our principal trademarks or using trademarks different from the ones you will use under your franchise agreement. We do not pay any compensation to you for soliciting orders from inside your territory. However, orders from clients inside your territory will be referred to you. We reserve the right to sell digital materials to persons located in your territory.

<u>Soliciting by You Outside Your Territory</u>

There are restrictions on you from soliciting or accepting orders from consumers outside of your territory. Orders from clients outside your territory must be referred to any franchisee who has a franchise agreement covering that particular territory.

<u>Competition by Us Under Different Trademarks</u>

Neither we nor any of our affiliates operates, franchises, or have plans to operate or franchise a business under a different trademark selling goods or services similar to those you will offer. However, the franchise agreement does not prohibit us from doing so.

## Item 13
## TRADEMARKS

<u>Principal Trademark</u>

The following are the principal trademarks that we license to you. These trademarks are owned by our affiliate, Gradum, LLC. Except where noted below, the trademarks are registered on the Principal Register of the United States Patent and Trademark Office:

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

| Trademark | Registration Date | Registration Number |
|---|---|---|
| **GRADUM®** | **August 20, 2019** | **5840027** |
| **GSWING®** | **January 5, 2021** | **6236192** |
| **GRADUM GSWING®** | **January 17, 2023** | **6954087** |
| | **Application Date** | **Serial Number** |
| **TEACH TRAIN TRANSFER** | **September 20, 2022** | **97599133** |

The Teach Train Transfer™ trademark application is pending. Because we do not yet have a federal registration for this trademark, this trademark does not yet have as many legal benefits and rights as a federally registered trademark. The other trademarks shown are registered and do have those benefits.

We intend to file when due all required affidavits or declarations. There are no currently effective material determinations of the United States Patent and Trademark Office, the Trademark Trial and Appeal Board, or any state trademark administrator or court. There are no pending infringement, opposition, or cancellation proceedings. or any pending material litigation involving the Marks that is relevant to your ability to use the Marks in connection with the business. There are no agreements that significantly limit our rights to use or license you to use the Marks in any manner material to the business.

Protection of Rights

We protect your right to use the principal trademarks listed in this Item, and we protect you against claims of infringement or unfair competition arising out of your use of the trademarks, to the extent described in this section.

The franchise agreement obligates you to notify us of the use of, or claims of rights to, a trademark identical to or confusingly similar to a trademark licensed to you. The franchise agreement does not require us to take affirmative action when notified of these uses or claims. We have the right to control any administrative proceedings or litigation involving a trademark licensed by us to you.

If you use our trademarks in accordance with the franchise agreement, then (i) we will defend you (at our expense) against any legal action by a third-party alleging infringement by your use of the trademark, and (ii) we will indemnify you for expenses and damages if the legal action is resolved unfavorably to you.

Under the franchise agreement, we may require you to modify or discontinue using a trademark, at your expense.

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

<u>Superior Prior Rights and Infringing Uses</u>

We do not know of either superior prior rights or infringing uses that could materially affect your use of the principal trademarks.

**Item 14**
**PATENTS, COPYRIGHTS AND PROPRIETARY INFORMATION**

<u>Patents</u>

We do not own rights in, or licenses to, patents that are material to the franchise. We do not have any pending patent applications.

<u>Copyrights</u>

All of our original works of authorship fixed in a tangible medium of expression are automatically protected under the U.S. Copyright Act, whether or not we have obtained registrations. This includes our Operations Manual as well as all other sales, training, management and other materials that we have created or will create. You may use these copyrighted materials during the term of the franchise, in a manner consistent with our ownership rights, solely for your franchised business.

We do not have any registered copyrights. There are no pending copyright applications for our copyrighted materials. There are no currently effective determinations of the U.S. Copyright Office (Library of Congress) or any court regarding any copyright.

There are no agreements currently in effect that limit our right to use or license the use of our copyrighted materials.

We have no obligation to protect any of our copyrights or to defend you against claims arising from your use of copyrighted items. The franchise agreement does not require us to take affirmative action when notified of copyright infringement. We control any copyright litigation. We are not required to participate in the defense of a franchisee or indemnify a franchisee for expenses or damages in a proceeding involving a copyright licensed to the franchisee. We may require you to modify or discontinue using the subject matter covered by any of our copyrights, at your expense.

We do not know of any copyright infringement that could materially affect you.

<u>Proprietary Information</u>

We have a proprietary, confidential Operations Manual and related materials that include guidelines, standards and policies for the development and operation of your training center . We also claim proprietary rights in other confidential information or trade secrets that include all methods for developing and operating the training center , and all non-public plans, data, financial information, processes, vendor pricing, supply systems, marketing systems, formulas, techniques, designs, layouts, operating procedures, customer data, information and know-how.

24

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

You (and your owners, if the franchise is owned by an entity) must protect the confidentiality of our Operations Manual and other proprietary information, and you must use our confidential information only for your franchised business. We may require your managers and key employees to sign confidentiality agreements.

## Item 15
## OBLIGATION TO PARTICIPATE IN THE ACTUAL OPERATION OF THE FRANCHISE BUSINESS

<u>Your Participation</u>

You are not required to participate personally in the direct operation of your business. However, we recommend that you participate.

You must designate one person as your "Principal Executive." The Principal Executive is the executive primarily responsible for your business and has decision-making authority on behalf of the business. The Principal Executive must complete our initial training program. The Principal Executive must complete any post-opening training programs that we develop in the future. The Principal Executive must make reasonable efforts to attend all in-person meetings and remote meetings (such as telephone conference calls), including regional or national brand conferences, that we require. The Principal Executive cannot fail to attend more than three consecutive required meetings.

If your business is owned by an entity, all owners of the business must sign our Guaranty and Non-Compete Agreement (see Attachment 3 to the Franchise Agreement).

<u>"On-Premises" Supervision</u>

You are not required to personally conduct "on-premises" supervision of your business. However, we strongly recommend on-premises supervision by you.

There is no limit on who you can hire as an on-premises supervisor. The general manager of your business (whether that is you or a hired person) must successfully complete our training program.

If the franchise business is owned by an entity, we do not require that the general manager own any equity in the entity.

<u>Restrictions on Your Manager</u>

If we request, you must have your general manager sign a confidentiality and non-compete agreement. We do not require you to place any other restrictions on your manager.

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

## Item 16
## RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL

You must offer for sale only goods and services that we have approved and not offer any goods or services we have disapproved.

You must offer for sale all goods and services that we require. We have the right to change the types of authorized goods or services, and there are no limits on our right to make changes. We do not restrict your access to customers, except that all sales must be made at or from your training center .

## Item 17
## RENEWAL, TERMINATION, TRANSFER, AND DISPUTE RESOLUTION

### THE FRANCHISE RELATIONSHIP

**This table lists certain important provisions of the franchise and related agreements. You should read these provisions in the agreements attached to this disclosure document.**

| Provision | Section in franchise or other agreement | Summary |
|---|---|---|
|  |  |  |
| a. Length of the franchise term | Franchise Agreement (FA): § 3.1<br><br>Multi-Territory Development Agreement (MTDA): none | 10 years from date of franchise agreement. |
| b. Renewal or extension of the term | FA: § 3.2<br>MTDA: none | You may obtain two successor franchise agreement renewals for 5-year terms each. |
| c. Requirements for franchisee to renew or extend | FA: § 3.2<br>MTDA: none | For our franchise system, "renewal" means that at the end of your term, you sign our successor franchise agreement for an additional 5-year term. You may be asked to sign a contract with materially different terms and conditions than your original contract.<br><br>To renew, you must give advance notice to us; be in compliance with all contractual obligations to us and third parties; renovate to our then-current standards; sign then-current form of |

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

| Provision | Section in franchise or other agreement | Summary |
|---|---|---|
| | | franchise agreement and related documents (including personal guaranty); sign general release (unless prohibited by applicable law). If you continue operating your franchise after the expiration of the term without a renewal agreement, then we may either terminate your operation at any time or deem you to have renewed your agreement for a 5-year term. |
| d. Termination by franchisee | FA: § 14.1 MTDA: § 4 | If we violate a material provision of the franchise agreement and fail to cure or to make substantial progress toward curing the violation within 30 days after notice from you. If you sign a MTDA, you may terminate it at any time. |
| e. Termination by franchisor without cause | Not Applicable | |
| f. Termination by franchisor with cause | FA: § 14.2 MTDA: § 4 | We may terminate your agreement for cause, subject to any applicable notice and cure opportunity. If you sign a Multi-Territory Development Agreement, termination of your MTDA does not give us the right to terminate your franchise agreement. However, if your franchise agreement is terminated, we have the right to terminate your MTDA. |
| g. "Cause" defined--curable defaults | FA: § 14.2 MTDA: none | Non-payment by you (10 days to cure); violate franchise agreement other than non-curable default (30 days to cure). |
| h. "Cause" defined--non-curable defaults | FA: § 14.2 MTDA: § 4 | FA: Misrepresentation when applying to be a franchisee; knowingly submitting false information; bankruptcy; lose possession of your location; violation of law; violation of confidentiality; violation of non-compete; violation of transfer restrictions; slander or libel of us; |

27

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

| Provision | Section in franchise or other agreement | Summary |
|---|---|---|
| | | refusal to cooperate with our training center inspection; cease operations for more than 5 consecutive days; three defaults in 12 months; cross-termination; charge or conviction of, or plea to a felony, or commission or accusation of an act that is reasonably likely to materially and unfavorably affect our brand; any other breach of franchise agreement which by its nature cannot be cured. |
| | | MTDA: failure to meet development schedule; violation of franchise agreement or other agreement which gives us the right to terminate it. |
| i. Franchisee's obligations on termination/non-renewal | FA: §§ 14.3 – 14.6 MTDA: none | Pay all amounts due; return Manual and proprietary items; notify phone, internet, and other providers and transfer service; cease doing business; remove identification; purchase option by us. |
| j. Assignment of agreement by franchisor | FA: § 15.1 MTDA: § 7 | Unlimited |
| k. "Transfer" by franchisee - defined | FA: Article 1 MTDA: Background Statement | For you (or any owner of your business) to voluntarily or involuntarily transfer, sell, or dispose of, in any single or series of transactions, (i) substantially all of the assets of the business, (ii) the franchise agreement, (iii) any direct or indirect ownership interest in the business, or (iv) control of the business. |
| l. Franchisor's approval of transfer by franchisee | FA: § 15.2 MTDA: § 7 | No transfers without our approval. |
| m. Conditions for franchisor's approval of transfer | FA: § 15.2 MTDA: none | Pay transfer fee; buyer meets our standards; buyer is not a competitor of ours; buyer and its owners sign our then-current franchise agreement and related documents (including personal guaranty); you've made all payments to us and are in compliance with all |

28

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

| Provision | Section in franchise or other agreement | Summary |
|---|---|---|
| | | contractual requirements; pay transfer fee, buyer completes training program; you sign a general release; training center complies with then-current system specifications (including remodel, if applicable). |
| n. Franchisor's right of first refusal to acquire franchisee's business | FA: § 15.5 MTDA: none | If you want to transfer your business (other than to your co-owner or your spouse, sibling, or child), we have a right of first refusal. |
| o. Franchisor's option to purchase franchisee's business | Not Applicable | |
| p. Death or disability of franchisee | FA: §§ 2.4, 15.4 MTDA: none | If you die or become incapacitated, a new principal executive acceptable to us must be designated to operate the business, and your executor must transfer the business to an approved new owner within nine months. |
| q. Non-competition covenants during the term of the franchise | FA: § 13.2 MTDA: none | Neither you, any owner of the business, or any spouse of an owner may have ownership interest in, lend money or provide financial assistance to, provide services to, or be employed by, any competitor. |
| r. Non-competition covenants after the franchise is terminated or expires | FA: § 13.2 MTDA: none | For two years, neither you, any owner of the business, or any spouse of an owner may have ownership interest in, lend money or provide financial assistance to, provide services to, or be employed by a competitor located within twenty-five miles of your former territory or the territory of any other GSwing training center operating on the date of termination. |
| s. Modification of the agreement | FA: § 18.4 MTDA: § 7 | No modification or amendment of the agreement will be effective unless it is in writing and signed by both parties. This provision does not limit our right to modify the Manual or system specifications. |

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

| Provision | Section in franchise or other agreement | Summary |
|-----------|------------------------------------------|---------|
| t. Integration/merger clause | FA: § 18.3<br>MTDA: § 7 | Only the terms of the agreement are binding (subject to state law). Any representations or promises outside of the disclosure document and franchise agreement (or MTDA) may not be enforceable. However, no claim made in any franchise agreement (or MTDA) is intended to disclaim the express representations made in this Disclosure Document. |
| u. Dispute resolution by arbitration or mediation | FA: § 17.1<br>MTDA: § 7 | All disputes are resolved by arbitration (except for injunctive relief) (subject to applicable state law). |
| v. Choice of forum | FA: §§ 17.1; 17.5<br>MTDA: § 7 | Arbitration in west Palm Beach, Florida (subject to applicable state law). Any legal proceedings not subject to arbitration will take place in the District Court of the United States, in the district where our headquarters is then located, or if this court lacks jurisdiction, the state courts of the state and county where our headquarters is then located (subject to applicable state law). |
| w. Choice of law | FA: § 18.8<br>MTDA: § 7 | Florida (subject to applicable state law). |

For additional disclosures required by certain states, refer to Exhibit H - State Addenda to Disclosure Document

## Item 18
## PUBLIC FIGURES

We reserve the right to decide to use Major League/Minor League and College Baseball players to promote our franchise, at which time compensation will be determined.

## Item 19
## FINANCIAL PERFORMANCE REPRESENTATIONS

The FTC's Franchise Rule permits a franchisor to provide information about the actual or potential financial performance of its franchised and/or franchisor-owned outlets, if there is a

30

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

reasonable basis for the information, and if the information is included in the disclosure document. Financial performance information that differs from that included in Item 19 may be given only if: (1) a franchisor provides the actual records of an existing outlet you are considering buying; or (2) a franchisor supplements the information provided in this Item 19, for example, by providing information about possible performance at a particular location or under particular circumstances.

## 2022 Financial Results

This financial performance representation is based upon the historical information from the one affiliate operated Gradum Gswing business that was (i) open and continuously operating for two years or more and (ii) reported sales and expenses the entire year from January 1, 2022 through December 31, 2022 (the "2022 Fully Operational Location"). The information presented in the Table for the 2022 Fully Operational Location was taken from sales as reported by our POS system.

"Fully operational" means that the business was offering the complete range of services according to the System and was open and operating throughout the relevant time period. This financial performance representation therefore does not include any locations that have not been open and continuously operating for less than two years.

The following chart contains the profit and loss statement from January 1, 2022 to December 31, 2022 for the Gradum Gswing location owned by our affiliate that was open and operating at least two years. The affiliate owned business is located in South Miami, Florida.

31

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

## Gradum Gswing

### Profit and Loss
January - December 2022

|  | TOTAL |
|---|---|
| **Income** |  |
|   Income | 17,202.50 |
|   Sales | 280,507.47 |
| **Total Income** | **$297,709.97** |
| **GROSS PROFIT** | **$297,709.97** |
| **Expenses** |  |
|   Advertising & Marketing | 3,554.84 |
|   Ask My Accountant | 0.00 |
|   Bank Charges & Fees | 574.35 |
|   Cleaning Expense | 2,700.00 |
|   Dues & Subscriptions | 4,839.95 |
|   Gradum Baseball Admin Expense | 51,797.62 |
|   Interest Paid | 1,382.55 |
|   Job Supplies | 2,142.63 |
|   Legal & Professional Services | 3,000.00 |
|   Meals & Entertainment | 3,068.51 |
|   Merchant Fees | 7,306.92 |
|   Office Supplies & Software | 140.00 |
|   Payroll Expenses | 0.00 |
|     Payroll Service Fees | 2,306.03 |
|     Salaries & Wages | 65,159.96 |
|     Taxes | 19,068.96 |
|     Workers Compensation | 919.18 |
|   **Total Payroll Expenses** | **87,454.13** |
|   Rent & Lease | 82,285.84 |
|   Repairs & Maintenance | 885.00 |
|   Utilities | 5,612.43 |
| **Total Expenses** | **$256,744.57** |
| **NET OPERATING INCOME** | **$40,965.40** |
| **NET INCOME** | **$40,965.40** |

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

Estimated Royalties if Franchised:    $23,816.79

Estimated Brand Development Fund if Franchised:  $5,954.20

These Royalties and Brand Development Fund estimates reflect the 8% royalty plus the 2% Brand Development Fund Contribution that this outlet would have paid if it were franchised.

Notes:

1.    The foregoing information shows historical financial performance and is not a projection of future performance.

2.    "Total Income" means total of all revenue in a period, not including discounts, taxes, voids, or refunds.

3.    The Expenses listed are all costs associated with the operation of the franchised business which are associated with management and operations.

4.    "Gradum Baseball Admin Expense" is compensation for the owners.

5.    "Net Income" means Total Income minus all operating expenses associated with managing the business.

6.    The results are not audited.

**Some outlets have sold these amounts. Your individual results may differ. There is no assurance that you'll sell as much.**

Written substantiation of the information contained in this Item 19 will be made available to prospective franchisees upon reasonable request.

Other than what is included in this Item 19, we do not make any representations about a franchisee's future financial performance or the past financial performance of company-owned or franchised outlets. We also do not authorize our employees or representatives to make any such representations either orally or in writing. If you are purchasing an existing outlet, however, we may provide you with the actual records of that outlet. If you receive any other financial performance information or projections of your future income, you should report it to the franchisor's management by contacting Priscilla Garmendia, Esq., the Federal Trade Commission, and the appropriate state regulatory agencies.

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

**Item 20**
**OUTLETS AND FRANCHISEE INFORMATION**

**Table 1**
**Systemwide Outlet Summary**
**For Years 2020 to 2022**

| Column 1<br>Outlet Type | Column 2<br>Year | Column 3<br>Outlets at the Start of the Year | Column 4<br>Outlets at the End of the Year | Column 5<br>Net Change |
|---|---|---|---|---|
| Franchised | 2020 | 0 | 0 | 0 |
| | 2021 | 0 | 0 | 0 |
| | 2022 | 0 | 0 | 0 |
| Company-Owned | 2020 | 3 | 3 | 0 |
| | 2021 | 3 | 4 | +1 |
| | 2022 | 4 | 6 | +2 |
| Total Outlets | 2020 | 3 | 3 | 0 |
| | 2021 | 3 | 4 | +1 |
| | 2022 | 4 | 6 | +2 |

**Table 2**
**Transfers of Outlets from Franchisees to New Owners (other than the Franchisor)**
**For Years 2020 to 2022**

| Column 1<br>State | Column 2<br>Year | Column 3<br>Number of Transfers |
|---|---|---|
| N/A | 2020 | 0 |
| | 2021 | 0 |
| | 2022 | 0 |
| Total | 2020 | 0 |
| | 2021 | 0 |
| | 2022 | 0 |

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

**Table 3**
**Status of Franchised Outlets**
**For Years 2020 to 2022**

| Column 1 State | Column 2 Year | Column 3 Outlets at the Start of the Year | Column 4 Outlets Opened | Column 5 Termi-Nations | Column 6 Non-Renewals | Column 7 Reacquired by Franchisor | Column 8 Ceased Operations – Other Reasons | Column 9 Outlets at End of the Year |
|---|---|---|---|---|---|---|---|---|
| N/A | 2020 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2021 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2022 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Totals | 2020 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2021 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2022 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

**Table 4**
**Status of Company-Owned Outlets**
**For Years 2020 to 2022**

| Column 1 State | Column 2 Year | Column 3 Outlets at the Start of the Year | Column 4 Outlets Opened | Column 5 Outlets Reacquired from Franchisee | Column 6 Outlets Closed | Column 7 Outlets Sold to Franchisee | Column 8 Outlets at End of the Year |
|---|---|---|---|---|---|---|---|
| Florida | 2020 | 3 | 0 | 0 | 0 | 0 | 3 |
| | 2021 | 3 | 1 | 0 | 0 | 0 | 4 |
| | 2022 | 4 | 0 | 0 | 0 | 0 | 4 |
| North Carolina | 2020 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2021 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2022 | 0 | 1 | 0 | 0 | 0 | 1 |
| Texas | 2020 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2021 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2022 | 0 | 1 | 0 | 0 | 0 | 1 |

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

| Column 1 State | Column 2 Year | Column 3 Outlets at the Start of the Year | Column 4 Outlets Opened | Column 5 Outlets Reacquired from Franchisee | Column 6 Outlets Closed | Column 7 Outlets Sold to Franchisee | Column 8 Outlets at End of the Year |
|---|---|---|---|---|---|---|---|
| Totals | 2020 | 3 | 0 | 0 | 0 | 0 | 3 |
| | 2021 | 3 | 1 | 0 | 0 | 0 | 4 |
| | 2022 | 4 | 2 | 0 | 0 | 0 | 6 |

**Table 5**
**Projected Openings As Of December 31, 2022**

| Column 1 State | Column 2 Franchise Agreements Signed but Outlet Not Opened | Column 3 Projected New Franchised Outlets in the Next Fiscal Year | Column 4 Projected New Company-Owned Outlets in the Next Fiscal Year |
|---|---|---|---|
| Florida | 0 | 2 | 2 |
| North Carolina | 0 | 0 | 3 |
| Ohio | 0 | 1 | 0 |
| Texas | 0 | 0 | 3 |
| Totals | 0 | 3 | 8 |

<u>Current Franchisees</u>

Exhibit G contains the names of all current franchisees (as of the end of our last fiscal year) and the address and telephone number of each of their outlets.

<u>Former Franchisees</u>

Exhibit G contains the name, city and state, and current business telephone number, or if unknown, the last known home telephone number of every franchisee who had an outlet terminated, canceled, not renewed, or otherwise voluntarily or involuntarily ceased to do business under the franchise agreement during the most recently completed fiscal year or who have not communicated with us within 10 weeks of the disclosure document issuance date.

If you buy this franchise, your contact information may be disclosed to other buyers when you leave the franchise system.

Franchise Agreement

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

<u>Confidentiality Clauses</u>

In the last three fiscal years, no franchisees have signed any contract, order, or settlement provision that directly or indirectly restricts a current or former franchisee from discussing his or her personal experience as a franchisee in our system with any prospective franchisee.

<u>Franchisee Organizations</u>

There are no trademark-specific franchisee organizations associated with our franchise system.

## Item 21
## FINANCIAL STATEMENTS

**We have not been franchising for three years or more, and therefore cannot include all financial statements required by the Franchise Rule of the Federal Trade Commission.** Exhibit E contains our unaudited opening balance sheet dated as of August 11, 2023. Our fiscal year end is December 31.

## Item 22
## CONTRACTS

Copies of all proposed agreements regarding this franchise offering are attached as the following Exhibits:

B.    Franchise Agreement (with Exhibits)
C.    Multi-Territory Development Agreement
D.    Form of General Release
I.    State Addenda to Agreements

## Item 23
## RECEIPTS

Detachable documents acknowledging your receipt of this disclosure document are attached as the last two pages of this disclosure document.

FDD 2023                                                                 Franchise Agreement

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

# EXHIBIT A

## STATE ADMINISTRATORS AND AGENTS FOR SERVICE OF PROCESS

We may register this Disclosure Document in some or all of the following states in accordance with the applicable state law. If and when we pursue franchise registration, or otherwise comply with the franchise investment laws, in these states, the following are the state administrators responsible for the review, registration, and oversight of franchises in each state and the state offices or officials that we will designate as our agents for service of process in those states:

| State | State Administrator | Agent for Service of Process (if different from State Administrator) |
|---|---|---|
| California | Commissioner of Business Oversight<br>Department of Business Oversight<br>1515 K Street<br>Suite 200<br>Sacramento, CA 95814-4052<br>866-275-2677 | |
| Hawaii | Department of Commerce and Consumer Affairs<br>Business Registration Division<br>Commissioner of Securities<br>P.O. Box 40<br>Honolulu, HI 96810<br>(808) 586-2722 | Commissioner of Securities<br>Department of Commerce and Consumer Affairs<br>Business Registration Division<br>Securities Compliance Branch<br>335 Merchant Street, Room 203<br>Honolulu, HI 96813 |
| Illinois | Franchise Bureau<br>Office of Attorney General<br>500 South Second Street<br>Springfield, IL 62706<br>(217) 782-4465 | |
| Indiana | Franchise Section<br>Indiana Securities Division<br>Secretary of State<br>Room E-111<br>302 W. Washington Street<br>Indianapolis, IN 46204<br>(317) 232-6681 | |
| Maryland | Office of the Attorney General<br>Division of Securities<br>200 St. Paul Place<br>Baltimore, MD 21202-2020<br>(410) 576-6360 | Maryland Commissioner of Securities<br>200 St. Paul Place<br>Baltimore, MD 21202-2020 |

FDD 2023

Franchise Agreement

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

| State | State Administrator | Agent for Service of Process (if different from State Administrator) |
|---|---|---|
| Michigan | Michigan Attorney General's Office<br>Consumer Protection Division<br>Attn: Franchise Section<br>525 W. Ottawa Street<br>Williams Building, 1st Floor<br>Lansing, MI 48933<br>(517) 373-7117 | |
| Minnesota | Minnesota Department of Commerce<br>Securities-Franchise Registration<br>85 7th Place East, Suite 280<br>St. Paul, MN 55101-2198<br>(651) 539-1500 | Commissioner of Commerce<br>Minnesota Department of Commerce<br>85 7th Place East, Suite 280<br>St. Paul, MN 55101-2198<br>(651) 539-1500 |
| New York | New York State Department of Law<br>Investor Protection Bureau<br>28 Liberty St. 21st Floor<br>New York, NY 10005<br>212-416-8236 | Secretary of State<br>99 Washington Avenue<br>Albany, NY 12231 |
| North Dakota | North Dakota Securities Department<br>600 East Boulevard Ave., State Capital<br>Fifth Floor, Dept. 414<br>Bismarck, ND 58505-0510<br>(701) 328-4712 | |
| Oregon | Department of Consumer & Business<br>Services<br>Division of Finance and Corporate<br>Securities<br>Labor and Industries Building<br>Salem, Oregon 97310<br>(503) 378-4140 | |
| Rhode Island | Department of Business Regulation<br>Securities Division<br>1511 Pontiac Avenue<br>John O. Pastore Complex–69-1<br>Cranston, RI 02920-4407<br>(401) 462-9527 | |
| South Dakota | Division of Insurance<br>Securities Regulation<br>124 South Euclid Suite 104<br>Pierre, SD 57501-3185<br>(605) 773-3563 | |

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

| State | State Administrator | Agent for Service of Process (if different from State Administrator) |
|---|---|---|
| Virginia | State Corporation Commission<br>1300 East Main Street<br>9th Floor<br>Richmond, VA 23219<br>(804) 371-9051 | Clerk of the State Corporation Commission<br>1300 East Main Street, 1st Floor<br>Richmond, VA 23219 |
| Washington | Department of Financial Institutions<br>Securities Division<br>P.O. Box 9033<br>Olympia, WA 98507<br>(360) 902-8760 | Department of Financial Institutions<br>Securities Division<br>150 Israel Rd SW<br>Tumwater, WA 98501<br>(360) 902-8760 |
| Wisconsin | Division of Securities<br>Department of Financial Institutions<br>Post Office Box 1768<br>Madison, WI 53701<br>(608) 266-2801 | Securities and Franchise Registration<br>Wisconsin Securities Commission<br>201 West Washington Avenue, Suite 300<br>Madison, WI 53703 |

Franchise Agreement

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

# EXHIBIT B TO DISCLOSURE DOCUMENT

# FRANCHISE AGREEMENT

Franchise Agreement

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

# FRANCHISE AGREEMENT

| SUMMARY PAGE | |
|---|---|
| 1. **Franchisee** | Chin Music Partners, LLC |
| 2. **Initial Franchise Fee** | $50,000.00 |
| 3. **Development Area** | Huntsville, Alabama |
| 4. **Training Facility Location** | TBD in Huntsville, Alabama |
| 5. **Territory** | Huntsville, Alabama |
| 6. **Opening Deadline** | August 1, 2024 |
| 7. **Principal Executive** | Jack Dunn, Ken Clayton, Matt Capps |
| 8. **Franchisee's Address** | 12136 Walnut Terrace Alpharetta, GA 30004 |

FDD 2023                                                                                                    Franchise Agreement

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

## FRANCHISE AGREEMENT

This Agreement is made between GradumGswing Franchising, LLC, a Florida Limited Liability Company ("Franchisor"), and Franchisee effective as of the ____27th____ day ____March____, 20_24_ (the "<u>Effective Date</u>").

### Background Statement:

A.     Franchisor has created and owns a system (the "<u>System</u>") for developing and operating a Gradum Gswing .

B.     The System includes (1) methods, procedures, and standards for developing and operating Gradum Gswing business, (2) plans, specifications, equipment, signage and trade dress for Gradum Gswing businesses, (3) particular products and services, (4) the Marks, (5) training programs, (6) business knowledge, (7) marketing plans and concepts, and (8) other mandatory and recommended methods of operation as determined by Franchisor from time to time.

C.     The parties desire that Franchisor license the Marks and the System to Franchisee for Franchisee to develop and operate one Gradum Gswing Training Facility on the terms and conditions of this Agreement.

### DEFINITIONS

"**Action**" means any action, suit, proceeding, claim, demand, governmental investigation, governmental inquiry, judgment or appeal thereof, whether formal or informal.

"**Approved Vendor**" means a supplier, vendor, or distributor of goods or services which has been approved by Franchisor.

"**Business**" means the business owned by Franchisee and operated under this Agreement, including without limitation the Training Facility .

"**Competitor**" means any business which engages in, owns, is affiliated with or operates a business featuring private baseball/softball hitting/swing instruction.

"**Confidential Information**" means all non-public information of or about the System and any Gradum Gswing business, including all methods for developing and operating the business, and all non-public plans, data, financial information, processes, vendor pricing, supply systems, marketing systems, formulas, techniques, designs, layouts, operating procedures, customer data, information and know-how.

"**Gross Sales**" means the total dollar amount of all sales generated through the Training Facility for a given period, including, but not limited to, payment for any services or products sold by Franchisee, whether for cash or credit. Gross Sales does not include (i) bona fide refunds to customers, (ii) sales taxes collected by Franchisee, (iii) sales of used equipment not in the ordinary course of business, or (iv) sales of prepaid cards or similar products (but the redemption of any such card or product will be included in Gross Sales).

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

"**Location**" means the location stated on the Summary Page. If no location is stated on the Summary Page, then the Location will be determined in accordance with Section 6.1 of this Agreement.

"**Losses**" includes (but is not limited to) all losses; damages; fines; charges; expenses; lost profits; reasonable attorneys' fees; travel expenses, expert witness fees; court costs; settlement amounts; judgments; loss of Franchisor's reputation and goodwill; costs of or resulting from delays; financing; costs of advertising material and media time/space and the costs of changing, substituting or replacing the same; and any and all expenses of recall, refunds, compensation, public notices and other such amounts incurred in connection with the matters described.

"**Manual**" means Franchisor's confidential Brand Standards Manual(s), including any supplements, additions, or revisions from time to time, which may be in any form or media.

" **Brand Development Fund**" means the fund established (or which may be established) by Franchisor into which Brand Development Fund Contributions are deposited.

"**Marks**" means the trade name and logo contained on the Summary Page, and all other trade names, trademarks, service marks and logos specified by Franchisor from time to time for use to identify or in connection with Franchisor's business or associated with Franchisor or its affiliates.

"**Owner**" means each person or entity which directly or indirectly owns or controls any equity of Franchisee. If Franchisee is an individual person, then "Owner" means Franchisee.

"**Remodel**" means a refurbishment, renovation, and remodeling of the Location to conform to the building design, exterior facade, trade dress, signage, fixtures, furnishings, equipment, decor, color schemes, presentation of the Marks, and other System Standards in a manner consistent with the image then in effect for a new Gradum Gswing Training Facility .

"**Required Vendor**" means a supplier, vendor, or distributor of products or services which Franchisor requires franchisees to use.

"**System Standards**" means, as of any given time, the then-current mandatory procedures, requirements, and/or standards of the System as determined by, which may include without limitation, any procedures, requirements and/or standards for appearance, business metrics, cleanliness, customer service, design (such as construction, decoration, layout, furniture, fixtures and signs), equipment, inventory, marketing and public relations, operating days, operating hours, presentation of Marks, product and service offerings, quality of products and services (including any guaranty and warranty programs), reporting, safety, technology (such as computers, computer peripheral equipment, smartphones, point-of-sale systems, back-office systems, information management systems, security systems, video monitors, other software, backup and archiving systems, communications systems (including email, audio, and video systems), payment acceptance systems, and internet access, as well as upgrades, supplements, and modifications thereto), uniforms, and vehicles.

"**Territory**" means the territory stated on the Summary Page. If no territory is stated on the Summary Page, then the Territory is determined in accordance with Section 6.1 of this Agreement.

44

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

"**Training Facility** " means the training facility operated under this Agreement at the Location approved by Franchisor.

"**Transfer**" means for Franchisee (or any Owner) to voluntarily or involuntarily transfer, sell, or dispose of, in any single or series of transactions, (i) substantially all of the assets of the Business, (ii) this Agreement, (iii) any direct or indirect ownership interest in the Business, or (iv) control of the Business.

**GRANT OF LICENSE**

**2.1    Grant.** Franchisor grants to Franchisee the right to operate one Gradum Gswing only at the Location. If no Location is stated on the Summary Page when this Agreement is signed, then the parties will determine the Location in accordance with Section 6.1 of this Agreement. Franchisee shall develop, open and operate a Gradum Gswing Training Facility at the Location for the entire term of this Agreement and any renewals thereof.

**2.2    Protected Territory.** During the term of this Agreement and any renewals thereof, Franchisor agrees not to itself establish, or license or franchise the establishment of, another training facility within the Territory selling the same or similar goods or services under the same trademarks or service marks as a Gradum Gswing training facility. Franchisor retains the right to:

(i)     establish and license others to establish and operate Gradum Gswing training facilities and businesses outside the Territory, notwithstanding their proximity to the Territory or their impact on the Training Facility;

(ii)    operate and license others to operate businesses anywhere that do not operate under Gradum Gswing Marks; and

(iii)   sell and license others to sell products and services in the Territory through channels of distribution (including the internet) other than Gradum Gswing training facilities.

Franchisee acknowledges that in order to maintain the protected exclusive territory, Franchisee must generate at least $350,000 in gross sales each year after your first year of operating the franchise. If Franchisee fails to achieve that minimum sales requirement, Franchisor may, at our option, reduce or eliminate Franchisee's territory or terminate the franchise agreement.

**2.3    Franchisee Control.** Franchisee represents that Exhibit 1 to this Agreement (i) identifies each owner, officer and director of Franchisee, and (ii) describes the nature and extent of each owner's interest in Franchisee. If any information on Exhibit 1 changes that does not constitute a Transfer, Franchisee shall notify Franchisor within ten (10) days of such change.

**2.4    Principal Executive.** Franchisee agrees that the person designated as the "Principal Executive" on the Summary Page is the executive primarily responsible for the Business and has decision-making authority on behalf of Franchisee. The Principal Executive is not required to serve as a day-to-day general manager of the Business, but the Principal Executive must devote substantial time and attention to the Business. If the Principal Executive dies, becomes incapacitated, transfers his/her interest in Franchisee, or otherwise ceases to be the executive

45

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

primarily responsible for the Business, Franchisee shall promptly designate a new Principal Executive, subject to Franchisor's approval.

**2.5    Guaranty.** If Franchisee is an entity, then Franchisee shall have each Owner sign a personal guaranty of Franchisee's obligations to Franchisor, in the form of Exhibit 3 to this Agreement.

**2.6    No Conflict.** Franchisee represents to Franchisor that Franchisee and each of its Owners (i) are not violating any agreement (including any confidentiality or non-competition covenant) by entering into or performing under this Agreement, (ii) are not a direct or indirect owner of any Competitor, and (iii) are not listed or "blocked" in connection with, and are not in violation under, any anti-terrorism law, regulation, or executive order.

**TERM**

**3.1    Term.** This Agreement commences on the Effective Date and continues for ten (10) years.

**3.2    Successor Agreement.** When the Initial Term of this Agreement expires, Franchisee may enter into two successor franchise agreements for additional periods of five (5) years each (the "Renewal Term"), subject to the following conditions prior to the expiration of the Initial Term and each Renewal Term:

(i)    Franchisee notifies Franchisor of the election to renew between ninety (90) and one hundred eighty (180) days prior to the end of the Initial Term and each Renewal Term;

(ii)    Franchisee (and its affiliates) are in compliance with this Agreement and all other agreements with Franchisor and any of its affiliates at the time of election and at the time of renewal;

(iii)    Within a period of time acceptable to Franchisor, Franchisee has made or makes renovations and changes to the Location as Franchisor requires, including without limitation a Remodel, to conform to Franchisor's then-current System Standards;

(iv)    Franchisee and its Owners execute Franchisor's then-current form of franchise agreement and related documents, which may be materially different than this Agreement including, without limitation, higher and different fees, provided however that Franchisee will not pay another initial franchise fee;

(v)    Franchisee and each Owner executes a general release of any and all claims against Franchisor, its affiliates, and their respective owners, officers, directors, agents and employees.

**4.1    Initial Franchise Fee.** Upon signing this Agreement, Franchisee shall pay an initial franchise fee in the amount stated on the Summary Page. This initial franchise fee is not refundable.

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

**4.2    Site Selection and Lease Negotiation Fee.** Contemporaneously with the signing of this Agreement, Franchisee may pay Franchisor a Site Selection and Lease Negotiation fee in the amount of Three Thousand Dollars ($3,250).

**4.3    Construction Fee**. Upon approval of a site by Franchisor, Franchisee may pay Franchisor a fee for construction consulting assistance in the amount of Five Thousand Dollars ($3,250),

**4.4    Royalty Fee.** Franchisee shall pay Franchisor each month a royalty fee (the "Royalty Fee") equal to eight percent (8%) of Gross Sales. The Royalty Fee for any month shall be paid in the immediately following month by the day designated by Franchisor in the Manual or otherwise in writing.

**4.5    Brand Development Fund Contributions.**

  (a)    Brand Development  Fund Contribution. Franchisee shall pay Franchisor a contribution to the  Brand Development Fund (the " Brand Development Fund Contribution") equal to two percent (2%) of Franchisee's Gross Sales for any Brand Development Fund that is in effect at the same time as the Royalty Fee is paid.

  (b)    Market Cooperative Contribution. If the Business participates in a Market Cooperative, then Franchisee shall contribute to the Market Cooperative a percentage of Gross Sales as determined by majority vote of the Market Cooperative.

**4.6    Replacement / Additional Training Fee.** If Franchisee sends an employee to Franchisor's training program after opening, Franchisor may charge its then-current training fee, if any. Franchisee shall be responsible for any of its travel, food and lodging expenses.

**4.7    Non-Compliance Fee.** Franchisor may charge Franchisee One Thousand Five Hundred Dollars ($1,500) for any instance of non-compliance with the System Standards or this Agreement (other than Franchisee's non-payment of a fee owed to Franchisor) which Franchisee fails to cure after thirty (30) days' notice. Franchisor may also charge Franchise for its costs incurred if in the exercise of its discretion it determines that travel to Franchisee's location is appropriate. This fee is a reasonable estimate of Franchisor's internal cost of personnel time attributable to addressing the non-compliance, and it is not a penalty or estimate of all damages arising from Franchisee's breach. The non-compliance fee is in addition to all of Franchisor's other rights and remedies (including default and termination under Section 14.2 of this Agreement).

**4.8    Curing Non-Compliance.** Franchisor may in its sole discretion  cure any instance of non-compliance by Franchisee with a requirement of this Agreement and Franchisee shall pay Franchisor's cost incurred in curing the non-compliance and an administrative fee of ten percent (10%) of such costs.

**4.9    Special Inspection Fee.** Franchisor may charge its reasonable out -of-pocket expenses incurred  if Franchisor inspects the Location because of a government report, customer complaint or other customer feedback, or your default or non-compliance with any system specification.

**4.10    Reimbursement.** Franchisor may, but has no obligation to, pay on Franchisee's behalf any amount that Franchisee owes to a supplier or other third party. If Franchisor does so or intends to

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

do so, Franchisee shall pay the amount paid by Franchisor plus a ten percent (10%) administrative charge to Franchisor within fifteen (15) days after invoice by Franchisor accompanied by reasonable documentation.

**4.11    Payment for Products , Supplies and other items supplied by Franchisor**. Franchisee shall pay Franchisor or its affiliate for any products, supplies or other items supplied to Franchisee, according to the terms and conditions of the invoices for same.

**4.12    Method of Payment and Reporting.**

(a)    <u>Method of Payment</u>. Franchisee shall pay the Royalty Fee, Brand Development Fund Contribution, and any other amounts owed to Franchisor by pre-authorized bank draft, wire or ACH or in such other manner as Franchisor may require. Franchisee shall comply with Franchisor's payment instructions. If Franchisor elects to have payments made by pre-authorized bank draft, Franchisee shall execute the authorization attached to this Agreement as Exhibit 4.

(b)    <u>Calculation of Fees</u>. Each week, on a day designated by Franchisor, Franchisee shall report to Franchisor, its Gross Sales from the previous week. If Franchisee fails to report weekly Gross Sales, then Franchisor may withdraw estimated Royalty Fees and Brand Development Fund Contributions equal to One Hundred twenty-Five percent (125%) of the last Gross Sales reported to Franchisor. The parties will true-up the actual fees after Franchisee reports Gross Sales. Franchisee acknowledges that Franchisor has the right to remotely access Franchisee's point-of-sale system to calculate Gross Sales.

(c)    <u>Late Fees and Interest</u>. If Franchisee does not make a payment by the due date, Franchisee shall pay a late fee of One Hundred Dollar ($100) plus interest on the unpaid amount at a rate equal to eighteen percent (18%) per year (or, if such payment exceeds the maximum allowed by law, then interest at the highest rate allowed by law).

(d)    <u>Insufficient Funds</u>. Franchisor may charge Thirty Dollars ($30) for any payment returned for insufficient funds (or, if such amount exceeds the maximum allowed by law, then the fee allowed by law).

(e)    <u>Costs of Collection</u>. Franchisee shall repay any costs incurred by Franchisor (including reasonable attorney fees) in attempting to collect payments owed by Franchisee.

(f)    <u>Application</u>. Franchisor may apply any payment received from Franchisee to any obligation and in any order as Franchisor may reasonably determine, regardless of any designation by Franchisee.

(g)    <u>Obligations Independent; No Set-Off.</u> The obligations of Franchisee to pay to Franchisor any fees or amounts described in this Agreement are independent covenants by Franchisee. Franchisee shall make all such payments without offset or deduction.

**FRANCHISOR'S ASSISTANCE**

**5.1    Pre-Opening Assistance**

48

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

Franchisor agrees to the provide the following assistance to Franchise before Franchise commences operation of the Business:

(a)     Location. Franchisor shall provide Franchisee with its criteria for Gradum Gswing locations and review information provided by Franchisee regarding proposed location(s) for the Business and approve or disapprove the Location in accordance with Section 6.1 of this Agreement; provided however, that Franchisee acknowledges that Franchisor's approval of a location is not any way to be construed as guaranty of the performance of the Business at that location; Franchisor may provide site selection and lease negotiation assistance to Franchisee.

(b)     Territory. Franchisor shall designate a Territory for the franchise in accordance with Section 6.1 of this Agreement.

(c)     Pre-Opening Plans, Specifications, and Vendors Provide Franchisee with a plan for the Franchisee's location with (i) Franchisor's sample set of standard plans or specifications for a recommended field and office plans; (ii) the applicable System Standards, (iii) other specifications as Franchisor deems appropriate, including without limitation specifications regarding inventory, equipment, computer system , any required vehicles for use in the Business, supplies and materials, and (iv) Franchisor's lists of Approved Vendors and/or Required Vendors. Franchisor may provide location construction consulting assistance to Franchisee.

(d)     Certain Other Specifications. Make available to Franchisee, Franchisor's specifications and approved suppliers for signs, fixtures, equipment, inventory, computer system, and supplies;

(e)     Employees. Provide Franchisee with suggested staffing and operational instructions in the Manual or otherwise in writing for training Franchisee's employees; provided however that Franchisee acknowledges that all hiring decisions, terms and conditions of employment and training of Franchisees employees, remain the sole responsibility of Franchise.

(f)     Manual. Provide Franchisee with access to, or a copy of, Franchisor's Manual;

(g)     Training. Make available an initial training program for Franchisee's Principal Executive or owner at Franchisor's headquarters and/or at another location designated by Franchisor at no fee for this training; provided however, that Franchisee is responsible for its own travel, lodging, meal, and other out-of-pocket expenses.

(h)     Business Plan. Upon Franchisee's reasonable request, review and provide advice regarding Franchisee's business plan and any financial projections; provided however, that franchise acknowledges that Franchisor bears no responsibility for the performance of the Business and that the performance of the Franchisee will depend on many factors beyond Franchisor's control including without limitation Franchisee's business acumen;

(i)     Market Introduction Plan. Advise Franchisee regarding the planning and execution of Franchisee's market introduction plan, including without limitation any grand opening of the Business;

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

   (j) <u>On-site Opening Assistance</u>. Send at least one representative to Franchisee's location to assist with Franchisee's opening of the Business.

**5.2 Post-Opening Assistance.**

   Franchisor agrees to the provide the following assistance to Franchise  after Franchise commences operation of the Business:

   (a) <u>Advice, Consulting, and Support</u>. If Franchisee requests, Franchisor will provide advice to Franchisee regarding improving and developing Franchisee's business, and resolving operating problems Franchisee encounters, to the extent Franchisor deems reasonable. If Franchisor provides in-person support in response to Franchisee's request, Franchisor may charge its then-current fee for such support plus any out-of-pocket expenses such as travel, lodging, and meals for employees providing onsite support;

   (b) <u>Procedures</u>. Franchisor will provide Franchisee with Franchisor's recommended administrative, bookkeeping, accounting, and inventory control procedures. Franchisor may make any such procedures part of required System Standards;

   (c) <u>Brand Development Fund</u>. Franchisor shall manage the Brand Development Fund;

   (d) <u>Internet</u>. Franchisor may maintain a website for the Gradum Gswing brand, which will include Franchisee's location or territory and telephone number.

**LOCATION, DEVELOPMENT, AND OPENING**

**6.1 Determining Location and Territory.** If the Location and Territory are not stated on the Summary Page:

   (i) Franchisee shall find a potential Location within the Development Area described on the Summary Page. Franchisee shall submit its proposed Location to Franchisor for acceptance, with all related information Franchisor may request. Franchisor may assist Franchisee in site selection. If Franchisor does not accept the proposed Location in writing within thirty (30) days, then the site will be deemed rejected.

   (ii) When Franchisor accepts the Location, it may provide assistance to Franchisee with the terms and conditions of any lease. Franchisee shall have paid the Site Selection and Lease Negotiation Fee specified in Section 4.2 of this Agreement if such assistance it to be provided. Upon completion of the process, Franchisor will issue a Location Acceptance Letter in the form of Exhibit 2 to this Agreement which will set forth the Location and Territory. Franchisor shall determine and assign Franchisee the Territory in its good faith discretion.

   (iii) Franchisor's advice regarding a site or the acceptance of a site and assistance with the lease negotiation is not a representation or warranty that the Business will be successful, and Franchisor shall not be liable to Franchisee with respect to the location of the Training Facility .

**6.2 Lease.** For any lease between Franchisee and the landlord of the Location, Franchisee shall:

50

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

(i) upon Franchisor's request, submit the proposed lease to Franchisor for written approval,

(ii) have the term of the lease provide for a period of not less than the Initial Term of this Agreement or any Renewal Term, and,

(iii) use commercially reasonable efforts to obtain the landlord's signature to the conditional assignment of the lease substantially in the form required by Franchisor as shown on Exhibit 5 to this Agreement.

**6.3     Development.** Franchisee shall construct (or remodel) and finish the Location in conformity with Franchisor's System Standards. If required by Franchisor, Franchisee shall engage the services of an architect licensed in the jurisdiction of the Location. Franchisee shall not begin any construction or remodeling work without first obtaining Franchisor's approval of Franchisee's plans. Franchisor may provide assistance to Franchisee with the construction consulting assistance. Franchisee shall have paid the construction assistance fee specified in Section   4.3  of this Agreement if such assistance it to be provided. Franchisor may, but is not required to, inspect Franchisee's construction or remodeling progress at any reasonable time. Franchisee shall not rely upon any information provided or opinions expressed by Franchisor or its representatives regarding any architectural, engineering, or legal matters (including without limitation the Americans With Disabilities Act) in the development and construction of the Training Facility and Franchisor shall not have any liability with respect thereto. Franchisor's inspection and/or approval to open the Training Facility  is not a representation or a warranty that the Training Facility  has been constructed in accordance with any architectural, engineering, or legal standards.

**6.4     New Franchisee Training.** Franchisee's Principal Executive must complete Franchisor's training program for new franchisees to Franchisor's satisfaction by the time designated by Franchisor before opening the Training Facility .

**6.5     Conditions to Opening.** Franchisee shall notify Franchisor at least  twenty (20) days before Franchisee intends to open the Training Facility  to the public. Before opening, Franchisee must satisfy all of the following conditions:

(i) Franchisee is in compliance with this Agreement,

(ii) Franchisee has obtained all applicable governmental permits and authorizations,

(iii) the Business and Training Facility  conform to all applicable System Standards,

(iv) Franchisor has inspected and approved the Training Facility ,

(v) Franchisee's officers and employees have completed all of Franchisor's required pre-opening training; and

(vi) Franchisor has given its written approval to open, which approval will not be unreasonably withheld or delayed.

**6.6     Opening Date.** Franchisee shall open the Training Facility  to the public on or before the date stated on the Summary Page.

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

## OPERATIONS

**7.1    Compliance with Manual and System Standards**. Franchisee shall at all times and at its own expense comply with all mandatory obligations contained in the Manual and with all System Standards.

**7.2    Compliance with Law.** Franchisee and the Business shall comply with all laws and regulations. Franchisee and the Training Facility shall obtain and keep in force all governmental permits and licenses required for the Training Facility .

**7.3    Products, Services, and Methods of Sale.** Franchisee shall offer all products and services, and only those products and services, as from time to time prescribed by Franchisor in the Manual or otherwise in writing, including without limitation products supplied by Franchisor or its affiliate or designated supplier. Franchisee shall make sales only to retail customers, and only at the Location. Unless otherwise approved or required by Franchisor, Franchisee shall not, without Franchisor's written approval, make sales by any other means, including without limitation by wholesale, by delivery, by mail order or over the internet, or at temporary or satellite locations.

**7.4    Prices.** Franchisee shall generally determine its own prices; provided however, that, to the extent permitted by applicable law, Franchisee shall honor any customer loyalty programs and promotions implemented by Franchisor and any maximum prices and minimum discounts for any given product or service established by Franchisor.

**7.5    Personnel.**

(a)    <u>Management</u>. Franchisee's Training Facility  must at all times be under the on-site supervision of the Principal Executive or a general manager who has completed Franchisor's training program.

(b)    <u>Service</u>. Franchisee shall cause its personnel to render competent and courteous service to all customers and members of the public.

(c)    <u>Appearance</u>. Franchisee shall cause its personnel to comply with any dress attire, uniform, personal appearance and hygiene standards set forth in the Manual.

(d)    <u>Qualifications</u>. Franchisor may set minimum qualifications for categories of employees employed by Franchisee.

(e)    <u>Sole Responsibility</u>. Franchisee is solely responsible for the terms and conditions of employment of all of its personnel, including recruiting, hiring, training, scheduling, supervising, compensation, and termination. Franchisee is solely responsible for all actions of its personnel. Franchisee and Franchisor are not joint employers, and no employee of Franchisee will be deemed to be an agent or employee of Franchisor. Within seven days of Franchisor's request, Franchisee and each of its employees will sign an acknowledgment form stating that only Franchisee, and not Franchisor, is the employee's sole employer. Franchisee will use its legal name on all documents with its employees and independent contractors, including, but not limited to, employment applications, timecards, pay checks, and employment and independent contractor agreements, and Franchisee will not use the Marks on any of these documents.

Franchise Agreement

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

**7.6    Post-Opening Training.** Franchisor may at any time require that the Principal Executive and/or any other employees to complete training programs, in any format and in any location determined by Franchisor. Franchisor may charge a reasonable fee for any training programs. Franchisor may require Franchisee to provide training programs to its employees. If a training program is held at a location which requires travel by the Principal Executive or any other employee, then Franchisee shall pay all related travel, living and other expenses.

**7.7    Software.** Without limiting the generality of Section 7.1 or Section 8.1 of this Agreement, Franchisee shall acquire and use all software and related systems required by Franchisor. Franchisee shall enter into any subscription and support agreements that Franchisor may require. Franchisee shall upgrade, update, or replace any software from time to time as Franchisor may require. Franchisee shall protect the confidentiality and security of all software systems, and Franchisee shall abide by any System Standards related thereto. Franchisee shall give Franchisor unlimited access to Franchisee's point of sale system and other software systems used in the Business, by any means designated by Franchisor.

**7.8    Customer Complaints.** Franchisee shall use its best efforts to promptly resolve any customer complaints. Franchisor may take any action it deems appropriate to resolve a customer complaint regarding the Business, and Franchisor may require Franchisee to reimburse Franchisor for any expenses incurred thereby.

**7.9    Evaluation and Compliance Programs.** Franchisee shall participate at its own expense in programs required from time to time by Franchisor for obtaining customer evaluations, reviewing Franchisee's compliance with the System, and/or managing customer complaints, including without limitation a customer feedback system, customer survey programs, and mystery shopping. Franchisor shall share with Franchisee the results of these programs, as they pertain to the Business. Franchisee must meet or exceed any minimum score requirements set by Franchisor for such programs. Franchisor may set minimum scores that Franchisee must receive from the public on social media and internet review sites such as Yelp or Google.

**7.10    Payment Systems.** Franchisee shall accept payment from customers in any form or manner designated by Franchisor (which may include, for example, cash, specific credit and/or debit cards, gift cards, electronic fund transfer systems, and mobile payment systems). Franchisee shall purchase or lease all equipment and enter into all business relationships necessary to accept payments as required by Franchisor. Franchisee must at all times comply with payment card industry data security standards (PCI-DSS).

**7.11    Gift Cards, Loyalty Programs, and Incentive Programs.** At its own expense, Franchisee shall sell or otherwise issue gift cards, certificates, or other pre-paid systems, and participate in any customer loyalty programs, membership/subscription programs, or customer incentive programs, designated by Franchisor, in the manner specified by Franchisor in the Manual or otherwise in writing. Franchisee shall honor all valid gift cards and other pre-paid systems, regardless of whether issued by Franchisee or another Gradum Gswing business. Franchisee shall comply with all procedures and specifications of Franchisor related to gift cards, certificates, and other pre-paid systems, or related to customer loyalty, membership/subscription, or customer incentive programs.

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

**7.12    Maintenance and Repair.** Franchisee shall at all times keep the Training Facility  in a neat and clean condition, perform all appropriate maintenance, and keep all physical property in good repair. In addition, Franchisee shall promptly perform all work on the physical property of the Training Facility  as Franchisor may prescribe from time to time, including but not limited to periodic interior and exterior painting; resurfacing of the parking lot; roof repairs; and replacement of obsolete or worn-out signage, floor coverings, furnishings, equipment and décor. Franchisee acknowledges that the System Standards may include requirements for cleaning, maintenance, and repair.

**7.13    Remodeling.** In addition to Franchisee's obligations to comply with all System Standards in effect from time to time, Franchisor may require Franchisee to undertake and complete a Remodel of the Location to Franchisor's satisfaction. Franchisee must complete the Remodel in the time frame specified by Franchisor. Franchisor may require the Franchisee to submit plans for Franchisor's reasonable approval prior to commencing a required Remodel. Franchisor's right to require a Remodel is limited as follows: (i) the Remodel will not be required in the first two or last two years of the term, except that a Remodel may be required as a condition to renewal of the term or a Transfer, and (ii) a Remodel will not be required more than once every five years from the date on which Franchisee was required to complete the prior Remodel.

**7.14    Meetings.** The Principal Executive shall use reasonable efforts to attend all in-person meetings and remote meetings (such as telephone conference calls) that Franchisor requires, including any national or regional brand conventions.

**7.15    Insurance.**

(a)    Franchisee shall obtain and maintain insurance policies in the types and amounts as specified by Franchisor in the Manual. If not specified in the Manual, Franchisee shall maintain at least the following insurance coverage:

(i)    "Special" causes of loss coverage forms, including fire and extended coverage, crime, on all property of the Training Facility, for full repair and replacement value subject to a reasonable deductible;

(ii)    Commercial General Liability insurance, including products liability coverage, and broad form commercial liability coverage, written on an "occurrence" policy form in an amount of not less than $1,000,000 single limit per occurrence and $2,000,000 aggregate limit with extended coverage, child endangerment and molestation, from a company rated A+ or better by A.M. Best or equivalent, providing protection which is standard or greater in the hitting, baseball, fitness and health club industry;

(iii)    Umbrella liability insurance in excess of and not more restrictive than the underlying coverage listed above, with limits of not less than $1,000,000 per occurrence/$2,000,000 aggregate; and

(iv)    Workers Compensation coverage as required by the laws of the state where the Training Facility  is located.

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

(b)    Except for workers compensation insurance, Franchisee's policies shall (1) list Franchisor and its affiliates as an additional insured, (2) include a waiver of subrogation in favor of Franchisor and its affiliates, (3) be primary and non-contributing with any insurance carried by Franchisor or its affiliates, and (4) stipulate that Franchisor shall receive thirty (30) days' prior written notice of cancellation.

(c)    Franchisee shall provide Certificates of Insurance evidencing the required coverage to Franchisor prior to opening and upon annual renewal of the insurance coverage, as well as at any time upon request of Franchisor.

**7.16    Payments to Third Parties.** Franchisee shall pay all vendors and suppliers in a timely manner. Franchisee shall pay all taxes when due. If Franchisee borrows money, it shall comply with the terms of its loan and make all loan payments when due. If Franchisee leases the Location, Franchisee shall comply with its lease for the Location and make all rent payments when due.

**7.17    Public Relations.** Without Franchisor's prior written approval, which will not be unreasonably withheld, Franchisee shall not make any public statements, including without limitation interviews or issuing press releases, regarding Franchisor, the Training Facility or Business, or any particular incident or occurrence related to the Training Facility or Business.

**7.18    Association with Causes.** Franchisee shall not in the name of the Business (i) donate money, products, or services to any charitable, political, religious, or other organization, or (ii) act in support of any such organization, without Franchisor's prior written approval, which will not be unreasonably withheld.

**7.19    No Other Activity Associated with the Business.** Franchisee shall not engage in any business or other activity at the Location other than operation of the Gradum Gswing Training Facility . Franchisee shall not use assets of the Training Facility for any purpose other than the Training Facility . If Franchisee is an entity, the entity shall not own or operate any other business except the Gradum Gswing businesses.

**7.20    No Third-Party Management.** Franchisee shall not engage a third-party management company to manage or operate the Training Facility without the prior written approval of Franchisor, which will not be unreasonably withheld.

**7.21    Identification.** Franchisee must identify itself as the independent owner of the Business in the manner prescribed by Franchisor. Franchisee must display at the Training Facility signage prescribed by Franchisor identifying the Location as an independently owned franchise.

**7.22    Business Practices.** Franchisee, in all interactions with customers, employees, vendors, governmental authorities, and other third parties, shall be honest and fair. Franchisee shall comply with any code of ethics or statement of values from Franchisor. Franchisee shall not take any action which may injure the goodwill associated with the Marks.

## SUPPLIERS AND VENDORS

**8.1    Generally.** Franchisee shall acquire all products and services required by Franchisor from time to time in accordance with System Standards. Franchisor may require Franchisee to purchase

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

or lease any products from Franchisor's designee, Required Vendors, Approved Vendors, and under Franchisor's specifications. Franchisor may periodically change any such requirement or change the status of any vendor. Any such requirement or change by Franchisor shall be made effective by insertion into the Manual, System Standards or otherwise by written notice to Franchisee.

**8.2    Alternate Vendor Approval.** If Franchisor requires Franchisee to purchase a particular product or service only from an Approved Vendor or Required Vendor, and Franchisee desires to purchase the product or service from a different vendor, then Franchisee shall submit a written request to Franchisor for approval and any information, specifications and/or samples requested by Franchisor. Franchisor may condition its approval on such criteria as Franchisor deems appropriate, which may include evaluations of the vendor's capacity, quality, financial stability, reputation, and reliability; inspections; product testing, and performance reviews. Franchisor will provide Franchisee with written notice of the approval or disapproval of any proposed new vendor within thirty (30) days after receipt of Franchisee's request.

**8.3    Alternate Product or service Approval.** If Franchisor requires Franchisee to purchase a particular Product or service, and Franchisee desires to purchase an alternate Product or service, Franchisee must submit a written request for approval and any information, specifications and/or samples requested by Franchisor. Franchisor will provide Franchisee with written notification of the approval or disapproval of any proposed alternate Product or service within thirty (30) days after receipt of Franchisee's request.

**8.4    Purchasing.** Franchisor may negotiate prices and terms with vendors on behalf of the System. Franchisor may receive rebates, payments or other consideration from vendors in connection with purchases by franchisees. Franchisor has the right, but not the obligation, to collect payments from Franchisee on behalf of a vendor and remit the payments to the vendor and impose a reasonable markup or charge for administering the payment. Franchisor may implement a centralized purchasing system. Franchisor may establish a purchasing cooperative and require Franchisee to join and participate in the purchasing cooperative on such terms and conditions as Franchisor may determine.

**8.5    No Liability of Franchisor.** Franchisor shall not be liable to Franchisee for any claim or loss related to any product provided or service performed by any Approved Vendor or Required Vendor, including without limitation defects, delays, or unavailability of products or services.

**8.6    Product Recalls.** If Franchisor or any vendor, supplier, or manufacturer of an item used or sold in Franchisee's Training Facility issues a recall of such item or otherwise notifies Franchisee that such item is defective or dangerous, Franchisee shall immediately cease using or selling such item, and Franchisee shall at its own expense comply with all instructions from Franchisor or the vendor, supplier, or manufacturer of such item with respect to such item, including without limitation the recall, repair, or replacement of such item.

# MARKETING

**9.1    Approval and Implementation.** Franchisee shall not conduct any marketing, advertising, or public relations activities, including without limitation, marketing materials, websites, online

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

advertising, social media marketing or presence, and sponsorships, which have not been approved by Franchisor. Franchisor may, but is not obligated to, operate all "social media" accounts on behalf of the System, or it may permit franchisees to operate one or more accounts. Franchisee must comply with any System Standards regarding marketing, advertising, and public relations, include any social media policy that Franchisor may prescribe. Franchisee shall implement any social media and marketing plans, or campaigns as determined by Franchisor. If Franchisor permits Franchisee to operate its own social media accounts, Franchisee shall obtain Franchisor's prior approval for any and all social media postings or content relating or referring to the Training Facility or the Marks, or in any way associated with the Training Facility or the Marks.

**9.2     Use by Franchisor.** Franchisor may use any marketing materials or campaigns developed by or on behalf of Franchisee, and Franchisee hereby grants an unlimited, perpetual, royalty-free license to Franchisor for such purpose.

**9.3     Brand Development Fund.** Franchisor may establish a Brande Development Fund to promote the System on a local, regional, national, and/or international level. If Franchisor has established a Brand Development Fund, the following shall apply:

(a)     Separate Account. Franchisor shall hold the Brand Development Fund Contributions from all franchisees in one or more bank accounts separate from Franchisor's other accounts.

(b)     Use. Franchisor shall use the Brand Development Fund only for marketing, advertising, and public relations materials, programs and campaigns (including at local, regional, national, and/or international level), and related overhead. The foregoing includes such activities and expenses as Franchisor reasonably determines, and may include, without limitation: development and placement of advertising and promotions; sponsorships; contests and sweepstakes; development of décor, trade dress, Marks, and/or branding; development and maintenance of brand websites; social media; internet activities; e-commerce programs; search engine optimization; market research; public relations, media or agency costs; trade shows and other events; printing and mailing; and administrative and overhead expenses related to the Brand Development Fund (including the compensation of Franchisor's employees working on marketing and for accounting, bookkeeping, reporting, legal and other expenses related to the Brand Development Fund).

(c)     Discretion. Franchisee agrees that expenditures from the Brand Development Fund need not be proportionate to contributions made by Franchisee or provide any direct or indirect benefit to Franchisee. The Brand Development Fund will be spent at Franchisor's sole discretion, and Franchisor is not a fiduciary with respect to the Fund.

(d)     Contribution by Other Outlets. Franchisor is not obligated to (i) have all other Gradum Gswing training facilities (whether owned by other franchisees or by Franchisor or its affiliates) contribute to the Brand Development Fund, or (ii) have other Gradum Gswing training facilities contribute the same amount or at the same rate as Franchisee.

(e)     Surplus or Deficit. Franchisor may accumulate funds in the Brand Development Fund and carry the balance over to subsequent years. If the Brand Development Fund operates at

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

a deficit or requires additional funds at any time, Franchisor may loan such funds to the Fund on reasonable terms.

(f)    Financial Statement. Franchisor will prepare an unaudited annual financial statement of the Brand Development Fund within 120 days of the close Franchisor's fiscal year and will provide the financial statement to Franchisee upon request.

**9.4    Market Cooperatives.** Franchisor may establish market advertising and promotional cooperative funds ("Market Cooperative") in any geographical areas. If a Market Cooperative for the geographic area encompassing the Location has been established at the time Franchisee commences operations hereunder, Franchisee shall immediately become a member of such Market Cooperative. If a Market Cooperative for the geographic area encompassing the Location is established during the term of this Agreement, Franchisee shall become a member of such Market Cooperative within thirty (30) days. Franchisor shall not require Franchisee to be a member of more than one Market Cooperative. If Franchisor establishes a Market Cooperative:

(a)    Governance. Each Market Cooperative will be organized and governed in a form and manner and shall commence operations on a date determined by Franchisor. Franchisor may require the Market Cooperative to adopt bylaws or regulations prepared by Franchisor. Unless otherwise specified by Franchisor, the activities carried on by each Market Cooperative shall be decided by a majority vote of its members. Franchisor will be entitled to attend and participate in any meeting of a Market Cooperative. Any Franchisor business owned by Franchisor in the Market Cooperative shall have the same voting rights as those owned by its franchisees. Each Business owner will be entitled to cast one vote for each Training Facility owned, provided, however, that a franchisee shall not be entitled to vote if it is in default under its franchise agreement. If the members of a Market Cooperative are unable or fail to determine the manner in which Market Cooperative monies will be spent, Franchisor may assume this decision-making authority after 10 days' notice to the members of the Market Cooperative.

(b)    Purpose. Each Market Cooperative shall be devoted exclusively to administering regional advertising and marketing programs and developing standardized promotional materials for use by the members in local advertising and promotions, all of which are subject to Franchisor's approval.

(c)    Approval. No advertising or promotional plans or materials may be used by a Market Cooperative or furnished to its members without the prior approval of Franchisor pursuant to Section 9.1 of this Agreement. Franchisor may designate the national or regional advertising agencies used by the Market Cooperative.

(d)    Funding. The majority vote of the Market Cooperative will determine the dues to be paid by members of the Market Cooperative, including Franchisee, but not less than 1% and provided Franchisor or its affiliates have a majority vote,   not more than 3% of Gross Sales.

(e)    Enforcement. Only Franchisor will have the right to enforce the obligations of franchisees who are members of a Market Cooperative to contribute to the Market Cooperative.

(f)    Termination. Franchisor may terminate any Market Cooperative. Any funds left in a Market Cooperative upon termination will be transferred to the Brand Development Fund.

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

**9.5    Local Advertising and Marketing.** Franchisee shall spend five percent (5%) of Gross Sales each month on marketing the Training Facility . Upon request of Franchisor, Franchisee shall furnish proof of its compliance with this Section. Franchisor has the sole discretion to determine what activities constitute "marketing" under this Section. Franchisor may, in its discretion, determine that if Franchisee contributes to a Market Cooperative, the amount of the contribution will be counted towards Franchisee's required spending under this Section 9.5.

**9.6    Market Introduction Plan.** Franchisee must develop a market introduction plan and obtain Franchisor's approval of the market introduction plan at least thirty (30) days before the projected opening date of the Training Facility .

## RECORDS AND REPORTS

**10.1    Systems.** Franchisee shall use such customer data management, sales data management, administrative, bookkeeping, accounting, and inventory control procedures and systems as Franchisor may specify in the Manual or otherwise in writing.

**10.2    Reports.**

    (a)    <u>Financial Reports</u>. Franchisee shall provide such periodic financial reports as Franchisor may require in the Manual or otherwise in writing, including:

        (i)    a monthly profit and loss statement and balance sheet for the Business within thirty (30) days after the end of each calendar month;

        (ii)    an annual financial statement (including profit and loss statement, cash flow statement, and balance sheet) for the Business within ninety (90) days after the end of Franchisor's fiscal year; and

        (iii)    any information Franchisor requests in order to prepare a financial performance representation for Franchisor's franchise disclosure document.

    (b)    <u>Legal Actions and Investigations</u>. Franchisee shall promptly notify Franchisor of any Action or threatened Action by any customer, governmental authority, or other third party against Franchisee or the Business, or otherwise involving the Franchisee or the Business. Franchisee shall provide such documents and information related to any such Action as Franchisor may request.

    (c)    <u>Government Inspections</u>. Franchisee shall give Franchisor copies of all inspection reports, warnings, certificates, and ratings issued by any governmental entity with respect to the Training Facility , within three days of Franchisee's receipt thereof.

    (d)    <u>Other Information</u>. Franchisee shall submit to Franchisor such other financial statements, budgets, forecasts, reports, records, copies of contracts, documents related to litigation, tax returns, copies of governmental permits, and other documents and information related to the Business as specified in the Manual or that Franchisor may reasonably request.

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

**10.3    Initial Investment Report.** Within one hundred twenty (120) days after opening for business, Franchisee shall submit to Franchisor a report detailing Franchisee's investment costs to develop and open the Training Facility , with costs allocated to the categories listed in Item 7 of Franchisor's Franchise Disclosure Document and with such other information as Franchisor may request.

**10.4    Training Facility Records.** Franchisee shall keep complete and accurate books and records reflecting all expenditures and receipts of the Training Facility, with supporting documents, including, but not limited to, payroll records, payroll tax returns, register receipts, production reports, sales invoices, bank statements, deposit receipts, cancelled checks and paid invoices, for at least three years. Franchisee shall keep such other business records as Franchisor may specify in the Manual or otherwise in writing.

**10.5    Records Audit.** Franchisor may examine and audit all books and records related to the Training Facility and supporting documentation, at any reasonable time. Franchisor may conduct the audit at the Location and/or require Franchisee to deliver copies of books, records and supporting documentation to a location designated by Franchisor. Franchisee shall reimburse Franchisor for all costs and expenses of the examination or audit if (i) Franchisor conducted the audit because Franchisee failed to submit required reports or was otherwise not in compliance with the System, or (ii) the audit reveals that Franchisee understated Gross Sales by three percent (3%) or more during any four-week period.

## FRANCHISOR'S RIGHTS

**11.1    Manual; Modification.** The Manual, and any part of the Manual, may be in any form or media determined by Franchisor. Franchisor may supplement, revise, or modify the Manual, and Franchisor may change, add or delete System Standards at any time in its discretion. Franchisor may inform Franchisee thereof by any method that Franchisor deems appropriate. Such notice need not qualify as "notice" under Section 18.9 of this Agreement. In the event of any dispute as to the contents of the Manual, Franchisor's master copy will control.

**11.2    Inspections.** Franchisor may enter the premises of the Training Facility  from time to time during normal business hours and conduct an inspection. Franchisee shall cooperate Franchisor's inspectors. The inspection may include, but is not limited to, observing operations, conducting a physical inventory, evaluating physical conditions, monitoring sales activity, speaking with employees and customers, and removing samples of products, supplies and materials. Franchisor may videotape and/or take photographs of the inspection and the Training Facility . Franchisor may set a minimum score requirement for inspections, and Franchisee's failure to meet or exceed the minimum score will be a default under this Agreement. Without limiting Franchisor's other rights under this Agreement, Franchisee will, as soon as reasonably practical, correct any deficiencies noted during an inspection. If Franchisor conducts an inspection because of a governmental report, customer complaint or other customer feedback, or a default or non-compliance with any System Standard by Franchisee, including following up a previous failed inspection, then Franchisor may charge all out-of-pocket expenses plus its then-current inspection fee to Franchisee.

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

**11.3     Franchisor's Right to Cure.** If Franchisee breaches or defaults under any provision of this Agreement, Franchisor may, but shall not be obligated to, take any action to cure the default on behalf of Franchisee, without any liability to Franchisee. Franchisee shall reimburse Franchisor for its costs and expenses. Including without limitation, the allocation of any internal costs, for such action, plus a ten percent (10%) administrative fee.

**11.4     Right to Discontinue Supplies Upon Default.** While Franchisee is in default or breach of this Agreement, Franchisor may (i) require that Franchisee pay cash on delivery for products or services supplied by Franchisor, (ii) stop selling or providing any products and services to Franchisee, and/or (iii) request any third-party vendors to not sell or provide products or services to Franchisee. No such action by Franchisor shall be a breach or constructive termination of this Agreement, change in competitive circumstances or similarly characterized, and Franchisee shall not be relieved of any obligations under this Agreement because of any such action. Such rights of Franchisor are in addition to any other right or remedy available to Franchisor.

**11.5     Training Facility Data.** All customer data and other non-public data generated by the Training Facility is Confidential Information and is exclusively owned by Franchisor. Franchisor hereby licenses such data back to Franchisee without charge solely for Franchisee's use in connection with the Training Facility for the term of this Agreement and any renewals thereof.

**11.6     Innovations.** Franchisee shall disclose to Franchisor all ideas, plans, improvements, concepts, methods and techniques relating to the Training Facility (collectively, "Innovations") conceived or developed by Franchisee, its employees, agents or contractors. Franchisor will automatically own all Innovations, and it will have the right to use and incorporate any Innovations into the System, without any compensation to Franchisee. Franchisee shall execute any documents reasonably requested by Franchisor to document Franchisor's ownership of Innovations.

**11.7     Communication Systems.** If Franchisor provides email accounts and/or other communication systems to Franchisee, then Franchisee acknowledges that it has no expectation of privacy in the assigned email accounts and other communications systems, and Franchisee authorizes Franchisor to access such communications.

**11.8     Delegation.** Franchisor may delegate any duty or obligation of Franchisor under this Agreement to an affiliate or to a third party.

**11.9     System Variations.** Franchisor may vary or waive any System Standard for any one or more of Franchisor franchises due to the peculiarities of the particular site or circumstances, density of population, business potential, population of trade area, existing business practices, applicable laws or regulations, or any other condition relevant to the performance of a franchise or group of franchises. Franchisee is not entitled to the same variation or waiver.

**11.10    Temporary Public Safety Closure.** If Franchisor discovers or becomes aware of any aspect of the Training Facility which, in Franchisor's opinion, constitutes an imminent danger to the health or safety of any person, then immediately upon notice from Franchisor, Franchisee must temporarily cease operations of the Training Facility and remedy the dangerous condition. Franchisor shall not be liable to Franchisee or any other person for action or failure to act with respect to a dangerous condition.

61

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

## MARKS

**12.1    Authorized Marks.** Franchisee shall not use any trademarks, service marks or logos in connection with the Training Facility  other than the Marks. Franchisee shall use all Marks specified by Franchisor only in the manner designated by Franchisor. Franchisee has no rights in the Marks other than the right to use them in the operation of the Training Facility  in compliance with this Agreement. All use of the Marks by Franchisee and any goodwill associated with the Marks, including any goodwill arising due to Franchisee's operation of the Training Facility  and Business, shall inure to the exclusive benefit of Franchisor.

**12.2    Change of Marks.** Franchisor may add, modify, or discontinue any Marks to be used under the System. Within a reasonable time after Franchisor makes any such change, Franchisee must comply with the change at Franchisee's sole expense.

**12.3    Infringement.**

(a)    <u>Defense of Franchisee</u>. If Franchisee has used the Marks in accordance with this Agreement, then (i) Franchisor shall defend Franchisee (at Franchisor's expense) against any Action by a third-party alleging infringement by Franchisee's use of a Mark, and (ii) Franchisor will indemnify Franchisee for expenses and damages if the Action is resolved unfavorably to Franchisee.

(b)    <u>Infringement by Third Party</u>. Franchisee shall promptly notify Franchisor if Franchisee becomes aware of any possible infringement of a Mark by a third party. Franchisor may, in its sole discretion, commence or join any claim against the infringing party.

(c)    <u>Control</u>. Franchisor shall have the exclusive right to control any prosecution or defense of any Action related to possible infringement of or by the Marks.

## COVENANTS

**13.1    Confidential Information.** With respect to all Confidential Information, Franchisee shall (a) adhere to all procedures prescribed by Franchisor for maintaining confidentiality, (b) disclose such information to its employees only to the extent necessary for the operation of the Training Facility ; (c) not use any such information in any other business or in any manner not specifically authorized in writing by Franchisor, (d) exercise the highest degree of diligence and effort to maintain the confidentiality of all such information during and after the term of this Agreement, (e) not copy or otherwise reproduce any Confidential Information, and (f) promptly report any unauthorized disclosure or use of Confidential Information. Franchisee acknowledges that all Confidential Information is owned by Franchisor (except for Confidential Information which Franchisor licenses from another person or entity). This Section will survive the termination or expiration of this Agreement indefinitely.

**13.2    Covenants Not to Compete.**

(a)    <u>Restriction – In Term</u>. During the term of this Agreement, neither Franchisee, any Owner, nor any spouse of an Owner (the "Restricted Parties or "Restricted Party") shall directly

Franchise Agreement

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

or indirectly have any ownership interest in, lend money or provide financial assistance to, provide any services to, or be employed by, any Competitor.

(b)    Restriction – Post Term. For two years after this Agreement expires or is terminated for any reason or, where applicable, for two years after a Transfer, no Restricted Party shall directly or indirectly operate, have any ownership interest in, lend money or provide financial assistance to, provide any services to, or be employed by, any Competitor which is located at the premises upon which the Gradum Gswing is or was located or is located or within a twenty-five (25) mile radius of the Franchisee's location or any other Gradum Gswing location, whether owned by Franchisor or another Franchisee. Franchisee expressly agrees that the two-year period and the twenty-five (25) mile radius are the reasonable and necessary time and distance needed to protect Franchisor if this Agreement expires or is terminated for any reason. Franchisee agrees that the two-year time period of the non-competition provision shall not accrue during any time period that Franchise or any Restricted Party is in violation of this covenant. If this Agreement is terminated before the Territory is determined, then the area of non-competition will the Development Area and the territory of any other Gradum Gswing business operating on the date of termination.

(c)    Interpretation. The parties agree that each of the foregoing covenants is independent of any other covenant or provision of this Agreement. If all or any portion of the covenants in this Section is held to be unenforceable or unreasonable by any arbitrator or court, then the parties intend that the arbitrator or court modify such restriction to the extent reasonably necessary to protect the legitimate business interests of Franchisor. Franchisee agrees that the existence of any claim it may have against Franchisor shall not constitute a defense to the enforcement by Franchisor of the covenants of this Section. If a Restricted Party fails to comply with the obligations under this Section during the restrictive period, then the restrictive period will be extended an additional day for each day of noncompliance.

**13.3    General Manager and Key Employees.** If requested by Franchisor, Franchisee will cause its general manager and other employees to sign Franchisor's then-current form of confidentiality and non-compete agreement.

## DEFAULT AND TERMINATION

**14.1    Termination by Franchisee.** Franchisee may terminate this Agreement only if Franchisor violates a material provision of this Agreement and fails to cure or to make substantial progress toward curing the violation within thirty (30) days after receiving written notice from Franchisee detailing the alleged default. Termination by Franchisee is effective ten (10) days after Franchisor receives written notice of termination.

**14.2    Termination by Franchisor.**

(a)    Termination Subject to 10-Day Cure Period. Franchisor may terminate this Agreement if Franchisee does not make any payment to Franchisor when due, or if Franchisee has insufficient funds in its account when Franchisor attempts an electronic funds withdrawal, and Franchisee fails to cure such non-payment within ten (10) days after Franchisor gives notice to Franchisee of such breach.

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

(b)    <u>Termination Subject to 30-Day Cure Period</u>. Franchisor may terminate this Agreement if Franchisee breaches this Agreement in any manner not described in subsection (a) or (c) of this Section 14.2, and Franchisee fails to cure such breach to Franchisor's satisfaction within thirty (30) days after Franchisor notifies Franchisee of the breach.

(c)    <u>Termination Without Cure Period</u>. Franchisor may terminate this Agreement by giving notice to Franchisee, without opportunity to cure, if any of the following occur:

(i)    Franchisee misrepresented or omitted material facts when applying to be a franchisee, or makes any misrepresentation in this Agreement;

(ii)    Franchisee knowingly submits any false report or knowingly provides any other false information to Franchisor;

(iii)    a receiver or trustee for the Business or all or substantially all of Franchisee's property is appointed by any court, or Franchisee makes a general assignment for the benefit of Franchisee's creditors, or Franchisee is unable to pay its debts as they become due, or a levy or execution is made against the Business, or an attachment or lien remains on the Business for thirty (30) days unless the attachment or lien is being duly contested in good faith by Franchisee, or a petition in bankruptcy is filed by Franchisee, or such a petition is filed against or consented to by Franchisee and the petition is not dismissed within forty-five (45) days, or Franchisee is adjudicated as bankrupt;

(iv)    Franchisee fails to open the Training Facility for business by the date specified on the Summary Page after ten (10) days' notice from Franchisor;

(v)    Franchisee loses possession of the Location;

(vi)    Franchisee or any Owner commits a material violation of Section 7.2 of this Agreement (compliance with laws) or Section 13.1 of this Agreement (confidentiality), violates Section 13.2 of this Agreement (non-compete) or Article 15 of this Agreement (transfer), or commits any other violation of this Agreement which by its nature cannot be cured;

(vii)    Franchisee abandons the Training Facility or ceases operation of the Training Facility for more than five (5) consecutive days;

(viii)    Franchisee or any Owner slanders or libels Franchisor or any of its employees, directors, or officers;

(ix)    Franchisee refuses to cooperate with or permit any audit or inspection by Franchisor or its agents or contractors, or otherwise fails to comply with Sections 10.5 or 11.2 of this Agreement;

(x)    the Training Facility is operated in a manner which, in Franchisor's reasonable judgment, constitutes a significant danger to the health or safety of any person, and

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

Franchisee fails to cure such danger within forty-eight (48) hours after becoming aware of the danger, whether as a result of notice from Franchisor or otherwise;

(xi)    Franchisee has received two or more notices of default and Franchisee commits another breach of this Agreement, all in the same 12-month period;

(xii)   Franchisor or any Franchisor affiliate terminates any other agreement with Franchisee (or any affiliate) due to the breach of such other agreement by Franchisee or its affiliate; provided however, that termination of a Multi-Territory Development Agreement with Franchisee or its affiliate shall not automatically give Franchisor the right to terminate this Agreement;

(xiii)  Franchisee or any Owner is charged with, pleads guilty or no-contest to, or is convicted of a felony; or

(xiv)   Franchisee or any Owner is accused by any governmental authority or third party of any act, or if Franchisee or any Owner commits any act or series of acts, that in Franchisor's opinion is reasonably likely to materially and unfavorably affect the Gradum Gswing brand.

**14.3    Effect of Termination.** Upon termination or expiration of this Agreement, all obligations that by their terms or by reasonable implication survive termination, including those pertaining to non-competition, confidentiality, indemnity, and dispute resolution, will remain in effect, and Franchisee must immediately:

(i)     pay all amounts owed to Franchisor;

(ii)    return to Franchisor all copies of the Manual, Confidential Information and any and all other materials provided by Franchisor to Franchisee or created by a third party for Franchisee relating to the operation of the Training Facility , and all items containing any Marks, copyrights, and other proprietary items; and delete all Confidential Information and proprietary materials from electronic devices;

(iii)   notify the telephone, internet, email, electronic network, directory, and listing entities of the termination or expiration of Franchisee's right to use any numbers, addresses, domain names, locators, directories and listings associated with any of the Marks, and authorize their transfer to Franchisor or any new franchisee as may be directed by Franchisor, and Franchisee hereby irrevocably appoints Franchisor, with full power of substitution, as its true and lawful attorney-in-fact, which appointment is coupled with an interest; to execute such directions and authorizations as may be necessary or appropriate to accomplish the foregoing; and

(iv)    cease doing business under any of the Marks.

**14.4    Remove Identification.** Within thirty (30) days after termination or expiration of this Agreement, Franchisee shall at its own expense "de-identify" the Location so that it no longer contains the Marks, signage, or any trade dress of or associated with a Gradum Gswing training facility or business, to the reasonable satisfaction of Franchisor. Franchisee shall comply with any

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

reasonable instructions and procedures of Franchisor for de-identification. If Franchisee fails to do so within thirty (30) days after this Agreement expires or is terminated, Franchisor may enter the Location to remove the Marks and de-identify the Location. In this event, Franchisor will not be charged with trespass nor be accountable or required to pay for any assets removed or altered, or for any damage caused by Franchisor.

**14.5    Liquidated Damages.** If Franchisor terminates this Agreement based upon Franchisee's default or if Franchisee purports to terminate this agreement for any reason not specified in Section 14.1 of this Agreement, then within ten (10) days thereafter Franchisee shall pay to Franchisor a lump sum (as liquidated damages and not as a penalty) calculated as follows: (x) the average Royalty Fees and Brand Development Fund Contributions that Franchisee owed to Franchisor under this Agreement for the 52-week period preceding the date on which Franchisee ceased operating the Training Facility ; multiplied by (y) the lesser of (i) 104 or (ii) the number of weeks remaining in the then-current term of this Agreement. If Franchisee had not operated the Training Facility for at least 52 weeks, then (x) will equal the average Royalty Fees and Brand Development Fund Contributions that Franchisee owed to Franchisor during the period that Franchisee operated the Training Facility . The "average Royalty Fees and Brand Development Fund Contributions that Franchisee owed to Franchisor" shall not be discounted or adjusted due to any deferred or reduced Royalty Fees and Brand Development Fund Contributions set forth in an addendum to this Agreement unless this Section 14.5 of this Agreement is specifically amended in such addendum. Franchisee acknowledges that a precise calculation of the full extent Franchisor's damages under these circumstances is difficult to determine and the method of calculation of such damages as set forth in this Section is reasonable. Franchisee's payment to Franchisor under this Section 14.5 will be in lieu of any direct monetary damages that Franchisor may incur as a result of Franchisor's loss of Royalty Fees and Brand Development Fund Contributions that would have been owed to Franchisor after the date of termination; however, such payment shall be in addition to all damages and other amounts arising under Sections 14.3 and 14.4 of this Agreement, Franchisor's right to injunctive relief for enforcement of Article 13 of this Agreement, and any attorneys' fees and other costs and expenses to which Franchisor is entitled under this Agreement. Except as provided in this Section, Franchisee's payment of this lump sum shall be in addition to any other right or remedy that Franchisor may have under this Agreement or otherwise.

**14.6    Purchase Option.** When this Agreement expires or is terminated, Franchisor has the right but not the obligation to purchase any or all of the assets related to the Training Facility , and/or to require Franchisee to assign its lease or sublease to Franchisor. To exercise this option, Franchisor must notify Franchisee no later than thirty (30) days after this Agreement expires or is terminated. The purchase price for all assets that Franchisor elects to purchase will be the lower of (i) the book value of such assets as declared on Franchisee's last filed tax returns or (ii) the fair market value of the assets. If the parties cannot agree on fair market value within thirty (30) days after the exercise notice, the fair market value will be determined by an independent appraiser reasonably acceptable to both parties. The parties will equally share the cost of the appraisal. Franchisor's purchase will be of assets only (free and clear of all liens), and the purchase will not include any liabilities of Franchisee. The purchase price for assets will not include any factor or increment for any trademark or other commercial symbol used in the business, the value of any intangible assets, or any goodwill or "going concern" value for the Business. Franchisor may withdraw its exercise of the purchase option at any time before it pays for the assets. Franchisee will sign a bill of sale for the purchased assets and any other transfer documents reasonably

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

requested by Franchisor. If Franchisor exercises the purchase option, Franchisor may deduct from the purchase price: (a) all amounts due from Franchisee; (b) Franchisee's portion of the cost of any appraisal conducted hereunder; and (c) amounts paid or to be paid by Franchisor to cure defaults under Franchisee's lease and/or amounts owed by Franchisee to third parties. If any of the assets are subject to a lien, Franchisor may pay a portion of the purchase price directly to the lienholder to pay off such lien. Franchisor may withhold twenty-five percent (25%) of the purchase price for ninety (90) days to ensure that all of Franchisee's taxes and other liabilities are paid. Franchisor may assign this purchase option to another party.

<strong>TRANSFERS</strong>

**15.1    By Franchisor.** Upon notice to Franchisee, Franchisor may transfer or assign this Agreement, or any of its rights or obligations under this Agreement, to any person or entity, and Franchisor may undergo a change in ownership or control, without the consent of Franchisee.

**15.2    By Franchisee.** Franchisee acknowledges that the rights and duties set forth in this Agreement are personal to Franchisee and that Franchisor entered into this Agreement in reliance on Franchisee's business skill, financial capacity, personal character, experience, and business ability. Accordingly, Franchisee shall not Transfer this Agreement without obtaining Franchisor's prior written consent, which shall not be unreasonably withheld provided that certain conditions of Transfer are satisfied, including, without limitation, the following:

(i)     Franchisor receives a transfer fee equal to  Ten Thousand Dollars ($10,000) plus any broker fees and other out-of-pocket costs incurred by Franchisor;

(ii)    the proposed assignee and its owners have completed Franchisor's franchise application processes, meet Franchisor's then-applicable standards for new franchisees, and have been approved by Franchisor as franchisees;

(iii)   the proposed assignee is not a Competitor;

(iv)    the proposed assignee executes Franchisor's then-current form of franchise agreement and any related documents, which form may contain materially different provisions than this Agreement (provided, however, that the proposed assignee will not be required to pay an initial franchise fee);

(v)     all owners of the proposed assignee provide a guaranty in accordance with Section 2.5 of this Agreement;

(vi)    Franchisee has paid all monetary obligations to Franchisor and its affiliates, and to any lessor, vendor, supplier, or lender to the Business, and Franchisee is not otherwise in default or breach of this Agreement or of any other obligation owed to Franchisor or its affiliates;

(vii)   the proposed assignee and its owners and employees undergo such training as Franchisor may require;

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

    (viii)   Franchisee, its Owners, and the transferee and its owners execute a general release of Franchisor in a form satisfactory to Franchisor; and

    (ix)   the Training Facility fully complies with all of Franchisor's most recent System Standards.

**15.3    Transfer for Convenience of Ownership.** If Franchisee is an individual, Franchisee may Transfer this Agreement to a corporation or limited liability company formed for the convenience of ownership after at least fifteen (15) days' notice to Franchisor, if, prior to the Transfer: (1) the transferee provides the information required by Section 2.3 of this Agreement; (2) Franchisee provides copies of the entity's charter documents, by-laws or operating agreement and similar documents, as may be requested by Franchisor, (3) Franchisee owns all voting securities of the corporation or limited liability company, and (4) Franchisee provides a guaranty in accordance with Section 2.5 of this Agreement.

**15.4    Transfer upon Death or Incapacity.** Upon the death or incapacity of Franchisee (or, if Franchisee is an entity, the Owner with the largest ownership interest in Franchisee), the executor, administrator, or personal representative of that person must Transfer the Business to a third party approved by Franchisor (or to another person who was an Owner at the time of death or incapacity of the largest Owner) within nine months after death or incapacity. Such transfer must comply with Section 15.2 of this Agreement.

**15.5    Franchisor's Right of First Refusal.** Before Franchisee (or any Owner) engages in a Transfer (except under Section 15.3 of this Agreement, to a co-Owner, or to a spouse, sibling, or child of an Owner), Franchisor will have a right of first refusal, as set forth in this Section. Franchisee (or its Owners) shall provide to Franchisor a copy of the terms and conditions of any Transfer. For a period of thirty (30) days from the date of Franchisor's receipt of such copy, Franchisor will have the right, exercisable by notice to Franchisee, to purchase the assets subject of the proposed Transfer for the same price and on the same terms and conditions (except that Franchisor may substitute cash for any other form of payment). If Franchisor does not exercise its right of first refusal, Franchisee may proceed with the Transfer, subject to the other terms and conditions of this Article.

**15.6    No Sublicense.** Franchisee has no right to sublicense the Marks or any of Franchisee's rights under this Agreement.

**15.7    No Lien on Agreement.** Franchisee shall not grant a security interest in this Agreement to any person or entity. If Franchisee grants an "all assets" security interest to any lender or other secured party, Franchisee shall cause the secured party to expressly exempt this Agreement from the security interest.

## INDEMNITY

**16.1    Indemnity.** Franchisee shall indemnify and defend, with counsel reasonably acceptable to Franchisor, Franchisor, its parent entities, subsidiaries and affiliates, and their respective owners, directors, officers, employees, agents, successors and assignees (collectively, "Indemnitees") against all Losses in any Action by or against Franchisor and/or any Indemnitee arising directly or indirectly related to, or alleged to arise out of, the operation of the Business. Franchisee shall not

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

settle an Action without the consent of the Indemnitee. This indemnity will continue in full force and effect and shall survive any termination or expiration of this Agreement.

**16.2    Assumption.** An Indemnitee may elect to assume the defense of any Action subject to this indemnification, and control all aspects of defending the Action, including negotiations and settlement, at Franchisee's expense. Such an undertaking shall not diminish Franchisee's obligation to indemnify the Indemnitees.

## DISPUTE RESOLUTION

**17.1    Arbitration.**

(a)    <u>Disputes Subject to Arbitration</u>. Except as expressly provided in subsection (c) and (d), any controversy or claim between the parties (including any controversy or claim arising out of or relating to this Agreement or its formation and including any question of arbitrability) shall be resolved by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, including the Optional Rules for Emergency Measures of Protection. Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction.

(b)    <u>Location</u>. The place of arbitration shall be the city and state where Franchisor's headquarters are located.

(c)    <u>Injunctive Relief</u>. Either party may apply to the arbitrator seeking injunctive relief until the arbitration award is rendered or the controversy is otherwise resolved. Either party also may, without waiving any remedy or right to arbitrate under this Agreement, seek from any court having jurisdiction any interim or provisional injunctive relief.

(d)    <u>Intellectual Property Claims</u>. A claim involving an alleged infringement of any of Franchisor's intellectual property rights may be brought in a court authorized to hear such claims under Section 17.5 of this Agreement without first proceeding in arbitration.

(e)    <u>Confidentiality</u>. All documents, information, and results pertaining to any arbitration or lawsuit will be confidential, except as required by law or as required for Franchisor to comply with laws and regulations applicable to the sale of franchises.

(f)    <u>Performance During Arbitration or Litigation</u>. Unless this Agreement has been terminated, Franchisor and Franchisee will comply with this Agreement and perform their respective obligations under this Agreement during the arbitration or litigation process.

**17.2    Damages.** In any controversy or claim arising out of or relating to this Agreement, each party waives any right to punitive or other monetary damages not measured by the prevailing party's actual damages, except damages expressly authorized by federal statute and damages expressly authorized by this Agreement.

**17.3    Waiver of Class Actions.** The parties agree that any claims will be arbitrated, litigated, or otherwise resolved on an individual basis, and waive any right to act on a class-wide basis.

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

**17.4    Time Limitation.** Any arbitration or other legal action arising from or related to this Agreement must be instituted within two years from the date such party discovers the conduct or event that forms the basis of the arbitration or other legal action. The foregoing time limit does not apply to claims (i) by one party related to non-payment under this Agreement by the other party, (ii) for indemnification under Article 16 of this Agreement, or (iii) related to unauthorized use of Confidential Information or the Marks.

**17.5    Venue Other Than Arbitration.** For any legal proceeding not required to be submitted to arbitration, the parties agree that any such legal proceeding will be brought in the United States District Court where Franchisor's headquarters is then located. If there is no federal jurisdiction over the dispute, the parties agree that any such legal proceeding will be brought in the court of appropriate jurisdiction in the state and county where Franchisor's headquarters is then located. Each party consents to the jurisdiction of such courts and waives any objection that it, he or she may have to the laying of venue of any proceeding in any of these courts.

**17.6    Legal Costs.** In any legal proceeding (including arbitration) related to this Agreement or any guaranty, the non-prevailing party shall pay the prevailing party's attorney fees, costs and other expenses of the legal proceeding. "Prevailing party" means the party, if any, which prevailed upon the central litigated issues and obtained substantial relief.

## MISCELLANEOUS

**18.1    Relationship of the Parties.** The parties are independent contractors, and neither is the agent, partner, joint venturer, or employee of the other. Franchisor is not a fiduciary of Franchisee. Franchisor does not control or have the right to control Franchisee or its Business. Any required specifications and standards in this Agreement and in the System Standards exist to protect Franchisor's interest in the System and the Marks, and the goodwill established in them, and not for the purpose of establishing any control, or duty to take control, over the Business. Franchisor has no liability for Franchisee's obligations to any third party whatsoever.

**18.2    No Third-Party Beneficiaries.** This Agreement does not confer any rights or remedies upon any person or entity other than Franchisee and Franchisor.

**18.3    Entire Agreement.** This Agreement constitutes the entire agreement of the parties and supersedes all prior discussions, negotiations and representations. Nothing in this Agreement or in any related agreement is intended to disclaim the representations made by GradumGswing Franchising, LLC in its Franchise Disclosure Document.

**18.4    Modification.** No modification or amendment of this Agreement will be effective unless it is in writing and signed by both parties. This provision does not limit Franchisor's rights to modify the Manual or System Standards.

**18.5    Consent; Waiver.** No consent under this Agreement, and no waiver of satisfaction of a condition or nonperformance of an obligation under this Agreement will be effective unless it is in writing and signed by the party granting the consent or waiver. No waiver by a party of any right will affect the party's rights as to any subsequent exercise of that right or any other right. No delay, forbearance or omission by a party to exercise any right will constitute a waiver of such right.

FDD 2023                                                                                    Franchise Agreement

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

**18.6    Cumulative Remedies.** Rights and remedies under this Agreement are cumulative. No enforcement of a right or remedy precludes the enforcement of any other right or remedy.

**18.7    Severability.** The parties intend that (i) if any provision of this Agreement is held by an arbitrator or court to be unenforceable, then that provision be modified to the minimum extent necessary to make it enforceable, unless that modification is not permitted by law, in which case that provision will be disregarded, and (ii) if an unenforceable provision is modified or disregarded, then the rest of this Agreement will remain in effect as written.

**18.8    Governing Law.** The laws of the state of Florida (without giving effect to its principles of conflicts of law) govern all adversarial proceedings between the parties. The parties agree that any Florida law for the protection of franchisees or business opportunity purchasers will not apply unless its jurisdictional requirements are met independently without reference to this Section 18.8.

**18.9    Notices.** Any notice will be effective under this Agreement only if made in writing and delivered as set forth in this Section to: (A) if to Franchisee, addressed to Franchisee at the notice address set forth in the Summary Page; and (B) if to Franchisor, addressed to Chief Executive Officer, GradumGswing Franchising, LLC, 7872 SW Jack James Drive, Unit 4, Stuart, Florida 34997. Any party may designate a new address for notices by giving notice of the new address pursuant to this Section. Notices will be effective upon receipt (or first rejection) and must be: (1) delivered personally; (2) sent by registered or certified U.S. mail with return receipt requested; or (3) sent via overnight courier. Notwithstanding the foregoing, Franchisor may amend the Manual, give binding notice of changes to System Standards, and deliver notices of default by electronic mail or other electronic communication.

**18.10    Holdover.** If Franchisee continues operating the Training Facility after the expiration of the term without a renewal agreement or successor franchise agreement executed by the parties in accordance with Section 3.2 of this Agreement, then at any time (regardless of any course of dealing by the parties), Franchisor may by giving written notice to Franchisee (the "Holdover Notice") either (i) require Franchisee to cease operating the Training Facility and comply with all post-closing obligations effective immediately upon giving notice or effective on such other date as Franchisor specifies, or (ii) bind Franchisee to a renewal term of 5 years, and deem Franchisee and its Owners to have made the general release of liability described in Section 3.2(vi) of this Agreement.

**18.11    Joint and Several Liability.** If two or more people sign this Agreement as "Franchisee," each will have joint and several liability.

**18.12    No Offer and Acceptance.** Delivery of a draft of this Agreement to Franchisee by Franchisor does not constitute an offer. This Agreement shall not be effective unless and until it is executed by both Franchisee and Franchisor.

## CERTIFICATION OF FRANCHISOR'S COMPLIANCE

By signing this Agreement, Franchisee acknowledges the following:

(1)    Franchisee understands all the information in Franchisor's Disclosure Document.

71

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

(2)     Franchisee understands the success or failure of the Business will depend in large part upon Franchisee's skills, abilities and efforts and those of the persons Franchisee employs, as well as many factors beyond Franchisee's control such as weather, competition, interest rates, the economy, inflation, labor and supply costs, lease terms, and the marketplace.

(3)     That no person acting on Franchisor's behalf made any statement or promise regarding the costs involved in operating a Gradum Gswing franchise that is not in the Disclosure Document or that is contrary to, or different from, the information in the Disclosure Document.

(4)     That no person acting on Franchisor's behalf made any claim or representation to Franchisee, orally, visually, or in writing, that contradicted the information in the Disclosure Document.

(5)     That no person acting on Franchisor's behalf made any statement or promise regarding the actual, average or projected profits or earnings, the likelihood of success, the amount of money Franchisee may earn, or the total amount of revenue a Gradum Gswing franchise will generate, that is not in the Disclosure Document or that is contrary to, or different from, the information in the Disclosure Document.

(6)     That no person acting on Franchisor's behalf made any statement or promise or agreement, other than those matters addressed in this Agreement, concerning advertising, marketing, media support, market penetration, training, support service, or assistance that is contrary to, or different from, the information contained in the Disclosure Document.

(7)     Franchisee understands that this Agreement contains the entire agreement between Franchisor and Franchisee concerning the Gradum Gswing franchise, which means that any oral or written statements not set out in this Agreement will not be binding. In deciding to enter into this Agreement, Franchisee is not relying on any statement, promise, claim, or representation not expressly set forth in this Agreement or in the Disclosure Document.

*[Signatures on next page]*

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

Agreed to by:

FRANCHISOR:
GradumGswing Franchising, LLC

By: _____
Name: Carlos Garmendia
Title: Manager
Date: 4/5/2024


FRANCHISEE:

[*if an individual:*]

_____
Name: _____
Date: _____


[*if an entity:*]

Chin Music Partners, LLC

By: _____Jack Dunn_____
Name: Jack Dunn
Title: Partner
Date: 3/29/2024

By: _____Ken T. Clayton_____
Name: Ken T. Clayton
Title: Partner
Date: 3/31/2024

By: _____
Name: Matt Capps
Title: Partner
Date: 4/5/2024

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

## EXHIBIT 1 TO THE
## GRADUM GSWING FRANCHISE AGREEMENT

### OWNERSHIP INFORMATION

1.    **Form of Ownership.** Franchisee is a (check one):

|  |  |
|---|---|
| _____ | *Sole Proprietorship* |
| _____ | *Partnership* |
| ____X_____ | *Limited Liability Company* |
| _____ | *Corporation* |

State: _____Georgia_____

2.    **Owners.** If Franchisee is a partnership, limited liability company or corporation:

| Name | Shares or Percentage of Ownership |
|---|---|
| Jack Dunn | |
| Ken Clayton | |
| Matt Capps | |
| | |
| | |

3.    **Officers.** If Franchisee is a limited liability company or corporation:

| Name | Title |
|---|---|
| Jack Dunn | Partner |
| Ken Clayton | Partner |
| Matt Capps | Partner |
| | |
| | |

FDD 2023                                            Franchise Agreement

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

**EXHIBIT 2  TO THE**
**GRADUM GSWING FRANCHISE AGREEMENT**

**LOCATION ACCEPTANCE LETTER**

To:    Chin Music Partners, LLC

This Location Acceptance Letter is issued by GradumGswing Franchising, LLC for your
Gradum Gswing franchise in accordance with Section 6.1 of the Franchise Agreement.

1.      The Location of the Training Facility  is:

   To Be Determined

2.      The Territory of the Training Facility  is:

   Huntsville, Alabama

GradumGswing Franchising, LLC

By: _____
Name: _____
Title: _____
Date: _____

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

**EXHIBIT 3  TO THE**

**GRADUM GSWING FRANCHISE AGREEMENT**

**GUARANTY AND NON-COMPETE AGREEMENT**

This Guaranty and Non-Compete Agreement (this "Guaranty") is executed by the undersigned person(s) (each, a "Guarantor") in favor of GradumGswing Franchising, LLC, a  Florida Limited Liability Company ("Franchisor" ).

**Background Statement:**   Chin Music Partners, LLC   ("Franchisee") desires to enter into a Franchise Agreement with Franchisor for the franchise of a Gradum Gswing business (the "Franchise Agreement;" capitalized terms used but not defined in this Guaranty have the meanings given in the Franchise Agreement). Guarantor owns an equity interest in Franchisee. Guarantor is executing this Guaranty in order to induce Franchisor to enter into the Franchise Agreement.

Guarantor agrees as follows:

**1.      Guaranty.** Guarantor hereby unconditionally guarantees to Franchisor and its successors and assigns that Franchisee shall pay and perform every undertaking, agreement and covenant set forth in the Franchise Agreement and further guarantees every other liability and obligation of Franchisee to Franchisor, whether or not contained in the Franchise Agreement. Guarantor shall render any payment or performance required under the Franchise Agreement or any other agreement between Franchisee and Franchisor upon demand from Franchisor. Guarantor waives (a) acceptance and notice of acceptance by  Franchisor of this Guaranty; (b) notice of demand for payment of any indebtedness or nonperformance of any obligations of Franchisee; (c) protest and notice of default to any party with respect to the indebtedness or nonperformance of any obligations hereby guaranteed; (d) any right Guarantor may have to require that an action be brought against Franchisee or any other person or entity as a condition of liability hereunder; (e) all rights to payments and claims for reimbursement or subrogation which any of the undersigned may have against Franchisee arising as a result of the execution of and performance under this Guaranty by the undersigned; (f) any law which requires that  Franchisor make demand upon, assert claims against or collect from Franchisee or any other person or entity (including any other guarantor), foreclose any security interest, sell collateral, exhaust any remedies or take any other action against Franchisee or any other person or entity (including any other guarantor) prior to making any demand upon, collecting from or taking any action against the undersigned with respect to this Guaranty; and (g) any and all other notices and legal or equitable defenses to which Guarantor may be entitled.

**2.      Confidential Information.** With respect to all Confidential Information Guarantor shall (a) adhere to all security procedures prescribed by Franchisor for maintaining confidentiality, (b) disclose such information to its employees only to the extent necessary for the operation of the or the Training Facility ; (c) not use any such information in any other business or in any manner not specifically authorized or approved in writing by Franchisor, (d) exercise the highest degree of diligence and make every effort to maintain the confidentiality of all such information during and

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

after the term of the Franchise Agreement, (e) not copy or otherwise reproduce any Confidential Information, and (f) promptly report any unauthorized disclosure or use of Confidential Information. Guarantor acknowledges that all Confidential Information is owned by Franchisor or its affiliates (except for Confidential Information which Franchisor licenses from another person or entity). Guarantor acknowledges that all customer data generated or obtained by Guarantor is Confidential Information belonging to Franchisor. This Section will survive the termination or expiration of the Franchise Agreement indefinitely.

**3.      Covenants Not to Compete.**

(a)      <u>Restriction - In Term</u>. During the term of the Franchise Agreement, Guarantor shall not directly or indirectly have any ownership interest in, lend money or provide financial assistance to, provide any services to, or be employed by, any Competitor.

(b)      <u>Restriction – Post Term</u>. For two years after the Franchise Agreement expires or is terminated for any reason (or, if applicable, for two years after a Transfer by Guarantor), Guarantor shall not directly or indirectly have any ownership interest in, lend money or provide financial assistance to, provide any services to, or be employed by, any Competitor located within twenty-five (25) miles of Franchisee's Territory or the territory of any other Gradum Gswing business operating on the date of termination or transfer, as applicable. If the Franchise Agreement is terminated before the Territory is determined, then the area of non-competition will be the Development Area and the territory of any other Gradum Gswing business operating on the date of termination.

(c)      <u>Interpretation</u>. Guarantor agrees that each of the foregoing covenants is independent of any other covenant or provision of this Guaranty or the Franchise Agreement. If all or any portion of the covenants in this Section is held to be unenforceable or unreasonable by any court or arbitrator, then the parties intend that the court or arbitrator modify such restriction to the extent reasonably necessary to protect the legitimate business interests of Franchisor. Guarantor agrees that the existence of any claim it or Franchisee may have against Franchisor shall not constitute a defense to the enforcement by Franchisor of the covenants of this Section. If Guarantor fails to comply with the obligations under this Section during the restrictive period, then the restrictive period will be extended an additional day for each day of noncompliance.

**4.      Modification.** Guarantor agrees that Guarantor's liability hereunder shall not be diminished, relieved or otherwise affected by (a) any amendment of the Franchise Agreement, (b) any extension of time, credit or other indulgence which Franchisor may from time-to-time grant to Franchisee or to any other person or entity, or (c) the acceptance of any partial payment or performance or the compromise or release of any claims.

**5.      Governing Law; Dispute Resolution.** This Guaranty shall be governed by and construed in accordance with the laws of the state of Florida (without giving effect to its principles of conflicts of law). The parties agree that any Florida law for the protection of franchisees or business opportunity purchasers will not apply unless its jurisdictional requirements are met independently without reference to this Section 5. The provisions of Article 17 (Dispute Resolution) of the Franchise Agreement apply to and are incorporated into this Guaranty as if fully set forth herein. Guarantor shall pay to Franchisor all costs incurred by Franchisor (including reasonable attorney

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

fees) in enforcing this Guaranty. If multiple Guarantors sign this Guaranty, each will have joint and several liability.

Agreed to by:

Name: Jack Dunn

Address: 12136 Walnut Terrace
Alpharetta, GA 30004

Date: 3/29/2024

Name: Ken T. Clayton

Address: 12136 Walnut Terrace
Alpharetta, GA 30004

Date: 3/31/2024

Name: Matt Capps

Address: 12136 Walnut Terrace
Alpharetta, GA 30004

Date: 4/5/2024

FDD 2023                                                          Franchise Agreement

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

## EXHIBIT 4  TO THE
## GRADUM GSWING FRANCHISE AGREEMENT

## ACH PAYMENT AGREEMENT

ACCOUNT NAME: _____

CUSTOMER NUMBER: _____

FRANCHISE NAME: _____

AUTHORIZATION AGREEMENT FOR ACH Payments:

(I/we) do hereby authorize GradumGswing Franchising, LLC, a Florida Limited Liability Company, (hereinafter "Franchisor") to initiate (debit or credit) entries to (my/our) (Checking Account / Savings Account) as indicated and named below as the depository financial institution, hereafter named FINANCIAL INSTITUTION pursuant to the terms of the Franchise Agreement by and between us and the Franchisor.

(I/we) acknowledge that the origination of ACH transactions to my (my/our) account must comply with the provisions of U.S. law. Furthermore, if any such debit(s) should be returned NSF, (I/we) authorize the Franchisor to collect such debit(s) by electronic debit and subsequently collect a returned debit NSF fee of $75 per item by electronic debit from my account identified below. In the event all funds and interests are not received by Franchisor within 15 days from presentment and intended withdrawal from our account by Franchisor, then we will be deemed in default of the Franchise Agreement. We further agree to pay all reasonable costs of collection including but not limited to reasonable attorney's fees and court costs incurred by Franchisor. I am a duly authorized check signer on the financial institution account identified below and authorize all of the above as evidenced by my signature below.

CHECK (ACH) INFORMATION ROUTING NUMBER:

ACCOUNT NUMBER:

DEPOSITORY NAME:

BRANCH: _____

CITY: _____ STATE: _____ ZIP: _____

COMPANY NAME: _____

FIRST NAME/LAST NAME: _____

BILLING ADDRESS: _____

CITY: _____ STATE: _____ ZIP: _____

PHONE NUMBER: _____

CUSTOMER NUMBER: _____

SIGNATURE ON FILE: _____

PHONE OR EMAIL APPROVAL AUTHORIZATION NUMBER: _____

FRANCHISEE: _____

By: _____

Name: _____

79

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

Title: _____
Date: _____

Franchise Agreement

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

## EXHIBIT 5  TO THE
## GRADUM GSWING FRANCHISE AGREEMENT

### RIDER TO LEASE AGREEMENT

Landlord: _____    Franchisor: GradumGswing Franchising, LLC

Notice Address: _____

_____    Notice Address:

_____    7872 SW Jack James Drive, Unit 4,

Telephone:_____    Stuart, Florida 34997

Telephone: _____


Tenant: _____

Leased Premises: _____

    1.    Use. Tenant is a franchisee of Franchisor. The Leased Premises shall be used only for the operation of a Gradum Gswing business (or any name authorized by Franchisor).

    2.    Notice of Default and Opportunity to Cure. Landlord shall provide Franchisor with copies of any written notice of default ("Default") given to Tenant under the Lease, and Landlord grants to Franchisor the option (but not the obligation) to cure any Default under the Lease (should Tenant fail to do so) within ten (10) days after the expiration of the period in which Tenant may cure the Default.

    3.    Termination of Lease. Proprietor shall copy Franchisor on any notice of termination of the Lease. If Landlord terminates the Lease for Tenant's Default, Franchisor shall have the option to enter into a new Lease with Landlord on the same terms and conditions as the terminated Lease. To exercise this option, Franchisor must notify Landlord within fifteen (15) days after Franchisor receives notice of the termination of the Lease.

    4.    Termination of Franchise Agreement. If the Franchise Agreement between Franchisor and Tenant is terminated during the term of the Lease, then upon the written request of Franchisor, Tenant shall assign the Lease to Franchisor. Landlord hereby consents to the assignment of the Lease to Franchisor.

    5.    Assignment and Subletting. Notwithstanding any provision of the Lease to the contrary, Tenant shall have the right to assign or sublet the Lease to Franchisor, provided that no such assignment or sublease shall relieve Tenant or any guarantor of liability under the Lease. If Franchisor becomes the lessee of the Leased Premises, then Franchisor shall have the right to assign or sublease its lease to a franchisee of the Gradum Gswing brand. Any provision of the

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

Lease which limits Tenant's right to own or operate other Gradum Gswing outlets in proximity to the Leased Premises shall not apply to Franchisor.

       6.     <u>Authorization</u>. Tenant authorizes Landlord and Franchisor to communicate directly with each other about Tenant and Tenant's business.

       7.     <u>Right to Enter</u>. Upon the expiration or termination of the Franchise Agreement or the Lease, or the termination of Tenant's right of possession of the Leased Premises, Franchisor or its designee may, after giving reasonable prior notice to Landlord, enter the Leased Premises to remove signs and other material bearing Franchisor's brand name, trademarks, and commercial symbols, provided that Franchisor will be liable to Landlord for any damage Franchisor or its designee causes by such removal.

       8.     <u>No Liability</u>. By executing this Rider, Franchisor does not assume any liability with respect to the Leased Premises or any obligation as Tenant under the Lease.

       Executed by:

                        LANDLORD:

                        _____

                        By: _____
                        Name: _____
                        Title: _____
                        Date: _____

                        TENANT:

                        _____

                        By: _____
                        Name: _____
                        Title: _____
                        Date: _____

                        FRANCHISOR:

                        GradumGswing Franchising, LLC

                        By: _____
                        Name: _____
                        Title: _____
                        Date: _____

                                                                 

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

## EXHIBIT C TO DISCLOSURE DOCUMENT

## MULTI-TERRITORY DEVELOPMENT AGREEMENT

This Multi-Territory Development Agreement (this "MTDA") is made between GradumGswing Franchising, LLC, a Florida Limited Liability Company ("Franchisor") and _____, a _____ ("Franchisee") on _____, _____, 20____ the ("Effective Date").
.

**Background Statement:** On the same day as they executed this MTDA, Franchisor and Franchisee have entered into a Franchise Agreement for the franchise of a Gradum Gswing training facility (the "Franchise Agreement;" capitalized terms used but not defined in this MTDA have the meanings given in the Franchise Agreement). Franchisor and Franchisee desire that Franchisee open multiple Gradum Gswing facilities.

1.    **Multi-Territory Commitment.**

   (a)    Development Schedule; Fee. Franchisee    shall    develop    and    open _____ training facilities on the following schedule:

| Franchise # | Deadline for Opening | Total Training Facilities to be Open and Operating on Deadline | Initial Franchise Fee |
|:---:|---|:---:|---|
| 1 | | 1 | $_____ |
| 2 | | 2 | $_____ |
| 3 | | 3 | $_____ |
| 4 | | 4 | $_____ |
| 5 | | 5 | $_____ |
| | | Total Initial Franchise Fee: | |

   (b)    Payment. Upon execution of this MTDA, Franchisee shall pay the total Initial Franchise Fees to Franchisor. The Initial Franchise Fees are non-refundable.

2.    **Form of Agreement.** For the first location, Franchisee and Franchisor have executed the Franchise Agreement simultaneously with this MTDA. For each additional franchise, Franchisee shall execute Franchisor's then-current standard form of franchise agreement no later than three business days after Franchisee leases or acquires a location for the franchise. This MTDA does not give Franchisee the right to construct, open, or operate a Gradum Gswing training facility , and Franchisee acknowledges that Franchisee may construct, open, and operate each Gradum Gswing training facility only pursuant to a separate franchise agreement executed pursuant to this MTDA for each Gradum Gswing training facility .

FDD 2023

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

3.    **Development Area.** Franchisee shall locate each Gradum Gswing training facility it develops under this MTDA within the following area: _____ _____ (the "Development Area"). Franchisee acknowledges that it does not have exclusive rights to develop, open or operate Gradum Gswing training facilities in the Development Area.

4.    **Default and Termination.** Franchisor may terminate this MTDA by giving notice to Franchisee, without opportunity to cure, if any of the following occur:

(i)    Franchisee fails to satisfy the development schedule; or

(ii)    Franchisor has the right to terminate any franchise agreement between Franchisor and Franchisee (or any affiliate thereof) due to Franchisee's default thereunder (whether or not Franchisor actually terminates such franchise agreement).

5.    **Limitation of Liability.** Franchisee's commitment to develop Gradum Gswing training facilities is in the nature of an option only. If Franchisor terminates this MTDA for Franchisee's default, Franchisee shall not be liable to Franchisor for lost future revenues or profits from the unopened Gradum Gswing training facilities.

6.    **Conditions.** Franchisee's right to develop each Gradum Gswing franchise after the first franchise is subject to the following:

(i)    Franchisee must possess sufficient financial and organizational capacity to develop, open, operate, and manage each additional Gradum Gswing training facility in the reasonable judgment of Franchisor, and

(ii)    Franchisee must be in full compliance with all brand requirements at its operating Gradum Gswing Training Facility(ies), and not in default under any Franchise Agreement or any other agreement with Franchisor.

7.    **Dispute Resolution; Miscellaneous.** The laws of the State of Florida (without giving effect to its principles of conflicts of law) govern all adversarial proceedings between the parties. The parties agree that any Florida law for the protection of franchisees or business opportunity purchasers will not apply unless its jurisdictional requirements are met independently without reference to this Section 7. Franchisee shall not Transfer this MTDA without the prior written consent of Franchisor, and any Transfer without Franchisor's prior written consent shall be void. The provisions of Article 17 (Dispute Resolution) and Article 18 (Miscellaneous) of the Franchise Agreement apply to and are incorporated into this MTDA as if fully set forth herein.

*[Signatures on Next Page]*

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

Agreed to by:

FRANCHISOR:

GradumGswing Franchising, LLC
By: _____
Name: _____
Title: _____
Date: _____

FRANCHISEE:

[*if an individual:*]

_____
Name: _____

[*if an entity:*]

_____

By: _____
Name: _____
Title: _____
Date: _____

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

## EXHIBIT D TO DISCLOSURE DOCUMENT

## FORM OF GENERAL RELEASE

[*This is our current standard form of General Release. This document is not signed when you purchase a franchise. In circumstances such as a renewal of your franchise or as a condition of our approval of a sale of your franchise, we may require you to sign a general release.*]

This General Release ("Release") is executed by the undersigned ("Releasor") in favor of GradumGswing Franchising, LLC, a Florida Limited Liability Company ("Franchisor").

**Background Statement:** [*describe circumstances of Release*]

Releasor agrees as follows:

1.    **Release.** Releasor (on behalf of itself and its parents, subsidiaries and affiliates and their respective past and present officers, directors, shareholders, managers, members, partners, agents, and employees (collectively, the "Releasing Parties")) hereby releases Franchisor its affiliates, and their respective directors, officers, shareholders, employees, and agents (collectively, the "Released Parties") from any and all claims, causes of action, suits, debts, agreements, promises, demands, liabilities, contractual rights and/or obligations, of whatever nature, known or unknown, which any Releasing Party now has or ever had against any Released Party based upon and/or arising out of events that occurred through the date hereof, including without limitation, anything arising out of the Franchise Agreement (collectively, "Claims").

2.    **Covenant Not to Sue.** Releasor (on behalf of all Releasing Parties) covenants not to initiate, prosecute, encourage, assist, or (except as required by law) participate in any civil, criminal, or administrative proceeding or investigation in any court, agency, or other forum, either affirmatively or by way of crossclaim, defense, or counterclaim, against any Released Party with respect to any Claim.

3.    **Representations and Acknowledgments.** Releasor represents and warrants that: (i) Releasor is the sole owner of all Claims, and that no Releasing Party has assigned or transferred, or purported to assign or transfer, to any person or entity, any Claim; (ii) Releasor has full power and authority to sign this Release; and (iii) this Release has been voluntarily and knowingly signed after Releasor has had the opportunity to consult with counsel of Releasor's choice. Releasor acknowledges that the release in Section 1 is a complete defense to any Claim.

4.    **Miscellaneous.** If any of the provisions of this Release are held invalid for any reason, the remainder of this Release will not be affected and will remain in full force and effect. In the event of any dispute concerning this Release, the dispute resolution, governing law, and venue provisions of the Franchise Agreement shall apply. Releasor agrees to take any actions and sign any documents that Franchisor reasonably requests to effectuate the purposes of this Release. This Release contains the entire agreement of the parties concerning the subject matter hereof. This Release shall not apply to any liability under the Maryland Franchise Registration and Disclosure Law.

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

Agreed to by:

Name: _____

Date: _____

FDD 2023

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

## EXHIBIT E TO DISCLOURE DOCUMENT

### FINANCIAL STATEMENTS

THESE FINANCIAL STATEMENTS ARE PREPARED WITHOUT AN AUDIT. PROSPECTIVE FRANCHISEES OR SELLERS OF FRANCHISES SHOULD BE ADVISED THAT NO CERTIFIED PUBLIC ACCOUNTANT HAD AUDITED THESE FIGURES OR EXPRESSED HIS/HER OPINION WITH REGARD TO THE CONTENT OR FORM.

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

# GradumGswing Franchising, LLC

Balance Sheet

As of August 11, 2023

| | TOTAL |
|---|---|
| ASSETS | |
| Current Assets | |
| Bank Accounts | |
| Checking Account | 10,285.95 |
| **Total Bank Accounts** | **$10,285.95** |
| **Total Current Assets** | **$10,285.95** |
| **TOTAL ASSETS** | **$10,285.95** |
| LIABILITIES AND EQUITY | |
| Liabilities | |
| Current Liabilities | |
| Other Current Liabilities | |
| | 0.00 |
| **Total Other Current Liabilities** | **$0.00** |
| **Total Current Liabilities** | **$0.00** |
| **Total Liabilities** | **$0.00** |
| Equity | |
| Carlos Garmendia | 21,078.10 |
| Retained Earnings | |
| Net Income | -10,792.15 |
| **Total Equity** | **$ 10,285.95** |
| **TOTAL LIABILITIES AND EQUITY** | **$10,285.95** |

FDD 2023

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

**EXHIBIT F TO DISCLOSURE DOCUMENT**

**OPERATIONS MANUAL TABLE OF CONTENTS**

FDD 2023

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

*Gradum Gswing*

**Franchise Brand Standards Manual**
*Table of Contents*

| Section | Number of Pages (Including *Cover Pages and Table of Contents Pages*) |
|---|---|
| Section A: Introduction | 15 |
| Section B: Establishing a Franchise Business | 55 |
| Section C: Personnel & Training | 50 |
| Section D: Administrative Procedures | 50 |
| Section E: Daily Procedures | 45 |
| Section F: Selling & Marketing | 40 |
| **Total Number of Pages** | **255** |



DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

**EXHIBIT G TO DISCLOSURE DOCUMENT**

**CURRENT AND FORMER FRANCHISEES**

<u>Current Franchisees</u>

Names of all current franchisees (as of the end of our last fiscal year) and the address and telephone number of each of their outlets:

    None

    Note: We did not have any multi-unit developers at the close of our last fiscal year.

<u>Former Franchisees</u>

Name, city and state, and current business telephone number, or if unknown, the last known home telephone number of every franchisee who had an outlet terminated, canceled, not renewed, or otherwise voluntarily or involuntarily ceased to do business under the franchise agreement during the most recently completed fiscal year or who have not communicated with us within 10 weeks of the disclosure document issuance date:

    None

FDD 2023

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

# EXHIBIT H TO DISCLOSURE DOCUMENT

# STATE ADDENDA TO DISCLOSURE DOCUMENT

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

## CALIFORNIA ADDENDUM TO DISCLOSURE DOCUMENT

California Corporations Code, Section 31125 requires the franchisor to give the franchisee a disclosure document, approved by the Department of Business Oversight, prior to a solicitation of a proposed material modification of an existing franchise.

THE CALIFORNIA FRANCHISE INVESTMENT LAW REQUIRES THAT A COPY OF ALL PROPOSED AGREEMENTS RELATING TO THE SALE OF THE FRANCHISE BE DELIVERED TOGETHER WITH THE OFFERING CIRCULAR.

OUR WEBSITE HAS NOT BEEN REVIEWED OR APPROVED BY THE CALIFORNIA DEPARTMENT OF BUSINESS OVERSIGHT. ANY COMPLAINTS CONCERNING THE CONTENT OF THIS WEBSITE MAY BE DIRECTED TO THE CALIFORNIA DEPARTMENT OF BUSINESS OVERSIGHT AT www.dbo.ca.gov.

THESE FRANCHISES HAVE BEEN REGISTERED UNDER THE FRANCHISE INVESTMENT LAW OF THE STATE OF CALIFORNIA. SUCH REGISTRATION DOES NOT CONSTITUTE APPROVAL, RECOMMENDATION OR ENDORSEMENT BY THE COMMISSIONER OF BUSINESS OVERSIGHT NOR A FINDING BY THE COMMISSIONER THAT THE INFORMATION PROVIDED HEREIN IS TRUE, COMPLETE AND NOT MISLEADING.

ALL THE OWNERS OF THE FRANCHISE WILL BE REQUIRED TO EXECUTE PERSONAL GUARANTEES. THIS REQUIREMENT PLACES THE MARITAL ASSETS OF THE SPOUSES DOMICILED IN COMMUNITY PROPERTY STATES – ARIZONA, CALIFORNIA, IDAHO, LOUISIANA, HAWAII, NEW MEXICO, TEXAS, WASHINGTON AND WISCONSIN AT risk IF YOUR FRANCHISE FAILS.

1.    The following paragraph is added to the end of Item 3 of the Disclosure Document:

Neither franchisor nor any person or franchise broker in Item 2 of this disclosure document is subject to any currently effective order of any national securities association or national securities exchange, as defined in the Securities Exchange Act of 1934, 15 U.S.C.A. 78a et seq., suspending or expelling such persons from membership in that association or exchange.

2.    The following paragraph is added to the end of Item 6 of the Disclosure Document:

With respect to the Late Fee described in Item 6, this Item is amended to disclose that the maximum rate of interest permitted under California law is 10%.

3.    The following paragraphs are added at the end of Item 17 of the Disclosure Document:

The Franchise Agreement requires franchisee to sign a general release of claims upon renewal or transfer of the Franchise Agreement. California Corporations Code Section 31512 provides that any condition, stipulation or provision purporting to bind any person acquiring a franchise to waive compliance with any provision of that law or any rule or order thereunder is void.

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

California Business and Professions Code Sections 20000 through 20043 provide rights to the franchisee concerning termination, transfer, or non-renewal of a franchise. If the Franchise Agreement contains a provision that is inconsistent with the law, the law will control.

The Franchise Agreement provides for termination upon bankruptcy. This provision may not be enforceable under federal bankruptcy law (11 U.S.C.A. Sec. 101 et seq.).

The Franchise Agreement contains a covenant not to compete which extends beyond the termination of the franchise. This provision may not be enforceable under California law.

The Franchise Agreement contains a liquidated damages clause. Under California Civil Code Section 1671, certain liquidated damages clauses are unenforceable.

The Franchise Agreement requires binding arbitration. The arbitration will occur in West Palm Beach, Florida, with the costs being borne equally by Franchisor and Franchisee. Prospective franchisees are encouraged to consult private legal counsel to determine the applicability of California and federal laws (such as Business and Professions Code Section 20040.5, Code of Civil Procedure Section 1281, and the Federal Arbitration Act) to any provisions of a franchise agreement restricting venue to a forum outside the State of California.

The Franchise Agreement requires application of the laws of Florida to apply. This provision may not be enforceable under California law.

4.    The following paragraph is added at the end of Item 19 of the Disclosure Document:

The earnings claims figures do not reflect the costs of sales, operating expenses, or other costs or expenses that must be deducted from the gross revenue or gross sales figures to obtain your net income or profit. You should conduct an independent investigation of the costs and expenses you will incur in operating your franchised business. Franchisees or former franchisees, listed in the offering circular, may be one source of this information.

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

## HAWAII ADDENDUM TO DISCLOSURE DOCUMENT

In the State of Hawaii only, this Disclosure Document is amended as follows:

**THESE FRANCHISES WILL BE/HAVE BEEN FILED UNDER THE FRANCHISE INVESTMENT LAW OF THE STATE OF HAWAII. FILING DOES NOT CONSTITUTE APPROVAL, RECOMMENDATION OR ENDORSEMENT BY THE DIRECTOR OF COMMERCE AND CONSUMER AFFAIRS OR A FINDING BY THE DIRECTOR OF COMMERCE AND CONSUMER AFFAIRS THAT THE INFORMATION PROVIDED HEREIN IS TRUE, COMPLETE AND NOT MISLEADING.**

**THE FRANCHISE INVESTMENT LAW MAKES IT UNLAWFUL TO OFFER OR SELL ANY FRANCHISE IN THIS STATE WITHOUT FIRST PROVIDING TO THE PROSPECTIVE FRANCHISEE, OR SUBFRANCHISOR, AT LEAST SEVEN DAYS PRIOR TO THE EXECUTION BY THE PROSPECTIVE FRANCHISEE, OF ANY BINDING FRANCHISE OR OTHER AGREEMENT, OR AT LEAST SEVEN DAYS PRIOR TO THE PAYMENT OF ANY CONSIDERATION BY THE FRANCHISEE, OR SUBFRANCHISOR, WHICHEVER OCCURS FIRST, A COPY OF THE DISCLOSURE DOCUMENT, TOGETHER WITH A COPY OF ALL PROPOSED AGREEMENTS RELATING TO THE SALE OF THE FRANCHISE.**

**THIS DISCLOSURE DOCUMENT CONTAINS A SUMMARY ONLY OF CERTAIN MATERIAL PROVISIONS OF THE FRANCHISE AGREEMENT. THE CONTRACT OR AGREEMENT SHOULD BE REFERRED TO FOR A STATEMENT OF ALL RIGHTS, CONDITIONS, RESTRICTIONS AND OBLIGATIONS OF BOTH THE FRANCHISOR AND THE FRANCHISEE.**

Registered agent in the state authorized to receive service of process:

Commissioner of Securities
335 Merchant Street
Honolulu, Hawaii 96813

<u>Registration of franchises or filings of offering circulars in other states</u>. As of the date of filing of this Addendum in the State of Hawaii:

1.    A franchise registration is effective, or an offering circular is on file in the following states: _____

2.    A proposed registration or filing is or will be shortly on file in the following states: _____

3.    No states have refused, by order or otherwise to register these franchises.

4.    No states have revoked or suspended the right to offer these franchises.

5.    The proposed registration of these franchises has not been withdrawn in any state.

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

## ILLINOIS ADDENDUM TO DISCLOSURE DOCUMENT

In recognition of the requirements of the Illinois Franchise Disclosure Act of 1987, as amended (the "Act"), this Disclosure Document is amended as follows:

Illinois law governs the agreements between the parties to this franchise.

Section 4 of the Act provides that any provision in a franchise agreement that designates jurisdiction of venue outside the State of Illinois is void. However, a franchise agreement may provide for arbitration outside of Illinois.

Section 41 of the Act provides that any condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with the Act or any other law of Illinois is void.

Your rights upon termination and non-renewal of a franchise agreement are set forth in sections 19 and 20 of the Act.

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

## MARYLAND ADDENDUM TO DISCLOSURE DOCUMENT

In the State of Maryland only, this Disclosure Document is amended as follows:

The following is added to Item 17:

The general release required as a condition of renewal, sale, and/or assignment/transfer shall not apply to any liability under the Maryland Franchise Registration and Disclosure Law.

Any claims arising under the Maryland Franchise Registration and Disclosure Law must be brought within 3 years after the grant of the franchise.

You have the right to file a lawsuit alleging a cause of action arising under the Maryland Franchise Law in any court of competent jurisdiction in the State of Maryland.

The Franchise Agreement provides for termination upon bankruptcy of the franchisee. This provision may not be enforceable under federal bankruptcy law.

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

## MINNESOTA ADDENDUM TO DISCLOSURE DOCUMENT

In the State of Minnesota only, this Disclosure Document is amended as follows:

Minnesota Statutes, Section 80C.21 and Minnesota Rules 2860.4400(J) prohibit the franchisor from requiring litigation to be conducted outside Minnesota, requiring waiver of a jury trial, or requiring the franchisee to consent to liquidated damages, termination penalties or judgment notes. In addition, nothing in the Franchise Disclosure Document or agreement(s) can abrogate or reduce (1) any of the franchisee's rights as provided for in Minnesota Statutes, Chapter 80C or (2) franchisee's rights to any procedure, forum, or remedies provided for by the laws of the jurisdiction.

With respect to franchises governed by Minnesota law, the franchisor will comply with Minnesota Statutes, Section 80C.14, Subd. 3-5, which require (except in certain specified cases) (1) that a franchisee be given 90 days' notice of termination (with 60 days to cure) and 180 days' notice for non-renewal of the franchise agreement and (2) that consent to the transfer of the franchise will not be unreasonably withheld.

The franchisor will protect the franchisee's rights to use the trademarks, service marks, trade names, logotypes or other commercial symbols or indemnify the franchisee from any loss, costs or expenses arising out of any claim, suit or demand regarding the use of the name.

Minnesota considers it unfair to not protect the franchisee's right to use the trademarks. Refer to Minnesota Statues, Section 80C.12, Subd. 1(g).

Minnesota Rules 2860.4400(D) prohibits a franchisor from requiring a franchisee to assent to a general release.

The franchisee cannot consent to the franchisor obtaining injunctive relief. The franchisor may seek injunctive relief. See Minn. Rules 2860.4400J. Also, a court will determine if a bond is required.

The Limitations of Claims section must comply with Minnesota Statutes, Section 80C.17, Subd. 5, which states "No action may be commenced pursuant to this Section more than three years after the cause of action accrues."

**THESE FRANCHISES HAVE BEEN REGISTERED UNDER THE MINNESOTA FRANCHISE ACT. REGISTRATION DOES NOT CONSTITUTE APPROVAL, RECOMMENDATION OR ENDORSEMENT BY THE COMMISSIONER OF COMMERCE OF MINNESOTA OR A FINDING BY THE COMMISSIONER THAT THE INFORMATION PROVIDED HEREIN IS TRUE, COMPLETE AND NOT MISLEADING.**

**THE MINNESOTA FRANCHISE ACT MAKES IT UNLAWFUL TO OFFER OR SELL ANY FRANCHISE IN THIS STATE WHICH IS SUBJECT TO REGISTRATION**

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

**WITHOUT FIRST PROVIDING TO THE PROSPECTIVE FRANCHISEE, AT LEAST 7 DAYS PRIOR TO THE EXECUTION BY THE PROSPECTIVE FRANCHISEE OF ANY BINDING FRANCHISE OR OTHER AGREEMENT, OR AT LEAST 7 DAYS PRIOR TO THE PAYMENT OF ANY CONSIDERATION, BY THE FRANCHISEE, WHICHEVER OCCURS FIRST, A COPY OF THIS PUBLIC OFFERING STATEMENT, TOGETHER WITH A COPY OF ALL PROPOSED AGREEMENTS RELATING TO THE FRANCHISE. THIS PUBLIC OFFERING STATEMENT CONTAINS A SUMMARY ONLY OF CERTAIN MATERIAL PROVISIONS OF THE FRANCHISE AGREEMENT. THE CONTRACT OR AGREEMENT SHOULD BE REFERRED TO FOR AN UNDERSTANDING OF ALL RIGHTS AND OBLIGATIONS OF BOTH THE FRANCHISOR AND THE FRANCHISEE.**

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

## NEW YORK ADDENDUM TO DISCLOSURE DOCUMENT

In the State of New York only, this Disclosure Document is amended as follows:

1.     The following information is added to the cover page of the Franchise Disclosure Document:

**INFORMATION COMPARING FRANCHISORS IS AVAILABLE. CALL THE STATE ADMINISTRATORS LISTED IN EXHIBIT A OR YOUR PUBLIC LIBRARY FOR SOURCES OF INFORMATION. REGISTRATION OF THIS FRANCHISE BY NEW YORK STATE DOES NOT MEAN THAT NEW YORK STATE RECOMMENDS IT OR HAS VERIFIED THE INFORMATION IN THIS FRANCHISE DISCLOSURE DOCUMENT. IF YOU LEARN THAT ANYTHING IN THE FRANCHISE DISCLOSURE DOCUMENT IS UNTRUE, CONTACT THE FEDERAL TRADE COMMISSION AND NEW YORK STATE DEPARTMENT OF LAW, BUREAU OF INVESTOR PROTECTION AND SECURITIES, 28 LIBERTY ST. 21ST FLOOR, NEW YORK, NY 10005. THE FRANCHISOR MAY, IF IT CHOOSES, NEGOTIATE WITH YOU ABOUT ITEMS COVERED IN THE FRANCHISE DISCLOSURE DOCUMENT. HOWEVER, THE FRANCHISOR CANNOT USE THE NEGOTIATING PROCESS TO PREVAIL UPON A PROSPECTIVE FRANCHISEE TO ACCEPT TERMS WHICH ARE LESS FAVORABLE THAN THOSE SET FORTH IN THIS FRANCHISE DISCLOSURE DOCUMENT.**

2.     The following is added at the end of Item 3:

Except as provided above, with regard to the franchisor, its predecessor, a person identified in Item 2, or an affiliate offering franchises under the franchisor's principal trademark:

A. No such party has an administrative, criminal or civil action pending against that person alleging: a felony, a violation of a franchise, antitrust, or securities law, fraud, embezzlement, fraudulent conversion, misappropriation of property, unfair or deceptive practices, or comparable civil or misdemeanor allegations.

B. No such party has pending actions, other than routine litigation incidental to the business, which are significant in the context of the number of franchisees and the size, nature or financial condition of the franchise system or its business operations.

C. No such party has been convicted of a felony or pleaded nolo contendere to a felony charge or, within the 10-year period immediately preceding the application for registration, has been convicted of or pleaded nolo contendere to a misdemeanor charge or has been the subject of a civil action alleging: violation of a franchise, antifraud, or securities law; fraud; embezzlement; fraudulent conversion or misappropriation of property; or unfair or deceptive practices or comparable allegations.

D. No such party is subject to a currently effective injunctive or restrictive order or decree relating to the franchise, or under a Federal, State, or Canadian franchise, securities, antitrust, trade regulation or trade practice law, resulting from a concluded or pending

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

action or proceeding brought by a public agency; or is subject to any currently effective order of any national securities association or national securities exchange, as defined in the Securities and Exchange Act of 1934, suspending or expelling such person from membership in such association or exchange; or is subject to a currently effective injunctive or restrictive order relating to any other business activity as a result of an action brought by a public agency or department, including, without limitation, actions affecting a license as a real estate broker or sales agent.

3.  The following is added to the end of Item 4:

Neither the franchisor, its affiliate, its predecessor, officers, or general partner during the 10-year period immediately before the date of the offering circular: (a) filed as debtor (or had filed against it) a petition to start an action under the U.S. Bankruptcy Code; (b) obtained a discharge of its debts under the bankruptcy code; or (c) was a principal officer of a company or a general partner in a partnership that either filed as a debtor (or had filed against it) a petition to start an action under the U.S. Bankruptcy Code or that obtained a discharge of its debts under the U.S. Bankruptcy Code during or within 1 year after that officer or general partner of the franchisor held this position in the company or partnership.

4.  The following is added to the end of Item 5:

The initial franchise fee constitutes part of our general operating funds and will be used as such in our discretion.

5.  The following is added to the end of the "Summary" sections of Item 17(c), titled **"Requirements for franchisee to renew or extend,"** and Item 17(m), entitled **"Conditions for franchisor approval of transfer"**:

However, to the extent required by applicable law, all rights you enjoy and any causes of action arising in your favor from the provisions of Article 33 of the General Business Law of the State of New York and the regulations issued thereunder shall remain in force; it being the intent of this proviso that the non-waiver provisions of General Business Law Sections 687.4 and 687.5 be satisfied.

6.  The following language replaces the "Summary" section of Item 17(d), titled **"Termination by franchisee"**:

You may terminate the agreement on any grounds available by law.

7.  The following is added to the end of the "Summary" section of Item 17(j), titled **"Assignment of contract by franchisor"**:

However, no assignment will be made except to an assignee who in good faith and judgment of the franchisor, is willing and financially able to assume the franchisor's obligations under the Franchise Agreement.

8.  The following is added to the end of the "Summary" sections of Item 17(v), titled **"Choice of forum"**, and Item 17(w), titled **"Choice of law"**: The foregoing choice of law should not be

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

considered a waiver of any right conferred upon the franchisor or upon the franchisee by Article 33 of the General Business Law of the State of New York.

9.     The following is added to the end of Item 19:

## REPRESENTATIONS REGARDING EARNINGS CAPABILITY

GRADUMGSWING FRANCHISING, LLC DOES NOT FURNISH OR AUTHORIZE ITS SALESPERSONS TO FURNISH ANY ORAL OR WRITTEN INFORMATION CONCERNING THE ACTUAL OR POTENTIAL SALES, COSTS, INCOME OR PROFITS OF A FRANCHISE. ACTUAL RESULTS VARY FROM UNIT TO UNIT AND, GRADUMGSWING FRANCHISING, LLC CANNOT ESTIMATE THE EARNINGS OF ANY PARTICULAR FRANCHISE.

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

## NORTH DAKOTA ADDENDUM TO DISCLOSURE DOCUMENT

In the State of North Dakota only, this Disclosure Document is amended as follows:

THE SECURITIES COMMISSIONER HAS HELD THE FOLLOWING TO BE UNFAIR, UNJUST OR INEQUITABLE TO NORTH DAKOTA FRANCHISEES (NDCC SECTION 51-19-09):

1.    <u>Restrictive Covenants</u>: Franchise disclosure documents that disclose the existence of covenants restricting competition contrary to NDCC Section 9-08-06, without further disclosing that such covenants will be subject to the statute.

2.    <u>Situs of Arbitration Proceedings</u>: Franchise agreements providing that the parties must agree to the arbitration of disputes at a location that is remote from the site of the franchisee's business.

3.    <u>Restrictions on Forum</u>: Requiring North Dakota franchisees to consent to the jurisdiction of courts outside of North Dakota.

4.    <u>Liquidated Damages and Termination Penalties</u>: Requiring North Dakota franchisees to consent to liquidated damages or termination penalties.

5.    <u>Applicable Laws</u>: Franchise agreements that specify that they are to be governed by the laws of a state other than North Dakota.

6.    <u>Waiver of Trial by Jury</u>: Requiring North Dakota Franchises to consent to the waiver of a trial by jury.

7.    <u>Waiver of Exemplary and Punitive Damages</u>: Requiring North Dakota Franchisees to consent to a waiver of exemplary and punitive damage.

8.    <u>General Release</u>: Franchise Agreements that require the franchisee to sign a general release upon renewal of the franchise agreement.

9.    <u>Limitation of Claims</u>: Franchise Agreements that require the franchisee to consent to a limitation of claims. The statute of limitations under North Dakota law applies.

10.    <u>Enforcement of Agreement</u>: Franchise Agreements that require the franchisee to pay all costs and expenses incurred by the franchisor in enforcing the agreement. The prevailing party in any enforcement action is entitled to recover all costs and expenses including attorney's fees.

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

## RHODE ISLAND ADDENDUM TO DISCLOSURE DOCUMENT

In the State of Rhode Island only, this Disclosure Document is amended as follows:

Item 17, summary columns for (v) and (w) are amended to add the following:

> Any provision in the franchise agreement restricting jurisdiction or venue to a forum outside Rhode Island or requiring the application of the laws of a state other than Rhode Island is void as to a claim otherwise enforceable under the Rhode Island Franchise Investment Act.

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

## VIRGINIA ADDENDUM TO DISCLOSURE DOCUMENT

In the Commonwealth of Virginia only, this Disclosure Document is amended as follows:

The following statements are added to Item 17(h):

> Under Section 13.1-564 of the Virginia Retail Franchising Act, it is unlawful for a franchisor to cancel a franchise without reasonable cause. If any grounds for default or termination stated in the Franchise Agreement do not constitute "reasonable cause," as that term may be defined in the Virginia Retail Franchising Act or the laws of Virginia, that provision may not be enforceable.

> Under Section 13.1-564 of the Virginia Retail Franchising Act, it is unlawful for a franchisor to use undue influence to induce a franchisee to surrender any right given to him under the franchise. If any provision of the Franchise Agreement involves the use of undue influence by the franchisor to induce a franchisee to surrender any rights given to the franchisee under the franchise, that provision may not be enforceable.

Item 17(t) is amended to read as follows:

> Only the terms of the Franchise Agreement and other related written agreements are binding (subject to applicable state law). Any representations or promises outside of the Disclosure Document and Franchise Agreement may not be enforceable.

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

# WASHINGTON ADDENDUM TO DISCLOSURE DOCUMENT

(See Exhibit H and I for Washington Addendum to Disclosure Document and Rider to Franchise Agreement)

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

# EXHIBIT I

## STATE ADDENDA TO AGREEMENTS

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

## ILLINOIS RIDER TO FRANCHISE AND MULTI-TERRITORY DEVELOPMENT AGREEMENT

This Rider amends the Franchise and Multi-Territory Development Agreement dated _____ (the "Agreement"), between GradumGswing Franchising, LLC, a Florida Limited Liability Company ("Franchisor") and _____, a _____ _____ ("Franchisee").

1.    **Definitions.** Capitalized terms used but not defined in this Rider have the meanings given in the Agreement. The "Illinois Act" means the Illinois Franchise Disclosure Act of 1987.

2.    **Governing Law and Jurisdiction.** Notwithstanding any provision of the Agreement to the contrary, the Agreement is governed by Illinois law. The parties irrevocably submit to the jurisdiction and venue of the federal and state courts in Illinois, except for matters which the Agreement provides will be resolved by arbitration.

3.    **Limitation of Claims.** No action can be maintained to enforce any liability created by the Illinois Act unless brought before the expiration of 3 years from the act or transaction constituting the violation upon which it is based, the expiration of 1 year after Franchisee become aware of facts or circumstances reasonably indicating that Franchisee may have a claim for relief in respect to conduct governed by the Illinois Act, or 90 days after delivery to the Franchisee of a written notice disclosing the violation, whichever shall first expire.

4.    **Waivers Void.** Notwithstanding any provision of the Agreement to the contrary, any condition, stipulation, or provision purporting to bind Franchisee to waive compliance with any provision of the Illinois Act or any other law of the State of Illinois is void. This Section shall not prevent Franchisee from entering into a settlement agreement or executing a general release regarding a potential or actual lawsuit filed under any of the provisions of this Act, nor shall it prevent the arbitration of any claim pursuant to the provisions of Title 9 of the United States Code.

5.    **Effective Date.** This Rider is effective as of the Effective Date.

Agreed to by:

FRANCHISOR:                                FRANCHISEE:

GradumGswing Franchising, LLC        _____
By: _____
Name: _____        By: _____
Title: _____        Name: _____
Date: _____        Title: _____
                                        Date: _____

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

## INDIANA RIDER TO FRANCHISE AND MULTI-TERRITORY DEVELOPMENT AGREEMENT

This Rider amends the Franchise and Multi-Territory Development Agreement dated _____ (the "Agreement"), between GradumGswing Franchising, LLC, a Florida Limited Liability Company, ("Franchisor") and _____, a _____ _____ ("Franchisee").

**1.    Definitions.** Capitalized terms used but not defined in this Rider have the meanings given in the Agreement. The "Indiana Acts" means the Indiana Franchise Act and the Indiana Deceptive Franchise Practices Act.

**2.    Certain Provisions Modified.** Any provision of the Agreement which would have any of the following effects is hereby modified to the extent required for the Agreement to be in compliance with the Indiana Acts:

(1)    Requiring goods, supplies, inventories, or services to be purchased exclusively from the franchisor or sources designated by the franchisor where such goods, supplies, inventories, or services of comparable quality are available from sources other than those designated by the franchisor. However, the publication by the franchisor of a list of approved suppliers of goods, supplies, inventories, or services or the requirement that such goods, supplies, inventories, or services comply with specifications and standards prescribed by the franchisor does not constitute designation of a source nor does a reasonable right of the franchisor to disapprove a supplier constitute a designation. This subdivision does not apply to the principal goods, supplies, inventories, or services manufactured or trademarked by the franchisor.

(2)    Allowing the franchisor to establish a franchisor-owned outlet engaged in a substantially identical business to that of the franchisee within the exclusive territory granted the franchisee by the franchise agreement; or, if no exclusive territory is designated, permitting the franchisor to compete unfairly with the franchisee within a reasonable area.

(3)    Allowing substantial modification of the franchise agreement by the franchisor without the consent in writing of the franchisee.

(4)    Allowing the franchisor to obtain money, goods, services, or any other benefit from any other person with whom the franchisee does business, on account of, or in relation to, the transaction between the franchisee and the other person, other than for compensation for services rendered by the franchisor, unless the benefit is promptly accounted for, and transmitted to the franchisee.

(5)    Requiring the franchisee to prospectively assent to a release, assignment, novation, waiver, or estoppel which purports to relieve any person from liability to be imposed by the Indiana Deceptive Franchise Practices Act or requiring any controversy between the franchisee and the franchisor to be referred to any person, if referral would be binding on the franchisee. This subsection (5) does not apply to arbitration before an independent arbitrator.

(6)    Allowing for an increase in prices of goods provided by the franchisor which the franchisee had ordered for private retail consumers prior to the franchisee's receipt of an official price increase

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

notification. A sales contract signed by a private retail consumer shall constitute evidence of each order. Price changes applicable to new models of a product at the time of introduction of such new models shall not be considered a price increase. Price increases caused by conformity to a state or federal law, or the revaluation of the United States dollar in the case of foreign-made goods, are not subject to this subsection (6).

(7)     Permitting unilateral termination of the franchise if such termination is without good cause or in bad faith. Good cause within the meaning of this subsection (7) includes any material violation of the franchise agreement.

(8)     Permitting the franchisor to fail to renew a franchise without good cause or in bad faith. This chapter shall not prohibit a franchise agreement from providing that the agreement is not renewable upon expiration or that the agreement is renewable if the franchisee meets certain conditions specified in the agreement.

(9)     Requiring a franchisee to covenant not to compete with the franchisor for a period longer than three years or in an area greater than the exclusive area granted by the franchise agreement or, in absence of such a provision in the agreement, an area of reasonable size, upon termination of or failure to renew the franchise.

(10)    Limiting litigation brought for breach of the agreement in any manner whatsoever.

(11)    Requiring the franchisee to participate in any (A) advertising campaign or contest; (B) promotional campaign; (C) promotional materials; or (D) display decorations or materials; at an expense to the franchisee that is indeterminate, determined by a third party, or determined by a formula, unless the franchise agreement specifies the maximum percentage of gross monthly sales or the maximum absolute sum that the franchisee may be required to pay.

**3.    Effective Date.** This Rider is effective as of the Effective Date.

Agreed to by:

FRANCHISOR:                              FRANCHISEE:

GradumGswing Franchising, LLC            _____

By: _____     By: _____
Name: _____      Name: _____
Title: _____      Title: _____
Date: _____      Date: _____

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

## MARYLAND RIDER TO FRANCHISE AGREEMENT AND MULTI-TERRITORY DEVELOPMENT AGREEMENT

This Rider amends the Franchise and Multi-Territory Development Agreement dated _____ (the "Agreement"), between GradumGswing Franchising, LLC, a Florida Limited Liability Company ("Franchisor") and _____, a _____ ("Franchisee").

1.    **Definitions.** Capitalized terms used but not defined in this Rider have the meanings given in the Agreement. The "Maryland Franchise Law" means the Maryland Franchise Registration and Disclosure Law, Business Regulation Article, §14-206, Annotated Code of Maryland.

2.    **Releases, Estoppels and Waivers of Liability.** All representations requiring prospective franchisees to assent to a release, estoppel or waiver of liability are not intended to nor shall they act as a release, estoppel or waiver of any liability incurred under the Maryland Franchise Law.

3.    **Statute of Limitations.** Any provision of the Agreement which provides for a period of limitations for causes of action shall not apply to causes of action under the Maryland Franchise Law, Business Regulation Article, §14-227, Annotated Code of Maryland. Franchisee must bring an action under such law within three years after the grant of the franchise.

4.    **Jurisdiction.** Franchisee does not waive its right to file a lawsuit alleging a cause of action arising under the Maryland Franchise Law in any court of competent jurisdiction in the State of Maryland.

5.    **Effective Date.** This Rider is effective as of the Effective Date.

Agreed to by:

FRANCHISOR:                          FRANCHISEE:

GradumGswing Franchising, LLC        _____

By: _____         By: _____
Name: _____         Name: _____
Title: _____       Title: _____
Date: _____        Date: _____

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

## MINNESOTA RIDER TO FRANCHISE AND MULTI-TERRITORY DEVELOPMENT AGREEMENT

This Rider amends the Franchise and Multi-Territory Development Agreement dated _____ (the "Agreement"), between GradumGswing Franchising, LLC, a Florida Limited Liability Company,    ("Franchisor") and  _____,  a  _____ ("Franchisee").

1.    **Definitions.** Capitalized terms used but not defined in this Rider have the meanings given in the Agreement. The "Minnesota Act" means Minnesota Statutes, Sections 80C.01 to 80C.22.

2.    **Amendments.** The Agreement is amended to comply with the following:

Minnesota Statutes, Section 80C.21 and Minnesota Rules 2860.4400(J) prohibit the franchisor from requiring litigation to be conducted outside Minnesota, requiring waiver of a jury trial, or requiring the franchisee to consent to liquidated damages, termination penalties or judgment notes. In addition, nothing in the Franchise Disclosure Document or agreement(s) can abrogate or reduce (1) any of the franchisee's rights as provided for in Minnesota Statutes, Chapter 80C or (2) franchisee's rights to any procedure, forum, or remedies provided for by the laws of the jurisdiction.

With respect to franchises governed by Minnesota law, the franchisor will comply with Minnesota Statutes, Section 80C.14, Subd. 3-5, which require (except in certain specified cases) (1) that a franchisee be given 90 days' notice of termination (with 60 days to cure) and 180 days' notice for non-renewal of the franchise agreement and (2) that consent to the transfer of the franchise will not be unreasonably withheld.

The franchisor will protect the franchisee's rights to use the trademarks, service marks, trade names, logotypes or other commercial symbols or indemnify the franchisee from any loss, costs or expenses arising out of any claim, suit or demand regarding the use of the name. Minnesota considers it unfair to not protect the franchisee's right to use the trademarks. Refer to Minnesota Statues, Section 80C.12, Subd. 1(g).

Minnesota Rules 2860.4400(D) prohibits a franchisor from requiring a franchisee to assent to a general release.

The franchisee cannot consent to the franchisor obtaining injunctive relief. The franchisor may seek injunctive relief. See Minn. Rules 2860.4400J. Also, a court will determine if a bond is required.

The Limitations of Claims section must comply with Minnesota Statutes, Section 80C.17, Subd. 5, and therefore the applicable provision of the Agreement is amended to state "No action may be commenced pursuant to Minnesota Statutes, Section 80C.17 more than three years after the cause of action accrues."

3.    **Effective Date.** This Rider is effective as of the Effective Date.

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

Agreed to by:

FRANCHISOR:                              FRANCHISEE:

GradumGswing Franchising, LLC            _____

By: _____              By: _____
Name: _____               Name: _____
Title: _____              Title: _____
Date: _____               Date: _____

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

# NEW YORK RIDER TO FRANCHISE AND MULTI-TERRITORY DEVELOPMENT AGREEMENT

This Rider amends the Franchise and Multi-Territory Development Agreement dated _____ (the "Agreement"), between GradumGswing Franchising, LLC, a Florida Limited Liability Company ("Franchisor") and _____, a _____ _____ ("Franchisee").

1. **Definitions.** Capitalized terms used but not defined in this Rider have the meanings given in the Agreement.

2. **Waivers Not Required.** Notwithstanding any provision of the Agreement to the contrary, Franchisee is not required to assent to a release, assignment, novation, waiver or estoppel which would relieve Franchisor or any other person from any duty or liability imposed by New York General Business Law, Article 33.

3. **Waivers of New York Law Deleted.** Any condition, stipulation, or provision in the Agreement purporting to bind Franchisee to waive compliance by Franchisor with any provision of New York General Business Law, or any rule promulgated thereunder, is hereby deleted.

4. **Governing Law.** Notwithstanding any provision of the Agreement to the contrary, the New York Franchises Law shall govern any claim arising under that law.

5. **Effective Date.** This Rider is effective as of the Effective Date.

Agreed to by:

FRANCHISOR:                                         FRANCHISEE:

GradumGswing Franchising, LLC                       _____

By: _____                By: _____
Name: _____                Name: _____
Title: _____                Title: _____
Date: _____                Date: _____

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

## NORTH DAKOTA RIDER TO FRANCHISE AND MULTI-TERRITORY DEVELOPMENT AGREEMENT

This Rider amends the Franchise and Multi-Territory Development Agreement dated _____ (the "Agreement"), between GradumGswing Franchising, LLC, a Florida Limited Liability Company ("Franchisor") and _____, a _____ _____ ("Franchisee").

**1.    Definitions.** Capitalized terms used but not defined in this Rider have the meanings given in the Agreement.

**2.    Amendments.** The Agreement (and any Guaranty Agreement) is amended to comply with the following:

(1)    <u>Restrictive Covenants</u>: Every contract by which Franchisee, any Guarantor, or any other person is restrained from exercising a lawful profession, trade, or business of any kind is subject to NDCC Section 9-08-06.

(2)    <u>Situs of Arbitration Proceedings</u>: Franchisee and any Guarantor are not required to agree to the arbitration of disputes at a location that is remote from the site of Franchisee's business.

(3)    <u>Restrictions on Forum</u>: Franchisee and any Guarantor are not required to consent to the jurisdiction of courts outside of North Dakota.

(4)    <u>Liquidated Damages and Termination Penalties</u>: Franchisee is not required to consent to liquidated damages or termination penalties.

(5)    <u>Applicable Laws</u>: The Agreement (and any Guaranty Agreement) is governed by the laws of the State of North Dakota.

(6)    <u>Waiver of Trial by Jury</u>: Franchisee and any Guarantor do not waive a trial by jury.

(7)    <u>Waiver of Exemplary and Punitive Damages</u>: The parties do not waive exemplary and punitive damages.

(8)    <u>General Release</u>: Franchisee and any Guarantor are not required to sign a general release upon renewal of the Agreement.

(9)    <u>Limitation of Claims</u>: Franchisee is not required to consent to a limitation of claims. The statute of limitations under North Dakota law applies.

(10)    <u>Enforcement of Agreement</u>: The prevailing party in any enforcement action is entitled to recover all costs and expenses including attorney's fees.

**3.    Effective Date.** This Rider is effective as of the Effective Date.

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

Agreed to by:

FRANCHISOR:                        FRANCHISEE:

GradumGswing Franchising, LLC      _____

By: _____         By: _____
Name: _____         Name: _____
Title: _____        Title: _____
Date: _____         Date: _____

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

## RHODE ISLAND RIDER TO FRANCHISE AND MULTI-TERRITORY DEVELOPMENT AGREEMENT

This Rider amends the Franchise and Multi-Territory Development Agreement dated _____ (the "Agreement"), between GradumGswing Franchising, LLC, a Florida Limited Liability Company ("Franchisor") and _____, a _____ _____ ("Franchisee").

**1.     Definitions.** Capitalized terms used but not defined in this Rider have the meanings given in the Agreement.

**2.     Jurisdiction and Venue.** Any provision of the Agreement restricting jurisdiction or venue to a forum outside the State of Rhode Island or requiring the application of the laws of another state is void with respect to a claim otherwise enforceable under Rhode Island Franchise Investment Act.

**3.     Effective Date.** This Rider is effective as of the Effective Date.

Agreed to by:

FRANCHISOR:                              FRANCHISEE:

GradumGswing Franchising, LLC            _____

By: _____     By: _____
Name: _____      Name: _____
Title: _____      Title: _____
Date: _____      Date: _____

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

## WASHINGTON ADDENDUM TO DISCLOSURE DOCUMENT
### AND
## RIDER TO FRANCHISE AND MULTI-TERRITORY DEVELOPMENT AGREEMENT

The state of Washington has a statute, RCW 19.100.180 which may supersede the franchise agreement in your relationship with the franchisor including the areas of termination and renewal of your franchise. There may also be court decisions which may supersede the franchise agreement in your relationship with the franchisor including the areas of termination and renewal of your franchise.

In any arbitration involving a franchise purchased in Washington, the arbitration site shall be either in the state of Washington, or in a place mutually agreed upon at the time of the arbitration, or as determined by the arbitrator.

In the event of a conflict of laws, the provisions of the Washington Franchise Investment Protection Act, Chapter 19.100 RCW shall prevail.

A release or waiver of rights executed by a franchisee shall not include rights under the Washington Franchise Investment Protection Act except when executed pursuant to a negotiated settlement after the agreement is in effect and where the parties are represented by independent counsel. Provisions such as those which unreasonably restrict or limit the statute of limitation period for claims under the Act, rights or remedies under the Act such as a right to a jury trial may not be enforceable.

Transfer fees are collectable to the extent that they reflect the franchisor's reasonable estimated or actual costs in effecting a transfer.

Agreed to by:

FRANCHISOR:                                FRANCHISEE:

GradumGswing Franchising, LLC              _____

By: _____               By: _____
Name: _____               Name: _____
Title: _____                Title: _____
Date: _____               Date: _____

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

## STATE EFFECTIVE DATES

The following states have franchise laws that require that the Franchise Disclosure Document be registered or filed with the states, or be exempt from registration: California, Hawaii, Illinois, Indiana, Maryland, Michigan, Minnesota, New York, North Dakota, Rhode Island, South Dakota, Virginia, Washington, and Wisconsin.

This document is effective and may be used in the following states, where the document is filed, registered, or exempt from registration, as of the Effective Date stated below:

None at this time.

Other states may require registration, filing, or exemption of a franchise under other laws, such as those that regulate the offer and sale of business opportunities or seller-assisted marketing plans.

GSwing FDD 2023

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

## RECEIPT

This disclosure document summarizes certain provisions of the franchise agreement and other information in plain language. Read this disclosure document and all agreements carefully.

If GradumGswing Franchising, LLC offers you a franchise, it must provide this disclosure document to you 14 calendar-days before you sign a binding agreement with, or make a payment to, the franchisor or an affiliate in connection with the proposed franchise sale. New York requires that you be given this disclosure document at the earlier of the first personal meeting or 10 business days before the execution of any franchise or other agreement, or payment of any consideration that relates to the franchise relationship.

If GradumGswing Franchising, LLC does not deliver this disclosure document on time or if it contains a false or misleading statement, or a material omission, a violation of federal law and state law may have occurred and should be reported to the Federal Trade Commission, Washington, D.C. 20580 and any applicable state agency (which are listed in Exhibit A).

The name, principal business address, and telephone number of each franchise seller offering the franchise is:

| Name | Principal Business Address | Telephone Number |
|---|---|---|
| Carlos Garmendia | 7872 SW Jack James Drive, Unit 4, Stuart, Florida 34997 | 786-620-9131 |

Any additional franchise sellers involved in offering and selling the franchise to you are listed below (with address and telephone number), or will be provided to you separately before you sign a franchise agreement and listed below: _____

Issuance Date:  August 11, 2023

I received a disclosure document dated August 11, 2023, that included the following Exhibits:

A.    State Administrators and Agents for Service of Process
B.    Franchise Agreement (with Exhibits)
C.    Multi-Territory Development Agreement
D.    Form of General Release
E.    Financial Statements
F.    Operations Manual Table of Contents
G.    Current and Former Franchisees
H     Addenda to Disclosure Document
I.    State Addenda to Agreements

Signature: _____

Print Name: _____

Date Received: _____

**Keep This Copy For Your Records**

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

## RECEIPT

This disclosure document summarizes certain provisions of the franchise agreement and other information in plain language. Read this disclosure document and all agreements carefully.

If GradumGswing Franchising, LLC offers you a franchise, it must provide this disclosure document to you 14 calendar-days before you sign a binding agreement with, or make a payment to, the franchisor or an affiliate in connection with the proposed franchise sale. New York requires that you be given this disclosure document at the earlier of the first personal meeting or 10 business days before the execution of any franchise or other agreement, or payment of any consideration that relates to the franchise relationship.

If GradumGswing Franchising, LLC does not deliver this disclosure document on time or if it contains a false or misleading statement, or a material omission, a violation of federal law and state law may have occurred and should be reported to the Federal Trade Commission, Washington, D.C. 20580 and any applicable state agency (which are listed in Exhibit A).

The name, principal business address, and telephone number of each franchise seller offering the franchise is:

| Name | Principal Business Address | Telephone Number |
|---|---|---|
| Carlos Garmendia | 7872 SW Jack James Drive, Unit 4, Stuart, Florida 34997 | 786-620-9131 |

Any additional franchise sellers involved in offering and selling the franchise to you are listed below (with address and telephone number), or will be provided to you separately before you sign a franchise agreement and listed below: _____

Issuance Date: August 11, 2023

I received a disclosure document dated August 11, 2023, that included the following Exhibits:

    A.      State Administrators and Agents for Service of Process
    B.      Franchise Agreement (with Exhibits)
    C.      Multi-Territory Development Agreement
    D.      Form of General Release
    E.      Financial Statements
    F.      Operations Manual Table of Contents
    G.      Current and Former Franchisees
    H.      State Addenda to Disclosure Document
    I.      State Addenda to Agreements

Signature: _____

Print Name: _____

Date Received: _____

## Return This Copy To Us

# EXHIBIT B

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

# FRANCHISE AGREEMENT

| SUMMARY PAGE | |
|---|---|
| 1. **Franchisee** | Chin Music Partners, LLC |
| 2. **Initial Franchise Fee** | $50,000.00 |
| 3. **Development Area** | Huntsville, Alabama |
| 4. **Training Facility Location** | TBD in Huntsville, Alabama |
| 5. **Territory** | Huntsville, Alabama |
| 6. **Opening Deadline** | August 1, 2024 |
| 7. **Principal Executive** | Jack Dunn, Ken Clayton, Matt Capps |
| 8. **Franchisee's Address** | 12136 Walnut Terrace Alpharetta, GA 30004 |

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

## FRANCHISE AGREEMENT

This Agreement is made between GradumGswing Franchising, LLC, a Florida Limited Liability Company ("Franchisor"), and Franchisee effective as of the ___27th___ day ___March___, 20 _24_ (the "Effective Date").

### Background Statement:

    A.    Franchisor has created and owns a system (the "System") for developing and operating a Gradum Gswing .

    B.    The System includes (1) methods, procedures, and standards for developing and operating Gradum Gswing business, (2) plans, specifications, equipment, signage and trade dress for Gradum Gswing businesses, (3) particular products and services, (4) the Marks, (5) training programs, (6) business knowledge, (7) marketing plans and concepts, and (8) other mandatory and recommended methods of operation as determined by Franchisor from time to time.

    C.    The parties desire that Franchisor license the Marks and the System to Franchisee for Franchisee to develop and  operate one Gradum Gswing Training Facility  on the terms and conditions of this Agreement.

### DEFINITIONS

"**Action**" means any action, suit, proceeding, claim, demand, governmental investigation, governmental inquiry, judgment or appeal thereof, whether formal or informal.

"**Approved Vendor**" means a supplier, vendor, or distributor of goods or services which has been approved by Franchisor.

"**Business**" means the business owned by Franchisee and operated under this Agreement, including without limitation the Training Facility .

"**Competitor**" means any business which engages in, owns, is affiliated with or operates a business featuring  private baseball/softball hitting/swing instruction.

"**Confidential Information**" means all non-public information of or about the System and any Gradum Gswing business, including all methods for developing and operating the business, and all non-public plans, data, financial information, processes, vendor pricing, supply systems, marketing systems, formulas, techniques, designs, layouts, operating procedures, customer data, information and know-how.

"**Gross Sales**" means the total dollar amount of all sales generated through the Training Facility for a given period, including, but not limited to, payment for any services or products sold by Franchisee, whether for cash or credit. Gross Sales does not include (i) bona fide refunds to customers, (ii) sales taxes collected by Franchisee, (iii) sales of used equipment not in the ordinary course of business, or (iv) sales of prepaid cards or similar products (but the redemption of any such card or product will be included in Gross Sales).

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

"**Location**" means the location stated on the Summary Page. If no location is stated on the Summary Page, then the Location will be determined in accordance with Section 6.1 of this Agreement.

"**Losses**" includes (but is not limited to) all losses; damages; fines; charges; expenses; lost profits; reasonable attorneys' fees; travel expenses, expert witness fees; court costs; settlement amounts; judgments; loss of Franchisor's reputation and goodwill; costs of or resulting from delays; financing; costs of advertising material and media time/space and the costs of changing, substituting or replacing the same; and any and all expenses of recall, refunds, compensation, public notices and other such amounts incurred in connection with the matters described.

"**Manual**" means Franchisor's confidential Brand Standards Manual(s), including any supplements, additions, or revisions from time to time, which may be in any form or media.

" **Brand Development Fund**" means the fund established (or which may be established) by Franchisor into which Brand Development Fund Contributions are deposited.

"**Marks**" means the trade name and logo contained on the Summary Page, and all other trade names, trademarks, service marks and logos specified by Franchisor from time to time for use to identify or in connection with Franchisor's business or associated with Franchisor or its affiliates.

"**Owner**" means each person or entity which directly or indirectly owns or controls any equity of Franchisee. If Franchisee is an individual person, then "Owner" means Franchisee.

"**Remodel**" means a refurbishment, renovation, and remodeling of the Location to conform to the building design, exterior facade, trade dress, signage, fixtures, furnishings, equipment, decor, color schemes, presentation of the Marks, and other System Standards in a manner consistent with the image then in effect for a new Gradum Gswing Training Facility .

"**Required Vendor**" means a supplier, vendor, or distributor of products or services which Franchisor requires franchisees to use.

"**System Standards**" means, as of any given time, the then-current mandatory procedures, requirements, and/or standards of the System as determined by, which may include without limitation, any procedures, requirements and/or standards for appearance, business metrics, cleanliness, customer service, design (such as construction, decoration, layout, furniture, fixtures and signs), equipment, inventory, marketing and public relations, operating days, operating hours, presentation of Marks, product and service offerings, quality of products and services (including any guaranty and warranty programs), reporting, safety, technology (such as computers, computer peripheral equipment, smartphones, point-of-sale systems, back-office systems, information management systems, security systems, video monitors, other software, backup and archiving systems, communications systems (including email, audio, and video systems), payment acceptance systems, and internet access, as well as upgrades, supplements, and modifications thereto), uniforms, and vehicles.

"**Territory**" means the territory stated on the Summary Page. If no territory is stated on the Summary Page, then the Territory is determined in accordance with Section 6.1 of this Agreement.

44

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

"**Training Facility** " means the training facility operated under this Agreement at the Location approved by Franchisor.

"**Transfer**" means for Franchisee (or any Owner) to voluntarily or involuntarily transfer, sell, or dispose of, in any single or series of transactions, (i) substantially all of the assets of the Business, (ii) this Agreement, (iii) any direct or indirect ownership interest in the Business, or (iv) control of the Business.

## GRANT OF LICENSE

**2.1    Grant.** Franchisor grants to Franchisee the right to operate one Gradum Gswing only at the Location. If no Location is stated on the Summary Page when this Agreement is signed, then the parties will determine the Location in accordance with Section 6.1 of this Agreement. Franchisee shall develop, open and operate  a Gradum Gswing Training Facility  at the Location for the entire term of this Agreement and any renewals thereof.

**2.2    Protected Territory.** During the term of this Agreement and any renewals thereof, Franchisor agrees not to itself establish, or  license or franchise the establishment of, another training facility within the Territory selling the same or similar goods or services under the same trademarks or service marks as a Gradum Gswing training facility. Franchisor retains the right to:

(i)     establish and license others to establish and operate Gradum Gswing training facilities and businesses outside the Territory, notwithstanding their proximity to the Territory or their impact on the Training Facility;

(ii)    operate and license others to operate businesses anywhere that do not operate under Gradum Gswing Marks; and

(iii)   sell and license others to sell products and services in the Territory through channels of distribution (including the internet) other than Gradum Gswing training facilities.

Franchisee acknowledges that in order to maintain the protected exclusive territory, Franchisee must generate at least $350,000 in gross sales each year after your first year of operating the franchise. If  Franchisee fails to achieve that minimum sales requirement, Franchisor may, at our option, reduce or eliminate Franchisee's territory or terminate the franchise agreement.

**2.3    Franchisee Control.** Franchisee represents that Exhibit 1 to this Agreement  (i) identifies each owner, officer and director of Franchisee, and (ii) describes the nature and extent of each owner's interest in Franchisee. If any information on Exhibit 1 changes that does not constitute a Transfer, Franchisee shall notify Franchisor within ten (10) days of such change.

**2.4    Principal Executive.** Franchisee agrees that the person designated as the "Principal Executive" on the Summary Page is the executive primarily responsible for the Business and has decision-making authority on behalf of Franchisee. The Principal Executive is not required to serve as a day-to-day general manager of the Business, but the Principal Executive must devote substantial time and attention to the Business. If the Principal Executive dies, becomes incapacitated, transfers his/her interest in Franchisee, or otherwise ceases to be the executive

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

primarily responsible for the Business, Franchisee shall promptly designate a new Principal Executive, subject to Franchisor's approval.

**2.5    Guaranty.** If Franchisee is an entity, then Franchisee shall have each Owner sign a personal guaranty of Franchisee's obligations to Franchisor, in the form of Exhibit 3 to this Agreement.

**2.6    No Conflict.** Franchisee represents to Franchisor that Franchisee and each of its Owners (i) are not violating any agreement (including any confidentiality or non-competition covenant) by entering into or performing under this Agreement, (ii) are not a direct or indirect owner of any Competitor, and (iii) are not listed or "blocked" in connection with, and are not in violation under, any anti-terrorism law, regulation, or executive order.

## TERM

**3.1    Term.** This Agreement commences on the Effective Date and continues for ten (10) years.

**3.2    Successor Agreement.** When the Initial Term of this Agreement expires, Franchisee may enter into two successor franchise agreements for additional periods of five (5) years each (the "Renewal Term"), subject to the following conditions prior to the expiration of the Initial Term and each Renewal Term:

(i)      Franchisee notifies Franchisor of the election to renew between ninety (90) and one hundred eighty (180) days prior to the end of the Initial Term and each Renewal Term;

(ii)     Franchisee (and its affiliates) are in compliance with this Agreement and all other agreements with Franchisor and any of its affiliates at the time of election and at the time of renewal;

(iii)    Within a period of time acceptable to Franchisor, Franchisee has made or makes renovations and changes to the Location as Franchisor requires, including without limitation a Remodel, to conform to Franchisor's then-current System Standards;

(iv)     Franchisee and its Owners execute Franchisor's then-current form of franchise agreement and related documents, which may be materially different than this Agreement including, without limitation, higher and different fees, provided however that Franchisee will not pay another initial franchise fee;

(v)      Franchisee and each Owner executes a general release of any and all claims against Franchisor, its affiliates, and their respective owners, officers, directors, agents and employees.

**4.1    Initial Franchise Fee.** Upon signing this Agreement, Franchisee shall pay an initial franchise fee in the amount stated on the Summary Page. This initial franchise fee is not refundable.

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

**4.2    Site Selection and Lease Negotiation Fee.** Contemporaneously with the signing of this Agreement, Franchisee may pay Franchisor a Site Selection and Lease Negotiation fee in the amount of Three Thousand Dollars ($3,250).

**4.3    Construction Fee.** Upon approval of a site by Franchisor, Franchisee may pay Franchisor a fee for construction consulting assistance in the amount of Five Thousand Dollars ($3,250),

**4.4    Royalty Fee.** Franchisee shall pay Franchisor each month a royalty fee (the "Royalty Fee") equal to eight percent (8%) of Gross Sales. The Royalty Fee for any month shall be paid in the immediately following month by the day designated by Franchisor in the Manual or otherwise in writing.

**4.5    Brand Development Fund Contributions.**

(a)    <u>Brand Development Fund Contribution</u>. Franchisee shall pay Franchisor a contribution to the  Brand Development Fund (the "<u> Brand Development Fund Contribution</u>") equal to two percent (2%) of Franchisee's Gross Sales for any <u>Brand Development </u>Fund that is in effect at the same time as the Royalty Fee is paid.

(b)    <u>Market Cooperative Contribution</u>. If the Business participates in a Market Cooperative, then Franchisee shall contribute to the Market Cooperative a percentage of Gross Sales as determined by majority vote of the Market Cooperative.

**4.6    Replacement / Additional Training Fee.** If Franchisee sends an employee to Franchisor's training program after opening, Franchisor may charge its then-current training fee, if any. Franchisee shall be responsible for any of its travel, food and lodging expenses.

**4.7    Non-Compliance Fee.** Franchisor may charge Franchisee One Thousand Five Hundred Dollars ($1,500) for any instance of non-compliance with the System Standards or this Agreement (other than Franchisee's non-payment of a fee owed to Franchisor) which Franchisee fails to cure after thirty (30) days' notice. Franchisor may also charge Franchise for its costs incurred if in the exercise of its discretion it determines that travel to Franchisee's location is appropriate. This fee is a reasonable estimate of Franchisor's internal cost of personnel time attributable to addressing the non-compliance, and it is not a penalty or estimate of all damages arising from Franchisee's breach. The non-compliance fee is in addition to all of Franchisor's other rights and remedies (including default and termination under Section 14.2 of this Agreement).

**4.8    Curing Non-Compliance.** Franchisor may in its sole discretion  cure any instance of non-compliance by Franchisee with a requirement of this Agreement and Franchisee shall pay Franchisor's cost incurred in curing the non-compliance and an administrative fee of ten percent (10%) of such costs.

**4.9    Special Inspection Fee.** Franchisor may charge its reasonable out -of-pocket expenses incurred  if Franchisor inspects the Location because of a government report, customer complaint or other customer feedback, or your default or non-compliance with any system specification.

**4.10    Reimbursement.** Franchisor may, but has no obligation to, pay on Franchisee's behalf any amount that Franchisee owes to a supplier or other third party. If Franchisor does so or intends to

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

do so, Franchisee shall pay the amount paid by Franchisor plus a ten percent (10%) administrative charge to Franchisor within fifteen (15) days after invoice by Franchisor accompanied by reasonable documentation.

**4.11    Payment for Products , Supplies and other items supplied by Franchisor**. Franchisee shall pay Franchisor or its affiliate for any products, supplies or other items supplied to Franchisee, according to the terms and conditions of the invoices for same.

**4.12    Method of Payment and Reporting.**

(a)    <u>Method of Payment</u>. Franchisee shall pay the Royalty Fee, Brand Development Fund Contribution, and any other amounts owed to Franchisor by pre-authorized bank draft, wire or ACH or in such other manner as Franchisor may require. Franchisee shall comply with Franchisor's payment instructions. If Franchisor elects to have payments made by pre-authorized bank draft, Franchisee shall execute the authorization attached to this Agreement as Exhibit 4.

(b)    <u>Calculation of Fees</u>. Each week, on a day designated by Franchisor, Franchisee shall report to Franchisor, its Gross Sales from the previous week. If Franchisee fails to report weekly Gross Sales, then Franchisor may withdraw estimated Royalty Fees and Brand Development Fund Contributions equal to One Hundred twenty-Five percent (125%) of the last Gross Sales reported to Franchisor. The parties will true-up the actual fees after Franchisee reports Gross Sales. Franchisee acknowledges that Franchisor has the right to remotely access Franchisee's point-of-sale system to calculate Gross Sales.

(c)    <u>Late Fees and Interest</u>. If Franchisee does not make a payment by the due date, Franchisee shall pay a late fee of One Hundred Dollar ($100) plus interest on the unpaid amount at a rate equal to eighteen percent (18%) per year (or, if such payment exceeds the maximum allowed by law, then interest at the highest rate allowed by law).

(d)    <u>Insufficient Funds</u>. Franchisor may charge Thirty Dollars ($30) for any payment returned for insufficient funds (or, if such amount exceeds the maximum allowed by law, then the fee allowed by law).

(e)    <u>Costs of Collection</u>. Franchisee shall repay any costs incurred by Franchisor (including reasonable attorney fees) in attempting to collect payments owed by Franchisee.

(f)    <u>Application</u>. Franchisor may apply any payment received from Franchisee to any obligation and in any order as Franchisor may reasonably determine, regardless of any designation by Franchisee.

(g)    <u>Obligations Independent; No Set-Off.</u> The obligations of Franchisee to pay to Franchisor any fees or amounts described in this Agreement are independent covenants by Franchisee. Franchisee shall make all such payments without offset or deduction.

<b>FRANCHISOR'S ASSISTANCE</b>

**5.1    Pre-Opening Assistance**

48

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

Franchisor agrees to the provide the following assistance to Franchise  before Franchise commences operation of the Business:

(a)    Location. Franchisor shall provide Franchisee with  its criteria for Gradum Gswing locations and review information provided by Franchisee regarding proposed location(s) for the Business and approve or disapprove the Location in accordance with Section 6.1 of this Agreement; provided however, that Franchisee acknowledges that Franchisor's approval of a location is not any way to be construed as guaranty of the performance of the Business at that location; Franchisor may provide site selection and lease negotiation assistance to Franchisee.

(b)    Territory. Franchisor shall designate a Territory for the franchise in accordance with Section 6.1 of this Agreement.

(c)    Pre-Opening Plans, Specifications, and Vendors Provide Franchisee with a plan for the Franchisee's  location with (i)  Franchisor's sample set of standard plans or specifications for a recommended  field  and  office  plans; (ii)  the  applicable  System  Standards, (iii)  other specifications  as  Franchisor  deems  appropriate,  including  without  limitation  specifications regarding inventory, equipment, computer system , any required vehicles for use in the Business, supplies and materials, and (iv)  Franchisor's lists of Approved Vendors and/or Required Vendors. Franchisor may provide location construction consulting assistance to Franchisee.

(d)    Certain  Other  Specifications.  Make  available  to  Franchisee,  Franchisor's specifications and approved suppliers for signs, fixtures, equipment, inventory,  computer system, and supplies;

(e)    Employees. Provide  Franchisee  with  suggested  staffing  and  operational instructions in the Manual or otherwise in writing for training Franchisee's employees; provided however that  Franchisee  acknowledges  that  all  hiring  decisions,  terms  and  conditions  of employment and training of Franchisees employees, remain the sole responsibility of Franchise.

(f)    Manual. Provide Franchisee with access to, or a copy of, Franchisor's Manual;

(g)    Training. Make available an initial training program for Franchisee's Principal Executive  or  owner  at  Franchisor's  headquarters  and/or  at  another  location  designated  by Franchisor at no fee for this training; provided however, that Franchisee is responsible for its own travel, lodging, meal, and other out-of-pocket expenses.

(h)    Business Plan. Upon Franchisee's reasonable request, review and provide advice regarding  Franchisee's business plan and any financial projections; provided however, that franchise acknowledges that Franchisor bears no responsibility for the performance of the Business and that the performance of the Franchisee will depend on many factors beyond Franchisor's control including without limitation  Franchisee's business acumen;

(i)    Market Introduction Plan. Advise Franchisee regarding the planning and execution of Franchisee's market introduction plan, including without limitation any grand opening of the Business;

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

(j)    On-site Opening Assistance. Send at least one representative to Franchisee's location to assist with Franchisee's opening of the Business.

**5.2    Post-Opening Assistance.**

Franchisor agrees to the provide the following assistance to Franchise    after Franchise commences operation of the Business:

(a)    Advice, Consulting, and Support. If Franchisee requests, Franchisor will provide advice to Franchisee regarding improving and developing Franchisee's business, and resolving operating problems Franchisee encounters, to the extent Franchisor deems reasonable. If Franchisor provides in-person support in response to Franchisee's request, Franchisor may charge its then-current fee for such support plus any out-of-pocket expenses such as travel, lodging, and meals for employees providing onsite support;

(b)    Procedures. Franchisor will provide Franchisee with Franchisor's recommended administrative, bookkeeping, accounting, and inventory control procedures. Franchisor may make any such procedures part of required System Standards;

(c)    Brand Development Fund. Franchisor shall manage the Brand Development Fund;

(d)    Internet. Franchisor may maintain a website for the Gradum Gswing brand, which will include Franchisee's location or territory and telephone number.

## LOCATION, DEVELOPMENT, AND OPENING

**6.1    Determining Location and Territory.** If the Location and Territory are not stated on the Summary Page:

(i)    Franchisee shall find a potential Location within the Development Area described on the Summary Page. Franchisee shall submit its proposed Location to Franchisor for acceptance, with all related information Franchisor may request. Franchisor may assist Franchisee in site selection. If Franchisor does not accept the proposed Location in writing within thirty (30) days, then the site will be deemed rejected.

(ii)    When Franchisor accepts the Location, it may provide assistance to Franchisee with the terms and conditions of any lease. Franchisee shall have paid the Site Selection and Lease Negotiation Fee specified in Section 4.2 of this Agreement if such assistance it to be provided. Upon completion of the process, Franchisor will issue a Location Acceptance Letter in the form of Exhibit 2 to this Agreement which will set forth the Location and Territory. Franchisor shall determine and assign Franchisee the Territory in its good faith discretion.

(iii)    Franchisor's advice regarding a site or the acceptance of a site and assistance with the lease negotiation is not a representation or warranty that the Business will be successful, and Franchisor shall not be liable to Franchisee with respect to the location of the Training Facility .

**6.2    Lease.** For any lease between Franchisee and the landlord of the Location, Franchisee shall:

FDD 2023                                                                    Franchise Agreement

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

(i) upon Franchisor's request, submit the proposed lease to Franchisor for written approval,

(ii) have the term of the lease provide for a period of not less than the Initial Term of this Agreement or any Renewal Term, and,

(iii) use commercially reasonable efforts to obtain the landlord's signature to the conditional assignment of the lease substantially in the form required by Franchisor as shown on Exhibit 5 to this Agreement.

**6.3    Development.** Franchisee shall construct (or remodel) and finish the Location in conformity with Franchisor's System Standards. If required by Franchisor, Franchisee shall engage the services of an architect licensed in the jurisdiction of the Location. Franchisee shall not begin any construction or remodeling work without first obtaining Franchisor's approval of Franchisee's plans. Franchisor may provide assistance to Franchisee with the construction consulting assistance. Franchisee shall have paid the construction assistance fee specified in Section  4.3 of this Agreement if such assistance it to be provided. Franchisor may, but is not required to, inspect Franchisee's construction or remodeling progress at any reasonable time. Franchisee shall not rely upon any information provided or opinions expressed by Franchisor or its representatives regarding any architectural, engineering, or legal matters (including without limitation the Americans With Disabilities Act) in the development and construction of the Training Facility  and Franchisor shall not have any liability with respect thereto. Franchisor's inspection and/or approval to open the Training Facility  is not a representation or a warranty that the Training Facility  has been constructed in accordance with any architectural, engineering, or legal standards.

**6.4    New Franchisee Training.** Franchisee's Principal Executive must complete Franchisor's training program for new franchisees to Franchisor's satisfaction by the time designated by Franchisor before opening the Training Facility .

**6.5    Conditions to Opening.** Franchisee shall notify Franchisor at least  twenty (20) days before Franchisee intends to open the Training Facility  to the public. Before opening, Franchisee must satisfy all of the following conditions:

(i) Franchisee is in compliance with this Agreement,

(ii) Franchisee has obtained all applicable governmental permits and authorizations,

(iii) the Business and Training Facility  conform to all applicable System Standards,

(iv) Franchisor has inspected and approved the Training Facility ,

(v) Franchisee's officers and employees have completed all of Franchisor's required pre-opening training; and

(vi) Franchisor has given its written approval to open, which approval will not be unreasonably withheld or delayed.

**6.6    Opening Date.** Franchisee shall open the Training Facility  to the public on or before the date stated on the Summary Page.

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

## OPERATIONS

**7.1    Compliance with Manual and System Standards**. Franchisee shall at all times and at its own expense comply with all mandatory obligations contained in the Manual and with all System Standards.

**7.2    Compliance with Law.** Franchisee and the Business shall comply with all laws and regulations. Franchisee and the Training Facility shall obtain and keep in force all governmental permits and licenses required for the Training Facility .

**7.3    Products, Services, and Methods of Sale.** Franchisee shall offer all products and services, and only those products and services, as from time to time prescribed by Franchisor in the Manual or otherwise in writing, including without limitation products supplied by Franchisor or its affiliate or designated supplier. Franchisee shall make sales only to retail customers, and only at the Location. Unless otherwise approved or required by Franchisor, Franchisee shall not, without Franchisor's written approval, make sales by any other means, including without limitation by wholesale, by delivery, by mail order or over the internet, or at temporary or satellite locations.

**7.4    Prices.** Franchisee shall generally determine its own prices; provided however, that, to the extent permitted by applicable law, Franchisee shall honor any customer loyalty programs and promotions implemented by Franchisor and any maximum prices and minimum discounts for any given product or service established by Franchisor.

**7.5    Personnel.**

(a)    <u>Management</u>. Franchisee's Training Facility must at all times be under the on-site supervision of the Principal Executive or a general manager who has completed Franchisor's training program.

(b)    <u>Service</u>. Franchisee shall cause its personnel to render competent and courteous service to all customers and members of the public.

(c)    <u>Appearance</u>. Franchisee shall cause its personnel to comply with any dress attire, uniform, personal appearance and hygiene standards set forth in the Manual.

(d)    <u>Qualifications</u>. Franchisor may set minimum qualifications for categories of employees employed by Franchisee.

(e)    <u>Sole Responsibility</u>. Franchisee is solely responsible for the terms and conditions of employment of all of its personnel, including recruiting, hiring, training, scheduling, supervising, compensation, and termination. Franchisee is solely responsible for all actions of its personnel. Franchisee and Franchisor are not joint employers, and no employee of Franchisee will be deemed to be an agent or employee of Franchisor. Within seven days of Franchisor's request, Franchisee and each of its employees will sign an acknowledgment form stating that only Franchisee, and not Franchisor, is the employee's sole employer. Franchisee will use its legal name on all documents with its employees and independent contractors, including, but not limited to, employment applications, timecards, pay checks, and employment and independent contractor agreements, and Franchisee will not use the Marks on any of these documents.

FDD 2023                                                      Franchise Agreement

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

**7.6     Post-Opening Training.** Franchisor may at any time require that the Principal Executive and/or any other employees to complete training programs, in any format and in any location determined by Franchisor. Franchisor may charge a reasonable fee for any training programs. Franchisor may require Franchisee to provide training programs to its employees. If a training program is held at a location which requires travel by the Principal Executive or any other employee, then Franchisee shall pay all related travel, living and other expenses.

**7.7     Software.** Without limiting the generality of Section 7.1 or Section 8.1 of this Agreement, Franchisee shall acquire and use all software and related systems required by Franchisor. Franchisee shall enter into any subscription and support agreements that Franchisor may require. Franchisee shall upgrade, update, or replace any software from time to time as Franchisor may require. Franchisee shall protect the confidentiality and security of all software systems, and Franchisee shall abide by any System Standards related thereto. Franchisee shall give Franchisor unlimited access to Franchisee's point of sale system and other software systems used in the Business, by any means designated by Franchisor.

**7.8     Customer Complaints.** Franchisee shall use its best efforts to promptly resolve any customer complaints. Franchisor may take any action it deems appropriate to resolve a customer complaint regarding the Business, and Franchisor may require Franchisee to reimburse Franchisor for any expenses incurred thereby.

**7.9     Evaluation and Compliance Programs.** Franchisee shall participate at its own expense in programs required from time to time by Franchisor for obtaining customer evaluations, reviewing Franchisee's compliance with the System, and/or managing customer complaints, including without limitation a customer feedback system, customer survey programs, and mystery shopping. Franchisor shall share with Franchisee the results of these programs, as they pertain to the Business. Franchisee must meet or exceed any minimum score requirements set by Franchisor for such programs. Franchisor may set minimum scores that Franchisee must receive from the public on social media and internet review sites such as Yelp or Google.

**7.10     Payment Systems.** Franchisee shall accept payment from customers in any form or manner designated by Franchisor (which may include, for example, cash, specific credit and/or debit cards, gift cards, electronic fund transfer systems, and mobile payment systems). Franchisee shall purchase or lease all equipment and enter into all business relationships necessary to accept payments as required by Franchisor. Franchisee must at all times comply with payment card industry data security standards (PCI-DSS).

**7.11     Gift Cards, Loyalty Programs, and Incentive Programs.** At its own expense, Franchisee shall sell or otherwise issue gift cards, certificates, or other pre-paid systems, and participate in any customer loyalty programs, membership/subscription programs, or customer incentive programs, designated by Franchisor, in the manner specified by Franchisor in the Manual or otherwise in writing. Franchisee shall honor all valid gift cards and other pre-paid systems, regardless of whether issued by Franchisee or another Gradum Gswing business. Franchisee shall comply with all procedures and specifications of Franchisor related to gift cards, certificates, and other pre-paid systems, or related to customer loyalty, membership/subscription, or customer incentive programs.

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

**7.12    Maintenance and Repair.** Franchisee shall at all times keep the Training Facility  in a neat and clean condition, perform all appropriate maintenance, and keep all physical property in good repair. In addition, Franchisee shall promptly perform all work on the physical property of the Training Facility  as Franchisor may prescribe from time to time, including but not limited to periodic interior and exterior painting; resurfacing of the parking lot; roof repairs; and replacement of obsolete or worn-out signage, floor coverings, furnishings, equipment and décor. Franchisee acknowledges that the System Standards may include requirements for cleaning, maintenance, and repair.

**7.13    Remodeling.** In addition to Franchisee's obligations to comply with all System Standards in effect from time to time, Franchisor may require Franchisee to undertake and complete a Remodel of the Location to Franchisor's satisfaction. Franchisee must complete the Remodel in the time frame specified by Franchisor. Franchisor may require the Franchisee to submit plans for Franchisor's reasonable approval prior to commencing a required Remodel. Franchisor's right to require a Remodel is limited as follows: (i) the Remodel will not be required in the first two or last two years of the term, except that a Remodel may be required as a condition to renewal of the term or a Transfer, and (ii) a Remodel will not be required more than once every five years from the date on which Franchisee was required to complete the prior Remodel.

**7.14    Meetings.** The Principal Executive shall use reasonable efforts to attend all in-person meetings and remote meetings (such as telephone conference calls) that Franchisor requires, including any national or regional brand conventions.

**7.15    Insurance.**

(a)    Franchisee shall obtain and maintain insurance policies in the types and amounts as specified by Franchisor in the Manual. If not specified in the Manual, Franchisee shall maintain at least the following insurance coverage:

(i)    "Special" causes of loss coverage forms, including fire and extended coverage, crime, on all property of the Training Facility, for full repair and replacement value subject to a reasonable deductible;

(ii)    Commercial General Liability insurance, including products liability coverage, and broad form commercial liability coverage, written on an "occurrence" policy form in an amount of not less than $1,000,000 single limit per occurrence and $2,000,000 aggregate limit with extended coverage, child endangerment and molestation, from a company rated A+ or better by A.M. Best or equivalent, providing protection which is standard or greater in the hitting, baseball, fitness and health club industry;

(iii)    Umbrella liability insurance in excess of and not more restrictive than the underlying coverage listed above, with limits of not less than $1,000,000 per occurrence/$2,000,000 aggregate; and

(iv)    Workers Compensation coverage as required by the laws of the state where the Training Facility  is located.

Franchise Agreement

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

(b)     Except for workers compensation insurance, Franchisee's policies shall (1) list Franchisor and its affiliates as an additional insured, (2) include a waiver of subrogation in favor of Franchisor and its affiliates, (3) be primary and non-contributing with any insurance carried by Franchisor or its affiliates, and (4) stipulate that Franchisor shall receive thirty (30) days' prior written notice of cancellation.

(c)     Franchisee shall provide Certificates of Insurance evidencing the required coverage to Franchisor prior to opening and upon annual renewal of the insurance coverage, as well as at any time upon request of Franchisor.

**7.16    Payments to Third Parties.** Franchisee shall pay all vendors and suppliers in a timely manner. Franchisee shall pay all taxes when due. If Franchisee borrows money, it shall comply with the terms of its loan and make all loan payments when due. If Franchisee leases the Location, Franchisee shall comply with its lease for the Location and make all rent payments when due.

**7.17    Public Relations.** Without Franchisor's prior written approval, which will not be unreasonably withheld, Franchisee shall not make any public statements, including without limitation interviews or issuing press releases, regarding Franchisor, the Training Facility  or Business, or any particular incident or occurrence related to the Training Facility  or Business.

**7.18    Association with Causes.** Franchisee shall not in the name of the Business (i) donate money, products, or services to any charitable, political, religious, or other organization, or (ii) act in support of any such organization, without Franchisor's prior written approval, which will not be unreasonably withheld.

**7.19    No Other Activity Associated with the Business.** Franchisee shall not engage in any business or other activity at the Location other than operation of the Gradum Gswing Training Facility . Franchisee shall not use assets of the Training Facility  for any purpose other than the Training Facility . If Franchisee is an entity, the entity shall not own or operate any other business except the Gradum Gswing businesses.

**7.20    No Third-Party Management.** Franchisee shall not engage a third-party management company to manage or operate the Training Facility  without the prior written approval of Franchisor, which will not be unreasonably withheld.

**7.21    Identification.** Franchisee must identify itself as the independent owner of the Business in the manner prescribed by Franchisor. Franchisee must display at the Training Facility  signage prescribed by Franchisor identifying the Location as an independently owned franchise.

**7.22    Business Practices.** Franchisee, in all interactions with customers, employees, vendors, governmental authorities, and other third parties, shall be honest and fair. Franchisee shall comply with any code of ethics or statement of values from Franchisor. Franchisee shall not take any action which may injure the goodwill associated with the Marks.

### SUPPLIERS AND VENDORS

**8.1    Generally.** Franchisee shall acquire all products and services required by Franchisor from time to time in accordance with System Standards. Franchisor may require Franchisee to purchase

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

or lease any products from Franchisor's designee, Required Vendors, Approved Vendors, and under Franchisor's specifications. Franchisor may periodically change any such requirement or change the status of any vendor. Any such requirement or change by Franchisor shall be made effective by insertion into the Manual, System Standards or otherwise by written notice to Franchisee.

**8.2    Alternate Vendor Approval.** If Franchisor requires Franchisee to purchase a particular product or service only from an Approved Vendor or Required Vendor, and Franchisee desires to purchase the product or service from a different vendor, then Franchisee shall submit a written request to Franchisor for approval and any information, specifications and/or samples requested by Franchisor. Franchisor may condition its approval on such criteria as Franchisor deems appropriate, which may include evaluations of the vendor's capacity, quality, financial stability, reputation, and reliability; inspections; product testing, and performance reviews. Franchisor will provide Franchisee with written notice of the approval or disapproval of any proposed new vendor within thirty (30) days after receipt of Franchisee's request.

**8.3    Alternate Product or service Approval.** If Franchisor requires Franchisee to purchase a particular Product or service, and Franchisee desires to purchase an alternate Product or service, Franchisee must submit a written request for approval and any information, specifications and/or samples requested by Franchisor. Franchisor will provide Franchisee with written notification of the approval or disapproval of any proposed alternate Product or service within thirty (30) days after receipt of Franchisee's request.

**8.4    Purchasing.** Franchisor may negotiate prices and terms with vendors on behalf of the System. Franchisor may receive rebates, payments or other consideration from vendors in connection with purchases by franchisees. Franchisor has the right, but not the obligation, to collect payments from Franchisee on behalf of a vendor and remit the payments to the vendor and impose a reasonable markup or charge for administering the payment. Franchisor may implement a centralized purchasing system. Franchisor may establish a purchasing cooperative and require Franchisee to join and participate in the purchasing cooperative on such terms and conditions as Franchisor may determine.

**8.5    No Liability of Franchisor.** Franchisor shall not be liable to Franchisee for any claim or loss related to any product provided or service performed by any Approved Vendor or Required Vendor, including without limitation defects, delays, or unavailability of products or services.

**8.6    Product Recalls.** If Franchisor or any vendor, supplier, or manufacturer of an item used or sold in Franchisee's Training Facility  issues a recall of such item or otherwise notifies Franchisee that such item is defective or dangerous, Franchisee shall immediately cease using or selling such item, and Franchisee shall at its own expense comply with all instructions from Franchisor or the vendor, supplier, or manufacturer of such item with respect to such item, including without limitation the recall, repair, or replacement of such item.

## MARKETING

**9.1    Approval and Implementation.** Franchisee shall not conduct any marketing, advertising, or public relations activities, including without limitation, marketing materials, websites, online

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

advertising, social media marketing or presence, and sponsorships, which have not been approved by Franchisor. Franchisor may, but is not obligated to, operate all "social media" accounts on behalf of the System, or it may permit franchisees to operate one or more accounts. Franchisee must comply with any System Standards regarding marketing, advertising, and public relations, include any social media policy that Franchisor may prescribe. Franchisee shall implement any social media and marketing plans, or campaigns as determined by Franchisor. If Franchisor permits Franchisee to operate its own social media accounts, Franchisee shall obtain Franchisor's prior approval for any and all  social media postings or content relating or  referring to the Training Facility  or the Marks,  or in any way associated with the Training Facility  or the Marks.

**9.2     Use by Franchisor.** Franchisor may use any marketing materials or campaigns developed by or on behalf of Franchisee, and Franchisee hereby grants an unlimited, perpetual, royalty-free license to Franchisor for such purpose.

**9.3     Brand Development Fund.** Franchisor may establish a  Brande Development Fund to promote the System on a local, regional, national, and/or international level. If Franchisor has established a Brand Development Fund, the following shall apply:

(a)     <u>Separate Account</u>. Franchisor shall hold the  Brand Development Fund Contributions from all franchisees in one or more bank accounts separate from  Franchisor's other accounts.

(b)     <u>Use</u>. Franchisor shall use the Brand Development Fund only for marketing, advertising, and public relations materials, programs and campaigns (including at local, regional, national, and/or international level), and related overhead. The foregoing includes such activities and expenses as Franchisor reasonably determines, and may include, without limitation: development and placement of advertising and promotions; sponsorships; contests and sweepstakes; development of décor, trade dress, Marks, and/or branding; development and maintenance of brand websites; social media; internet activities; e-commerce programs; search engine optimization; market research; public relations, media or agency costs; trade shows and other events; printing and mailing; and administrative and overhead expenses related to the  Brand Development Fund (including the compensation of Franchisor's employees working on marketing and for accounting, bookkeeping, reporting, legal and other expenses related to the Brand Development Fund).

(c)     <u>Discretion</u>. Franchisee agrees that expenditures from the  Brand Development Fund need not be proportionate to contributions made by Franchisee or provide any direct or indirect benefit to Franchisee. The  Brand Development Fund will be spent at Franchisor's sole discretion, and Franchisor is not a fiduciary with respect to the Fund.

(d)     <u>Contribution by Other Outlets</u>. Franchisor is not obligated to (i) have all other Gradum Gswing training facilities (whether owned by other franchisees or by Franchisor or its affiliates) contribute to the  Brand Development Fund, or (ii) have other  Gradum Gswing training facilities contribute the same amount or at the same rate as Franchisee.

(e)     <u>Surplus or Deficit</u>. Franchisor may accumulate funds in the Brand Development Fund and carry the balance over to subsequent years. If the Brand Development Fund operates at

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

a deficit or requires additional funds at any time, Franchisor may loan such funds to the Fund on reasonable terms.

(f)    Financial Statement. Franchisor will prepare an unaudited annual financial statement of the Brand Development Fund within 120 days of the close Franchisor's fiscal year and will provide the financial statement to Franchisee upon request.

**9.4    Market Cooperatives.** Franchisor may establish market advertising and promotional cooperative funds ("Market Cooperative") in any geographical areas. If a Market Cooperative for the geographic area encompassing the Location has been established at the time Franchisee commences operations hereunder, Franchisee shall immediately become a member of such Market Cooperative. If a Market Cooperative for the geographic area encompassing the Location is established during the term of this Agreement, Franchisee shall become a member of such Market Cooperative within thirty (30) days. Franchisor shall not require Franchisee to be a member of more than one Market Cooperative. If Franchisor establishes a Market Cooperative:

(a)    Governance. Each Market Cooperative will be organized and governed in a form and manner and shall commence operations on a date determined by Franchisor. Franchisor may require the Market Cooperative to adopt bylaws or regulations prepared by Franchisor. Unless otherwise specified by Franchisor, the activities carried on by each Market Cooperative shall be decided by a majority vote of its members. Franchisor will be entitled to attend and participate in any meeting of a Market Cooperative. Any Franchisor business owned by Franchisor in the Market Cooperative shall have the same voting rights as those owned by its franchisees. Each Business owner will be entitled to cast one vote for each Training Facility owned, provided, however, that a franchisee shall not be entitled to vote if it is in default under its franchise agreement. If the members of a Market Cooperative are unable or fail to determine the manner in which Market Cooperative monies will be spent, Franchisor may assume this decision-making authority after 10 days' notice to the members of the Market Cooperative.

(b)    Purpose. Each Market Cooperative shall be devoted exclusively to administering regional advertising and marketing programs and developing standardized promotional materials for use by the members in local advertising and promotions, all of which are subject to Franchisor's approval.

(c)    Approval. No advertising or promotional plans or materials may be used by a Market Cooperative or furnished to its members without the prior approval of Franchisor pursuant to Section 9.1 of this Agreement. Franchisor may designate the national or regional advertising agencies used by the Market Cooperative.

(d)    Funding. The majority vote of the Market Cooperative will determine the dues to be paid by members of the Market Cooperative, including Franchisee, but not less than 1% and provided Franchisor or its affiliates have a majority vote, not more than 3% of Gross Sales.

(e)    Enforcement. Only Franchisor will have the right to enforce the obligations of franchisees who are members of a Market Cooperative to contribute to the Market Cooperative.

(f)    Termination. Franchisor may terminate any Market Cooperative. Any funds left in a Market Cooperative upon termination will be transferred to the Brand Development Fund.

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

**9.5    Local Advertising and Marketing.** Franchisee shall spend five percent (5%) of Gross Sales each month on marketing the Training Facility . Upon request of Franchisor, Franchisee shall furnish proof of its compliance with this Section. Franchisor has the sole discretion to determine what activities constitute "marketing" under this Section. Franchisor may, in its discretion, determine that if Franchisee contributes to a Market Cooperative, the amount of the contribution will be counted towards Franchisee's required spending under this Section 9.5.

**9.6    Market Introduction Plan.** Franchisee must develop a market introduction plan and obtain Franchisor's approval of the market introduction plan at least thirty (30) days before the projected opening date of the Training Facility .

**RECORDS AND REPORTS**

**10.1    Systems.** Franchisee shall use such customer data management, sales data management, administrative, bookkeeping, accounting, and inventory control procedures and systems as Franchisor may specify in the Manual or otherwise in writing.

**10.2    Reports.**

(a)    <u>Financial Reports</u>. Franchisee shall provide such periodic financial reports as Franchisor may require in the Manual or otherwise in writing, including:

(i)    a monthly profit and loss statement and balance sheet for the Business within thirty (30) days after the end of each calendar month;

(ii)    an annual financial statement (including profit and loss statement, cash flow statement, and balance sheet) for the Business within ninety (90) days after the end of Franchisor's fiscal year; and

(iii)    any information Franchisor requests in order to prepare a financial performance representation for Franchisor's franchise disclosure document.

(b)    <u>Legal Actions and Investigations</u>. Franchisee shall promptly notify Franchisor of any Action or threatened Action by any customer, governmental authority, or other third party against Franchisee or the Business, or otherwise involving the Franchisee or the Business. Franchisee shall provide such documents and information related to any such Action as Franchisor may request.

(c)    <u>Government Inspections</u>. Franchisee shall give Franchisor copies of all inspection reports, warnings, certificates, and ratings issued by any governmental entity with respect to the Training Facility , within three days of Franchisee's receipt thereof.

(d)    <u>Other Information</u>. Franchisee shall submit to Franchisor such other financial statements, budgets, forecasts, reports, records, copies of contracts, documents related to litigation, tax returns, copies of governmental permits, and other documents and information related to the Business as specified in the Manual or that Franchisor may reasonably request.

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

**10.3    Initial Investment Report.** Within one hundred twenty (120) days after opening for business, Franchisee shall submit to Franchisor a report detailing Franchisee's investment costs to develop and open the Training Facility , with costs allocated to the categories listed in Item 7 of Franchisor's Franchise Disclosure Document and with such other information as Franchisor may request.

**10.4    Training Facility Records.** Franchisee shall keep complete and accurate books and records reflecting all expenditures and receipts of the Training Facility, with supporting documents, including, but not limited to, payroll records, payroll tax returns, register receipts, production reports, sales invoices, bank statements, deposit receipts, cancelled checks and paid invoices, for at least three years. Franchisee shall keep such other business records as Franchisor may specify in the Manual or otherwise in writing.

**10.5    Records Audit.** Franchisor may examine and audit all books and records related to the Training Facility and supporting documentation, at any reasonable time. Franchisor may conduct the audit at the Location and/or require Franchisee to deliver copies of books, records and supporting documentation to a location designated by Franchisor. Franchisee shall reimburse Franchisor for all costs and expenses of the examination or audit if (i) Franchisor conducted the audit because Franchisee failed to submit required reports or was otherwise not in compliance with the System, or (ii) the audit reveals that Franchisee understated Gross Sales by three percent (3%) or more during any four-week period.

## FRANCHISOR'S RIGHTS

**11.1    Manual; Modification.** The Manual, and any part of the Manual, may be in any form or media determined by Franchisor. Franchisor may supplement, revise, or modify the Manual, and Franchisor may change, add or delete System Standards at any time in its discretion. Franchisor may inform Franchisee thereof by any method that Franchisor deems appropriate. Such notice need not qualify as "notice" under Section 18.9 of this Agreement. In the event of any dispute as to the contents of the Manual, Franchisor's master copy will control.

**11.2    Inspections.** Franchisor may enter the premises of the Training Facility  from time to time during normal business hours and conduct an inspection. Franchisee shall cooperate Franchisor's inspectors. The inspection may include, but is not limited to, observing operations, conducting a physical inventory, evaluating physical conditions, monitoring sales activity, speaking with employees and customers, and removing samples of products, supplies and materials. Franchisor may videotape and/or take photographs of the inspection and the Training Facility . Franchisor may set a minimum score requirement for inspections, and Franchisee's failure to meet or exceed the minimum score will be a default under this Agreement. Without limiting Franchisor's other rights under this Agreement, Franchisee will, as soon as reasonably practical, correct any deficiencies noted during an inspection. If Franchisor conducts an inspection because of a governmental report, customer complaint or other customer feedback, or a default or non-compliance with any System Standard by Franchisee, including following up a previous failed inspection, then Franchisor may charge all out-of-pocket expenses plus its then-current inspection fee to Franchisee.

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

**11.3    Franchisor's Right to Cure.** If Franchisee breaches or defaults under any provision of this Agreement, Franchisor may, but shall not be obligated to, take any action to cure the default on behalf of Franchisee, without any liability to Franchisee. Franchisee shall reimburse Franchisor for its costs and expenses. Including without limitation, the allocation of any internal costs, for such action, plus a ten percent (10%) administrative fee.

**11.4    Right to Discontinue Supplies Upon Default.** While Franchisee is in default or breach of this Agreement, Franchisor may (i) require that Franchisee pay cash on delivery for products or services supplied by Franchisor, (ii) stop selling or providing any products and services to Franchisee, and/or (iii) request any third-party vendors to not sell or provide products or services to Franchisee. No such action by Franchisor shall be a breach or constructive termination of this Agreement, change in competitive circumstances or similarly characterized, and Franchisee shall not be relieved of any obligations under this Agreement because of any such action. Such rights of Franchisor are in addition to any other right or remedy available to Franchisor.

**11.5    Training Facility Data.** All customer data and other non-public data generated by the Training Facility is Confidential Information and is exclusively owned by Franchisor. Franchisor hereby licenses such data back to Franchisee without charge solely for Franchisee's use in connection with the Training Facility for the term of this Agreement and any renewals thereof.

**11.6    Innovations.** Franchisee shall disclose to Franchisor all ideas, plans, improvements, concepts, methods and techniques relating to the Training Facility (collectively, "<u>Innovations</u>") conceived or developed by Franchisee, its employees, agents or contractors. Franchisor will automatically own all Innovations, and it will have the right to use and incorporate any Innovations into the System, without any compensation to Franchisee. Franchisee shall execute any documents reasonably requested by Franchisor to document Franchisor's ownership of Innovations.

**11.7    Communication Systems.** If Franchisor provides email accounts and/or other communication systems to Franchisee, then Franchisee acknowledges that it has no expectation of privacy in the assigned email accounts and other communications systems, and Franchisee authorizes Franchisor to access such communications.

**11.8    Delegation.** Franchisor may delegate any duty or obligation of Franchisor under this Agreement to an affiliate or to a third party.

**11.9    System Variations.** Franchisor may vary or waive any System Standard for any one or more of Franchisor franchises due to the peculiarities of the particular site or circumstances, density of population, business potential, population of trade area, existing business practices, applicable laws or regulations, or any other condition relevant to the performance of a franchise or group of franchises. Franchisee is not entitled to the same variation or waiver.

**11.10    Temporary Public Safety Closure.** If Franchisor discovers or becomes aware of any aspect of the Training Facility which, in Franchisor's opinion, constitutes an imminent danger to the health or safety of any person, then immediately upon notice from Franchisor, Franchisee must temporarily cease operations of the Training Facility and remedy the dangerous condition. Franchisor shall not be liable to Franchisee or any other person for action or failure to act with respect to a dangerous condition.

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

**MARKS**

**12.1    Authorized Marks.** Franchisee shall not use any trademarks, service marks or logos in connection with the Training Facility  other than the Marks. Franchisee shall use all Marks specified by Franchisor only in the manner designated by Franchisor. Franchisee has no rights in the Marks other than the right to use them in the operation of the Training Facility  in compliance with this Agreement. All use of the Marks by Franchisee and any goodwill associated with the Marks, including any goodwill arising due to Franchisee's operation of the Training Facility  and Business, shall inure to the exclusive benefit of Franchisor.

**12.2    Change of Marks.** Franchisor may add, modify, or discontinue any Marks to be used under the System. Within a reasonable time after Franchisor makes any such change, Franchisee must comply with the change at Franchisee's sole expense.

**12.3    Infringement.**

(a)    Defense of Franchisee. If Franchisee has used the Marks in accordance with this Agreement, then (i) Franchisor shall defend Franchisee (at Franchisor's expense) against any Action by a third-party alleging infringement by Franchisee's use of a Mark, and (ii) Franchisor will indemnify Franchisee for expenses and damages if the Action is resolved unfavorably to Franchisee.

(b)    Infringement by Third Party. Franchisee shall promptly notify Franchisor if Franchisee becomes aware of any possible infringement of a Mark by a third party. Franchisor may, in its sole discretion, commence or join any claim against the infringing party.

(c)    Control. Franchisor shall have the exclusive right to control any prosecution or defense of any Action related to possible infringement of or by the Marks.

**COVENANTS**

**13.1    Confidential Information.** With respect to all Confidential Information, Franchisee shall (a) adhere to all procedures prescribed by Franchisor for maintaining confidentiality, (b) disclose such information to its employees only to the extent necessary for the operation of the Training Facility ; (c) not use any such information in any other business or in any manner not specifically authorized in writing by Franchisor, (d) exercise the highest degree of diligence and effort to maintain the confidentiality of all such information during and after the term of this Agreement, (e) not copy or otherwise reproduce any Confidential Information, and (f) promptly report any unauthorized disclosure or use of Confidential Information. Franchisee acknowledges that all Confidential Information is owned by Franchisor (except for Confidential Information which Franchisor licenses from another person or entity). This Section will survive the termination or expiration of this Agreement indefinitely.

**13.2    Covenants Not to Compete.**

(a)    Restriction – In Term. During the term of this Agreement, neither Franchisee, any Owner, nor any spouse of an Owner (the "Restricted Parties or "Restricted Party") shall directly

62

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

or indirectly have any ownership interest in, lend money or provide financial assistance to, provide any services to, or be employed by, any Competitor.

(b)    Restriction – Post Term. For two years after this Agreement expires or is terminated for any reason or, where applicable, for two years after a Transfer, no Restricted Party shall directly or indirectly operate, have any ownership interest in, lend money or provide financial assistance to, provide any services to, or be employed by, any Competitor which is located at the premises upon which the Gradum Gswing is or was located or is located or within a twenty-five (25) mile radius of the Franchisee's location or any other Gradum Gswing location, whether owned by Franchisor or another Franchisee.  Franchisee expressly agrees that the two-year period and the twenty-five (25) mile radius are the reasonable and necessary time and distance needed to protect Franchisor if this Agreement expires or is terminated for any reason. Franchisee agrees that the two-year time period of the non-competition provision shall not accrue during any time period that Franchise or any Restricted Party is in violation of this covenant. If this Agreement is terminated before the Territory is determined, then the area of non-competition will the Development Area and the territory of any other Gradum Gswing business operating on the date of termination.

(c)    Interpretation. The parties agree that each of the foregoing covenants is independent of any other covenant or provision of this Agreement. If all or any portion of the covenants in this Section is held to be unenforceable or unreasonable by any arbitrator or court, then the parties intend that the arbitrator or court modify such restriction to the extent reasonably necessary to protect the legitimate business interests of Franchisor. Franchisee agrees that the existence of any claim it may have against Franchisor shall not constitute a defense to the enforcement by Franchisor of the covenants of this Section. If a Restricted Party fails to comply with the obligations under this Section during the restrictive period, then the restrictive period will be extended an additional day for each day of noncompliance.

**13.3    General Manager and Key Employees.** If requested by Franchisor, Franchisee will cause its general manager and other employees to sign Franchisor's then-current form of confidentiality and non-compete agreement.

## DEFAULT AND TERMINATION

**14.1    Termination by Franchisee.** Franchisee may terminate this Agreement only if Franchisor violates a material provision of this Agreement and fails to cure or to make substantial progress toward curing the violation within thirty (30) days after receiving written notice from Franchisee detailing the alleged default. Termination by Franchisee is effective ten (10) days after Franchisor receives written notice of termination.

**14.2    Termination by Franchisor.**

(a)    Termination Subject to 10-Day Cure Period. Franchisor may terminate this Agreement if Franchisee does not make any payment to Franchisor when due, or if Franchisee has insufficient funds in its account when Franchisor attempts an electronic funds withdrawal, and Franchisee fails to cure such non-payment within ten (10) days after Franchisor gives notice to Franchisee of such breach.

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

(b)     <u>Termination Subject to 30-Day Cure Period</u>. Franchisor may terminate this Agreement if Franchisee breaches this Agreement in any manner not described in subsection (a) or (c) of this Section 14.2, and Franchisee fails to cure such breach to Franchisor's satisfaction within thirty (30) days after Franchisor notifies Franchisee of the breach.

(c)     <u>Termination Without Cure Period</u>. Franchisor may terminate this Agreement by giving notice to Franchisee, without opportunity to cure, if any of the following occur:

(i)     Franchisee misrepresented or omitted material facts when applying to be a franchisee, or makes any misrepresentation in this Agreement;

(ii)    Franchisee knowingly submits any false report or knowingly provides any other false information to Franchisor;

(iii)   a receiver or trustee for the Business or all or substantially all of Franchisee's property is appointed by any court, or Franchisee makes a general assignment for the benefit of Franchisee's creditors, or Franchisee is unable to pay its debts as they become due, or a levy or execution is made against the Business, or an attachment or lien remains on the Business for thirty (30) days unless the attachment or lien is being duly contested in good faith by Franchisee, or a petition in bankruptcy is filed by Franchisee, or such a petition is filed against or consented to by Franchisee and the petition is not dismissed within forty-five (45) days, or Franchisee is adjudicated as bankrupt;

(iv)    Franchisee fails to open the Training Facility for business by the date specified on the Summary Page after ten (10) days' notice from Franchisor;

(v)     Franchisee loses possession of the Location;

(vi)    Franchisee or any Owner commits a material violation of Section 7.2 of this Agreement (compliance with laws) or Section 13.1 of this Agreement (confidentiality), violates Section 13.2 of this Agreement (non-compete) or Article 15 of this Agreement (transfer), or commits any other violation of this Agreement which by its nature cannot be cured;

(vii)   Franchisee abandons the Training Facility or ceases operation of the Training Facility for more than five (5) consecutive days;

(viii)  Franchisee or any Owner slanders or libels Franchisor or any of its employees, directors, or officers;

(ix)    Franchisee refuses to cooperate with or permit any audit or inspection by Franchisor or its agents or contractors, or otherwise fails to comply with Sections 10.5 or 11.2 of this Agreement;

(x)     the Training Facility is operated in a manner which, in Franchisor's reasonable judgment, constitutes a significant danger to the health or safety of any person, and

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

Franchisee fails to cure such danger within forty-eight (48) hours after becoming aware of the danger, whether as a result of notice from Franchisor or otherwise;

(xi)    Franchisee has received two or more notices of default and Franchisee commits another breach of this Agreement, all in the same 12-month period;

(xii)    Franchisor or any Franchisor affiliate terminates any other agreement with Franchisee (or any affiliate) due to the breach of such other agreement by Franchisee or its affiliate; provided however, that termination of a Multi-Territory Development Agreement with Franchisee or its affiliate shall not automatically give Franchisor the right to terminate this Agreement;

(xiii)    Franchisee or any Owner is charged with, pleads guilty or no-contest to, or is convicted of a felony; or

(xiv)    Franchisee or any Owner is accused by any governmental authority or third party of any act, or if Franchisee or any Owner commits any act or series of acts, that in Franchisor's opinion is reasonably likely to materially and unfavorably affect the Gradum Gswing brand.

**14.3    Effect of Termination.** Upon termination or expiration of this Agreement, all obligations that by their terms or by reasonable implication survive termination, including those pertaining to non-competition, confidentiality, indemnity, and dispute resolution, will remain in effect, and Franchisee must immediately:

(i)    pay all amounts owed to Franchisor;

(ii)    return to Franchisor all copies of the Manual, Confidential Information and any and all other materials provided by Franchisor to Franchisee or created by a third party for Franchisee relating to the operation of the Training Facility , and all items containing any Marks, copyrights, and other proprietary items; and delete all Confidential Information and proprietary materials from electronic devices;

(iii)    notify the telephone, internet, email, electronic network, directory, and listing entities of the termination or expiration of Franchisee's right to use any numbers, addresses, domain names, locators, directories and listings associated with any of the Marks, and authorize their transfer to Franchisor or any new franchisee as may be directed by Franchisor, and Franchisee hereby irrevocably appoints Franchisor, with full power of substitution, as its true and lawful attorney-in-fact, which appointment is coupled with an interest; to execute such directions and authorizations as may be necessary or appropriate to accomplish the foregoing; and

(iv)    cease doing business under any of the Marks.

**14.4    Remove Identification.** Within thirty (30) days after termination or expiration of this Agreement, Franchisee shall at its own expense "de-identify" the Location so that it no longer contains the Marks, signage, or any trade dress of or associated with a Gradum Gswing training facility or business, to the reasonable satisfaction of Franchisor. Franchisee shall comply with any

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

reasonable instructions and procedures of Franchisor for de-identification. If Franchisee fails to do so within thirty (30) days after this Agreement expires or is terminated, Franchisor may enter the Location to remove the Marks and de-identify the Location. In this event, Franchisor will not be charged with trespass nor be accountable or required to pay for any assets removed or altered, or for any damage caused by Franchisor.

**14.5    Liquidated Damages.** If Franchisor terminates this Agreement based upon Franchisee's default or if Franchisee purports to terminate this agreement for any reason not specified in Section 14.1 of this Agreement, then within ten (10) days thereafter Franchisee shall pay to Franchisor a lump sum (as liquidated damages and not as a penalty) calculated as follows: (x) the average Royalty Fees and Brand Development Fund Contributions that Franchisee owed to Franchisor under this Agreement for the 52-week period preceding the date on which Franchisee ceased operating the Training Facility ; multiplied by (y) the lesser of (i) 104 or (ii) the number of weeks remaining in the then-current term of this Agreement. If Franchisee had not operated the Training Facility for at least 52 weeks, then (x) will equal the average Royalty Fees and Brand Development Fund Contributions that Franchisee owed to Franchisor during the period that Franchisee operated the Training Facility . The "average Royalty Fees and Brand Development Fund Contributions that Franchisee owed to Franchisor" shall not be discounted or adjusted due to any deferred or reduced Royalty Fees and Brand Development Fund Contributions set forth in an addendum to this Agreement unless this Section 14.5 of this Agreement is specifically amended in such addendum. Franchisee acknowledges that a precise calculation of the full extent Franchisor's damages under these circumstances is difficult to determine and the method of calculation of such damages as set forth in this Section is reasonable. Franchisee's payment to Franchisor under this Section 14.5 will be in lieu of any direct monetary damages that Franchisor may incur as a result of Franchisor's loss of Royalty Fees and Brand Development Fund Contributions that would have been owed to Franchisor after the date of termination; however, such payment shall be in addition to all damages and other amounts arising under Sections 14.3 and 14.4 of this Agreement, Franchisor's right to injunctive relief for enforcement of Article 13 of this Agreement, and any attorneys' fees and other costs and expenses to which Franchisor is entitled under this Agreement. Except as provided in this Section, Franchisee's payment of this lump sum shall be in addition to any other right or remedy that Franchisor may have under this Agreement or otherwise.

**14.6    Purchase Option.** When this Agreement expires or is terminated, Franchisor has the right but not the obligation to purchase any or all of the assets related to the Training Facility , and/or to require Franchisee to assign its lease or sublease to Franchisor. To exercise this option, Franchisor must notify Franchisee no later than thirty (30) days after this Agreement expires or is terminated. The purchase price for all assets that Franchisor elects to purchase will be the lower of (i) the book value of such assets as declared on Franchisee's last filed tax returns or (ii) the fair market value of the assets. If the parties cannot agree on fair market value within thirty (30) days after the exercise notice, the fair market value will be determined by an independent appraiser reasonably acceptable to both parties. The parties will equally share the cost of the appraisal. Franchisor's purchase will be of assets only (free and clear of all liens), and the purchase will not include any liabilities of Franchisee. The purchase price for assets will not include any factor or increment for any trademark or other commercial symbol used in the business, the value of any intangible assets, or any goodwill or "going concern" value for the Business. Franchisor may withdraw its exercise of the purchase option at any time before it pays for the assets. Franchisee will sign a bill of sale for the purchased assets and any other transfer documents reasonably

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

requested by Franchisor. If Franchisor exercises the purchase option, Franchisor may deduct from the purchase price: (a) all amounts due from Franchisee; (b) Franchisee's portion of the cost of any appraisal conducted hereunder; and (c) amounts paid or to be paid by Franchisor to cure defaults under Franchisee's lease and/or amounts owed by Franchisee to third parties. If any of the assets are subject to a lien, Franchisor may pay a portion of the purchase price directly to the lienholder to pay off such lien. Franchisor may withhold twenty-five percent (25%) of the purchase price for ninety (90) days to ensure that all of Franchisee's taxes and other liabilities are paid. Franchisor may assign this purchase option to another party.

## TRANSFERS

**15.1    By Franchisor.** Upon notice to Franchisee, Franchisor may transfer or assign this Agreement, or any of its rights or obligations under this Agreement, to any person or entity, and Franchisor may undergo a change in ownership or control, without the consent of Franchisee.

**15.2    By Franchisee.** Franchisee acknowledges that the rights and duties set forth in this Agreement are personal to Franchisee and that Franchisor entered into this Agreement in reliance on Franchisee's business skill, financial capacity, personal character, experience, and business ability. Accordingly, Franchisee shall not Transfer this Agreement without obtaining Franchisor's prior written consent, which shall not be unreasonably withheld provided that certain conditions of Transfer are satisfied, including, without limitation, the following:

(i)     Franchisor receives a transfer fee equal to  Ten Thousand Dollars ($10,000) plus any broker fees and other out-of-pocket costs incurred by Franchisor;

(ii)    the proposed assignee and its owners have completed Franchisor's franchise application processes, meet Franchisor's then-applicable standards for new franchisees, and have been approved by Franchisor as franchisees;

(iii)   the proposed assignee is not a Competitor;

(iv)    the proposed assignee executes Franchisor's then-current form of franchise agreement and any related documents, which form may contain materially different provisions than this Agreement (provided, however, that the proposed assignee will not be required to pay an initial franchise fee);

(v)     all owners of the proposed assignee provide a guaranty in accordance with Section 2.5 of this Agreement;

(vi)    Franchisee has paid all monetary obligations to Franchisor and its affiliates, and to any lessor, vendor, supplier, or lender to the Business, and Franchisee is not otherwise in default or breach of this Agreement or of any other obligation owed to Franchisor or its affiliates;

(vii)   the proposed assignee and its owners and employees undergo such training as Franchisor may require;

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

(viii)   Franchisee, its Owners, and the transferee and its owners execute a general release of Franchisor in a form satisfactory to Franchisor; and

(ix)   the Training Facility fully complies with all of Franchisor's most recent System Standards.

**15.3   Transfer for Convenience of Ownership.** If Franchisee is an individual, Franchisee may Transfer this Agreement to a corporation or limited liability company formed for the convenience of ownership after at least fifteen (15) days' notice to Franchisor, if, prior to the Transfer: (1) the transferee provides the information required by Section 2.3 of this Agreement; (2) Franchisee provides copies of the entity's charter documents, by-laws or operating agreement and similar documents, as may be requested by Franchisor, (3) Franchisee owns all voting securities of the corporation or limited liability company, and (4) Franchisee provides a guaranty in accordance with Section 2.5 of this Agreement.

**15.4   Transfer upon Death or Incapacity.** Upon the death or incapacity of Franchisee (or, if Franchisee is an entity, the Owner with the largest ownership interest in Franchisee), the executor, administrator, or personal representative of that person must Transfer the Business to a third party approved by Franchisor (or to another person who was an Owner at the time of death or incapacity of the largest Owner) within nine months after death or incapacity. Such transfer must comply with Section 15.2 of this Agreement.

**15.5   Franchisor's Right of First Refusal.** Before Franchisee (or any Owner) engages in a Transfer (except under Section 15.3 of this Agreement, to a co-Owner, or to a spouse, sibling, or child of an Owner), Franchisor will have a right of first refusal, as set forth in this Section. Franchisee (or its Owners) shall provide to Franchisor a copy of the terms and conditions of any Transfer. For a period of thirty (30) days from the date of Franchisor's receipt of such copy, Franchisor will have the right, exercisable by notice to Franchisee, to purchase the assets subject of the proposed Transfer for the same price and on the same terms and conditions (except that Franchisor may substitute cash for any other form of payment). If Franchisor does not exercise its right of first refusal, Franchisee may proceed with the Transfer, subject to the other terms and conditions of this Article.

**15.6   No Sublicense.** Franchisee has no right to sublicense the Marks or any of Franchisee's rights under this Agreement.

**15.7   No Lien on Agreement.** Franchisee shall not grant a security interest in this Agreement to any person or entity. If Franchisee grants an "all assets" security interest to any lender or other secured party, Franchisee shall cause the secured party to expressly exempt this Agreement from the security interest.

## INDEMNITY

**16.1   Indemnity.** Franchisee shall indemnify and defend, with counsel reasonably acceptable to Franchisor, Franchisor, its parent entities, subsidiaries and affiliates, and their respective owners, directors, officers, employees, agents, successors and assignees (collectively, "Indemnitees") against all Losses in any Action by or against Franchisor and/or any Indemnitee arising directly or indirectly related to, or alleged to arise out of, the operation of the Business. Franchisee shall not

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

settle an Action without the consent of the Indemnitee. This indemnity will continue in full force and effect and shall survive any termination or expiration of this Agreement.

**16.2    Assumption.** An Indemnitee may elect to assume the defense of any Action subject to this indemnification, and control all aspects of defending the Action, including negotiations and settlement, at Franchisee's expense. Such an undertaking shall not diminish Franchisee's obligation to indemnify the Indemnitees.

## DISPUTE RESOLUTION

**17.1    Arbitration.**

    (a)    <u>Disputes Subject to Arbitration</u>. Except as expressly provided in subsection (c) and (d), any controversy or claim between the parties (including any controversy or claim arising out of or relating to this Agreement or its formation and including any question of arbitrability) shall be resolved by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, including the Optional Rules for Emergency Measures of Protection. Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction.

    (b)    <u>Location</u>. The place of arbitration shall be the city and state where Franchisor's headquarters are located.

    (c)    <u>Injunctive Relief</u>. Either party may apply to the arbitrator seeking injunctive relief until the arbitration award is rendered or the controversy is otherwise resolved. Either party also may, without waiving any remedy or right to arbitrate under this Agreement, seek from any court having jurisdiction any interim or provisional injunctive relief.

    (d)    <u>Intellectual Property Claims</u>. A claim involving an alleged infringement of any of Franchisor's intellectual property rights may be brought in a court authorized to hear such claims under Section 17.5 of this Agreement without first proceeding in arbitration.

    (e)    <u>Confidentiality</u>. All documents, information, and results pertaining to any arbitration or lawsuit will be confidential, except as required by law or as required for Franchisor to comply with laws and regulations applicable to the sale of franchises.

    (f)    <u>Performance During Arbitration or Litigation</u>. Unless this Agreement has been terminated, Franchisor and Franchisee will comply with this Agreement and perform their respective obligations under this Agreement during the arbitration or litigation process.

**17.2    Damages.** In any controversy or claim arising out of or relating to this Agreement, each party waives any right to punitive or other monetary damages not measured by the prevailing party's actual damages, except damages expressly authorized by federal statute and damages expressly authorized by this Agreement.

**17.3    Waiver of Class Actions.** The parties agree that any claims will be arbitrated, litigated, or otherwise resolved on an individual basis, and waive any right to act on a class-wide basis.

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

**17.4    Time Limitation.** Any arbitration or other legal action arising from or related to this Agreement must be instituted within two years from the date such party discovers the conduct or event that forms the basis of the arbitration or other legal action. The foregoing time limit does not apply to claims (i) by one party related to non-payment under this Agreement by the other party, (ii) for indemnification under Article 16 of this Agreement, or (iii) related to unauthorized use of Confidential Information or the Marks.

**17.5    Venue Other Than Arbitration.** For any legal proceeding not required to be submitted to arbitration, the parties agree that any such legal proceeding will be brought in the United States District Court where Franchisor's headquarters is then located. If there is no federal jurisdiction over the dispute, the parties agree that any such legal proceeding will be brought in the court of appropriate jurisdiction in the state and county where Franchisor's headquarters is then located. Each party consents to the jurisdiction of such courts and waives any objection that it, he or she may have to the laying of venue of any proceeding in any of these courts.

**17.6    Legal Costs.** In any legal proceeding (including arbitration) related to this Agreement or any guaranty, the non-prevailing party shall pay the prevailing party's attorney fees, costs and other expenses of the legal proceeding. "Prevailing party" means the party, if any, which prevailed upon the central litigated issues and obtained substantial relief.

## MISCELLANEOUS

**18.1    Relationship of the Parties.** The parties are independent contractors, and neither is the agent, partner, joint venturer, or employee of the other. Franchisor is not a fiduciary of Franchisee. Franchisor does not control or have the right to control Franchisee or its Business. Any required specifications and standards in this Agreement and in the System Standards exist to protect Franchisor's interest in the System and the Marks, and the goodwill established in them, and not for the purpose of establishing any control, or duty to take control, over the Business. Franchisor has no liability for Franchisee's obligations to any third party whatsoever.

**18.2    No Third-Party Beneficiaries.** This Agreement does not confer any rights or remedies upon any person or entity other than Franchisee and Franchisor.

**18.3    Entire Agreement.** This Agreement constitutes the entire agreement of the parties and supersedes all prior discussions, negotiations and representations. Nothing in this Agreement or in any related agreement is intended to disclaim the representations made by GradumGswing Franchising, LLC in its Franchise Disclosure Document.

**18.4    Modification.** No modification or amendment of this Agreement will be effective unless it is in writing and signed by both parties. This provision does not limit Franchisor's rights to modify the Manual or System Standards.

**18.5    Consent; Waiver.** No consent under this Agreement, and no waiver of satisfaction of a condition or nonperformance of an obligation under this Agreement will be effective unless it is in writing and signed by the party granting the consent or waiver. No waiver by a party of any right will affect the party's rights as to any subsequent exercise of that right or any other right. No delay, forbearance or omission by a party to exercise any right will constitute a waiver of such right.

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

**18.6    Cumulative Remedies.** Rights and remedies under this Agreement are cumulative. No enforcement of a right or remedy precludes the enforcement of any other right or remedy.

**18.7    Severability.** The parties intend that (i) if any provision of this Agreement is held by an arbitrator or court to be unenforceable, then that provision be modified to the minimum extent necessary to make it enforceable, unless that modification is not permitted by law, in which case that provision will be disregarded, and (ii) if an unenforceable provision is modified or disregarded, then the rest of this Agreement will remain in effect as written.

**18.8    Governing Law.** The laws of the state of Florida (without giving effect to its principles of conflicts of law) govern all adversarial proceedings between the parties. The parties agree that any Florida law for the protection of franchisees or business opportunity purchasers will not apply unless its jurisdictional requirements are met independently without reference to this Section 18.8.

**18.9    Notices.** Any notice will be effective under this Agreement only if made in writing and delivered as set forth in this Section to: (A) if to Franchisee, addressed to Franchisee at the notice address set forth in the Summary Page; and (B) if to Franchisor, addressed to Chief Executive Officer, GradumGswing Franchising, LLC, 7872 SW Jack James Drive, Unit 4, Stuart, Florida 34997. Any party may designate a new address for notices by giving notice of the new address pursuant to this Section. Notices will be effective upon receipt (or first rejection) and must be: (1) delivered personally; (2) sent by registered or certified U.S. mail with return receipt requested; or (3) sent via overnight courier. Notwithstanding the foregoing, Franchisor may amend the Manual, give binding notice of changes to System Standards, and deliver notices of default by electronic mail or other electronic communication.

**18.10    Holdover.** If Franchisee continues operating the Training Facility  after the expiration of the term without a renewal agreement or successor franchise agreement executed by the parties in accordance with Section 3.2 of this Agreement, then at any time (regardless of any course of dealing by the parties), Franchisor may by giving written notice to Franchisee (the "Holdover Notice") either (i) require Franchisee to cease operating the Training Facility  and comply with all post-closing obligations effective immediately upon giving notice or effective on such other date as Franchisor specifies, or (ii) bind Franchisee to a renewal term of 5 years, and deem Franchisee and its Owners to have made the general release of liability described in Section 3.2(vi) of this Agreement.

**18.11    Joint and Several Liability.** If two or more people sign this Agreement as "Franchisee," each will have joint and several liability.

**18.12    No Offer and Acceptance.** Delivery of a draft of this Agreement to Franchisee by Franchisor does not constitute an offer. This Agreement shall not be effective unless and until it is executed by both Franchisee and Franchisor.

## CERTIFICATION OF FRANCHISOR'S COMPLIANCE

By signing this Agreement, Franchisee acknowledges the following:

(1)    Franchisee understands all the information in Franchisor's Disclosure Document.

FDD 2023                                                                                        Franchise Agreement

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

(2)     Franchisee understands the success or failure of the Business will depend in large part upon Franchisee's skills, abilities and efforts and those of the persons Franchisee employs, as well as many factors beyond Franchisee's control such as weather, competition, interest rates, the economy, inflation, labor and supply costs, lease terms, and the marketplace.

(3)     That no person acting on Franchisor's behalf made any statement or promise regarding the costs involved in operating a Gradum Gswing franchise that is not in the Disclosure Document or that is contrary to, or different from, the information in the Disclosure Document.

(4)     That no person acting on Franchisor's behalf made any claim or representation to Franchisee, orally, visually, or in writing, that contradicted the information in the Disclosure Document.

(5)     That no person acting on Franchisor's behalf made any statement or promise regarding the actual, average or projected profits or earnings, the likelihood of success, the amount of money Franchisee may earn, or the total amount of revenue a Gradum Gswing franchise will generate, that is not in the Disclosure Document or that is contrary to, or different from, the information in the Disclosure Document.

(6)     That no person acting on Franchisor's behalf made any statement or promise or agreement, other than those matters addressed in this Agreement, concerning advertising, marketing, media support, market penetration, training, support service, or assistance that is contrary to, or different from, the information contained in the Disclosure Document.

(7)     Franchisee understands that this Agreement contains the entire agreement between Franchisor and Franchisee concerning the Gradum Gswing franchise, which means that any oral or written statements not set out in this Agreement will not be binding. In deciding to enter into this Agreement, Franchisee is not relying on any statement, promise, claim, or representation not expressly set forth in this Agreement or in the Disclosure Document.

*[Signatures on next page]*

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

Agreed to by:

FRANCHISOR:
GradumGswing Franchising, LLC

By: _____
Name: Carlos Garmendia
Title: Manager
Date: 4/5/2024

FRANCHISEE:

[*if an individual:*]

_____
Name: _____
Date: _____

[*if an entity:*]

Chin Music Partners, LLC
By: _____
Name: Jack Dunn
Title: Partner
Date: 3/29/2024

By: _____
Name: Ken J. Clayton
Title: Partner
Date: 3/31/2024

By: _____
Name: Matt Capps
Title: Partner
Date: 4/5/2024

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

**<u>EXHIBIT 1  TO THE</u>**
**<u>GRADUM GSWING FRANCHISE AGREEMENT</u>**

**OWNERSHIP INFORMATION**

1.    **Form of Ownership.** Franchisee is a (check one):

|  |  |
|---|---|
| _____ | *Sole Proprietorship* |
| _____ | *Partnership* |
| ___X___ | *Limited Liability Company* |
| _____ | *Corporation* |

State: _____ Georgia _____

2.    **Owners.** If Franchisee is a partnership, limited liability company or corporation:

| Name | Shares or Percentage of Ownership |
|---|---|
| Jack Dunn | |
| Ken Clayton | |
| Matt Capps | |
| | |
| | |

3.    **Officers.** If Franchisee is a limited liability company or corporation:

| Name | Title |
|---|---|
| Jack Dunn | Partner |
| Ken Clayton | Partner |
| Matt Capps | Partner |
| | |
| | |

FDD 2023                                                    Franchise Agreement

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

**EXHIBIT 2  TO THE**
**GRADUM GSWING FRANCHISE AGREEMENT**

**LOCATION ACCEPTANCE LETTER**

To:    Chin Music Partners, LLC

This Location Acceptance Letter is issued by GradumGswing Franchising, LLC for your Gradum Gswing franchise in accordance with Section 6.1 of the Franchise Agreement.

1.    The Location of the Training Facility  is:

   To Be Determined

2.    The Territory of the Training Facility  is:

   Huntsville, Alabama

GradumGswing Franchising, LLC

By: _____
Name: _____
Title: _____
Date: _____

Franchise Agreement

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

**EXHIBIT 3  TO THE**

**GRADUM GSWING FRANCHISE AGREEMENT**

**GUARANTY AND NON-COMPETE AGREEMENT**

This Guaranty and Non-Compete Agreement (this "Guaranty") is executed by the undersigned person(s) (each, a "Guarantor") in favor of GradumGswing Franchising, LLC, a  Florida Limited Liability Company ("Franchisor" ).

**Background Statement:**  Chin Music Partners, LLC  ("Franchisee") desires to enter into a Franchise Agreement with Franchisor for the franchise of a Gradum Gswing business (the "Franchise Agreement;" capitalized terms used but not defined in this Guaranty have the meanings given in the Franchise Agreement). Guarantor owns an equity interest in Franchisee. Guarantor is executing this Guaranty in order to induce Franchisor to enter into the Franchise Agreement.

Guarantor agrees as follows:

**1.      Guaranty.** Guarantor hereby unconditionally guarantees to Franchisor and its successors and assigns that Franchisee shall pay and perform every undertaking, agreement and covenant set forth in the Franchise Agreement and further guarantees every other liability and obligation of Franchisee to Franchisor, whether or not contained in the Franchise Agreement. Guarantor shall render any payment or performance required under the Franchise Agreement or any other agreement between Franchisee and Franchisor upon demand from Franchisor. Guarantor waives (a) acceptance and notice of acceptance by  Franchisor of this Guaranty; (b) notice of demand for payment of any indebtedness or nonperformance of any obligations of Franchisee; (c) protest and notice of default to any party with respect to the indebtedness or nonperformance of any obligations hereby guaranteed; (d) any right Guarantor may have to require that an action be brought against Franchisee or any other person or entity as a condition of liability hereunder; (e) all rights to payments and claims for reimbursement or subrogation which any of the undersigned may have against Franchisee arising as a result of the execution of and performance under this Guaranty by the undersigned; (f) any law which requires that  Franchisor make demand upon, assert claims against or collect from Franchisee or any other person or entity (including any other guarantor), foreclose any security interest, sell collateral, exhaust any remedies or take any other action against Franchisee or any other person or entity (including any other guarantor) prior to making any demand upon, collecting from or taking any action against the undersigned with respect to this Guaranty; and (g) any and all other notices and legal or equitable defenses to which Guarantor may be entitled.

**2.      Confidential Information.** With respect to all Confidential Information Guarantor shall (a) adhere to all security procedures prescribed by Franchisor for maintaining confidentiality, (b) disclose such information to its employees only to the extent necessary for the operation of the or the Training Facility ; (c) not use any such information in any other business or in any manner not specifically authorized or approved in writing by Franchisor, (d) exercise the highest degree of diligence and make every effort to maintain the confidentiality of all such information during and

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

after the term of the Franchise Agreement, (e) not copy or otherwise reproduce any Confidential Information, and (f) promptly report any unauthorized disclosure or use of Confidential Information. Guarantor acknowledges that all Confidential Information is owned by Franchisor or its affiliates (except for Confidential Information which Franchisor licenses from another person or entity). Guarantor acknowledges that all customer data generated or obtained by Guarantor is Confidential Information belonging to Franchisor. This Section will survive the termination or expiration of the Franchise Agreement indefinitely.

**3.      Covenants Not to Compete.**

(a)      <u>Restriction - In Term</u>. During the term of the Franchise Agreement, Guarantor shall not directly or indirectly have any ownership interest in, lend money or provide financial assistance to, provide any services to, or be employed by, any Competitor.

(b)      <u>Restriction – Post Term</u>. For two years after the Franchise Agreement expires or is terminated for any reason (or, if applicable, for two years after a Transfer by Guarantor), Guarantor shall not directly or indirectly have any ownership interest in, lend money or provide financial assistance to, provide any services to, or be employed by, any Competitor located within twenty-five (25) miles of Franchisee's Territory or the territory of any other  Gradum Gswing business operating on the date of termination or transfer, as applicable. If the Franchise Agreement is terminated before the Territory is determined, then the area of non-competition will be the Development Area and the territory of any other Gradum Gswing business operating on the date of termination.

(c)      <u>Interpretation</u>. Guarantor agrees that each of the foregoing covenants is independent of any other covenant or provision of this Guaranty or the Franchise Agreement. If all or any portion of the covenants in this Section is held to be unenforceable or unreasonable by any court or arbitrator, then the parties intend that the court or arbitrator modify such restriction to the extent reasonably necessary to protect the legitimate business interests of Franchisor. Guarantor agrees that the existence of any claim it or Franchisee may have against Franchisor shall not constitute a defense to the enforcement by Franchisor of the covenants of this Section. If Guarantor fails to comply with the obligations under this Section during the restrictive period, then the restrictive period will be extended an additional day for each day of noncompliance.

**4.      Modification.** Guarantor agrees that Guarantor's liability hereunder shall not be diminished, relieved or otherwise affected by (a) any amendment of the Franchise Agreement, (b) any extension of time, credit or other indulgence which Franchisor may from time-to-time grant to Franchisee or to any other person or entity, or (c) the acceptance of any partial payment or performance or the compromise or release of any claims.

**5.      Governing Law; Dispute Resolution.** This Guaranty shall be governed by and construed in accordance with the laws of the state of Florida (without giving effect to its principles of conflicts of law). The parties agree that any Florida law for the protection of franchisees or business opportunity purchasers will not apply unless its jurisdictional requirements are met independently without reference to this Section 5. The provisions of Article 17 (Dispute Resolution) of the Franchise Agreement apply to and are incorporated into this Guaranty as if fully set forth herein. Guarantor shall pay to Franchisor all costs incurred by Franchisor (including reasonable attorney

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

fees) in enforcing this Guaranty. If multiple Guarantors sign this Guaranty, each will have joint and several liability.

Agreed to by:

DocuSigned by:

*Jack Dunn*

Name: Jack Dunn

Address: 12136 Walnut Terrace
Alpharetta, GA 30004

Date: 3/29/2024

DocuSigned by:

*Ken J. Clayton*

Name: Ken J. Clayton

Address: 12136 Walnut Terrace
Alpharetta, GA 30004

Date: 3/31/2024

DocuSigned by:

*Matt Capps*

Name: Matt Capps

Address: 12136 Walnut Terrace
Alpharetta, GA 30004

Date: 4/5/2024

FDD 2023                                              Franchise Agreement

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

**EXHIBIT 4 TO THE**
**GRADUM GSWING FRANCHISE AGREEMENT**

**ACH PAYMENT AGREEMENT**

ACCOUNT NAME: _____

CUSTOMER NUMBER: _____

FRANCHISE NAME: _____

AUTHORIZATION AGREEMENT FOR ACH Payments:

(I/we) do hereby authorize GradumGswing Franchising, LLC, a Florida Limited Liability Company, (hereinafter "Franchisor") to initiate (debit or credit) entries to (my/our) (Checking Account / Savings Account) as indicated and named below as the depository financial institution, hereafter named FINANCIAL INSTITUTION pursuant to the terms of the Franchise Agreement by and between us and the Franchisor.

(I/we) acknowledge that the origination of ACH transactions to my (my/our) account must comply with the provisions of U.S. law. Furthermore, if any such debit(s) should be returned NSF, (I/we) authorize the Franchisor to collect such debit(s) by electronic debit and subsequently collect a returned debit NSF fee of $75 per item by electronic debit from my account identified below. In the event all funds and interests are not received by Franchisor within 15 days from presentment and intended withdrawal from our account by Franchisor, then we will be deemed in default of the Franchise Agreement. We further agree to pay all reasonable costs of collection including but not limited to reasonable attorney's fees and court costs incurred by Franchisor. I am a duly authorized check signer on the financial institution account identified below and authorize all of the above as evidenced by my signature below.

CHECK (ACH) INFORMATION ROUTING NUMBER:

ACCOUNT NUMBER:

DEPOSITORY NAME:

BRANCH: _____

CITY: _____ STATE: _____ ZIP: _____

COMPANY NAME: _____

FIRST NAME/LAST NAME: _____

BILLING ADDRESS: _____

CITY: _____ STATE: _____ ZIP: _____

PHONE NUMBER: _____

CUSTOMER NUMBER: _____

SIGNATURE ON FILE: _____

PHONE OR EMAIL APPROVAL AUTHORIZATION NUMBER: _____

FRANCHISEE: _____

By: _____

Name: _____

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

Title: _____

Date: _____

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

**EXHIBIT 5  TO THE**
**GRADUM GSWING FRANCHISE AGREEMENT**

**RIDER TO LEASE AGREEMENT**

Landlord: _____        Franchisor: GradumGswing Franchising, LLC

Notice Address: _____

_____        Notice Address:

_____        7872 SW Jack James Drive, Unit 4,

Telephone:_____        Stuart, Florida 34997

Telephone: _____

Tenant: _____

Leased Premises: _____

    1.    <u>Use</u>. Tenant is a franchisee of Franchisor. The Leased Premises shall be used only for the operation of a Gradum Gswing business (or any name authorized by Franchisor).

    2.    <u>Notice of Default and Opportunity to Cure</u>. Landlord shall provide Franchisor with copies of any written notice of default ("<u>Default</u>") given to Tenant under the Lease, and Landlord grants to Franchisor the option (but not the obligation) to cure any Default under the Lease (should Tenant fail to do so) within ten (10) days after the expiration of the period in which Tenant may cure the Default.

    3.    <u>Termination of Lease</u>. Proprietor shall copy Franchisor on any notice of termination of the Lease. If Landlord terminates the Lease for Tenant's Default, Franchisor shall have the option to enter into a new Lease with Landlord on the same terms and conditions as the terminated Lease. To exercise this option, Franchisor must notify Landlord within fifteen (15) days after Franchisor receives notice of the termination of the Lease.

    4.    <u>Termination of Franchise Agreement</u>. If the Franchise Agreement between Franchisor and Tenant is terminated during the term of the Lease, then upon the written request of Franchisor, Tenant shall assign the Lease to Franchisor. Landlord hereby consents to the assignment of the Lease to Franchisor.

    5.    <u>Assignment and Subletting</u>. Notwithstanding any provision of the Lease to the contrary, Tenant shall have the right to assign or sublet the Lease to Franchisor, provided that no such assignment or sublease shall relieve Tenant or any guarantor of liability under the Lease. If Franchisor becomes the lessee of the Leased Premises, then Franchisor shall have the right to assign or sublease its lease to a franchisee of the Gradum Gswing brand. Any provision of the

FDD 2023                                                                                              Franchise Agreement

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

Lease which limits Tenant's right to own or operate other Gradum Gswing outlets in proximity to the Leased Premises shall not apply to Franchisor.

6.    <u>Authorization</u>. Tenant authorizes Landlord and Franchisor to communicate directly with each other about Tenant and Tenant's business.

7.    <u>Right to Enter</u>. Upon the expiration or termination of the Franchise Agreement or the Lease, or the termination of Tenant's right of possession of the Leased Premises, Franchisor or its designee may, after giving reasonable prior notice to Landlord, enter the Leased Premises to remove signs and other material bearing Franchisor's brand name, trademarks, and commercial symbols, provided that Franchisor will be liable to Landlord for any damage Franchisor or its designee causes by such removal.

8.    <u>No Liability</u>. By executing this Rider, Franchisor does not assume any liability with respect to the Leased Premises or any obligation as Tenant under the Lease.

Executed by:

LANDLORD:

_____

By: _____
Name: _____
Title: _____
Date: _____


TENANT:

_____

By: _____
Name: _____
Title: _____
Date: _____


FRANCHISOR:

GradumGswing Franchising, LLC

By: _____
Name: _____
Title: _____
Date: _____

.

# EXHIBIT C

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

# FRANCHISE AGREEMENT

| SUMMARY PAGE | |
|---|---|
| 1. **Franchisee** | Chin Music Partners, LLC |
| 2. **Initial Franchise Fee** | ** $150,000 (see below) |
| 3. **Development Area** | Nashville, Tennessee |
| 4. **Training Facility Location** | TBD in Nashville, Tennessee |
| 5. **Territory** | Nashville, Tennessee |
| 6. **Opening Deadline** | ** see below |
| 7. **Principal Executive** | Jack Dunn, Ken Clayton, Matt Capps |
| 8. **Franchisee's Address** | 12136 Walnut Terrace Alpharetta, GA 30004 |

**

$50,000.00 Premium
Minimum two (2) location commitment:
Schedule of Payments for two (2) locations would be as follows:

(A) Upon signing of Franchise Agreement:
    (i) Location 1 – Non-refundable Deposit of $25,000.00 (1/2 of Premium)
    (ii) Location 2 – Non-refundable Deposit of $25,000.00 (1/2 of Premium)

(B) Within twelve (12) months of Huntsville, AL opening/first session sale:
    (i) Location 1 – Franchise Fee $50,000.00
    (ii) Location 2 – Franchise Fee $50,000.00

Any additional location opened in Nashville, Tennessee would be $50,000.00 per location, with no additional premiums paid.

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

# FRANCHISE AGREEMENT

This Agreement is made between GradumGswing Franchising, LLC, a Florida Limited Liability Company ("Franchisor"), and Franchisee effective as of the ___27th___ day ___March___, 20_24_ (the "Effective Date").

## Background Statement:

A.    Franchisor has created and owns a system (the "System") for developing and operating a Gradum Gswing .

B.    The System includes (1) methods, procedures, and standards for developing and operating Gradum Gswing business, (2) plans, specifications, equipment, signage and trade dress for Gradum Gswing businesses, (3) particular products and services, (4) the Marks, (5) training programs, (6) business knowledge, (7) marketing plans and concepts, and (8) other mandatory and recommended methods of operation as determined by Franchisor from time to time.

C.    The parties desire that Franchisor license the Marks and the System to Franchisee for Franchisee to develop and operate one Gradum Gswing Training Facility on the terms and conditions of this Agreement.

## DEFINITIONS

"**Action**" means any action, suit, proceeding, claim, demand, governmental investigation, governmental inquiry, judgment or appeal thereof, whether formal or informal.

"**Approved Vendor**" means a supplier, vendor, or distributor of goods or services which has been approved by Franchisor.

"**Business**" means the business owned by Franchisee and operated under this Agreement, including without limitation the Training Facility .

"**Competitor**" means any business which engages in, owns, is affiliated with or operates a business featuring private baseball/softball hitting/swing instruction.

"**Confidential Information**" means all non-public information of or about the System and any Gradum Gswing business, including all methods for developing and operating the business, and all non-public plans, data, financial information, processes, vendor pricing, supply systems, marketing systems, formulas, techniques, designs, layouts, operating procedures, customer data, information and know-how.

"**Gross Sales**" means the total dollar amount of all sales generated through the Training Facility for a given period, including, but not limited to, payment for any services or products sold by Franchisee, whether for cash or credit. Gross Sales does not include (i) bona fide refunds to customers, (ii) sales taxes collected by Franchisee, (iii) sales of used equipment not in the ordinary course of business, or (iv) sales of prepaid cards or similar products (but the redemption of any such card or product will be included in Gross Sales).

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

"**Location**" means the location stated on the Summary Page. If no location is stated on the Summary Page, then the Location will be determined in accordance with Section 6.1 of this Agreement.

"**Losses**" includes (but is not limited to) all losses; damages; fines; charges; expenses; lost profits; reasonable attorneys' fees; travel expenses, expert witness fees; court costs; settlement amounts; judgments; loss of Franchisor's reputation and goodwill; costs of or resulting from delays; financing; costs of advertising material and media time/space and the costs of changing, substituting or replacing the same; and any and all expenses of recall, refunds, compensation, public notices and other such amounts incurred in connection with the matters described.

"**Manual**" means Franchisor's confidential Brand Standards Manual(s), including any supplements, additions, or revisions from time to time, which may be in any form or media.

" **Brand Development Fund**" means the fund established (or which may be established) by Franchisor into which Brand Development Fund Contributions are deposited.

"**Marks**" means the trade name and logo contained on the Summary Page, and all other trade names, trademarks, service marks and logos specified by Franchisor from time to time for use to identify or in connection with Franchisor's business or associated with Franchisor or its affiliates.

"**Owner**" means each person or entity which directly or indirectly owns or controls any equity of Franchisee. If Franchisee is an individual person, then "Owner" means Franchisee.

"**Remodel**" means a refurbishment, renovation, and remodeling of the Location to conform to the building design, exterior facade, trade dress, signage, fixtures, furnishings, equipment, decor, color schemes, presentation of the Marks, and other System Standards in a manner consistent with the image then in effect for a new Gradum Gswing Training Facility .

"**Required Vendor**" means a supplier, vendor, or distributor of products or services which Franchisor requires franchisees to use.

"**System Standards**" means, as of any given time, the then-current mandatory procedures, requirements, and/or standards of the System as determined by, which may include without limitation, any procedures, requirements and/or standards for appearance, business metrics, cleanliness, customer service, design (such as construction, decoration, layout, furniture, fixtures and signs), equipment, inventory, marketing and public relations, operating days, operating hours, presentation of Marks, product and service offerings, quality of products and services (including any guaranty and warranty programs), reporting, safety, technology (such as computers, computer peripheral equipment, smartphones, point-of-sale systems, back-office systems, information management systems, security systems, video monitors, other software, backup and archiving systems, communications systems (including email, audio, and video systems), payment acceptance systems, and internet access, as well as upgrades, supplements, and modifications thereto), uniforms, and vehicles.

"**Territory**" means the territory stated on the Summary Page. If no territory is stated on the Summary Page, then the Territory is determined in accordance with Section 6.1 of this Agreement.

44

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

"**Training Facility** " means the training facility operated under this Agreement at the Location approved by Franchisor.

"**Transfer**" means for Franchisee (or any Owner) to voluntarily or involuntarily transfer, sell, or dispose of, in any single or series of transactions, (i) substantially all of the assets of the Business, (ii) this Agreement, (iii) any direct or indirect ownership interest in the Business, or (iv) control of the Business.

## GRANT OF LICENSE

**2.1    Grant.** Franchisor grants to Franchisee the right to operate one Gradum Gswing only at the Location. If no Location is stated on the Summary Page when this Agreement is signed, then the parties will determine the Location in accordance with Section 6.1 of this Agreement. Franchisee shall develop, open and operate a Gradum Gswing Training Facility at the Location for the entire term of this Agreement and any renewals thereof.

**2.2    Protected Territory.** During the term of this Agreement and any renewals thereof, Franchisor agrees not to itself establish, or license or franchise the establishment of, another training facility within the Territory selling the same or similar goods or services under the same trademarks or service marks as a Gradum Gswing training facility. Franchisor retains the right to:

(i)    establish and license others to establish and operate Gradum Gswing training facilities and businesses outside the Territory, notwithstanding their proximity to the Territory or their impact on the Training Facility;

(ii)    operate and license others to operate businesses anywhere that do not operate under Gradum Gswing Marks; and

(iii)    sell and license others to sell products and services in the Territory through channels of distribution (including the internet) other than Gradum Gswing training facilities.

Franchisee acknowledges that in order to maintain the protected exclusive territory, Franchisee must generate at least $350,000 in gross sales each year after your first year of operating the franchise. If Franchisee fails to achieve that minimum sales requirement, Franchisor may, at our option, reduce or eliminate Franchisee's territory or terminate the franchise agreement.

**2.3    Franchisee Control.** Franchisee represents that Exhibit 1 to this Agreement (i) identifies each owner, officer and director of Franchisee, and (ii) describes the nature and extent of each owner's interest in Franchisee. If any information on Exhibit 1 changes that does not constitute a Transfer, Franchisee shall notify Franchisor within ten (10) days of such change.

**2.4    Principal Executive.** Franchisee agrees that the person designated as the "Principal Executive" on the Summary Page is the executive primarily responsible for the Business and has decision-making authority on behalf of Franchisee. The Principal Executive is not required to serve as a day-to-day general manager of the Business, but the Principal Executive must devote substantial time and attention to the Business. If the Principal Executive dies, becomes incapacitated, transfers his/her interest in Franchisee, or otherwise ceases to be the executive

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

primarily responsible for the Business, Franchisee shall promptly designate a new Principal Executive, subject to Franchisor's approval.

**2.5    Guaranty.** If Franchisee is an entity, then Franchisee shall have each Owner sign a personal guaranty of Franchisee's obligations to Franchisor, in the form of Exhibit 3 to this Agreement.

**2.6    No Conflict.** Franchisee represents to Franchisor that Franchisee and each of its Owners (i) are not violating any agreement (including any confidentiality or non-competition covenant) by entering into or performing under this Agreement, (ii) are not a direct or indirect owner of any Competitor, and (iii) are not listed or "blocked" in connection with, and are not in violation under, any anti-terrorism law, regulation, or executive order.

**TERM**

**3.1    Term.** This Agreement commences on the Effective Date and continues for ten (10) years.

**3.2    Successor Agreement.** When the Initial Term of this Agreement expires, Franchisee may enter into  two successor franchise agreements for additional periods of five (5) years each (the "Renewal Term"), subject to the following conditions prior to the expiration of the Initial Term and each Renewal Term:

    (i)    Franchisee notifies Franchisor of the election to renew between ninety (90) and one hundred eighty (180) days prior to the end of the Initial Term and each Renewal Term;

    (ii)    Franchisee (and its affiliates) are in compliance with this Agreement and all other agreements with Franchisor  and any of its affiliates at the time of election and at the time of renewal;

    (iii)    Within a period of time acceptable to Franchisor, Franchisee has made or makes renovations and changes to the Location as Franchisor requires, including without limitation a Remodel, to conform to Franchisor's then-current System Standards;

    (iv)    Franchisee and its Owners execute Franchisor's then-current form of franchise agreement and related documents, which may be materially different than this Agreement including, without limitation, higher and different fees, provided however  that Franchisee will not pay another initial franchise fee;

    (v)    Franchisee and each Owner executes a general release of any and all claims against Franchisor, its affiliates, and their respective owners, officers, directors, agents and employees.

**4.1    Initial Franchise Fee.** Upon signing this Agreement, Franchisee shall pay an initial franchise fee in the amount stated on the Summary Page. This initial franchise fee is not refundable.

46

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

**4.2    Site Selection and Lease Negotiation Fee.** Contemporaneously with the signing of this Agreement, Franchisee may pay Franchisor a Site Selection and Lease Negotiation fee in the amount of Three Thousand Dollars ($3,250).

**4.3    Construction Fee**. Upon approval of a site by Franchisor, Franchisee may pay Franchisor a fee for construction consulting assistance in the amount of Five Thousand Dollars ($3,250),

**4.4    Royalty Fee.** Franchisee shall pay Franchisor each month a royalty fee (the "Royalty Fee") equal to eight percent (8%) of Gross Sales. The Royalty Fee for any month shall be paid in the immediately following month by the day designated by Franchisor in the Manual or otherwise in writing.

**4.5    Brand Development Fund Contributions.**

(a)    Brand Development Fund Contribution. Franchisee shall pay Franchisor a contribution to the Brand Development Fund (the " Brand Development Fund Contribution") equal to two percent (2%) of Franchisee's Gross Sales for any Brand Development Fund that is in effect at the same time as the Royalty Fee is paid.

(b)    Market Cooperative Contribution. If the Business participates in a Market Cooperative, then Franchisee shall contribute to the Market Cooperative a percentage of Gross Sales as determined by majority vote of the Market Cooperative.

**4.6    Replacement / Additional Training Fee.** If Franchisee sends an employee to Franchisor's training program after opening, Franchisor may charge its then-current training fee, if any. Franchisee shall be responsible for any of its travel, food and lodging expenses.

**4.7    Non-Compliance Fee.** Franchisor may charge Franchisee One Thousand Five Hundred Dollars ($1,500) for any instance of non-compliance with the System Standards or this Agreement (other than Franchisee's non-payment of a fee owed to Franchisor) which Franchisee fails to cure after thirty (30) days' notice. Franchisor may also charge Franchise for its costs incurred if in the exercise of its discretion it determines that travel to Franchisee's location is appropriate. This fee is a reasonable estimate of Franchisor's internal cost of personnel time attributable to addressing the non-compliance, and it is not a penalty or estimate of all damages arising from Franchisee's breach. The non-compliance fee is in addition to all of Franchisor's other rights and remedies (including default and termination under Section 14.2 of this Agreement).

**4.8    Curing Non-Compliance.** Franchisor may in its sole discretion  cure any instance of non-compliance by Franchisee with a requirement of this Agreement and Franchisee shall pay Franchisor's cost incurred in curing the non-compliance and an administrative fee of ten percent (10%) of such costs.

**4.9    Special Inspection Fee.** Franchisor may charge its reasonable out -of-pocket expenses incurred  if Franchisor inspects the Location because of a government report, customer complaint or other customer feedback, or your default or non-compliance with any system specification.

**4.10    Reimbursement.** Franchisor may, but has no obligation to, pay on Franchisee's behalf any amount that Franchisee owes to a supplier or other third party. If Franchisor does so or intends to

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

do so, Franchisee shall pay the amount paid by Franchisor plus a ten percent (10%) administrative charge to Franchisor within fifteen (15) days after invoice by Franchisor accompanied by reasonable documentation.

**4.11    Payment for Products , Supplies and other items supplied by Franchisor**. Franchisee shall pay Franchisor or its affiliate for any products, supplies or other items supplied to Franchisee, according to the terms and conditions of the invoices for same.

**4.12    Method of Payment and Reporting.**

(a)    <u>Method of Payment</u>. Franchisee shall pay the Royalty Fee, Brand Development Fund Contribution, and any other amounts owed to Franchisor by pre-authorized bank draft, wire or ACH or in such other manner as Franchisor may require. Franchisee shall comply with Franchisor's payment instructions. If Franchisor elects to have payments made by pre-authorized bank draft, Franchisee shall execute the authorization attached to this Agreement as Exhibit 4.

(b)    <u>Calculation of Fees</u>. Each week, on a day designated by Franchisor, Franchisee shall report to Franchisor, its Gross Sales from the previous week. If Franchisee fails to report weekly Gross Sales, then Franchisor may withdraw estimated Royalty Fees and Brand Development Fund Contributions equal to One Hundred twenty-Five percent (125%) of the last Gross Sales reported to Franchisor. The parties will true-up the actual fees after Franchisee reports Gross Sales. Franchisee acknowledges that Franchisor has the right to remotely access Franchisee's point-of-sale system to calculate Gross Sales.

(c)    <u>Late Fees and Interest</u>. If Franchisee does not make a payment by the due date, Franchisee shall pay a late fee of One Hundred Dollar ($100) plus interest on the unpaid amount at a rate equal to eighteen percent (18%) per year (or, if such payment exceeds the maximum allowed by law, then interest at the highest rate allowed by law).

(d)    <u>Insufficient Funds</u>. Franchisor may charge Thirty Dollars ($30) for any payment returned for insufficient funds (or, if such amount exceeds the maximum allowed by law, then the fee allowed by law).

(e)    <u>Costs of Collection</u>. Franchisee shall repay any costs incurred by Franchisor (including reasonable attorney fees) in attempting to collect payments owed by Franchisee.

(f)    <u>Application</u>. Franchisor may apply any payment received from Franchisee to any obligation and in any order as Franchisor may reasonably determine, regardless of any designation by Franchisee.

(g)    <u>Obligations Independent; No Set-Off</u>. The obligations of Franchisee to pay to Franchisor any fees or amounts described in this Agreement are independent covenants by Franchisee. Franchisee shall make all such payments without offset or deduction.

**FRANCHISOR'S ASSISTANCE**

**5.1    Pre-Opening Assistance**

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

Franchisor agrees to the provide the following assistance to Franchise before Franchise commences operation of the Business:

(a)    Location. Franchisor shall provide Franchisee with its criteria for Gradum Gswing locations and review information provided by Franchisee regarding proposed location(s) for the Business and approve or disapprove the Location in accordance with Section 6.1 of this Agreement; provided however, that Franchisee acknowledges that Franchisor's approval of a location is not any way to be construed as guaranty of the performance of the Business at that location; Franchisor may provide site selection and lease negotiation assistance to Franchisee.

(b)    Territory. Franchisor shall designate a Territory for the franchise in accordance with Section 6.1 of this Agreement.

(c)    Pre-Opening Plans, Specifications, and Vendors Provide Franchisee with a plan for the Franchisee's location with (i) Franchisor's sample set of standard plans or specifications for a recommended field and office plans; (ii) the applicable System Standards, (iii) other specifications as Franchisor deems appropriate, including without limitation specifications regarding inventory, equipment, computer system , any required vehicles for use in the Business, supplies and materials, and (iv) Franchisor's lists of Approved Vendors and/or Required Vendors. Franchisor may provide location construction consulting assistance to Franchisee.

(d)    Certain Other Specifications. Make available to Franchisee, Franchisor's specifications and approved suppliers for signs, fixtures, equipment, inventory, computer system, and supplies;

(e)    Employees. Provide Franchisee with suggested staffing and operational instructions in the Manual or otherwise in writing for training Franchisee's employees; provided however that Franchisee acknowledges that all hiring decisions, terms and conditions of employment and training of Franchisees employees, remain the sole responsibility of Franchise.

(f)    Manual. Provide Franchisee with access to, or a copy of, Franchisor's Manual;

(g)    Training. Make available an initial training program for Franchisee's Principal Executive or owner at Franchisor's headquarters and/or at another location designated by Franchisor at no fee for this training; provided however, that Franchisee is responsible for its own travel, lodging, meal, and other out-of-pocket expenses.

(h)    Business Plan. Upon Franchisee's reasonable request, review and provide advice regarding Franchisee's business plan and any financial projections; provided however, that franchise acknowledges that Franchisor bears no responsibility for the performance of the Business and that the performance of the Franchisee will depend on many factors beyond Franchisor's control including without limitation Franchisee's business acumen;

(i)    Market Introduction Plan. Advise Franchisee regarding the planning and execution of Franchisee's market introduction plan, including without limitation any grand opening of the Business;

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

(j)    <u>On-site Opening Assistance</u>. Send at least one representative to Franchisee's location to assist with Franchisee's opening of the Business.

**5.2    Post-Opening Assistance.**

Franchisor agrees to the provide the following assistance to Franchise  after Franchise commences operation of the Business:

(a)    <u>Advice, Consulting, and Support</u>. If Franchisee requests, Franchisor will provide advice to Franchisee regarding improving and developing Franchisee's business, and resolving operating problems Franchisee encounters, to the extent Franchisor deems reasonable. If Franchisor provides in-person support in response to Franchisee's request, Franchisor may charge its then-current fee for such support plus any out-of-pocket expenses such as travel, lodging, and meals for employees providing onsite support;

(b)    <u>Procedures</u>. Franchisor will provide Franchisee with Franchisor's recommended administrative, bookkeeping, accounting, and inventory control procedures. Franchisor may make any such procedures part of required System Standards;

(c)    <u>Brand Development Fund</u>. Franchisor shall manage the Brand Development Fund;

(d)    <u>Internet</u>. Franchisor may maintain a website for the Gradum Gswing brand, which will include Franchisee's location or territory and telephone number.

## LOCATION, DEVELOPMENT, AND OPENING

**6.1    Determining Location and Territory.** If the Location and Territory are not stated on the Summary Page:

(i)    Franchisee shall find a potential Location within the Development Area described on the Summary Page. Franchisee shall submit its proposed Location to Franchisor for acceptance, with all related information Franchisor may request. Franchisor may assist Franchisee in site selection. If Franchisor does not accept the proposed Location in writing within thirty (30) days, then the site will be deemed rejected.

(ii)    When Franchisor accepts the Location, it may provide assistance to Franchisee with the terms and conditions of any lease. Franchisee shall have paid the Site Selection and Lease Negotiation Fee specified in Section 4.2 of this Agreement if such assistance it to be provided. Upon completion of the process, Franchisor will issue a Location Acceptance Letter in the form of Exhibit 2 to this Agreement which will set forth the Location and Territory. Franchisor shall determine and assign Franchisee the Territory in its good faith discretion.

(iii)    Franchisor's advice regarding a site or the acceptance of a site and assistance with the lease negotiation is not a representation or warranty that the Business will be successful, and Franchisor shall not be liable to Franchisee with respect to the location of the Training Facility .

**6.2    Lease.** For any lease between Franchisee and the landlord of the Location, Franchisee shall:

Franchise Agreement

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

(i)  upon Franchisor's request, submit the proposed lease to Franchisor for written approval,

(ii)  have the term of the lease provide for a period of not less than the Initial Term of this Agreement or any Renewal Term, and,

(iii)  use commercially reasonable efforts to obtain the landlord's signature to the conditional assignment of the lease substantially in the form required by Franchisor as shown on Exhibit 5 to this Agreement.

**6.3    Development.** Franchisee shall construct (or remodel) and finish the Location in conformity with Franchisor's System Standards. If required by Franchisor, Franchisee shall engage the services of an architect licensed in the jurisdiction of the Location. Franchisee shall not begin any construction or remodeling work without first obtaining Franchisor's approval of Franchisee's plans. Franchisor may provide assistance to Franchisee with the construction consulting assistance. Franchisee shall have paid the construction assistance fee specified in Section    4.3 of this Agreement if such assistance it to be provided. Franchisor may, but is not required to, inspect Franchisee's construction or remodeling progress at any reasonable time. Franchisee shall not rely upon any information provided or opinions expressed by Franchisor or its representatives regarding any architectural, engineering, or legal matters (including without limitation the Americans With Disabilities Act) in the development and construction of the Training Facility  and Franchisor shall not have any liability with respect thereto. Franchisor's inspection and/or approval to open the Training Facility  is not a representation or a warranty that the Training Facility  has been constructed in accordance with any architectural, engineering, or legal standards.

**6.4    New Franchisee Training.** Franchisee's Principal Executive must complete Franchisor's training program for new franchisees to Franchisor's satisfaction by the time designated by Franchisor before opening the Training Facility .

**6.5    Conditions to Opening.** Franchisee shall notify Franchisor at least  twenty (20) days before Franchisee intends to open the Training Facility  to the public. Before opening, Franchisee must satisfy all of the following conditions:

(i) Franchisee is in compliance with this Agreement,

(ii) Franchisee has obtained all applicable governmental permits and authorizations,

(iii) the Business and Training Facility  conform to all applicable System Standards,

(iv)  Franchisor has inspected and approved the Training Facility ,

(v) Franchisee's officers and employees have completed all of Franchisor's required pre-opening training; and

(vi)  Franchisor has given its written approval to open, which approval will not be unreasonably withheld or delayed.

**6.6    Opening Date.** Franchisee shall open the Training Facility  to the public on or before the date stated on the Summary Page.

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

## OPERATIONS

**7.1    Compliance with Manual and System Standards**. Franchisee shall at all times and at its own expense comply with all mandatory obligations contained in the Manual and with all System Standards.

**7.2    Compliance with Law.** Franchisee and the Business shall comply with all laws and regulations. Franchisee and the Training Facility  shall obtain and keep in force all governmental permits and licenses required for the Training Facility .

**7.3    Products, Services, and Methods of Sale.** Franchisee shall offer all products and services, and only those products and services, as from time to time prescribed by Franchisor in the Manual or otherwise in writing, including without limitation products supplied by Franchisor or its affiliate or designated supplier. Franchisee shall make sales only to retail customers, and only at the Location. Unless otherwise approved or required by Franchisor, Franchisee shall not, without Franchisor's written approval, make sales by any other means, including without limitation by wholesale, by delivery, by mail order or over the internet, or at temporary or satellite locations.

**7.4    Prices.** Franchisee shall generally determine its own prices; provided however, that, to the extent permitted by applicable law, Franchisee shall honor any customer loyalty programs and promotions implemented by Franchisor and any maximum prices and minimum discounts for any given product or service established by Franchisor.

**7.5    Personnel.**

        (a)    <u>Management</u>. Franchisee's Training Facility  must at all times be under the on-site supervision of the Principal Executive or a general manager who has completed Franchisor's training program.

        (b)    <u>Service</u>. Franchisee shall cause its personnel to render competent and courteous service to all customers and members of the public.

        (c)    <u>Appearance</u>. Franchisee shall cause its personnel to comply with any dress attire, uniform, personal appearance and hygiene standards set forth in the Manual.

        (d)    <u>Qualifications</u>. Franchisor may set minimum qualifications for categories of employees employed by Franchisee.

        (e)    <u>Sole Responsibility</u>. Franchisee is solely responsible for the terms and conditions of employment of all of its personnel, including recruiting, hiring, training, scheduling, supervising, compensation, and termination. Franchisee is solely responsible for all actions of its personnel. Franchisee and Franchisor are not joint employers, and no employee of Franchisee will be deemed to be an agent or employee of Franchisor. Within seven days of Franchisor's request, Franchisee and each of its employees will sign an acknowledgment form stating that only Franchisee, and not Franchisor, is the employee's sole employer. Franchisee will use its legal name on all documents with its employees and independent contractors, including, but not limited to, employment applications, timecards, pay checks, and employment and independent contractor agreements, and Franchisee will not use the Marks on any of these documents.

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

**7.6    Post-Opening Training.** Franchisor may at any time require that the Principal Executive and/or any other employees to complete training programs, in any format and in any location determined by Franchisor. Franchisor may charge a reasonable fee for any training programs. Franchisor may require Franchisee to provide training programs to its employees. If a training program is held at a location which requires travel by the Principal Executive or any other employee, then Franchisee shall pay all related travel, living and other expenses.

**7.7    Software.** Without limiting the generality of Section 7.1 or Section 8.1 of this Agreement, Franchisee shall acquire and use all software and related systems required by Franchisor. Franchisee shall enter into any subscription and support agreements that Franchisor may require. Franchisee shall upgrade, update, or replace any software from time to time as Franchisor may require. Franchisee shall protect the confidentiality and security of all software systems, and Franchisee shall abide by any System Standards related thereto. Franchisee shall give Franchisor unlimited access to Franchisee's point of sale system and other software systems used in the Business, by any means designated by Franchisor.

**7.8    Customer Complaints.** Franchisee shall use its best efforts to promptly resolve any customer complaints. Franchisor may take any action it deems appropriate to resolve a customer complaint regarding the Business, and Franchisor may require Franchisee to reimburse Franchisor for any expenses incurred thereby.

**7.9    Evaluation and Compliance Programs.** Franchisee shall participate at its own expense in programs required from time to time by Franchisor for obtaining customer evaluations, reviewing Franchisee's compliance with the System, and/or managing customer complaints, including without limitation a customer feedback system, customer survey programs, and mystery shopping. Franchisor shall share with Franchisee the results of these programs, as they pertain to the Business. Franchisee must meet or exceed any minimum score requirements set by Franchisor for such programs. Franchisor may set minimum scores that Franchisee must receive from the public on social media and internet review sites such as Yelp or Google.

**7.10    Payment Systems.** Franchisee shall accept payment from customers in any form or manner designated by Franchisor (which may include, for example, cash, specific credit and/or debit cards, gift cards, electronic fund transfer systems, and mobile payment systems). Franchisee shall purchase or lease all equipment and enter into all business relationships necessary to accept payments as required by Franchisor. Franchisee must at all times comply with payment card industry data security standards (PCI-DSS).

**7.11    Gift Cards, Loyalty Programs, and Incentive Programs.** At its own expense, Franchisee shall sell or otherwise issue gift cards, certificates, or other pre-paid systems, and participate in any customer loyalty programs, membership/subscription programs, or customer incentive programs, designated by Franchisor, in the manner specified by Franchisor in the Manual or otherwise in writing. Franchisee shall honor all valid gift cards and other pre-paid systems, regardless of whether issued by Franchisee or another Gradum Gswing business. Franchisee shall comply with all procedures and specifications of Franchisor related to gift cards, certificates, and other pre-paid systems, or related to customer loyalty, membership/subscription, or customer incentive programs.

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

**7.12   Maintenance and Repair.** Franchisee shall at all times keep the Training Facility in a neat and clean condition, perform all appropriate maintenance, and keep all physical property in good repair. In addition, Franchisee shall promptly perform all work on the physical property of the Training Facility as Franchisor may prescribe from time to time, including but not limited to periodic interior and exterior painting; resurfacing of the parking lot; roof repairs; and replacement of obsolete or worn-out signage, floor coverings, furnishings, equipment and décor. Franchisee acknowledges that the System Standards may include requirements for cleaning, maintenance, and repair.

**7.13   Remodeling.** In addition to Franchisee's obligations to comply with all System Standards in effect from time to time, Franchisor may require Franchisee to undertake and complete a Remodel of the Location to Franchisor's satisfaction. Franchisee must complete the Remodel in the time frame specified by Franchisor. Franchisor may require the Franchisee to submit plans for Franchisor's reasonable approval prior to commencing a required Remodel. Franchisor's right to require a Remodel is limited as follows: (i) the Remodel will not be required in the first two or last two years of the term, except that a Remodel may be required as a condition to renewal of the term or a Transfer, and (ii) a Remodel will not be required more than once every five years from the date on which Franchisee was required to complete the prior Remodel.

**7.14   Meetings.** The Principal Executive shall use reasonable efforts to attend all in-person meetings and remote meetings (such as telephone conference calls) that Franchisor requires, including any national or regional brand conventions.

**7.15   Insurance.**

(a)      Franchisee shall obtain and maintain insurance policies in the types and amounts as specified by Franchisor in the Manual. If not specified in the Manual, Franchisee shall maintain at least the following insurance coverage:

(i)      "Special" causes of loss coverage forms, including fire and extended coverage, crime, on all property of the Training Facility, for full repair and replacement value subject to a reasonable deductible;

(ii)     Commercial General Liability insurance, including products liability coverage, and broad form commercial liability coverage, written on an "occurrence" policy form in an amount of not less than $1,000,000 single limit per occurrence and $2,000,000 aggregate limit with extended coverage, child endangerment and molestation, from a company rated A+ or better by A.M. Best or equivalent, providing protection which is standard or greater in the hitting, baseball, fitness and health club industry;

(iii)    Umbrella liability insurance in excess of and not more restrictive than the underlying coverage listed above, with limits of not less than $1,000,000 per occurrence/$2,000,000 aggregate; and

(iv)     Workers Compensation coverage as required by the laws of the state where the Training Facility is located.

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

(b)    Except for workers compensation insurance, Franchisee's policies shall (1) list Franchisor and its affiliates as an additional insured, (2) include a waiver of subrogation in favor of Franchisor and its affiliates, (3) be primary and non-contributing with any insurance carried by Franchisor or its affiliates, and (4) stipulate that Franchisor shall receive thirty (30) days' prior written notice of cancellation.

(c)    Franchisee shall provide Certificates of Insurance evidencing the required coverage to Franchisor prior to opening and upon annual renewal of the insurance coverage, as well as at any time upon request of Franchisor.

**7.16    Payments to Third Parties.** Franchisee shall pay all vendors and suppliers in a timely manner. Franchisee shall pay all taxes when due. If Franchisee borrows money, it shall comply with the terms of its loan and make all loan payments when due. If Franchisee leases the Location, Franchisee shall comply with its lease for the Location and make all rent payments when due.

**7.17    Public Relations.** Without Franchisor's prior written approval, which will not be unreasonably withheld, Franchisee shall not make any public statements, including without limitation interviews or issuing press releases, regarding Franchisor, the Training Facility or Business, or any particular incident or occurrence related to the Training Facility or Business.

**7.18    Association with Causes.** Franchisee shall not in the name of the Business (i) donate money, products, or services to any charitable, political, religious, or other organization, or (ii) act in support of any such organization, without Franchisor's prior written approval, which will not be unreasonably withheld.

**7.19    No Other Activity Associated with the Business.** Franchisee shall not engage in any business or other activity at the Location other than operation of the Gradum Gswing Training Facility . Franchisee shall not use assets of the Training Facility for any purpose other than the Training Facility . If Franchisee is an entity, the entity shall not own or operate any other business except the Gradum Gswing businesses.

**7.20    No Third-Party Management.** Franchisee shall not engage a third-party management company to manage or operate the Training Facility without the prior written approval of Franchisor, which will not be unreasonably withheld.

**7.21    Identification.** Franchisee must identify itself as the independent owner of the Business in the manner prescribed by Franchisor. Franchisee must display at the Training Facility signage prescribed by Franchisor identifying the Location as an independently owned franchise.

**7.22    Business Practices.** Franchisee, in all interactions with customers, employees, vendors, governmental authorities, and other third parties, shall be honest and fair. Franchisee shall comply with any code of ethics or statement of values from Franchisor. Franchisee shall not take any action which may injure the goodwill associated with the Marks.

**SUPPLIERS AND VENDORS**

**8.1    Generally.** Franchisee shall acquire all products and services required by Franchisor from time to time in accordance with System Standards. Franchisor may require Franchisee to purchase

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

or lease any products from Franchisor's designee, Required Vendors, Approved Vendors, and under Franchisor's specifications. Franchisor may periodically change any such requirement or change the status of any vendor. Any such requirement or change by Franchisor shall be made effective by insertion into the Manual, System Standards or otherwise by written notice to Franchisee.

**8.2    Alternate Vendor Approval.** If Franchisor requires Franchisee to purchase a particular product or service only from an Approved Vendor or Required Vendor, and Franchisee desires to purchase the product or service from a different vendor, then Franchisee shall submit a written request to Franchisor for approval and any information, specifications and/or samples requested by Franchisor. Franchisor may condition its approval on such criteria as Franchisor deems appropriate, which may include evaluations of the vendor's capacity, quality, financial stability, reputation, and reliability; inspections; product testing, and performance reviews. Franchisor will provide Franchisee with written notice of the approval or disapproval of any proposed new vendor within thirty (30) days after receipt of Franchisee's request.

**8.3    Alternate Product or service Approval.** If Franchisor requires Franchisee to purchase a particular Product or service, and Franchisee desires to purchase an alternate Product or service, Franchisee must submit a written request for approval and any information, specifications and/or samples requested by Franchisor. Franchisor will provide Franchisee with written notification of the approval or disapproval of any proposed alternate Product or service within thirty (30) days after receipt of Franchisee's request.

**8.4    Purchasing.** Franchisor may negotiate prices and terms with vendors on behalf of the System. Franchisor may receive rebates, payments or other consideration from vendors in connection with purchases by franchisees. Franchisor has the right, but not the obligation, to collect payments from Franchisee on behalf of a vendor and remit the payments to the vendor and impose a reasonable markup or charge for administering the payment. Franchisor may implement a centralized purchasing system. Franchisor may establish a purchasing cooperative and require Franchisee to join and participate in the purchasing cooperative on such terms and conditions as Franchisor may determine.

**8.5    No Liability of Franchisor.** Franchisor shall not be liable to Franchisee for any claim or loss related to any product provided or service performed by any Approved Vendor or Required Vendor, including without limitation defects, delays, or unavailability of products or services.

**8.6    Product Recalls.** If Franchisor or any vendor, supplier, or manufacturer of an item used or sold in Franchisee's Training Facility issues a recall of such item or otherwise notifies Franchisee that such item is defective or dangerous, Franchisee shall immediately cease using or selling such item, and Franchisee shall at its own expense comply with all instructions from Franchisor or the vendor, supplier, or manufacturer of such item with respect to such item, including without limitation the recall, repair, or replacement of such item.

## MARKETING

**9.1    Approval and Implementation.** Franchisee shall not conduct any marketing, advertising, or public relations activities, including without limitation, marketing materials, websites, online

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

advertising, social media marketing or presence, and sponsorships, which have not been approved by Franchisor. Franchisor may, but is not obligated to, operate all "social media" accounts on behalf of the System, or it may permit franchisees to operate one or more accounts. Franchisee must comply with any System Standards regarding marketing, advertising, and public relations, include any social media policy that Franchisor may prescribe. Franchisee shall implement any social media and marketing plans, or campaigns as determined by Franchisor. If Franchisor permits Franchisee to operate its own social media accounts, Franchisee shall obtain Franchisor's prior approval for any and all  social media postings or content relating or  referring to the Training Facility  or the Marks,  or in any way associated with the Training Facility  or the Marks.

**9.2     Use by Franchisor.** Franchisor may use any marketing materials or campaigns developed by or on behalf of Franchisee, and Franchisee hereby grants an unlimited, perpetual, royalty-free license to Franchisor for such purpose.

**9.3     Brand Development Fund.** Franchisor may establish a  Brande Development Fund to promote the System on a local, regional, national, and/or international level. If Franchisor has established a Brand Development Fund, the following shall apply:

(a)     Separate Account. Franchisor shall hold the  Brand Development Fund Contributions from all franchisees in one or more bank accounts separate from  Franchisor's other accounts.

(b)     Use. Franchisor shall use the Brand Development Fund only for marketing, advertising, and public relations materials, programs and campaigns (including at local, regional, national, and/or international level), and related overhead. The foregoing includes such activities and expenses as Franchisor reasonably determines, and may include, without limitation: development and placement of advertising and promotions; sponsorships; contests and sweepstakes; development of décor, trade dress, Marks, and/or branding; development and maintenance of brand websites; social media; internet activities; e-commerce programs; search engine optimization; market research; public relations, media or agency costs; trade shows and other events; printing and mailing; and administrative and overhead expenses related to the  Brand Development Fund (including the compensation of Franchisor's employees working on marketing and for accounting, bookkeeping, reporting, legal and other expenses related to the Brand Development Fund).

(c)     Discretion. Franchisee agrees that expenditures from the  Brand Development Fund need not be proportionate to contributions made by Franchisee or provide any direct or indirect benefit to Franchisee. The  Brand Development Fund will be spent at Franchisor's sole discretion, and Franchisor is not a fiduciary with respect to the Fund.

(d)     Contribution by Other Outlets. Franchisor is not obligated to (i) have all other Gradum Gswing training facilities (whether owned by other franchisees or by Franchisor or its affiliates) contribute to the  Brand Development Fund, or (ii) have other  Gradum Gswing training facilities contribute the same amount or at the same rate as Franchisee.

(e)     Surplus or Deficit. Franchisor may accumulate funds in the Brand Development Fund and carry the balance over to subsequent years. If the Brand Development Fund operates at

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

a deficit or requires additional funds at any time, Franchisor may loan such funds to the Fund on reasonable terms.

(f)    Financial Statement. Franchisor will prepare an unaudited annual financial statement of the Brand Development Fund within 120 days of the close Franchisor's fiscal year and will provide the financial statement to Franchisee upon request.

**9.4    Market Cooperatives.** Franchisor may establish market advertising and promotional cooperative funds ("Market Cooperative") in any geographical areas. If a Market Cooperative for the geographic area encompassing the Location has been established at the time Franchisee commences operations hereunder, Franchisee shall immediately become a member of such Market Cooperative. If a Market Cooperative for the geographic area encompassing the Location is established during the term of this Agreement, Franchisee shall become a member of such Market Cooperative within thirty (30) days. Franchisor shall not require Franchisee to be a member of more than one Market Cooperative. If Franchisor establishes a Market Cooperative:

(a)    Governance. Each Market Cooperative will be organized and governed in a form and manner and shall commence operations on a date determined by Franchisor. Franchisor may require the Market Cooperative to adopt bylaws or regulations prepared by Franchisor. Unless otherwise specified by Franchisor, the activities carried on by each Market Cooperative shall be decided by a majority vote of its members. Franchisor will be entitled to attend and participate in any meeting of a Market Cooperative. Any Franchisor business owned by Franchisor in the Market Cooperative shall have the same voting rights as those owned by its franchisees. Each Business owner will be entitled to cast one vote for each Training Facility owned, provided, however, that a franchisee shall not be entitled to vote if it is in default under its franchise agreement. If the members of a Market Cooperative are unable or fail to determine the manner in which Market Cooperative monies will be spent, Franchisor may assume this decision-making authority after 10 days' notice to the members of the Market Cooperative.

(b)    Purpose. Each Market Cooperative shall be devoted exclusively to administering regional advertising and marketing programs and developing standardized promotional materials for use by the members in local advertising and promotions, all of which are subject to Franchisor's approval.

(c)    Approval. No advertising or promotional plans or materials may be used by a Market Cooperative or furnished to its members without the prior approval of Franchisor pursuant to Section 9.1 of this Agreement. Franchisor may designate the national or regional advertising agencies used by the Market Cooperative.

(d)    Funding. The majority vote of the Market Cooperative will determine the dues to be paid by members of the Market Cooperative, including Franchisee, but not less than 1% and provided Franchisor or its affiliates have a majority vote,  not more than 3% of Gross Sales.

(e)    Enforcement. Only Franchisor will have the right to enforce the obligations of franchisees who are members of a Market Cooperative to contribute to the Market Cooperative.

(f)    Termination. Franchisor may terminate any Market Cooperative. Any funds left in a Market Cooperative upon termination will be transferred to the Brand Development Fund.

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

**9.5    Local Advertising and Marketing.** Franchisee shall spend five percent (5%) of Gross Sales each month on marketing the Training Facility . Upon request of Franchisor, Franchisee shall furnish proof of its compliance with this Section. Franchisor has the sole discretion to determine what activities constitute "marketing" under this Section. Franchisor may, in its discretion, determine that if Franchisee contributes to a Market Cooperative, the amount of the contribution will be counted towards Franchisee's required spending under this Section 9.5.

**9.6    Market Introduction Plan.** Franchisee must develop a market introduction plan and obtain Franchisor's approval of the market introduction plan at least thirty (30) days before the projected opening date of the Training Facility .

<h3 style="text-align:center">RECORDS AND REPORTS</h3>

**10.1    Systems.** Franchisee shall use such customer data management, sales data management, administrative, bookkeeping, accounting, and inventory control procedures and systems as Franchisor may specify in the Manual or otherwise in writing.

**10.2    Reports.**

(a)    <u>Financial Reports</u>. Franchisee shall provide such periodic financial reports as Franchisor may require in the Manual or otherwise in writing, including:

    (i)    a monthly profit and loss statement and balance sheet for the Business within thirty (30) days after the end of each calendar month;

    (ii)    an annual financial statement (including profit and loss statement, cash flow statement, and balance sheet) for the Business within ninety (90) days after the end of Franchisor's fiscal year; and

    (iii)    any information Franchisor requests in order to prepare a financial performance representation for Franchisor's franchise disclosure document.

(b)    <u>Legal Actions and Investigations</u>. Franchisee shall promptly notify Franchisor of any Action or threatened Action by any customer, governmental authority, or other third party against Franchisee or the Business, or otherwise involving the Franchisee or the Business. Franchisee shall provide such documents and information related to any such Action as Franchisor may request.

(c)    <u>Government Inspections</u>. Franchisee shall give Franchisor copies of all inspection reports, warnings, certificates, and ratings issued by any governmental entity with respect to the Training Facility , within three days of Franchisee's receipt thereof.

(d)    <u>Other Information</u>. Franchisee shall submit to Franchisor such other financial statements, budgets, forecasts, reports, records, copies of contracts, documents related to litigation, tax returns, copies of governmental permits, and other documents and information related to the Business as specified in the Manual or that Franchisor may reasonably request.

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

**10.3    Initial Investment Report.** Within one hundred twenty (120) days after opening for business, Franchisee shall submit to Franchisor a report detailing Franchisee's investment costs to develop and open the Training Facility , with costs allocated to the categories listed in Item 7 of Franchisor's Franchise Disclosure Document and with such other information as Franchisor may request.

**10.4    Training Facility Records.** Franchisee shall keep complete and accurate books and records reflecting all expenditures and receipts of the Training Facility, with supporting documents, including, but not limited to, payroll records, payroll tax returns, register receipts, production reports, sales invoices, bank statements, deposit receipts, cancelled checks and paid invoices, for at least three years. Franchisee shall keep such other business records as Franchisor may specify in the Manual or otherwise in writing.

**10.5    Records Audit.** Franchisor may examine and audit all books and records related to the Training Facility and supporting documentation, at any reasonable time. Franchisor may conduct the audit at the Location and/or require Franchisee to deliver copies of books, records and supporting documentation to a location designated by Franchisor. Franchisee shall reimburse Franchisor for all costs and expenses of the examination or audit if (i) Franchisor conducted the audit because Franchisee failed to submit required reports or was otherwise not in compliance with the System, or (ii) the audit reveals that Franchisee understated Gross Sales by three percent (3%) or more during any four-week period.

## FRANCHISOR'S RIGHTS

**11.1    Manual; Modification.** The Manual, and any part of the Manual, may be in any form or media determined by Franchisor. Franchisor may supplement, revise, or modify the Manual, and Franchisor may change, add or delete System Standards at any time in its discretion. Franchisor may inform Franchisee thereof by any method that Franchisor deems appropriate. Such notice need not qualify as "notice" under Section 18.9 of this Agreement. In the event of any dispute as to the contents of the Manual, Franchisor's master copy will control.

**11.2    Inspections.** Franchisor may enter the premises of the Training Facility  from time to time during normal business hours and conduct an inspection. Franchisee shall cooperate Franchisor's inspectors. The inspection may include, but is not limited to, observing operations, conducting a physical inventory, evaluating physical conditions, monitoring sales activity, speaking with employees and customers, and removing samples of products, supplies and materials. Franchisor may videotape and/or take photographs of the inspection and the Training Facility . Franchisor may set a minimum score requirement for inspections, and Franchisee's failure to meet or exceed the minimum score will be a default under this Agreement. Without limiting Franchisor's other rights under this Agreement, Franchisee will, as soon as reasonably practical, correct any deficiencies noted during an inspection. If Franchisor conducts an inspection because of a governmental report, customer complaint or other customer feedback, or a default or non-compliance with any System Standard by Franchisee, including following up a previous failed inspection, then Franchisor may charge all out-of-pocket expenses plus its then-current inspection fee to Franchisee.

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

**11.3     Franchisor's Right to Cure.** If Franchisee breaches or defaults under any provision of this Agreement, Franchisor may, but shall not be obligated to, take any action to cure the default on behalf of Franchisee, without any liability to Franchisee. Franchisee shall reimburse Franchisor for its costs and expenses. Including without limitation, the allocation of any internal costs, for such action, plus a ten percent (10%) administrative fee.

**11.4     Right to Discontinue Supplies Upon Default.** While Franchisee is in default or breach of this Agreement, Franchisor may (i) require that Franchisee pay cash on delivery for products or services supplied by Franchisor, (ii) stop selling or providing any products and services to Franchisee, and/or (iii) request any third-party vendors to not sell or provide products or services to Franchisee. No such action by Franchisor shall be a breach or constructive termination of this Agreement, change in competitive circumstances or similarly characterized, and Franchisee shall not be relieved of any obligations under this Agreement because of any such action. Such rights of Franchisor are in addition to any other right or remedy available to Franchisor.

**11.5     Training Facility  Data.** All customer data and other non-public data generated by the Training Facility  is Confidential Information and is exclusively owned by Franchisor. Franchisor hereby licenses such data back to Franchisee without charge solely for Franchisee's use in connection with the Training Facility  for the term of this Agreement and any renewals thereof.

**11.6     Innovations.** Franchisee shall disclose to Franchisor all ideas, plans, improvements, concepts, methods and techniques relating to the Training Facility  (collectively, "Innovations") conceived or developed by Franchisee, its employees, agents or contractors. Franchisor will automatically own all Innovations, and it will have the right to use and incorporate any Innovations into the System, without any compensation to Franchisee. Franchisee shall execute any documents reasonably requested by Franchisor to document Franchisor's ownership of Innovations.

**11.7     Communication Systems.** If Franchisor provides email accounts and/or other communication systems to Franchisee, then Franchisee acknowledges that it has no expectation of privacy in the assigned email accounts and other communications systems, and Franchisee authorizes Franchisor to access such communications.

**11.8     Delegation.** Franchisor may delegate any duty or obligation of Franchisor under this Agreement to an affiliate or to a third party.

**11.9     System Variations.** Franchisor may vary or waive any System Standard for any one or more of Franchisor franchises due to the peculiarities of the particular site or circumstances, density of population, business potential, population of trade area, existing business practices, applicable laws or regulations, or any other condition relevant to the performance of a franchise or group of franchises. Franchisee is not entitled to the same variation or waiver.

**11.10    Temporary Public Safety Closure.** If Franchisor discovers or becomes aware of any aspect of the Training Facility  which, in Franchisor's opinion, constitutes an imminent danger to the health or safety of any person, then immediately upon notice from Franchisor, Franchisee must temporarily cease operations of the Training Facility   and remedy the dangerous condition. Franchisor shall not be liable to Franchisee or any other person for action or failure to act with respect to a dangerous condition.

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

## MARKS

**12.1    Authorized Marks.** Franchisee shall not use any trademarks, service marks or logos in connection with the Training Facility other than the Marks. Franchisee shall use all Marks specified by Franchisor only in the manner designated by Franchisor. Franchisee has no rights in the Marks other than the right to use them in the operation of the Training Facility in compliance with this Agreement. All use of the Marks by Franchisee and any goodwill associated with the Marks, including any goodwill arising due to Franchisee's operation of the Training Facility and Business, shall inure to the exclusive benefit of Franchisor.

**12.2    Change of Marks.** Franchisor may add, modify, or discontinue any Marks to be used under the System. Within a reasonable time after Franchisor makes any such change, Franchisee must comply with the change at Franchisee's sole expense.

**12.3    Infringement.**

(a)    <u>Defense of Franchisee</u>. If Franchisee has used the Marks in accordance with this Agreement, then (i) Franchisor shall defend Franchisee (at Franchisor's expense) against any Action by a third-party alleging infringement by Franchisee's use of a Mark, and (ii) Franchisor will indemnify Franchisee for expenses and damages if the Action is resolved unfavorably to Franchisee.

(b)    <u>Infringement by Third Party</u>. Franchisee shall promptly notify Franchisor if Franchisee becomes aware of any possible infringement of a Mark by a third party. Franchisor may, in its sole discretion, commence or join any claim against the infringing party.

(c)    <u>Control</u>. Franchisor shall have the exclusive right to control any prosecution or defense of any Action related to possible infringement of or by the Marks.

## COVENANTS

**13.1    Confidential Information.** With respect to all Confidential Information, Franchisee shall (a) adhere to all procedures prescribed by Franchisor for maintaining confidentiality, (b) disclose such information to its employees only to the extent necessary for the operation of the Training Facility ; (c) not use any such information in any other business or in any manner not specifically authorized in writing by Franchisor, (d) exercise the highest degree of diligence and effort to maintain the confidentiality of all such information during and after the term of this Agreement, (e) not copy or otherwise reproduce any Confidential Information, and (f) promptly report any unauthorized disclosure or use of Confidential Information. Franchisee acknowledges that all Confidential Information is owned by Franchisor (except for Confidential Information which Franchisor licenses from another person or entity). This Section will survive the termination or expiration of this Agreement indefinitely.

**13.2    Covenants Not to Compete.**

(a)    <u>Restriction – In Term</u>. During the term of this Agreement, neither Franchisee, any Owner, nor any spouse of an Owner (the "<u>Restricted Parties</u> or "<u>Restricted Party</u>") shall directly

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

or indirectly have any ownership interest in, lend money or provide financial assistance to, provide any services to, or be employed by, any Competitor.

(b)    Restriction – Post Term. For two years after this Agreement expires or is terminated for any reason or, where applicable, for two years after a Transfer, no Restricted Party shall directly or indirectly operate, have any ownership interest in, lend money or provide financial assistance to, provide any services to, or be employed by, any Competitor which is located at the premises upon which the Gradum Gswing is or was located or is located or within a twenty-five (25) mile radius of the Franchisee's location or any other Gradum Gswing location, whether owned by Franchisor or another Franchisee.  Franchisee expressly agrees that the two-year period and the twenty-five (25) mile radius are the reasonable and necessary time and distance needed to protect Franchisor if this Agreement expires or is terminated for any reason. Franchisee agrees that the two-year  time period of the non-competition provision shall not accrue during any time period that Franchise or any Restricted Party is in violation of this covenant. If this Agreement is terminated before the Territory is determined, then the area of non-competition will the Development Area and the territory of any other Gradum Gswing business operating on the date of termination.

(c)    Interpretation. The parties agree that each of the foregoing covenants is independent of any other covenant or provision of this Agreement. If all or any portion of the covenants in this Section is held to be unenforceable or unreasonable by any arbitrator or court, then the parties intend that the arbitrator or court modify such restriction to the extent reasonably necessary to protect the legitimate business interests of Franchisor. Franchisee agrees that the existence of any claim it may have against Franchisor shall not constitute a defense to the enforcement by Franchisor of the covenants of this Section. If a Restricted Party fails to comply with the obligations under this Section during the restrictive period, then the restrictive period will be extended an additional day for each day of noncompliance.

**13.3    General Manager and Key Employees.** If requested by Franchisor, Franchisee will cause its general manager and other employees to sign Franchisor's then-current form of confidentiality and non-compete agreement.

## DEFAULT AND TERMINATION

**14.1    Termination by Franchisee.** Franchisee may terminate this Agreement only if Franchisor violates a material provision of this Agreement and fails to cure or to make substantial progress toward curing the violation within thirty (30) days after receiving written notice from Franchisee detailing the alleged default. Termination by Franchisee is effective ten (10) days after Franchisor receives written notice of termination.

**14.2    Termination by Franchisor.**

(a)    Termination Subject to 10-Day Cure Period. Franchisor may terminate this Agreement if Franchisee does not make any payment to Franchisor when due, or if Franchisee has insufficient funds in its account when Franchisor attempts an electronic funds withdrawal, and Franchisee fails to cure such non-payment within ten (10) days after Franchisor gives notice to Franchisee of such breach.

Franchise Agreement

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

(b)    Termination Subject to 30-Day Cure Period. Franchisor may terminate this Agreement if Franchisee breaches this Agreement in any manner not described in subsection (a) or (c) of this Section 14.2, and Franchisee fails to cure such breach to Franchisor's satisfaction within thirty (30) days after Franchisor notifies Franchisee of the breach.

(c)    Termination Without Cure Period. Franchisor may terminate this Agreement by giving notice to Franchisee, without opportunity to cure, if any of the following occur:

(i)    Franchisee misrepresented or omitted material facts when applying to be a franchisee, or makes any misrepresentation in this Agreement;

(ii)    Franchisee knowingly submits any false report or knowingly provides any other false information to Franchisor;

(iii)    a receiver or trustee for the Business or all or substantially all of Franchisee's property is appointed by any court, or Franchisee makes a general assignment for the benefit of Franchisee's creditors, or Franchisee is unable to pay its debts as they become due, or a levy or execution is made against the Business, or an attachment or lien remains on the Business for thirty (30) days unless the attachment or lien is being duly contested in good faith by Franchisee, or a petition in bankruptcy is filed by Franchisee, or such a petition is filed against or consented to by Franchisee and the petition is not dismissed within forty-five (45) days, or Franchisee is adjudicated as bankrupt;

(iv)    Franchisee fails to open the Training Facility for business by the date specified on the Summary Page after ten (10) days' notice from Franchisor;

(v)    Franchisee loses possession of the Location;

(vi)    Franchisee or any Owner commits a material violation of Section 7.2 of this Agreement (compliance with laws) or Section 13.1 of this Agreement (confidentiality), violates Section 13.2 of this Agreement (non-compete) or Article 15 of this Agreement (transfer), or commits any other violation of this Agreement which by its nature cannot be cured;

(vii)    Franchisee abandons the Training Facility or ceases operation of the Training Facility for more than five (5) consecutive days;

(viii)    Franchisee or any Owner slanders or libels Franchisor or any of its employees, directors, or officers;

(ix)    Franchisee refuses to cooperate with or permit any audit or inspection by Franchisor or its agents or contractors, or otherwise fails to comply with Sections 10.5 or 11.2 of this Agreement;

(x)    the Training Facility is operated in a manner which, in Franchisor's reasonable judgment, constitutes a significant danger to the health or safety of any person, and

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

Franchisee fails to cure such danger within forty-eight (48) hours after becoming aware of the danger, whether as a result of notice from Franchisor or otherwise;

(xi)   Franchisee has received two or more notices of default and Franchisee commits another breach of this Agreement, all in the same 12-month period;

(xii)  Franchisor or any Franchisor affiliate terminates any other agreement with Franchisee (or any affiliate) due to the breach of such other agreement by Franchisee or its affiliate; provided however, that termination of a Multi-Territory Development Agreement with Franchisee or its affiliate shall not automatically give Franchisor the right to terminate this Agreement;

(xiii) Franchisee or any Owner is charged with, pleads guilty or no-contest to, or is convicted of a felony; or

(xiv)  Franchisee or any Owner is accused by any governmental authority or third party of any act, or if Franchisee or any Owner commits any act or series of acts, that in Franchisor's opinion is reasonably likely to materially and unfavorably affect the Gradum Gswing brand.

**14.3    Effect of Termination.** Upon termination or expiration of this Agreement, all obligations that by their terms or by reasonable implication survive termination, including those pertaining to non-competition, confidentiality, indemnity, and dispute resolution, will remain in effect, and Franchisee must immediately:

(i)    pay all amounts owed to Franchisor;

(ii)   return to Franchisor all copies of the Manual, Confidential Information and any and all other materials provided by Franchisor to Franchisee or created by a third party for Franchisee relating to the operation of the Training Facility , and all items containing any Marks, copyrights, and other proprietary items; and delete all Confidential Information and proprietary materials from electronic devices;

(iii)  notify the telephone, internet, email, electronic network, directory, and listing entities of the termination or expiration of Franchisee's right to use any numbers, addresses, domain names, locators, directories and listings associated with any of the Marks, and authorize their transfer to Franchisor or any new franchisee as may be directed by Franchisor, and Franchisee hereby irrevocably appoints Franchisor, with full power of substitution, as its true and lawful attorney-in-fact, which appointment is coupled with an interest; to execute such directions and authorizations as may be necessary or appropriate to accomplish the foregoing; and

(iv)   cease doing business under any of the Marks.

**14.4    Remove Identification.** Within thirty (30) days after termination or expiration of this Agreement, Franchisee shall at its own expense "de-identify" the Location so that it no longer contains the Marks, signage, or any trade dress of or associated with a Gradum Gswing training facility or business, to the reasonable satisfaction of Franchisor. Franchisee shall comply with any

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

reasonable instructions and procedures of Franchisor for de-identification. If Franchisee fails to do so within thirty (30) days after this Agreement expires or is terminated, Franchisor may enter the Location to remove the Marks and de-identify the Location. In this event, Franchisor will not be charged with trespass nor be accountable or required to pay for any assets removed or altered, or for any damage caused by Franchisor.

**14.5    Liquidated Damages.** If Franchisor terminates this Agreement based upon Franchisee's default or if Franchisee purports to terminate this agreement for any reason not specified in Section 14.1 of this Agreement, then within ten (10) days thereafter Franchisee shall pay to Franchisor a lump sum (as liquidated damages and not as a penalty) calculated as follows: (x) the average Royalty Fees and Brand Development Fund Contributions that Franchisee owed to Franchisor under this Agreement for the 52-week period preceding the date on which Franchisee ceased operating the Training Facility ; multiplied by (y) the lesser of (i) 104 or (ii) the number of weeks remaining in the then-current term of this Agreement. If Franchisee had not operated the Training Facility for at least 52 weeks, then (x) will equal the average Royalty Fees and Brand Development Fund Contributions that Franchisee owed to Franchisor during the period that Franchisee operated the Training Facility . The "average Royalty Fees and Brand Development Fund Contributions that Franchisee owed to Franchisor" shall not be discounted or adjusted due to any deferred or reduced Royalty Fees and Brand Development Fund Contributions set forth in an addendum to this Agreement unless this Section 14.5 of this Agreement is specifically amended in such addendum. Franchisee acknowledges that a precise calculation of the full extent Franchisor's damages under these circumstances is difficult to determine and the method of calculation of such damages as set forth in this Section is reasonable. Franchisee's payment to Franchisor under this Section 14.5 will be in lieu of any direct monetary damages that Franchisor may incur as a result of Franchisor's loss of Royalty Fees and Brand Development Fund Contributions that would have been owed to Franchisor after the date of termination; however, such payment shall be in addition to all damages and other amounts arising under Sections 14.3 and 14.4 of this Agreement, Franchisor's right to injunctive relief for enforcement of Article 13 of this Agreement, and any attorneys' fees and other costs and expenses to which Franchisor is entitled under this Agreement. Except as provided in this Section, Franchisee's payment of this lump sum shall be in addition to any other right or remedy that Franchisor may have under this Agreement or otherwise.

**14.6    Purchase Option.** When this Agreement expires or is terminated, Franchisor has the right but not the obligation to purchase any or all of the assets related to the Training Facility , and/or to require Franchisee to assign its lease or sublease to Franchisor. To exercise this option, Franchisor must notify Franchisee no later than thirty (30) days after this Agreement expires or is terminated. The purchase price for all assets that Franchisor elects to purchase will be the lower of (i) the book value of such assets as declared on Franchisee's last filed tax returns or (ii) the fair market value of the assets. If the parties cannot agree on fair market value within thirty (30) days after the exercise notice, the fair market value will be determined by an independent appraiser reasonably acceptable to both parties. The parties will equally share the cost of the appraisal. Franchisor's purchase will be of assets only (free and clear of all liens), and the purchase will not include any liabilities of Franchisee. The purchase price for assets will not include any factor or increment for any trademark or other commercial symbol used in the business, the value of any intangible assets, or any goodwill or "going concern" value for the Business. Franchisor may withdraw its exercise of the purchase option at any time before it pays for the assets. Franchisee will sign a bill of sale for the purchased assets and any other transfer documents reasonably

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

requested by Franchisor. If Franchisor exercises the purchase option, Franchisor may deduct from the purchase price: (a) all amounts due from Franchisee; (b) Franchisee's portion of the cost of any appraisal conducted hereunder; and (c) amounts paid or to be paid by Franchisor to cure defaults under Franchise's lease and/or amounts owed by Franchisee to third parties. If any of the assets are subject to a lien, Franchisor may pay a portion of the purchase price directly to the lienholder to pay off such lien. Franchisor may withhold twenty-five percent (25%) of the purchase price for ninety (90) days to ensure that all of Franchisee's taxes and other liabilities are paid. Franchisor may assign this purchase option to another party.

## TRANSFERS

**15.1    By Franchisor.** Upon notice to Franchisee, Franchisor may transfer or assign this Agreement, or any of its rights or obligations under this Agreement, to any person or entity, and Franchisor may undergo a change in ownership or control, without the consent of Franchisee.

**15.2    By Franchisee.** Franchisee acknowledges that the rights and duties set forth in this Agreement are personal to Franchisee and that Franchisor entered into this Agreement in reliance on Franchisee's business skill, financial capacity, personal character, experience, and business ability. Accordingly, Franchisee shall not Transfer this Agreement without obtaining Franchisor's prior written consent, which shall not be unreasonably withheld provided that certain conditions of Transfer are satisfied, including, without limitation, the following:

(i)     Franchisor receives a transfer fee equal to  Ten Thousand Dollars ($10,000) plus any broker fees and other out-of-pocket costs incurred by Franchisor;

(ii)    the proposed assignee and its owners have completed Franchisor's franchise application processes, meet Franchisor's then-applicable standards for new franchisees, and have been approved by Franchisor as franchisees;

(iii)   the proposed assignee is not a Competitor;

(iv)    the proposed assignee executes Franchisor's then-current form of franchise agreement and any related documents, which form may contain materially different provisions than this Agreement (provided, however, that the proposed assignee will not be required to pay an initial franchise fee);

(v)     all owners of the proposed assignee provide a guaranty in accordance with Section 2.5 of this Agreement;

(vi)    Franchisee has paid all monetary obligations to Franchisor and its affiliates, and to any lessor, vendor, supplier, or lender to the Business, and Franchisee is not otherwise in default or breach of this Agreement or of any other obligation owed to Franchisor or its affiliates;

(vii)   the proposed assignee and its owners and employees undergo such training as Franchisor may require;

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

(viii)   Franchisee, its Owners, and the transferee and its owners execute a general release of Franchisor in a form satisfactory to Franchisor; and

(ix)   the Training Facility fully complies with all of Franchisor's most recent System Standards.

**15.3    Transfer for Convenience of Ownership.** If Franchisee is an individual, Franchisee may Transfer this Agreement to a corporation or limited liability company formed for the convenience of ownership after at least fifteen (15) days' notice to Franchisor, if, prior to the Transfer: (1) the transferee provides the information required by Section 2.3 of this Agreement; (2) Franchisee provides copies of the entity's charter documents, by-laws or operating agreement and similar documents, as may be requested by Franchisor, (3) Franchisee owns all voting securities of the corporation or limited liability company, and (4) Franchisee provides a guaranty in accordance with Section 2.5 of this Agreement.

**15.4    Transfer upon Death or Incapacity.** Upon the death or incapacity of Franchisee (or, if Franchisee is an entity, the Owner with the largest ownership interest in Franchisee), the executor, administrator, or personal representative of that person must Transfer the Business to a third party approved by Franchisor (or to another person who was an Owner at the time of death or incapacity of the largest Owner) within nine months after death or incapacity. Such transfer must comply with Section 15.2 of this Agreement.

**15.5    Franchisor's Right of First Refusal.** Before Franchisee (or any Owner) engages in a Transfer (except under Section 15.3 of this Agreement, to a co-Owner, or to a spouse, sibling, or child of an Owner), Franchisor will have a right of first refusal, as set forth in this Section. Franchisee (or its Owners) shall provide to Franchisor a copy of the terms and conditions of any Transfer. For a period of thirty (30) days from the date of Franchisor's receipt of such copy, Franchisor will have the right, exercisable by notice to Franchisee, to purchase the assets subject of the proposed Transfer for the same price and on the same terms and conditions (except that Franchisor may substitute cash for any other form of payment). If Franchisor does not exercise its right of first refusal, Franchisee may proceed with the Transfer, subject to the other terms and conditions of this Article.

**15.6    No Sublicense.** Franchisee has no right to sublicense the Marks or any of Franchisee's rights under this Agreement.

**15.7    No Lien on Agreement.** Franchisee shall not grant a security interest in this Agreement to any person or entity. If Franchisee grants an "all assets" security interest to any lender or other secured party, Franchisee shall cause the secured party to expressly exempt this Agreement from the security interest.

## INDEMNITY

**16.1    Indemnity.** Franchisee shall indemnify and defend, with counsel reasonably acceptable to Franchisor, Franchisor, its parent entities, subsidiaries and affiliates, and their respective owners, directors, officers, employees, agents, successors and assignees (collectively, "Indemnitees") against all Losses in any Action by or against Franchisor and/or any Indemnitee arising directly or indirectly related to, or alleged to arise out of, the operation of the Business. Franchisee shall not

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

settle an Action without the consent of the Indemnitee. This indemnity will continue in full force and effect and shall survive any termination or expiration of this Agreement.

**16.2    Assumption.** An Indemnitee may elect to assume the defense of any Action subject to this indemnification, and control all aspects of defending the Action, including negotiations and settlement, at Franchisee's expense. Such an undertaking shall not diminish Franchisee's obligation to indemnify the Indemnitees.

## DISPUTE RESOLUTION

**17.1    Arbitration.**

(a)    Disputes Subject to Arbitration. Except as expressly provided in subsection (c) and (d), any controversy or claim between the parties (including any controversy or claim arising out of or relating to this Agreement or its formation and including any question of arbitrability) shall be resolved by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, including the Optional Rules for Emergency Measures of Protection. Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction.

(b)    Location. The place of arbitration shall be the city and state where Franchisor's headquarters are located.

(c)    Injunctive Relief. Either party may apply to the arbitrator seeking injunctive relief until the arbitration award is rendered or the controversy is otherwise resolved. Either party also may, without waiving any remedy or right to arbitrate under this Agreement, seek from any court having jurisdiction any interim or provisional injunctive relief.

(d)    Intellectual Property Claims. A claim involving an alleged infringement of any of Franchisor's intellectual property rights may be brought in a court authorized to hear such claims under Section 17.5 of this Agreement without first proceeding in arbitration.

(e)    Confidentiality. All documents, information, and results pertaining to any arbitration or lawsuit will be confidential, except as required by law or as required for Franchisor to comply with laws and regulations applicable to the sale of franchises.

(f)    Performance During Arbitration or Litigation. Unless this Agreement has been terminated, Franchisor and Franchisee will comply with this Agreement and perform their respective obligations under this Agreement during the arbitration or litigation process.

**17.2    Damages.** In any controversy or claim arising out of or relating to this Agreement, each party waives any right to punitive or other monetary damages not measured by the prevailing party's actual damages, except damages expressly authorized by federal statute and damages expressly authorized by this Agreement.

**17.3    Waiver of Class Actions.** The parties agree that any claims will be arbitrated, litigated, or otherwise resolved on an individual basis, and waive any right to act on a class-wide basis.

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

**17.4     Time Limitation.** Any arbitration or other legal action arising from or related to this Agreement must be instituted within two years from the date such party discovers the conduct or event that forms the basis of the arbitration or other legal action. The foregoing time limit does not apply to claims (i) by one party related to non-payment under this Agreement by the other party, (ii) for indemnification under Article 16 of this Agreement, or (iii) related to unauthorized use of Confidential Information or the Marks.

**17.5     Venue Other Than Arbitration.** For any legal proceeding not required to be submitted to arbitration, the parties agree that any such legal proceeding will be brought in the United States District Court where Franchisor's headquarters is then located. If there is no federal jurisdiction over the dispute, the parties agree that any such legal proceeding will be brought in the court of appropriate jurisdiction in the state and county where Franchisor's headquarters is then located. Each party consents to the jurisdiction of such courts and waives any objection that it, he or she may have to the laying of venue of any proceeding in any of these courts.

**17.6     Legal Costs.** In any legal proceeding (including arbitration) related to this Agreement or any guaranty, the non-prevailing party shall pay the prevailing party's attorney fees, costs and other expenses of the legal proceeding. "Prevailing party" means the party, if any, which prevailed upon the central litigated issues and obtained substantial relief.

## MISCELLANEOUS

**18.1     Relationship of the Parties.** The parties are independent contractors, and neither is the agent, partner, joint venturer, or employee of the other. Franchisor is not a fiduciary of Franchisee. Franchisor does not control or have the right to control Franchisee or its Business. Any required specifications and standards in this Agreement and in the System Standards exist to protect Franchisor's interest in the System and the Marks, and the goodwill established in them, and not for the purpose of establishing any control, or duty to take control, over the Business. Franchisor has no liability for Franchisee's obligations to any third party whatsoever.

**18.2     No Third-Party Beneficiaries.** This Agreement does not confer any rights or remedies upon any person or entity other than Franchisee and Franchisor.

**18.3     Entire Agreement.** This Agreement constitutes the entire agreement of the parties and supersedes all prior discussions, negotiations and representations. Nothing in this Agreement or in any related agreement is intended to disclaim the representations made by GradumGswing Franchising, LLC in its Franchise Disclosure Document.

**18.4     Modification.** No modification or amendment of this Agreement will be effective unless it is in writing and signed by both parties. This provision does not limit Franchisor's rights to modify the Manual or System Standards.

**18.5     Consent; Waiver.** No consent under this Agreement, and no waiver of satisfaction of a condition or nonperformance of an obligation under this Agreement will be effective unless it is in writing and signed by the party granting the consent or waiver. No waiver by a party of any right will affect the party's rights as to any subsequent exercise of that right or any other right. No delay, forbearance or omission by a party to exercise any right will constitute a waiver of such right.

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

**18.6    Cumulative Remedies.** Rights and remedies under this Agreement are cumulative. No enforcement of a right or remedy precludes the enforcement of any other right or remedy.

**18.7    Severability.** The parties intend that (i) if any provision of this Agreement is held by an arbitrator or court to be unenforceable, then that provision be modified to the minimum extent necessary to make it enforceable, unless that modification is not permitted by law, in which case that provision will be disregarded, and (ii) if an unenforceable provision is modified or disregarded, then the rest of this Agreement will remain in effect as written.

**18.8    Governing Law.** The laws of the state of Florida (without giving effect to its principles of conflicts of law) govern all adversarial proceedings between the parties. The parties agree that any Florida law for the protection of franchisees or business opportunity purchasers will not apply unless its jurisdictional requirements are met independently without reference to this Section 18.8.

**18.9    Notices.** Any notice will be effective under this Agreement only if made in writing and delivered as set forth in this Section to: (A) if to Franchisee, addressed to Franchisee at the notice address set forth in the Summary Page; and (B) if to Franchisor, addressed to Chief Executive Officer, GradumGswing Franchising, LLC, 7872 SW Jack James Drive, Unit 4, Stuart, Florida 34997. Any party may designate a new address for notices by giving notice of the new address pursuant to this Section. Notices will be effective upon receipt (or first rejection) and must be: (1) delivered personally; (2) sent by registered or certified U.S. mail with return receipt requested; or (3) sent via overnight courier. Notwithstanding the foregoing, Franchisor may amend the Manual, give binding notice of changes to System Standards, and deliver notices of default by electronic mail or other electronic communication.

**18.10    Holdover.** If Franchisee continues operating the Training Facility after the expiration of the term without a renewal agreement or successor franchise agreement executed by the parties in accordance with Section 3.2 of this Agreement, then at any time (regardless of any course of dealing by the parties), Franchisor may by giving written notice to Franchisee (the "Holdover Notice") either (i) require Franchisee to cease operating the Training Facility and comply with all post-closing obligations effective immediately upon giving notice or effective on such other date as Franchisor specifies, or (ii) bind Franchisee to a renewal term of 5 years, and deem Franchisee and its Owners to have made the general release of liability described in Section 3.2(vi) of this Agreement.

**18.11    Joint and Several Liability.** If two or more people sign this Agreement as "Franchisee," each will have joint and several liability.

**18.12    No Offer and Acceptance.** Delivery of a draft of this Agreement to Franchisee by Franchisor does not constitute an offer. This Agreement shall not be effective unless and until it is executed by both Franchisee and Franchisor.

## CERTIFICATION OF FRANCHISOR'S COMPLIANCE

By signing this Agreement, Franchisee acknowledges the following:

(1)    Franchisee understands all the information in Franchisor's Disclosure Document.

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

(2)     Franchisee understands the success or failure of the Business will depend in large part upon Franchisee's skills, abilities and efforts and those of the persons Franchisee employs, as well as many factors beyond Franchisee's control such as weather, competition, interest rates, the economy, inflation, labor and supply costs, lease terms, and the marketplace.

(3)     That no person acting on Franchisor's behalf made any statement or promise regarding the costs involved in operating a Gradum Gswing franchise that is not in the Disclosure Document or that is contrary to, or different from, the information in the Disclosure Document.

(4)     That no person acting on Franchisor's behalf made any claim or representation to Franchisee, orally, visually, or in writing, that contradicted the information in the Disclosure Document.

(5)     That no person acting on Franchisor's behalf made any statement or promise regarding the actual, average or projected profits or earnings, the likelihood of success, the amount of money Franchisee may earn, or the total amount of revenue a Gradum Gswing franchise will generate, that is not in the Disclosure Document or that is contrary to, or different from, the information in the Disclosure Document.

(6)     That no person acting on Franchisor's behalf made any statement or promise or agreement, other than those matters addressed in this Agreement, concerning advertising, marketing, media support, market penetration, training, support service, or assistance that is contrary to, or different from, the information contained in the Disclosure Document.

(7)     Franchisee understands that this Agreement contains the entire agreement between Franchisor and Franchisee concerning the Gradum Gswing franchise, which means that any oral or written statements not set out in this Agreement will not be binding. In deciding to enter into this Agreement, Franchisee is not relying on any statement, promise, claim, or representation not expressly set forth in this Agreement or in the Disclosure Document.

*[Signatures on next page]*

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

Agreed to by:

FRANCHISOR:
GradumGswing Franchising, LLC

By: _____
Name: _____Carlos Garmendia_____
Title: _____Manager_____
Date: ____4/5/2024____

FRANCHISEE:

[*if an individual:*]

_____
Name: _____
Date: _____

[*if an entity:*]

Chin Music Partners, LLC

By: _____
Name: _____Jack Dunn_____
Title: _____Partner_____
Date: ____3/29/2024____

By: _____
Name: _____Ken T. Clayton_____
Title: _____Partner_____
Date: ____4/1/2024____

By: _____
Name: _____Matt Capps_____
Title: _____Partner_____
Date: ____3/30/2024____

Franchise Agreement

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

## EXHIBIT 1 TO THE
## GRADUM GSWING FRANCHISE AGREEMENT

### OWNERSHIP INFORMATION

1. **Form of Ownership.** Franchisee is a (check one):

|  | |
|---|---|
| _____ | *Sole Proprietorship* |
| _____ | *Partnership* |
| ___X___ | *Limited Liability Company* |
| _____ | *Corporation* |

State: _____Georgia_____

2. **Owners.** If Franchisee is a partnership, limited liability company or corporation:

| Name | Shares or Percentage of Ownership |
|---|---|
| Jack Dunn | |
| Ken Clayton | |
| Matt Capps | |
| | |
| | |

3. **Officers.** If Franchisee is a limited liability company or corporation:

| Name | Title |
|---|---|
| Jack Dunn | Partner |
| Ken Clayton | Partner |
| Matt Capps | Partner |
| | |
| | |

74

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

## <u>EXHIBIT 2 TO THE</u>
## <u>GRADUM GSWING FRANCHISE AGREEMENT</u>

### LOCATION ACCEPTANCE LETTER

To:    <u>Chin Music Partners, LLC</u>

This Location Acceptance Letter is issued by GradumGswing Franchising, LLC for your Gradum Gswing franchise in accordance with Section 6.1 of the Franchise Agreement.

1.    The Location of the Training Facility  is:

    <u>To Be Determined</u>

2.    The Territory of the Training Facility  is:

    <u>Nashville, Tennessee</u>

GradumGswing Franchising, LLC

By: _____

Name: _____

Title: _____

Date: _____

Franchise Agreement

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

**EXHIBIT 3  TO THE**

**GRADUM GSWING FRANCHISE AGREEMENT**

**GUARANTY AND NON-COMPETE AGREEMENT**

This Guaranty and Non-Compete Agreement (this "Guaranty") is executed by the undersigned person(s) (each, a "Guarantor") in favor of GradumGswing Franchising, LLC, a  Florida Limited Liability Company ("Franchisor" ).

**Background Statement:**   Chin Music Partners, LLC  ("Franchisee") desires to enter into a Franchise Agreement with Franchisor for the franchise of a Gradum Gswing business (the "Franchise Agreement;" capitalized terms used but not defined in this Guaranty have the meanings given in the Franchise Agreement). Guarantor owns an equity interest in Franchisee. Guarantor is executing this Guaranty in order to induce Franchisor to enter into the Franchise Agreement.

Guarantor agrees as follows:

**1.      Guaranty.** Guarantor hereby unconditionally guarantees to Franchisor and its successors and assigns that Franchisee shall pay and perform every undertaking, agreement and covenant set forth in the Franchise Agreement and further guarantees every other liability and obligation of Franchisee to Franchisor, whether or not contained in the Franchise Agreement. Guarantor shall render any payment or performance required under the Franchise Agreement or any other agreement between Franchisee and Franchisor upon demand from Franchisor. Guarantor waives (a) acceptance and notice of acceptance by  Franchisor of this Guaranty; (b) notice of demand for payment of any indebtedness or nonperformance of any obligations of Franchisee; (c) protest and notice of default to any party with respect to the indebtedness or nonperformance of any obligations hereby guaranteed; (d) any right Guarantor may have to require that an action be brought against Franchisee or any other person or entity as a condition of liability hereunder; (e) all rights to payments and claims for reimbursement or subrogation which any of the undersigned may have against Franchisee arising as a result of the execution of and performance under this Guaranty by the undersigned; (f) any law which requires that  Franchisor make demand upon, assert claims against or collect from Franchisee or any other person or entity (including any other guarantor), foreclose any security interest, sell collateral, exhaust any remedies or take any other action against Franchisee or any other person or entity (including any other guarantor) prior to making any demand upon, collecting from or taking any action against the undersigned with respect to this Guaranty; and (g) any and all other notices and legal or equitable defenses to which Guarantor may be entitled.

**2.      Confidential Information.** With respect to all Confidential Information Guarantor shall (a) adhere to all security procedures prescribed by Franchisor for maintaining confidentiality, (b) disclose such information to its employees only to the extent necessary for the operation of the or the Training Facility ; (c) not use any such information in any other business or in any manner not specifically authorized or approved in writing by Franchisor, (d) exercise the highest degree of diligence and make every effort to maintain the confidentiality of all such information during and

76

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

after the term of the Franchise Agreement, (e) not copy or otherwise reproduce any Confidential Information, and (f) promptly report any unauthorized disclosure or use of Confidential Information. Guarantor acknowledges that all Confidential Information is owned by Franchisor or its affiliates (except for Confidential Information which Franchisor licenses from another person or entity). Guarantor acknowledges that all customer data generated or obtained by Guarantor is Confidential Information belonging to Franchisor. This Section will survive the termination or expiration of the Franchise Agreement indefinitely.

**3.    Covenants Not to Compete.**

(a)    <u>Restriction - In Term</u>. During the term of the Franchise Agreement, Guarantor shall not directly or indirectly have any ownership interest in, lend money or provide financial assistance to, provide any services to, or be employed by, any Competitor.

(b)    <u>Restriction – Post Term</u>. For two years after the Franchise Agreement expires or is terminated for any reason (or, if applicable, for two years after a Transfer by Guarantor), Guarantor shall not directly or indirectly have any ownership interest in, lend money or provide financial assistance to, provide any services to, or be employed by, any Competitor located within twenty-five (25) miles of Franchisee's Territory or the territory of any other Gradum Gswing business operating on the date of termination or transfer, as applicable. If the Franchise Agreement is terminated before the Territory is determined, then the area of non-competition will be the Development Area and the territory of any other Gradum Gswing business operating on the date of termination.

(c)    <u>Interpretation</u>. Guarantor agrees that each of the foregoing covenants is independent of any other covenant or provision of this Guaranty or the Franchise Agreement. If all or any portion of the covenants in this Section is held to be unenforceable or unreasonable by any court or arbitrator, then the parties intend that the court or arbitrator modify such restriction to the extent reasonably necessary to protect the legitimate business interests of Franchisor. Guarantor agrees that the existence of any claim it or Franchisee may have against Franchisor shall not constitute a defense to the enforcement by Franchisor of the covenants of this Section. If Guarantor fails to comply with the obligations under this Section during the restrictive period, then the restrictive period will be extended an additional day for each day of noncompliance.

**4.    Modification.** Guarantor agrees that Guarantor's liability hereunder shall not be diminished, relieved or otherwise affected by (a) any amendment of the Franchise Agreement, (b) any extension of time, credit or other indulgence which Franchisor may from time-to-time grant to Franchisee or to any other person or entity, or (c) the acceptance of any partial payment or performance or the compromise or release of any claims.

**5.    Governing Law; Dispute Resolution.** This Guaranty shall be governed by and construed in accordance with the laws of the state of Florida (without giving effect to its principles of conflicts of law). The parties agree that any Florida law for the protection of franchisees or business opportunity purchasers will not apply unless its jurisdictional requirements are met independently without reference to this Section 5. The provisions of Article 17 (Dispute Resolution) of the Franchise Agreement apply to and are incorporated into this Guaranty as if fully set forth herein. Guarantor shall pay to Franchisor all costs incurred by Franchisor (including reasonable attorney

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

fees) in enforcing this Guaranty. If multiple Guarantors sign this Guaranty, each will have joint and several liability.

Agreed to by:

DocuSigned by:

*Jack Dunn*

Name: _____Jack Dunn_____

Address: ___12136 Walnut Terrace___
___Alpharetta, GA 30004___

Date: ___3/29/2024___

DocuSigned by:

*Ken T. Clayton*

Name: _____Ken T. Clayton_____

Address: ___12136 Walnut Terrace___
___Alpharetta, GA 30004___

Date: ___4/1/2024___

DocuSigned by:

Name: _____Mace Capps_____

Address: ___12136 Walnut Terrace___
___Alpharetta, GA 30004___

Date: ___3/30/2024___

Franchise Agreement

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

**EXHIBIT 4  TO THE**
**GRADUM GSWING FRANCHISE AGREEMENT**

**ACH PAYMENT AGREEMENT**

ACCOUNT NAME: _____

CUSTOMER NUMBER: _____

FRANCHISE NAME: _____

AUTHORIZATION AGREEMENT FOR ACH Payments:

(I/we) do hereby authorize GradumGswing Franchising, LLC, a Florida Limited Liability Company, (hereinafter "Franchisor") to initiate (debit or credit) entries to (my/our) (Checking Account / Savings Account) as indicated and named below as the depository financial institution, hereafter named FINANCIAL INSTITUTION pursuant to the terms of the Franchise Agreement by and between us and the Franchisor.

(I/we) acknowledge that the origination of ACH transactions to my (my/our) account must comply with the provisions of U.S. law. Furthermore, if any such debit(s) should be returned NSF, (I/we) authorize the Franchisor to collect such debit(s) by electronic debit and subsequently collect a returned debit NSF fee of $75 per item by electronic debit from my account identified below. In the event all funds and interests are not received by Franchisor within 15 days from presentment and intended withdrawal from our account by Franchisor, then we will be deemed in default of the Franchise Agreement. We further agree to pay all reasonable costs of collection including but not limited to reasonable attorney's fees and court costs incurred by Franchisor. I am a duly authorized check signer on the financial institution account identified below and authorize all of the above as evidenced by my signature below.

CHECK (ACH) INFORMATION ROUTING NUMBER:
ACCOUNT NUMBER:
DEPOSITORY NAME:
BRANCH: _____
CITY: _____ STATE: _____ ZIP: _____

COMPANY NAME: _____
FIRST NAME/LAST NAME: _____
BILLING ADDRESS: _____
CITY: _____ STATE: _____ ZIP: _____
PHONE NUMBER: _____
CUSTOMER NUMBER: _____
SIGNATURE ON FILE: _____
PHONE OR EMAIL APPROVAL AUTHORIZATION NUMBER: _____

FRANCHISEE: _____
By: _____
Name: _____

79

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

Title: _____
Date: _____

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

## EXHIBIT 5  TO THE
## GRADUM GSWING FRANCHISE AGREEMENT

### RIDER TO LEASE AGREEMENT

Landlord: _____      Franchisor: GradumGswing Franchising, LLC
Notice Address: _____
_____      Notice Address:
_____      7872 SW Jack James Drive, Unit 4,
Telephone:_____      Stuart, Florida 34997
                                       Telephone: _____


Tenant: _____

Leased Premises: _____

    1.   Use. Tenant is a franchisee of Franchisor. The Leased Premises shall be used only for the operation of a Gradum Gswing business (or any name authorized by Franchisor).

    2.   Notice of Default and Opportunity to Cure. Landlord shall provide Franchisor with copies of any written notice of default ("Default") given to Tenant under the Lease, and Landlord grants to Franchisor the option (but not the obligation) to cure any Default under the Lease (should Tenant fail to do so) within ten (10) days after the expiration of the period in which Tenant may cure the Default.

    3.   Termination of Lease. Proprietor shall copy Franchisor on any notice of termination of the Lease. If Landlord terminates the Lease for Tenant's Default, Franchisor shall have the option to enter into a new Lease with Landlord on the same terms and conditions as the terminated Lease. To exercise this option, Franchisor must notify Landlord within fifteen (15) days after Franchisor receives notice of the termination of the Lease.

    4.   Termination of Franchise Agreement. If the Franchise Agreement between Franchisor and Tenant is terminated during the term of the Lease, then upon the written request of Franchisor, Tenant shall assign the Lease to Franchisor. Landlord hereby consents to the assignment of the Lease to Franchisor.

    5.   Assignment and Subletting. Notwithstanding any provision of the Lease to the contrary, Tenant shall have the right to assign or sublet the Lease to Franchisor, provided that no such assignment or sublease shall relieve Tenant or any guarantor of liability under the Lease. If Franchisor becomes the lessee of the Leased Premises, then Franchisor shall have the right to assign or sublease its lease to a franchisee of the Gradum Gswing brand. Any provision of the

FDD 2023                                                              Franchise Agreement

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

Lease which limits Tenant's right to own or operate other Gradum Gswing outlets in proximity to the Leased Premises shall not apply to Franchisor.

6.    Authorization. Tenant authorizes Landlord and Franchisor to communicate directly with each other about Tenant and Tenant's business.

7.    Right to Enter. Upon the expiration or termination of the Franchise Agreement or the Lease, or the termination of Tenant's right of possession of the Leased Premises, Franchisor or its designee may, after giving reasonable prior notice to Landlord, enter the Leased Premises to remove signs and other material bearing Franchisor's brand name, trademarks, and commercial symbols, provided that Franchisor will be liable to Landlord for any damage Franchisor or its designee causes by such removal.

8.    No Liability. By executing this Rider, Franchisor does not assume any liability with respect to the Leased Premises or any obligation as Tenant under the Lease.

Executed by:

LANDLORD:

_____

By: _____
Name: _____
Title: _____
Date: _____


TENANT:

_____

By: _____
Name: _____
Title: _____
Date: _____


FRANCHISOR:

GradumGswing Franchising, LLC

By: _____
Name: _____
Title: _____
Date: _____

82

Franchise Agreement

# EXHIBIT D

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

## EXHIBIT C TO DISCLOSURE DOCUMENT

## MULTI-TERRITORY DEVELOPMENT AGREEMENT

This Multi-Territory Development Agreement (this "MTDA") is made between GradumGswing Franchising, LLC, a Florida Limited Liability Company ("Franchisor") and Chin Music Partners, LLC, a ___Georgia___ ___LLC___ ("Franchisee") on ___March___ , ___27___, 20 _24_ the ("Effective Date").

.

**Background Statement:** On the same day as they executed this MTDA, Franchisor and Franchisee have entered into a Franchise Agreement for the franchise of a Gradum Gswing training facility (the "Franchise Agreement;" capitalized terms used but not defined in this MTDA have the meanings given in the Franchise Agreement). Franchisor and Franchisee desire that Franchisee open multiple Gradum Gswing facilities.

1.    **Multi-Territory Commitment.**

(a)    Development Schedule; Fee. Franchisee shall develop and open ___two (2)___ training facilities on the following schedule:

| Franchise # | Deadline for Opening | Total Training Facilities to be Open and Operating on Deadline | Initial Franchise Fee |
|---|---|---|---|
| 1 | Within twelve (12) months of Huntsville, AL opening/first session sale | 1 | $ 75,000.00 |
| 2 | Within twelve (12) months of Huntsville, AL opening/first session sale | 1 | $ 75,000.00 |
| 3 | | | $_____ |
| 4 | | | $_____ |
| 5 | | | $_____ |
| | | Total Initial Franchise Fee: | $150,000.00 |

(b)    Payment. Upon execution of this MTDA, Franchisee shall pay the total Initial Franchise Fees to Franchisor. The Initial Franchise Fees are non-refundable.

2.    **Form of Agreement.** For the first location, Franchisee and Franchisor have executed the Franchise Agreement simultaneously with this MTDA. For each additional franchise, Franchisee shall execute Franchisor's then-current standard form of franchise agreement no later than three business days after Franchisee leases or acquires a location for the franchise. This MTDA does not give Franchisee the right to construct, open, or operate a Gradum Gswing training facility , and Franchisee acknowledges that Franchisee may construct, open, and operate each Gradum Gswing training facility only pursuant to a separate franchise agreement executed pursuant to this MTDA for each Gradum Gswing training facility .

1

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

3.    **Development Area.** Franchisee shall locate each Gradum Gswing training facility   it develops under this MTDA within the following area: ___Nashville, Tennessee___ _____ (the "Development Area"). Franchisee acknowledges that it does not have exclusive rights to develop, open or operate Gradum Gswing  training facilities in the Development Area.

4.    **Default and Termination.** Franchisor may terminate this MTDA by giving notice to Franchisee, without opportunity to cure, if any of the following occur:

    (i)    Franchisee fails to satisfy the development schedule; or

    (ii)    Franchisor has the right to terminate any franchise agreement between Franchisor and Franchisee (or any affiliate thereof) due to Franchisee's default thereunder (whether or not Franchisor actually terminates such franchise agreement).

5.    **Limitation of Liability.** Franchisee's commitment to develop Gradum Gswing training facilities is in the nature of an option only. If Franchisor terminates this MTDA for Franchisee's default, Franchisee shall not be liable to Franchisor for lost future revenues or profits from the unopened  Gradum Gswing training facilities.

6.    **Conditions.** Franchisee's right to develop each Gradum Gswing franchise after the first franchise is subject to the following:

    (i)    Franchisee must possess sufficient financial and organizational capacity to develop, open, operate, and manage each additional Gradum Gswing training facility  in the reasonable judgment of Franchisor, and

    (ii)    Franchisee must be in full compliance with all brand requirements at its operating Gradum Gswing Training Facility(ies), and not in default under any Franchise Agreement or any other agreement with Franchisor.

7.    **Dispute Resolution; Miscellaneous.** The laws of the State of Florida (without giving effect to its principles of conflicts of law) govern all adversarial proceedings between the parties. The parties agree that any Florida law for the protection of franchisees or business opportunity purchasers will not apply unless its jurisdictional requirements are met independently without reference to this Section 7. Franchisee shall not Transfer this MTDA without the prior written consent of Franchisor, and any Transfer without Franchisor's prior written consent shall be void. The provisions of Article 17 (Dispute Resolution) and Article 18 (Miscellaneous) of the Franchise Agreement apply to and are incorporated into this MTDA as if fully set forth herein.

*[Signatures on Next Page]*

DocuSign Envelope ID: 492DC030-B973-4360-9A14-55D76CA3C190

Agreed to by:

FRANCHISOR:

GradumGswing Franchising, LLC
By: _____
    Carlos Barmendia
Name: _____
Title:   Manager
Date:   4/5/2024

FRANCHISEE:

[*if an individual:*]

_____
Name: _____

[*if an entity:*]

Chin Music Partners, LLC
By:   Jack Dunn
Name:   Jack Dunn
Title:   Partner
Date:   3/29/2024

By:   Ken T. Clayton
Name:   Ken T. Clayton
Title:   Partner
Date:   4/1/2024

By:   Matt Capps
Name:   Matt Capps
Title:   Partner
Date:   3/30/2024

3

FDD 2023

# EXHIBIT E

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

**EXHIBIT F TO DISCLOSURE DOCUMENT**

**OPERATIONS MANUAL TABLE OF CONTENTS**

DocuSign Envelope ID: DE4B7689-A4F2-4216-8478-71B9BBC652EB

*Gradum Gswing*

**Franchise Brand Standards Manual**
*Table of Contents*

| Section | Number of Pages (Including *Cover Pages and Table of Contents Pages*) |
|---|---|
| Section A: Introduction | 15 |
| Section B: Establishing a Franchise Business | 55 |
| Section C: Personnel & Training | 50 |
| Section D: Administrative Procedures | 50 |
| Section E: Daily Procedures | 45 |
| Section F: Selling & Marketing | 40 |
| **Total Number of Pages** | **255** |



3

# EXHIBIT F

Docusign Envelope ID: 393EB0C0-B698-4855-AAB6-D264A058C6F6

## MULTI-TERRITORY DEVELOPMENT AGREEMENT

This Multi-Territory Development Agreement (this "<u>MTDA</u>") is made between GradumGswing Franchising, LLC, a Florida Limited Liability Company ("Franchisor") and Chin Music Partners, LLC, a Georgia Limited Liability Company ("<u>Franchisee</u>") on August 19, 2024 the ("Effective Date").

**Background Statement:** On March 27, 2024, Franchisor and Franchisee have entered into a Franchise Agreement for the franchise of a Gradum Gswing training facility located at 564 Blake Bottom Road, 2E, Huntsville, AL 35806 (the "<u>Franchise Agreement</u>;" capitalized terms used but not defined in this MTDA have the meanings given in the Franchise Agreement). Franchisor and Franchisee desire that Franchisee open multiple Gradum Gswing facilities.

1.      **Multi-Territory Commitment.**

(a)      <u>Development Schedule; Fee</u>. Franchisee shall develop and open nine (9) additional training facilities on the following schedule:

| Franchise # | Deadline for Opening | Total Training Facilities to be Open and Operating on Deadline | Initial Franchise Fee |
|---|---|---|---|
| 1 | Huntsville (Completed) | 1 | ~~$50,000.00~~ (PAID) |
| 2 | Start of 5th month from Effective Date | 1 | $50,000.00 |
| 3 | Start of 8th month from Effective Date | 1 | $50,000.00 |
| 4 | Start of 12th month from Effective Date | 1 | $50,000.00 |
| 5 | Start of 16th month from Effective Date | 1 | $50,000.00 |
| 6 | Start of 20th month from Effective Date | 1 | $50,000.00 |
| 7 | Start of 24th month from Effective Date | 1 | $50,000.00 |
| 8 | Start of 28th month from Effective Date | 1 | $50,000.00 |
| 9 | Start of 32nd month from Effective Date | 1 | $50,000.00 |
| 10 | Start of 36th month from Effective Date | 1 | $50,000.00 |
| Total Initial Franchise Fee (Balance): | | | $450,000.00 |

(b)      <u>Payment</u>. Franchisee paid the nonrefundable Initial Franchise Fee for the first location (Huntsville, Alabama) and the nonrefundable market premium for the Nashville, Tennessee territory upon execution of the Franchise Agreement. Upon execution of this MTDA, there are no additional market premiums owed by the Franchisee. Franchisee shall pay the total

Docusign Envelope ID: 393EB0C0-B698-4855-AAB6-D264A058C6F6

Initial Franchise Fee Balance in the amount of Four Hundred Fifty Thousand Dollars ($450,000.00) to Franchisor and shall be divided into three (3) equal installments and payable as follows:

> (i) <u>First Payment</u>: One-third (1/3) of the total Initial Franchise Fee Balance, amounting to One Hundred Fifty Thousand Dollars ($150,000.00), shall be due and payable upon the signing of this Agreement.

> (ii) <u>Second Payment</u>: One-third (1/3) of the total Initial Franchise Fee Balance, amounting to One Hundred Fifty Thousand Dollars ($150,000.00), shall be due and payable on the first anniversary of the signing of this Agreement.

> (iii) <u>Third Payment</u>: The remaining one-third (1/3) of the total Initial Franchise Fee Balance, amounting to One Hundred Fifty Thousand Dollars ($150,000.00), shall be due and payable on the second anniversary of the signing of this Agreement.

The Initial Franchise Fees are non-refundable.

(c)     <u>Incentive Terms</u>. The Franchisee shall have the option to open additional Gradum Gswing facilities eleven (11), twelve (12), and thirteen (13) within the first three (3) years of the effective date this Agreement. If this option is exercised, the Franchisee will receive a fifty percent (50%) reduction on the franchise fees for these Gradum Gswing facilities. The reduced franchise fee for each of these Gradum Gswing facilities will be Twenty-Five Thousand Dollars ($25,000). Additionally, if the Franchisee develops the Gradum Gswing facilities ahead of the scheduled timeline, the Franchisee will not be required to make advance payments of the Initial Franchise Fee Balance for these Gradum Gswing facilities (i.e., if the Franchisee opens stores four (4) and five (5) within the first year, the corresponding payment for those locations will not be due until the originally scheduled payment dates as outlined in the payment schedule above).

**2.     Form of Agreement.** For the first location, Franchisee and Franchisor have executed the Franchise Agreement prior to this MTDA. For each additional franchise, Franchisee shall execute Franchisor's then-current standard form of franchise agreement no later than three business days after Franchisee leases or acquires a location for the franchise. This MTDA does not give Franchisee the right to construct, open, or operate a Gradum Gswing training facility , and Franchisee acknowledges that Franchisee may construct, open, and operate each Gradum Gswing training facility only pursuant to a separate franchise agreement executed pursuant to this MTDA for each Gradum Gswing training facility .

**3.     Development Area.** Franchisee shall locate each Gradum Gswing training facility  it develops under this MTDA within the following areas of Alabama and Tennessee pursuant to the following specific markets with the number of Gradum Gswing training facilities in parentheticals (the "<u>Development Area</u>"):

Nashville, TN (Two-Three (2-3) Gradum Gswing training facilities)

Knoxville, TN (Two (2) Gradum Gswing training facilities)

Chattanooga, TN (One (1) Gradum Gswing training facility)

Docusign Envelope ID: 393EB0C0-B698-4855-AAB6-D264A058C6F6

Memphis, TN (One (1) Gradum Gswing training facility)

~~Huntsville, AL (One (1) Gradum Gswing training facility)~~

Birmingham/Hoover, AL (Two (2) Gradum Gswing training facility)

Montgomery, AL (One (1) Gradum Gswing training facility)

Mobile, AL (One (1) Gradum Gswing training facility)

Franchisee has the exclusive rights to develop, open or operate Gradum Gswing training facilities in the Development Area for three (3) years from the Effective Date. During such time, Franchisee shall open anywhere within the Development Area to maximize their business model and efficiency, so long as all additional nine (9) locations are developed, opened, and operated by the third-year anniversary of this MTDA.

**4.** **Default and Termination.** Franchisor may terminate this MTDA by giving notice to Franchisee, without opportunity to cure, if any of the following occur:

    (i)    Franchisee fails to satisfy the development schedule; or

    (ii)    Franchisor has the right to terminate any franchise agreement between Franchisor and Franchisee (or any affiliate thereof) due to Franchisee's default thereunder (whether or not Franchisor actually terminates such franchise agreement).

**5.** **Limitation of Liability.** Franchisee's commitment to develop Gradum Gswing training facilities is in the nature of an option only. If Franchisor terminates this MTDA for Franchisee's default, Franchisee shall not be liable to Franchisor for lost future revenues or profits from the unopened Gradum Gswing training facilities.

**6.** **Conditions.** Franchisee's right to develop each Gradum Gswing franchise after the first franchise is subject to the following:

    (i)    Franchisee must possess sufficient financial and organizational capacity to develop, open, operate, and manage each additional Gradum Gswing training facility in the reasonable judgment of Franchisor, and

    (ii)    Franchisee must be in full compliance with all brand requirements at its operating Gradum Gswing Training Facility(ies), and not in default under any Franchise Agreement or any other agreement with Franchisor.

**7.** **Dispute Resolution; Miscellaneous.** The laws of the State of Florida (without giving effect to its principles of conflicts of law) govern all adversarial proceedings between the parties. The parties agree that any Florida law for the protection of franchisees or business opportunity purchasers will not apply unless its jurisdictional requirements are met independently without reference to this Section 7. Franchisee shall not Transfer this MTDA without the prior written consent of Franchisor, and any Transfer without Franchisor's prior written consent shall be void.

Docusign Envelope ID: 393EB0C0-B698-4855-AAB6-D264A058C6F6

The provisions of Article 17 (Dispute Resolution) and Article 18 (Miscellaneous) of the Franchise Agreement apply to and are incorporated into this MTDA as if fully set forth herein.

*[Signatures on Next Page]*

Docusign Envelope ID: 393EB0C0-B698-4855-AAB6-D264A058C6F6

Agreed to by:

FRANCHISOR:

GradumGSwing Franchising, LLC
By: _____
Name: Carlos Garmendia
Title: Manager
Date: 8/29/2024


FRANCHISEE:

Chin Music Partners, LLC

By: _____
Name: Ken T. Clayton
Title: Partner
Date: 8/28/2024

By: _____
Name: Jack Dunn
Title: Partner
Date: 8/28/2024

By: _____
Name: Matt Capps
Title: Partner
Date: 8/29/2024

# EXHIBIT G

 **Clark Hill**

Michael S. Rosenthal
T (678) 370-4385
F (678) 370-4358
Email: mrosenthal@clarkhill.com

Clark Hill PLC
3630 Peachtree Rd NE
Suite 700
Atlanta, GA 30326
T (678) 370-4360

November 4, 2025

Via Certified Mail to:

Lorenzo Garmendia
7872 SW Jack James Drive, Unit 4
Stuart, FL 34997

Carlos Garmendia
7872 SW Jack James Drive, Unit 4
Stuart, FL 34997

Via Certified Mail and via email to priscilla@gradumgswing.com
Priscilla Garmendia Sullivan, Registered Agent
GradumGswing Franchising, LLC
7872 SW Jack James Drive, Unit 4
Stuart, FL 34997

        Re: Chin Music Partners, LLC and related entities

Dear Mssrs. Garmendia and Ms. Sullivan:

        We represent Chin Music Partners, LLC and its affiliated entities, as well its members, Ken Clayton and Jack Dunn (collectively referred to herein as "CMP"). Mr. Clayton and Mr. Dunn may also be guarantors on certain agreements entered into with your company. The purpose of this letter is outline your violations of Florida and Georgia law and demand resolution of the harm you have caused our clients. The reason that two of you are addressed individually is that each of you had direct knowledge of and involvement in the unlawful and tortious acts that are discussed below, so each of you may unfortunately need to be named as a defendant if litigation/arbitration ensues between my client and GradumGswing Franchising, LLC ("GF"). You may also have individual criminal liability under Florida and Georgia statutes which I will discuss herein. I therefore strongly encourage each of you to seek counsel in this matter.

        Litigation has profound consequences for franchisors and the corporate officers and managers of franchisors. If filed, litigation will *immediately* trigger franchise disclosure obligations in Item 3 of your FDD, and mandate updated state registrations (along with an obligation that you temporarily cease offering franchises until your registration is amended) in any franchise registration state in which you are currently offering franchises for sale. The filing of any lawsuit or arbitration is a material matter which must be disclosed in your FDD's Item 3, and which in my experience will have a very significant negative impact on your ability to offer and sell franchises going forward. That disclosure obligation does not go away with the withdrawal or settlement of the case, but remains in place for an extended period of time, continuing to act as a dark cloud over your ability to sell franchises for years. I therefore encourage you to consult with

an experienced franchise law practitioner before responding to this letter or making any rash decisions regarding this matter. What you do now cannot readily be fixed later if you act unwisely.

As you may be aware, you entered into two Multi-Territory Development Agreements (collectively, the "MTDA") and Franchise Agreement ("FA") with CMP, dated on or about March 27, 2024 for one MTDA and the FA, and August 29, 2024 for the second MTDA. No current FDD (actually, no FDD at all) was provided to my clients in advance of executing the second MTDA. Those agreements called for CMP to develop a total of ten Gradum franchised units and to open and operate one franchised unit, in Huntsville, AL, respectively. I will discuss in this letter many of the state and federal franchise and other law violations associated with these transactions, but first, wanted to complete an outline of the series of events which occurred between the parties.

Following the execution of these agreements, CMP later opened a Gradum franchised unit in Birmingham, Alabama, and is preparing to open a third such unit in Marietta, Georgia. No franchise agreements have been entered into for the either of these units, although the Birmingham unit has been open and operating for quite some time. GF has collected both the initial franchise fee, development fees for the second MTDA, royalties and many other fees and expenses from my clients, in violation of Georgia law and the Federal Trade Commission Franchise Rule, which requires both a written franchise agreement for each unit as well as the delivery of a new, current FDD no less than 14 days before any such agreement can be signed or payment taken under the franchising arrangement. This is a rather basic tenet of franchise law (state and federal) that you seem to have overlooked. There is no such thing as an oral franchise agreement. As noted below, my clients hereby rescind all of the signed contractual agreements with GF, rescind any implicit or unsigned such agreements, and demand return of all payments made by them to you for any purpose.

Without limitation, and without my doing a much deeper dive into the bizarre series of events which has occurred since March, 2024 with respect to your arrangements with my clients, I can highlight some of the violations of law which you all have committed:

1. Failed to disclose that the de facto Chief Executive Officer and person involved in the daily fulfillment of GF's obligations to my clients as franchisees was Lorenzo Garmendia. Mr. Garmendia's involvement was not disclosed in the FDD's Item 2, nor was his very extensive criminal background and personal bankruptcy history disclosed in Item 3. I think any reasonable person will conclude that this was done purposefully in order to shield from my clients Mr. Garmendia's criminal and bankruptcy history.
2. Taken payments for one or more franchises without entering into a written contractual agreement with my clients and without providing them with a current franchise disclosure document.
3. Flagrantly misrepresented the existence of a 255 page operating manual for the franchise concept in the FDD, including reference to specific length sub-parts in a Table of Contents which is simply false. After paying you money, my clients learned that there was no such operating manual, and of course, that they were basically on their own in understanding every operational aspect of the franchised businesses that you sold to them. Included in this was the total absence of build-out plans or specifications. I note that the requirement that you provide the manual's table of contents is an explicit one in the Franchise Rule. The failure to have such a manual, in addition to being a Franchise Rule violation, was also fraudulent given your expressed representation that it existed and consisted of 255 pages.

4. Without my clients' knowledge or approval, posted an unauthorized "performance guarantee" on the Birmingham unit's website, committing my clients to provide free lessons indefinitely if any customer does not improve their performance within four weeks of signing up as a Birmingham customer.

5. Breached your contractual duty to my client with regard to the buildout of the Birmingham, Alabama location in that you insisted that they pay numerous false and phony charges unrelated to the construction of those facilities. Your "Not Disclosed CEO" Mr. Garmendia demanded that my clients provide a credit card which was then used by you to pay for expenses, purported incurred for lodging, meals, materials and labor related to those facilities' construction.

6. Charged my client for Mindbody point of sale software monthly invoices in an amount in excess of that disclosed in Items 6 and 7 of the FDD. When this was brought to your attention, you then reduced those charges for subsequent months to the lower amount which was disclosed in the FDD, but failed to refund to my client the excessively charged amounts billed by you and paid by my client over a period of four months.

7. Charged my clients a "market premium" fee for the Nashville market but failed to any way disclose that premium amount in the FDD (Items 5, 6, 7, and the Cover Page) as required by the Franchise Rule.

8. Failed to reference the MTDA on the Cover Page of the FDD, and failed to specifically disclose estimated costs and amounts which are a sub-part of those costs which are required payments to you as the franchisor, as required by the Franchise Rule.

9. Charged my client unauthorized fees for email addresses, which fees were not disclosed in the FDD.

10. Saddled my clients with undisclosed and unauthorized workers compensation insurance premiums by requiring CMP to utilize Lady and a Forklift as a vendor, when that vendor did not have workers compensation insurance coverage required by Alabama law. My clients also suspect an undisclosed relationship between GF and Lady and a Forklift which might include rebates or kickbacks, and which also would have been required to be disclosed in Item 8 of the FDD. This may apply to other vendors required by your client to be used, which is something that would be the target of discovery.

11. Understated unit buildout/construction costs in Item 7 of the FDD and/or failed to provide construction cost documentation for units constructed by my clients.

12. Attached incomplete or non-compliant financial statements for GF to the FDD.

13. Failed to properly and accurately describe the revenue capacity of each franchised facility.

Each of the above items, standing alone, was material to my clients' decision to enter into the agreements with Gradum. Together, they constitute a tsunami of non-disclosure, purposeful Franchise Rule violations, negligent behavior and fraud.

Your behaviors, in addition to constituting multiple direct violations of the Franchise Rule, are violative of state laws in Florida and Georgia. Both states' laws apply. Your activities took place in Florida, and my clients meet with Gradum officials and employees in Florida. Both of my individual clients are Georgia residents, and executed the franchise documents while in Georgia. Additionally, and perhaps obviously, the Marietta location will be operated here in Georgia.

Georgia's Fair Business Practices Act, O.C.G.A. § 10-1-390, et seq. ("FBPA") incorporates by reference the rules of the U.S. Federal Trade Commission, including, the Franchise Rule. The sale of a franchise without complying with the Franchise Rule (by not making full or proper disclosures in an FDD)

is therefore a violation of the FBPA. The failure to disclose management by Mr. Garmendia, who happens to be a convicted and bankrupt felon, along with flagrant misrepresentations regarding the existence and scope of the Operations Manual represent and evidence intentional behaviors, which trigger the treble damage and attorneys' fees recovery provisions of the FBPA. Under the FBPA, my clients are entitled to recover damages in the amount of no less than $400,000 paid to you under the MTDA and one executed Franchise Agreement, along with approximately $100,000 in damages for excessive and undocumented build out expenses for both Alabama units, operational delays resulting in lost free rent in Birmingham, workers compensation exposure (this amount has yet to be determined), POS costs increases, unauthorized email fees, and at least $5,000 in legal fees thus far. Again, those amounts (except for the legal fees) would be before any trebling of damages under the FBPA. Please consider this to be a demand for settlement within thirty (30) days hereof, which must include payment of $505,000 to my client, along with an agreement to rescind the Franchise Agreement and MTDA. I note that if a lawsuit is filed under the FBPA, it is mandatory that we provide the Attorney General of Georgia with a copy of the Complaint. By statute, the Attorney General is entitled to be heard in any such action.

In addition to your violations of the FBPA, my clients will allege in any lawsuit causes of action under O.C.G.A. § 51-1-6, which our appellate courts have opined specifically applies to violations of the Franchise Rule. This statute sounds in the nature of a tort, giving my clients the right to seek punitive and exemplary damages.

Further, any Complaint will of course allege breaches of contract.

Under Florida law, you've breached Florida Statutes § 817.416, which makes it unlawful to misrepresent in the sales process the prospects of chances of success of a proposed franchise, and unlawful to misrepresent the known required total investment. That statute allows my clients to recover "all moneys invested in such franchise", as well as attorneys' fees and costs. Knowing violations are also a second degree misdemeanor. The State of Florida's Department of Legal Affairs is also authorized to seek injunctive relief against such violations.

A few additional points worth making:

1. If you want to achieve a negotiated resolution of this matter, please reach out to me immediately. If you think it is wise to wait 30 days to delay beginning negotiation, that will not be well received, and you'll be negotiating *after a lawsuit or arbitration is filed.*
2. As noted above, the stain of litigation does not go away for franchisors for a very long time. The continuing disclosure requirements will absolutely have a very, very negative impact on franchise sales. You have one opportunity to avoid that problem, and once it's gone, it's never coming back.
3. If you think this is just a bluff and my clients aren't serious, you'd be mistaken. You need to take this very seriously and deal with it straight away.

GOVERN YOURSELF ACCORDINGLY.

Sincerely,

CLARK HILL

*/s/ Michael S. Rosenthal*

Michael S. Rosenthal

# EXHIBIT H

Saturday, November 8, 2025 at 7:17:54 PM Eastern Standard Time

| | |
|---|---|
| **Subject:** | Temporary Security Measures & Platform Access Update |
| **Date:** | Wednesday, November 5, 2025 at 12:19:41 PM Eastern Standard Time |
| **From:** | Priscilla G Sullivan |
| **To:** | Gradum gswing, Portsmouth, Gradum Gswing, Gswing Cincinnati, Gswing Cleveland, Gradum Birmingham, Gradum Gswing |
| **CC:** | Carlos Garmendia, Lorenzo Garmendia, Matthew Garmendia |
| **Attachments:** | Email Logo.png |

Good afternoon,

We recently identified a security incident involving our camera monitoring system at one of the locations. While there is no indication of broader system compromise, we are taking this very seriously.

As an abundance-of-caution measure under our brand-security and data-protection protocols, we are temporarily restricting access to certain centralized, company-owned platforms while we complete a security review. These include the Gradum Instagram credentials and our HighLevel HQ account. These platforms are owned and administered by Gradum.

Please note:

— This measure is precautionary.
— Your local operations and communication channels should continue uninterrupted.
— You may continue marketing and client outreach via your location-managed accounts and systems.

<u>Interim content process</u>:
For Instagram posts/stories during this period, please have your instructors or General Managers send content to Brandon Chin and he will handle the uploads.

We will follow up once the review is completed and appropriate access levels are confirmed. Thank you for your patience and cooperation as we take proactive steps to protect the brand, the network, and our shared customer data.

Thank you,

Priscilla G. Sullivan



GradumGswing Franchising, LLC

1 of 2

7872 SW Jack James Drive, Suite 4
Stuart, FL 34997
Phone: 786.266.0464
Email: priscilla@gradumgswing.com

Website: www.gradumgswing.com

"Take Your Hitting To The Next Level"

Fulton County Superior Court
***EFILED***ZZ
Date: 1/5/2026 2:09 PM
Che Alexander, Clerk

**General Civil and Domestic Relations Case Filing Information Form**

■ **Superior or** ☐ **State Court of** <u>Fulton</u> **County**

---

**For Clerk Use Only**

**Date Filed** <u>01/05/2026</u>
**MM-DD-YYYY**

**Case Number** 26CV000081

---

| Plaintiff(s) | | | | | Defendant(s) | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Chin | Music | Partners, | LLC | | Gradumgswing | Franchising | LLC | | |
| **Last** | **First** | **Middle I.** | **Suffix** | **Prefix** | **Last** | **First** | **Middle I.** | **Suffix** | **Prefix** |
| Clayton | Ken | | | | Garmendia | Lorenzo | | | |
| **Last** | **First** | **Middle I.** | **Suffix** | **Prefix** | **Last** | **First** | **Middle I.** | **Suffix** | **Prefix** |
| Dunn | Jack | | | | Garmendia | Carlos | | | |
| **Last** | **First** | **Middle I.** | **Suffix** | **Prefix** | **Last** | **First** | **Middle I.** | **Suffix** | **Prefix** |
| | | | | | | | | | |
| **Last** | **First** | **Middle I.** | **Suffix** | **Prefix** | **Last** | **First** | **Middle I.** | **Suffix** | **Prefix** |

**Plaintiff's Attorney** <u>A. Binford Minter</u>    **State Bar Number** <u>117844</u>    **Self-Represented** ☐

---

**Check one case type and one sub-type in the same box (if a sub-type applies):**

**General Civil Cases**
- ☐ Automobile Tort
- ☐ Civil Appeal
- ☐ Contempt/Modification/Other Post-Judgment
- ☐ Contract
- ☐ Garnishment
- ☐ General Tort
- ☐ Habeas Corpus
- ☐ Injunction/Mandamus/Other Writ
- ☐ Landlord/Tenant
- ☐ Medical Malpractice Tort
- ☐ Product Liability Tort
- ☐ Real Property
- ☐ Restraining Petition
- ☑ Other General Civil

**Domestic Relations Cases**
- ☐ Adoption
- ☐ Contempt
  - ☐ Non-payment of child support, medical support, or alimony
- ☐ Dissolution/Divorce/Separate Maintenance/Alimony
- ☐ Family Violence Petition
- ☐ Modification
  - ☐ Custody/Parenting Time/Visitation
- ☐ Paternity/Legitimation
- ☐ Support – IV-D
- ☐ Support – Private (non-IV-D)
- ☐ Other Domestic Relations

---

☐ Check if the action is related to another action pending or previously pending in this court involving some or all of the same: parties, subject matter, or factual issues. If so, provide a case number for each.

_____    _____
**Case Number**                **Case Number**

☑ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in OCGA § 9-11-7.1.

☐ Is a foreign language or sign-language interpreter needed in this case? If so, provide the language(s) required.

_____    **Language(s) Required**

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.

Version 1.1.20



Fulton County Superior Court
***EFILED***ZZ
Date: 1/5/2026 2:09 PM
Che Alexander, Clerk

# IN THE SUPERIOR COURT OF FULTON COUNTY

## STATE OF GEORGIA

185 Shirley Clarke Franklin Blvd., Suite J1-G200, Atlanta, Georgia, 30303

Chin Music Partners, LLC, Ken Clayton, and
Jack Dunn
**Plaintiff**

Civil Action No. _____

26CV000081

v.

Gradumgswing Franchising, LLC, Lorenzo
Garmendia, and Carlos Garmendia
**Defendant**

## **SUMMONS**

TO THE ABOVE NAMED DEFENDANT(S): Carlos Garmendia

You are hereby summoned and required to electronically file with the Clerk of said Court via eFileGA at https://efilega.tylertech.cloud/OfsEfsp/ui/landing or via PeachCourt at https://peachcourt.com (unless you are exempt from filing electronically) and serve upon the plaintiff or plaintiff's attorney, whose name, address and email address are:

A. Binford Minter

Clark Hill PLC

3630 Peachtree Road NE, Suite 700

Atlanta, GA 30326

bminter@clarkhill.com

an answer to the complaint which is hereby served on you. You must make your answer within 30 days after service of this summons upon you. This time excludes the day of service. If you fail to answer, the court will issue a default judgment against you for the relief sought in the complaint.

If this action pertains to a Protective Order, the answer is to be filed and served on or before the scheduled hearing date attached.

This _____ day of _____, 20___.

01/05/2026

Honorable Ché Alexander,
Clerk of Superior Court

By _____
Deputy Clerk

[Attach addendum sheet for additional parties, if needed. You must make a notation on this sheet if used.]

SC-1
Rev. 1/25



Fulton County Superior Court
***EFILED***ZZ
Date: 1/5/2026 2:09 PM
Che Alexander, Clerk

# IN THE SUPERIOR COURT OF FULTON COUNTY

## STATE OF GEORGIA

185 Shirley Clarke Franklin Blvd., Suite J1-G200, Atlanta, Georgia, 30303

Chin Music Partners, LLC, Ken Clayton, and
Jack Dunn _____

**Plaintiff**

Civil Action No. _____

26CV000081

v.

Gradumgswing Franchising, LLC, Lorenzo
Garmendia, and Carlos Garmendia _____

**Defendant**

## SUMMONS

TO THE ABOVE NAMED DEFENDANT(S): Gradumgswing Franchising, LLC

You are hereby summoned and required to electronically file with the Clerk of said Court via eFileGA at https://efilega.tylertech.cloud/OfsEfsp/ui/landing or via PeachCourt at https://peachcourt.com (unless you are exempt from filing electronically) and serve upon the plaintiff or plaintiff's attorney, whose name, address and email address are:

A. Binford Minter _____

Clark Hill PLC _____

3630 Peachtree Road NE, Suite 700 _____

Atlanta, GA 30326 _____

bminter@clarkhill.com

an answer to the complaint which is hereby served on you. You must make your answer within 30 days after service of this summons upon you. This time excludes the day of service. If you fail to answer, the court will issue a default judgment against you for the relief sought in the complaint.

If this action pertains to a Protective Order, the answer is to be filed and served on or before the scheduled hearing date attached.

This _____ day of _____, 20___.

01/05/2026

Honorable Ché Alexander,
Clerk of Superior Court

By _____
Deputy Clerk

[Attach addendum sheet for additional parties, if needed. You must make a notation on this sheet if used.]

SC-1
Rev. 1/25



Fulton County Superior Court
***EFILED***ZZ
Date: 1/5/2026 2:09 PM
Che Alexander, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY

## STATE OF GEORGIA

185 Shirley Clarke Franklin Blvd., Suite J1-G200, Atlanta, Georgia, 30303

Chin Music Partners, LLC, Ken Clayton, and
Jack Dunn _____

**Plaintiff**

Civil Action No. _____

26CV000081

**v.**

Gradumgswing Franchising, LLC, Lorenzo
Garmendia, and Carlos Garmendia _____

**Defendant**

## <u>SUMMONS</u>

TO THE ABOVE NAMED DEFENDANT(S): Gradumgswing Franchising, LLC

You are hereby summoned and required to electronically file with the Clerk of said Court via eFileGA at
https://efilega.tylertech.cloud/OfsEfsp/ui/landing or via PeachCourt at https://peachcourt.com (unless
you are exempt from filing electronically) and serve upon the plaintiff or plaintiff's attorney, whose
name, address and email address are:

A. Binford Minter _____

Clark Hill PLC _____

3630 Peachtree Road NE, Suite 700 _____

Atlanta, GA 30326 _____

an answer to the complaint which is hereby served on you. You must make your answer within 30 days
after service of this summons upon you. This time excludes the day of service. If you fail to answer, the
court will issue a default judgment against you for the relief sought in the complaint.

If this action pertains to a Protective Order, the answer is to be filed and served on or before
the scheduled hearing date attached.

This _____ day of _____, 20___.
          01/05/2026

Honorable Ché Alexander,
Clerk of Superior Court

By _____
Deputy Clerk

[Attach addendum sheet for additional parties, if needed. You must make a notation on this sheet if used.]

SC-1
Rev. 1/25

Fulton County Superior Court
***EFILED***LW
Date: 1/20/2026 12:00 AM
Che Alexander, Clerk



# IN THE SUPERIOR COURT OF FULTON COUNTY

## STATE OF GEORGIA

185 Shirley Clarke Franklin Blvd., Suite J1-G200, Atlanta, Georgia, 30303

Chin Music Partners, LLC, Ken Clayton, and
Jack Dunn
**Plaintiff**

Civil Action No. 26CV000081

v.

Gradumgswing Franchising, LLC, Lorenzo
Garmendia, and Carlos Garmendia
**Defendant**

## **SUMMONS**

TO THE ABOVE NAMED DEFENDANT(S): Lorenzo Garmendia

You are hereby summoned and required to electronically file with the Clerk of said Court via eFileGA at https://efilega.tylertech.cloud/OfsEfsp/ui/landing or via PeachCourt at https://peachcourt.com (unless you are exempt from filing electronically) and serve upon the plaintiff or plaintiff's attorney, whose name, address and email address are:

A. Binford Minter

Clark Hill PLC

3630 Peachtree Road NE, Suite 700

Atlanta, GA 30326

an answer to the complaint which is hereby served on you. You must make your answer within 30 days after service of this summons upon you. This time excludes the day of service. If you fail to answer, the court will issue a default judgment against you for the relief sought in the complaint.

If this action pertains to a Protective Order, the answer is to be filed and served on or before the scheduled hearing date attached.

This _____ day of _____1/05/2026_____, 20___.

Honorable Ché Alexander,
Clerk of Superior Court

By _____
Deputy Clerk

[Attach addendum sheet for additional parties, if needed. You must make a notation on this sheet if used.]

SC-1
Rev. 1/25

Fulton County Superior Court
***EFILED***MH
Date: 2/3/2026 11:02 AM
Che Alexander, Clerk

**IN THE SUPERIOR COURT OF FULTON COUNTY**
**STATE OF GEORGIA**

| | | |
|---|---|---|
| CHIN MUSIC PARTNERS, LLC, | ) | |
| KEN CLAYTON, and JACK DUNN | ) | |
| | ) | Civil Action |
| Plaintiffs | ) | File No. 26CV000081 |
| | ) | |
| v. | ) | |
| | ) | |
| GRADUMGSWING FRANCHISING, | ) | |
| LLC, LORENZO GARMENDIA | ) | |
| CARLOS GARMENDIA | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S NOTICE OF FILING VERIFIED RETURNS OF SERVICE**

Plaintiff hereby gives notice of filing the following verified returns of service:

1. Verified Return of Service as to Defendant GradumGwing Franchising, LLC, attached as Exhibit A;

2. Verified Return of Service as to Defendant Lorenzo Garmendia, attached as Exhibit B; and

3. Verified Return of Service as to Defendant Carlos Garmendia, attached as Exhibit C.

Respectfully submitted this 3rd day of February, 2026.

**CLARK HILL PLC**

*/s/ A. Binford Minter*
A. Binford Minter
Georgia Bar No. 117844
bminter@clarkhill.com
Michael S. Rosenthal
Georgia Bar No. 614750
mrosenthal@clarkhill.com
3630 Peachtree Road NE, Suite 700
Atlanta, Georgia 30326
(678) 370-4384 / Telephone

*Counsel for Plaintiffs*

1

# Exhibit A

# VERIFIED RETURN OF SERVICE

Job # 18839

**Client Info:**

CLARK HILL PLC
3630 Peachtree Road NE, Suite 700
Atlanta, Georgia 30326

**Case Info:**

| | |
|---|---|
| **PLAINTIFF:** | SUPERIOR COURT |
| CHIN MUSIC PARTNERS, LLC, KEN CLAYTON, and JACK DUNN | County of Fulton, Georgia |
| -versus- | Court Case # **26CV000081** |
| **DEFENDANT:** | |
| GRADUMGSWING FRANCHISING, LLC, LORENZO GARMENDIA, and | |
| CARLOS GARMENDIA | |

**Service Info:**

**Date Received: 1/21/2026** at **09:19 AM**
**Service:** I Served **GranumGSwing Franchising , LLC**
With: **SUMMONS; COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF; EXHIBITS**
by leaving with **Carlos Garmendia, EMPLOYEE-AUTHORIZED TO ACCEPT**

**At Residence 7872 SOUTHWEST JACK JAMES DR. UNIT #4 STUART, FL 34997**
Latitude: **27.109446**,   Longitude: **-80.26768**

On **1/27/2026** at **01:11 PM**
**Manner of Service: CORPORATE AT RESIDENCE**
SERVICE WAS COMPLETED IN ACCORDANCE TO 48.081(B) IF THE ADDRESS FOR THE REGISTERED AGENT, OFFICER, DIRECTOR,
OR PRINCIPAL PLACE OF BUSINESS IS A RESIDENCE, A PRIVATE MAILBOX, A VIRTUAL OFFICE, OR AN EXECUTIVE OFFICE OR MINI
SUITE, SERVICE ON THE CORPORATION MAY BE MADE BY SERVING THE REGISTERED AGENT, OFFICER, OR DIRECTOR IN
ACCORDANCE WITH S. 48.031.

**Served Description:  (Approx)**

Age: **40**, Sex: **Male**, Race: **White-Caucasian**, Height: **5' 10"**, Weight: **190**, Hair: **Black** Glasses:  **No**

**Military Status:**

**Military Status = No**

**Service Comments:**

Direct served to Carlos, he confirmed and accepted the documents by name

I **ASHISH BUTOLA** ACKNOWLEDGE THAT I AM OVER THE AGE OF 18, AUTHORIZED TO SERVE PROCESS, IN GOOD STANDING IN
THE JURISDICTION WHEREIN SERVICE WAS EFFECTED IN ACCORDANCE WITH STATE STATUTE, AND I HAVE NO INTEREST IN THE
ABOVE ACTION. UNDER PENALTIES OF PERJURY, I DECLARE THAT I HAVE READ THE FOREGOING DOCUMENT AND THAT THE
FACTS STATED IN IT ARE TRUE.




Job # 18839

_____

**ASHISH BUTOLA**
Lic # **2310**

**Investigation and Settlement Solutions**
120 Palencia Village Dr
Saint Augustine, FL 32095

Job # 18839




# Exhibit B

# VERIFIED RETURN OF SERVICE

Job # 18838

**Client Info:**

CLARK HILL PLC
3630 Peachtree Road NE, Suite 700
Atlanta, Georgia 30326

**Case Info:**

**PLAINTIFF:**                                                              SUPERIOR COURT
CHIN MUSIC PARTNERS, LLC, KEN CLAYTON, and JACK DUNN            County of Fulton, Georgia
  -versus-                                                     Court Case # **26CV000081**
**DEFENDANT:**
GRADUMGSWING FRANCHISING, LLC, LORENZO GARMENDIA, and
CARLOS GARMENDIA

**Service Info:**

**Date Received: 1/21/2026** at **09:13 AM**
**Service:** I Served **Lorenzo Garmendia**
With: **SUMMONS; COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF; EXHIBITS**
by leaving with **Carlos Garmendia, FATHER / CO-RESIDENT**

**At Residence 7872 SOUTHWEST JACK JAMES DR. UNIT #4 STUART, FL 34997**
Latitude: **27.109446**,   Longitude: **-80.26768**

On **1/27/2026** at **01:11 PM**
**Manner of Service: SUBSTITUTE SERVICE:**
FS 48.031(1)a SERVICE UPON ANY CO-RESIDENT RESIDING THEREIN 15 YEARS OF AGE OR ABOVE, AND THE PROCESS BEING
EXPLAINED TO THE PERSON WHO ACCEPTED SAID PROCESS.

**Served Description: (Approx)**

Age: **40**, Sex: **Male**, Race: **White-Caucasian**, Height: **5' 10"**, Weight: **190**, Hair: **Black** Glasses: **No**

**Military Status:**

**Military Status = No**

**Service Comments:**

Served to Carlos, he said Lorenzo Garmendia is my father. he confirmed and accepted the documents by name

I **ASHISH BUTOLA** ACKNOWLEDGE THAT I AM OVER THE AGE OF 18, AUTHORIZED TO SERVE PROCESS, IN GOOD STANDING IN
THE JURISDICTION WHEREIN SERVICE WAS EFFECTED IN ACCORDANCE WITH STATE STATUTE, AND I HAVE NO INTEREST IN THE
ABOVE ACTION. UNDER PENALTIES OF PERJURY, I DECLARE THAT I HAVE READ THE FOREGOING DOCUMENT AND THAT THE
FACTS STATED IN IT ARE TRUE.

_____
**ASHISH BUTOLA**
Lic # **2310**

**Investigation and Settlement Solutions**
120 Palencia Village Dr
Saint Augustine, FL 32095

Job # 18838




1 of 1

# Exhibit C

# VERIFIED RETURN OF SERVICE

Job # 18840

**Client Info:**

CLARK HILL PLC
3630 Peachtree Road NE, Suite 700
Atlanta, Georgia 30326

**Case Info:**

| | |
|---|---|
| **PLAINTIFF:** | SUPERIOR COURT |
| CHIN MUSIC PARTNERS, LLC, KEN CLAYTON, and JACK DUNN | County of Fulton, Georgia |
| -versus- | Court Case # **26CV000081** |
| **DEFENDANT:** | |
| GRADUMGSWING FRANCHISING, LLC, LORENZO GARMENDIA, and | |
| CARLOS GARMENDIA | |

**Service Info:**

**Date Received: 1/21/2026** at **09:20 AM**
**Service:** I Served **Carlos Garmendia**
With: **SUMMONS; COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF; EXHIBITS**
by leaving with **Carlos Garmendia, INDIVIDUALLY**

**At Residence 7872 SOUTHWEST JACK JAMES DR. UNIT #4 STUART, FL 34997**
Latitude: **27.109446**,   Longitude: **-80.26768**

On **1/27/2026** at **01:11 PM**
**Manner of Service: INDIVIDUAL**
F.S. 48.031(1) INDIVIDUAL SERVICE

**Served Description:  (Approx)**

Age: **40**, Sex: **Male**, Race: **White-Caucasian**, Height: **5' 10"**, Weight: **190**, Hair: **Black** Glasses:  **No**

**Military Status:**

**Military Status = No**

**Service Comments:**

Direct served to Carlos, he accepted the documents by name

I **ASHISH BUTOLA** ACKNOWLEDGE THAT I AM OVER THE AGE OF 18, AUTHORIZED TO SERVE PROCESS, IN GOOD STANDING IN THE JURISDICTION WHEREIN SERVICE WAS EFFECTED IN ACCORDANCE WITH STATE STATUTE, AND I HAVE NO INTEREST IN THE ABOVE ACTION. UNDER PENALTIES OF PERJURY, I DECLARE THAT I HAVE READ THE FOREGOING DOCUMENT AND THAT THE FACTS STATED IN IT ARE TRUE.

**ASHISH BUTOLA**
Lic # **2310**

**Investigation and Settlement Solutions**
120 Palencia Village Dr
Saint Augustine, FL 32095

Job # 18840




1 of 1

Fulton County Superior Court
***EFILED***IF
Date: 2/3/2026 9:49 PM
Che Alexander, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

CHIN MUSIC PARTNERS, LLC *et al.*,

    Plaintiff(s),

v.

GRADUMGSWING FRANCHISING, LLC
*et al.*,

    Defendant(s).

CIVIL ACTION FILE
NO. 26CV000081

---

### ORDER TO PERFECT SERVICE

The Court notes that service has not yet been perfected upon Defendants, although the Complaint was filed on January 5, 2026. Accordingly, this Court **HEREBY ORDERS that Plaintiff causes process to be served on all Defendants by the Sheriff's department or an otherwise valid process server pursuant to O.C.G.A. § 9-11-4 and the return of service filed no later than February 26, 2026**, or the Complaint will be dismissed. Any Defendants who remain unserved by the deadline will be dismissed, which may affect ability to recover. E-filing alone by said deadline is insufficient. Plaintiff must also email a copy of the return of service to the Court's Staff Attorney, Allison Candler, at allison.candler@fultoncountyga.gov by the deadline. Any requests related to this Order shall be made on the record and not via email.

**SO ORDERED** this the 2nd day of February, 2026.

_____
Shukura L. Ingram
Judge, Fulton County Superior Court
Atlanta Judicial Circuit

*Filed and served via e-File GA.*

## Case Information

26CV000081 | Chin Music Partners, LLC,Ken Clayton,Jack DunnVS.Gradumgswing Franchising, LLC,Lorenzo Garmendia,Carlos Garmendia

| | | |
|---|---|---|
| Case Number | Court | Judicial Officer |
| 26CV000081 | EJ2 | INGRAM, SHUKURA L |
| File Date | Case Type | Case Status |
| 01/05/2026 | OTHER CIVIL CAUSE OF ACTION | Open |

## Party

PLAINTIFF
Chin Music Partners, LLC

Active Attorneys ▾
Attorney
Rosenthal, Michael S.
Retained

Lead Attorney
Minter, A. Binford
Retained

PLAINTIFF
Clayton, Ken

Active Attorneys ▾
Attorney
Rosenthal, Michael S.
Retained

Lead Attorney
Minter, A. Binford
Retained

PLAINTIFF
Dunn, Jack

Active Attorneys ▾

Attorney
Rosenthal, Michael S.
Retained

Lead Attorney
Minter, A. Binford
Retained

DEFENDANT
Gradumgswing Franchising, LLC

DEFENDANT
Garmendia, Lorenzo

DEFENDANT
Garmendia, Carlos

## Events and Hearings

01/05/2026 PLAINTIFF'S ORIGINAL PETITION ▾

COMPLAINT

01/05/2026 CASE INITIATION FORM ▾

CASE INITIATION FORM

Comment
OTHER CIVIL CAUSE OF ACTION ($218.00)

01/05/2026 SUMMONS ▾

SUMMONS

Comment
SERVICE UPON DEFENDANT

01/05/2026 SUMMONS ▾

SUMMONS

Comment
SERVICE UPON DEFENDANT

01/05/2026 SUMMONS ▾

SUMMONS

Comment
SERVICE UPON DEFENDANT

01/20/2026 SUMMONS ▾

SUMMONS

Comment
Proposed (Corrected) Summons as to Lorenzo Garmendia

02/03/2026 NOTICE OF FILING ▾

NOTICE OF FILING

Comment
Plaintiffs' Notice of Filing Verified Returns of Service

02/03/2026 ORDER ▾

ORDER

Comment
to perfect service

## Financial

Chin Music Partners, LLC

| | |
|---|---|
| Total Financial Assessment | $218.00 |
| Total Payments and Credits | $218.00 |

| 1/5/2026 | Transaction Assessment | | | $218.00 |
| 1/5/2026 | Efile GA Electronic Payment | Receipt # 2026-424768 | Chin Music Partners, LLC | ($218.00) |

## Documents

COMPLAINT

CASE INITIATION FORM

SUMMONS

SUMMONS

SUMMONS

SUMMONS

NOTICE OF FILING

ORDER